IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————————x
                                   :

BACARDI & COMPANY LIMITED      :

and                              :

BACARDI U.S.A., INC.,          :

                *Plaintiffs,*    :

*v.*                                :

EMPRESA CUBANA EXPORTADORA DE  :    Civil Action No. 04 CV 519 (EGS)
ALIMENTOS Y PRODUCTOS VARIOS  :
d/b/a/ CUBAEXPORT         :

and                              :

HAVANA CLUB HOLDING, S.A. d/b/a  :
HCH, S.A.                      :
5 Rue Eugène Ruppert L2453     :
Luxembourg                   :
Luxembourg                   :

                *Defendants.*  :
—————————————————————:


**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT HAVANA CLUB HOLDING, S.A.'S MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Preliminary Statement.................................................................................................... 1

Statement of the Case ................................................................................................... 1

    A.    Cubaexport Registers the HAVANA CLUB Mark in the USPTO, and
            Thereafter Sells the Worldwide Havana Club Business............................................ 1

    B.    The HAVANA CLUB Registration is Renewed.......................................................... 2

    C.    Bacardi's 10-year Fight to Block HCH From Ever Replicating in the
            U.S. Its Success in the Non-U.S. Rum Market ............................................... 3

ARGUMENT...................................................................................................................... 7

I.      THE TTAB CORRECTLY DISMISSED BACARDI'S PETITION TO CANCEL ..................... 7

II.    BACARDI'S CLAIMS, IN COUNTS II, III, AND IV OF THE COMPLAINT, FOR
       DECLARATIONS OF SUPERIOR COMMON LAW RIGHTS, AND NON-VIOLATION OF
       FEDERAL AND STATE LAW RIGHTS, SHOULD BE DISMISSED........................................ 7

    A.    This Court Lacks Subject Matter Jurisdiction, As No Justiciable Claim
            Or Controversy Exists To Warrant Declaratory Relief. ............................................ 8

    B.    Res Judicata............................................................................................................ 8

          1)    The Parties Are Identical Or In Privity.......................................................... 9

          2)    The Present Claims Were Raised, and If Not Might Have Been
               Raised, In The Prior Action. ..........................................................................10

          3)    Judgment Was Rendered In The Prior Action By A Court Of
               Competent Jurisdiction..................................................................................16

          4)    The Prior Action Ended With A Final Decision On The Merits. ...............16

III.   COUNT V, WHICH SEEKS CANCELLATION OF THE HAVANA CLUB REGISTRATION
       FOR LACK OF CONSTITUTIONAL POWER TO REGISTER OR MAINTAIN THE MARK,
       SHOULD BE DISMISSED .................................................................................................. 17

    A.    Grounds for Cancellation Not Raised in the TTAB May Not Be Raised
            in a § 1071 District  Court Proceeding...................................................... 17

    B.    Both The Commerce Clause And The Treaty Clause Authorize
            Legislation Providing For Registration And Maintenance Of Foreign
            Marks Regardless Of Present Use .......................................................... 18

1.      Congress Has The Power, Pursuant To The Foreign Commerce
        Clause, To Authorize Registration and Maintenance of the
        Havana Club Mark ....................................................................................19

2.      The Treaty and Necessary and Proper Clauses Also Empower
        Congress To Authorize Registration and Maintenance of the
        HAVANA CLUB Mark..............................................................................24

IV.     DISMISSAL OF BACARDI'S PETITION TO CANCEL MAY BE UPHELD ON THE
        ALTERNATIVE GROUND THAT IT WAS REQUIRED AS A SANCTION FOR
        BACARDI'S REPEATED, FLAGRANT VIOLATIONS OF THE GOVERNMENT IN THE
        SUNSHINE ACT AND MANIPULATION OF THE ADMINISTRATIVE PROCESS...........................26

A.      Governor Bush's Office Pressured The USPTO *Ex Parte*, On Bacardi's
        Behalf, To Cancel the HAVANA CLUB Trademark Registration .........................27

B.      Bacardi's *Ex Parte* Contacts Violated The Sunshine Act And The
        Agency's Own Rules And Were Fundamentally Unfair.......................................29

        i.      Bacardi's *Ex Parte* Communications Were Illegal.......................................29

        ii.     Bacardi's Ex Parte Communications Violated The USPTO's
                Own Regulations And Fundamental Fairness.............................................34

C.      Bacardi's Petition to Cancel Should Have Been, and Should Now Be,
        Dismissed Or In The Alternative Remanded For Full Disclosure and
        An Appropriate Remedy. ...........................................................................36

CONCLUSION .................................................................................................37

Defendant Havana Club Holdings, S.A. ("HCH") submits the following Statement of

Points and Authorities in Support of its Motion to Dismiss the Complaint filed by Bacardi &

Company Limited and Bacardi U.S.A., Inc. (collectively, "Bacardi"), Or, In the Alternative, For

Summary Judgment.

## Preliminary Statement

Bacardi's claims are the opposite of claims of first impression; they have been asserted

repeatedly, in numerous forums, since 1995 – including the Southern District of New York, the

Patent and Trademark Office, the Federal Circuit, and now the Trademark Trial and Appeal

Board.  Careful attention to Bacardi's prior efforts makes plain that its claims should be

dismissed because they are either meritless (for the reasons explained by the Trademark Trial

and Appeal Board ("TTAB"))  or barred by reason of their repeated consideration in those other

forums and Bacardi's egregarious violations of the Government in the Sunshine Act.

## Statement of the Case

A.    <u>Cubaexport Registers the HAVANA CLUB Mark in the USPTO, and Thereafter
Sells the Worldwide Havana Club Business.</u>

Under Section 44 of the Lanham Act, 15 U.S.C. § 1026, foreign entities are permitted to

register trademarks in the United States based on registration in a foreign country.  In 1976,

Cubaexport, a Cuban state enterprise, registered its Cuban HAVANA CLUB trademark in the

United States, pursuant to Section 44, based on Cubaexport's registration of the mark in Cuba.

Cubaexport marketed HAVANA CLUB rum internationally from 1972 until 1993. *See Havana*

*Club Holding, S.A. v. Galleon, S.A.*, 974 F. Supp. 302, 305 (S.D.N.Y. 1997) (a copy of this Opinion is

attached to the accompanying Declaration of Charles S. Sims ("Sims Decl.") as Exhibit 6).

Although Cubaexport (and subsequently HCH, to whom the business was sold as

described below) sold Cuban-produced rum branded under the HAVANA CLUB trademark

throughout the world, and to United States citizens who are licensed to travel to Cuba, direct sales to the United States have been prohibited throughout that period because of the U.S. embargo. *See Havana Club Holding, S.A. v. Galleon, S.A.*, 974 F. Supp. at 305; *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 120 (2d Cir. 2000). Because Cubaexport (and later, HCH) intended to sell Havana Club rum in the United States as soon as it is legally possible to do so, Cubaexport applied for and obtained the HAVANA CLUB Registration, and Cubaexport, Havana Rum & Liquors ("HRL"), and HCH at all relevant times have intended to preserve it. *Id.*

In 1993, Cubaexport sold the entire Havana Club business, trademarks and all, to a joint venture owned 50% by the French company Pernod Ricard and 50% by a Cuban entity, HRL. *Id.* As part of that worldwide sale of the Havana Club business, all of Cubaexport's trademarks and registrations were assigned by Cubaexport to HRL, and then by HRL to HCH. *Id.* at 305-306. Such assignments were effectuated and recorded with the USPTO in 1994. *See* USPTO Assignment Reel 1104, Frame 0046 (Cubaexport to HRL) and Reel 1219, Frame 0428 (HRL to HCH). *Id.*

After an October 5, 1995 application to the Office of Foreign Asset Control ("OFAC") for a specific license authorizing the 1994 assignments of the HAVANA CLUB registration, OFAC issued a license on November 13, 1995, *nunc pro tunc* ("the Specific License"), approving the two assignments and authorizing all necessary transactions incident to the assignments of the registration. *Havana Club Holding, S.A.*, 974 F. Supp. at 306.

B.    The HAVANA CLUB Registration is Renewed.

Under the Specific License, on January 18, 1996, HCH filed with the USPTO an application to renew the HAVANA CLUB Registration (within the renewal period, which ran from January 27, 1995 through January 27, 1996). *See* Decision of TTAB dated January 29, 2004

at 24, Exhibit 18 to Sims Decl.  In June 1996, the USPTO accepted the renewal papers filed by

HCH, and granted renewal of the HAVANA CLUB Registration for an additional ten year term

that has not yet expired.  *Id.*; *Havana Club Holding, S.A. v. Galleon, S.A.*, 961 F. Supp. 498, 503

(S.D.N.Y. 1997) (Exhibit 3 to Sims Decl).  On April 17, 1997 -- more than one year after the

renewal period for the HAVANA CLUB Registration had closed -- OFAC revoked the Specific

License retroactive to its date of issuance.  *Havana Club Holding, S.A.*,  974 F. Supp. at 306.[1]

      C.     <u>Bacardi's 10-year Fight to Block HCH From Ever Replicating in the U.S. Its</u>
<u>Success in the Non-U.S. Rum Market</u>

As Havana Club rum began to make inroads against Bacardi in Western Europe and

Latin America, particularly in the premium rum market, Bacardi commenced what has now

become a ten-year-long attempt to ensure the permanent preservation of its dominance of the

U.S. market.  Central to that effort has been the attempt to ensure that even when the embargo

eventually ends, the successful inroads that Havana Club rum has made into Bacardi's sales

abroad cannot be replicated in the United States.  Much of that effort has consisted of claims

repeatedly asserted and litigated in prior proceedings between Bacardi and HCH.  Bacardi's

efforts have included the following:

1.  On  July 12, 1995, Bacardi initiated TTAB Cancellation Proceeding Number 92024108

by filing a petition to cancel the HAVANA CLUB Registration, naming HCH as respondent

("TTAB Proceeding").  On August 18, 1996, Bacardi filed an amended petition to cancel.  Sims

Decl. ¶ 2.  By Order dated March 17, 1997, the TTAB suspended the TTAB Proceeding pending

the outcome of the Southern District litigation described below.  *Id.*  It is that same TTAB

---

[1]  OFAC specified no ground for the revocation, and did not revoke the license on the ground of fraud on
OFAC as Bacardi has repeatedly, baselessly, and unsuccessfully suggested in prior proceedings. *See, e.g.,*
*Havana Club Holding, S.A.*,  974 F. Supp. at 306.  The U.S. District Court for the Southern District of New
York, moreover, has ruled that issuance or revocation of licenses by OFAC, and/or reasons therefor, are
unreviewable as a matter of law, and that courts may not delve into finding reasons for OFAC's actions
which OFAC has not itself volunteered. *Havana Club Holding, S.A.*, 961 F. Supp. at 503-506.

Proceeding, re-activated in 2001, that underlies this proceeding for review under 15 U.S.C. § 1071(b).

2.  On December 24, 1996, HCH brought suit against Bacardi for trademark infringement and related claims under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) in the Southern District of New York in an action entitled *Havana Club Holding, S.A. et al. v. Galleon S.A. et al.*, 96 Civ. 9655 (SAS) (the "Prior Action") (*See* Exhibit 1 to Sims Declaration).  Bacardi answered and asserted various counterclaims, including one asserting HCH's fraud on the USPTO, based on the same factual allegations included in the Complaint in this action.  *Compare* Bacardi's Answer and Counterclaims in the Prior Action at 6 - 17, Exhibit 2 to Sims Decl., *with* the present Complaint at 15 - 24.  Bacardi's claim alleging HCH's fraud on the USPTO was dismissed by the District Court on March 31, 1998.  *See  Havana Club Holding, S.A. v. Galleon, S.A.*, No. 96 Civ. 9655 (SAS), 1998 Wl 150983 (S.D.N.Y. Mar. 31, 1998), at *2 - *4, Exhibit 8 to Sims Decl.

3.  On October 17, 1997, Bacardi, in its Answer, Affirmative Defenses, and Counterclaims to First Amended Complaint in the Prior Action, asserted a counterclaim for a declaratory judgment that it has "the prior, superior, and exclusive right to use of the designation HAVANA CLUB as a trademark for rum in the United States. . . . "  *See* Exhibit 5 to Sims Decl. at page 16, par. 45.

4.  After Bacardi prevailed in the Prior Action by blocking adjudication of the trade name infringement claim (through post-trial insertion of what became Section 211[2] into the 1998

_____

[2]  On December 23, 1998, Bacardi brought to the attention of the court in the Prior Action Section 211 of Pub. Law 105-277, the Omnibus Appropriations Act of 1999, adopted by Congress on October 21, 1998. *See* Exhibit 9 to Sims Decl.  This legislation prohibits the authorization of any "transaction or payment" under the Cuban Asset Control Regulations "(CACR") with respect to a trademark "that was used in connection with a business or assets that were confiscated unless the original owner of the mark, trade name or commercial name, or the bona fide successor-in-interest has expressly consented"; and prohibits U.S. courts from (a) enforcing any trademark rights of "a designated national based on common law rights or registration obtained under [the CACR] of such a confiscated mark," and (b) enforcing any treaty rights by a "designated national" under sections 44(b) or (e) of the Trademark Act for a mark, "that

Omnibus Budget legislation) and of the section 43(a) claims on grounds of standing, and the

Court of Appeals affirmed, Bacardi nevertheless pressed the USPTO for resolution of its long-

pending petition to cancel in the TTAB Proceeding, and enlisted Florida Governor Jeb Bush and

his staff to make *ex parte* contacts to the Director and Deputy Director of the USPTO, both

statutory members of the TTAB, to intervene on its behalf, as discussed more fully below in

Point IV.

5.   On October 26, 2001, following the lift of the Southern District's partial stay of its

October 1997 Partial Judgment,[3] the Acting Director of the USPTO issued an order directing the

parties to the Prior Action, including Bacardi, to show cause why the records of the USPTO

should not be rectified to reflect the provisions of that Partial Judgment restoring Cubaexport as

the owner of the HAVANA CLUB Registration.  *See* Exhibit 13 to Sims Decl. (copy of October

26, 2001 order).  After receiving submissions from the parties, on January 15, 2002,

Commissioner of Trademarks Anne Chasser denied Bacardi's request that the HAVANA CLUB

Registration be canceled for the alleged wrong-party renewal, and instead revised the USPTO's

records so as to invalidate the assignments and restore Cubaexport as owner of the HAVANA

CLUB Registration, precisely as the District Court had directed.  *See* Exhibit 14 to Sims Decl

(January 15, 2002 Notice).  Bacardi appealed Commissioner Chasser's decision to the United

States Court of Appeals for the Federal Circuit, yet again seeking cancellation of the HAVANA

CLUB Registration for an alleged wrong-party renewal.  The appeal was dismissed.  Sims Decl.

¶ 17.

---

was used in connection with a business or assets that were confiscated unless the original owner of such mark. . . has expressly consented."

[3]  The October 20, 1997 Partial Judgment in the Prior Action dismissed HCH's federal trademark infringement claim against Bacardi, but stayed operation and enforcement of the Judgment pending appeal from the final judgment in the Prior Action.  *See* Exhibit 7 to Sims Decl.

The District Court, in re-vesting Cubaexport with ownership of the HAVANA CLUB

Registration, had recognized that Cubaexport had "a significant business interest in

maintaining the registration" and, toward that end, suggested that it reform its business

agreements with HCH. *Havana Club Holding, S.A.*, 974 F. Supp. at 312.[4]  Cubaexport and HCH

did so by written agreement dated March 19, 2002 (copy at Sims Decl. Exh. 16) which provides,

*inter alia*, as follows:

> The parties [including Cubaexport, HRL and HCH] mutually
> agree that it has been since 1993, and remains, the intention of
> every party that U.S. trademark registration No. 1,031,651 for the
> HAVANA CLUB mark be maintained in good standing by its
> lawful owner; and accordingly that, in view of the judgments of
> the District Court and Court of Appeals, the renewal of that
> registration undertaken in 1996 was, and should be considered to
> have been, undertaken by and for the benefit of Cubaexport.

*Id*. at ¶7.

6.   On or about March 15, 2002, nearly two years after the Second Circuit had affirmed

the District Court's dismissal of the Prior Action, Bacardi filed a motion to resume the TTAB

Proceeding, to substitute Cubaexport as respondent, and for summary judgment. *See* Decision

of TTAB Dated January 29, 2004 at 1.  By order dated January 21, 2003, the TTAB joined

Cubaexport as a respondent (in lieu of substitution), and resumed the TTAB Proceeding for the

limited purpose of considering Bacardi's pending motion for summary judgment. *Id* at 1 - 2.

HCH and then Cubaexport moved for dismissal, or in the alternative full disclosure, under the

Government in the Sunshine Act,  5 U.S.C. § 557(d)(1) in light of various documents that had

---

[4] Explaining its reasoning, the district court held (974 F. Supp. at 312): "Cubaexport has a significant
business interest in maintaining the registration of its mark. It may reform its agreement with Plaintiffs so
that it is once again the company entitled to export the rum under the Havana Club mark after the
embargo is lifted. Or, it may seek to renegotiate the assignment of the mark to Plaintiffs after Plaintiffs
restructure their corporate organization to comply with the provisions of the CACR. Such opportunities
would clearly be impaired if this Court granted Defendants' petition to cancel Cubaexport's registration."

been obtained under freedom of information laws demonstrating that Bacardi had procured extensive *ex parte* pressure on the TTAB.  HCH and Cubaexport argued that the TTAB was obligated to address the Sunshine Act motions prior to reaching the merits.  *Id.*

In response to those motions, the TTAB ruled (a) against the Sunshine Act motions, and (b) against Bacardi's petition to cancel in its entirety.  *See* TTAB January 29, 2004 Decision.

Bacardi has now filed the present action, ostensibly an appeal of the TTAB's January 29, 2004 Decision under 15 U.S.C. § 1071, but also re-asserting numerous claims that it asserted and litigated in the Prior Action.

## ARGUMENT

I.     THE TTAB CORRECTLY DISMISSED BACARDI'S PETITION TO CANCEL

HCH respectfully incorporates by reference, and relies on, Point I of Cubaexport's Memorandum of Law in support of its Motion to Dismiss Bacardi's complaint insofar as it seeks cancellation of the HAVANA CLUB registration.

The argument in Point IV below — under the Government in the Sunshine Act — presents an alternative basis for disposing of Count I of Bacardi's Complaint.

II.    BACARDI'S CLAIMS, IN COUNTS II, III, AND IV OF THE COMPLAINT, FOR DECLARATIONS OF SUPERIOR COMMON LAW RIGHTS, AND NON-VIOLATION OF FEDERAL AND STATE LAW RIGHTS, SHOULD BE DISMISSED.

Counts II, III, and IV of Bacardi's Complaint seek a "declaration of common law rights in the HAVANA CLUB trademark," alleging that it is the "true owner" of such rights as the successor to José Arechabala S.A. ("JASA"), which allegedly sold rum in the United States under the HAVANA CLUB mark from approximately 1934 until 1960, and due to Bacardi's own use of the mark in the United States in 1995 and 1996 (Count II); a declaration that its use of the HAVANA CLUB mark would not violate federal law (Count III); and a declaration that its

use of that mark would not violate defendants' state law rights (Count IV).  No jurisdiction exists over these count because there is no justiciable case or controversy as required under the Declaratory Judgments Act,  and in any event the claims are  barred by the doctrine of *res judicata.  Hardison v. Alexander*, 655 F.2d 1281, 1288 (D.C. Cir. 1981).

> A.    This Court Lacks Subject Matter Jurisdiction, As No Justiciable Claim Or Controversy Exists To Warrant Declaratory Relief.

For all the reasons set forth by Cubaexport in Point C of its Memorandum of Law, which HCH here respectfully relies on and incorporates, there is no "genuine controversy" between Bacardi and HCH sufficient to create subject matter jurisdiction for the declarations Bacardi seeks.

> B.    Res Judicata.

The parties have previously extensively litigated the issues raised by Counts II, III, and IV of Bacardi's Complaint,  in connection with the counterclaim Bacardi expressly asserted and litigated in the Prior Action for a declaration of the allegedly superior rights to the HAVANA CLUB mark, based on rights it had from JASA and on its own use in 1995 and 1996, that is essentially identical to the claims now asserted.  Because HCH and Bacardi have previously litigated the identical claims now asserted in Counts II, III, and IV, those claims are barred by *res judicata* and cannot be re-litigated here.

The doctrine of *res judicata* provides that when a final judgment has been entered on the merits of a case, "[i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, *but as to any other admissible matter which might have been offered for that purpose.*"  *Nevada v. United States*, 463 U.S. 110, 129-30 (1983) (quoting *Cromwell v. Sac County*, 94 U.S. 351, 352 (1876)).

Under District of Columbia law, the doctrine of *res judicata*, "the parties to a suit and their privies are bound by a final judgment and may not relitigate any ground for relief which they already have had an opportunity to litigate – ***even if they chose not to exploit that opportunity*** – whether the initial judgment was erroneous or not." *Sherwin v. Dep't of the Air Force*, 955 F. Supp. 140, 142 (D.D.C.), *aff'd*, 1997 U.S. App. LEXIS 28543 (D.C. Cir. 1997) (emphasis added); *Hardison v. Alexander*, 655 F.2d 1281, 1288 (D.C. Cir. 1981); *Mid-Atlantic Coca-Cola Co., Inc. v. Allegheny Beverage Corp.*, Civ. 80-3317, 1982 WL 1898 at *2 (D.D.C. 1982).

To determine whether the doctrine of res judicata applies, a court must decide (1) whether the parties are identical or in privity with each other in both suits; (2) whether the present claim is the same as a claim that was raised or might have been raised in the first proceeding; (3) whether a judgment was issued in the first action by a court of competent jurisdiction; and (4) whether the earlier decision was a final judgment on the merits. *Elliott v. Fed. Deposit Ins. Corp.*, Civ. A. 03-2091 (ESH), 2004 WL 305593, at *2 (D.D.C. 2004) (*citing U.S. Indus., Inc. v. Blake Constr. Co.*, 765 F.2d 195, 205 n. 21 (D.C. Cir. 1985)). All four of these elements are easily met here. Once the technical elements of res judicata are satisfied, the subsequent suit is barred and no further analysis is required. *See U.S. Indus., Inc.*, 765 F.2d at 207.

    1)    <u>The Parties Are Identical Or In Privity</u>

HCH and Bacardi are identical to, and at a minimum in privity with, the parties in the Prior Action. The plaintiffs are Bacardi & Company Limited ("Bacardi & Co.") and Bacardi U.S.A., Inc. Bacardi & Co. is the sole surviving entity after the 1997 merger of Galleon S.A. into Bacardi & Co., in which Bacardi & Co. succeeded to all the assets of Galleon S.A. and Bacardi & Co. assumed Galleon S.A.'s liabilities. *See* Complaint at ¶ 12. Galleon, S.A. was a named defendant in the Prior Action. During the course of the Prior Action, Bacardi & Co. was

substituted into the Prior Action as a named party as the successor to Galleon with respect to the claims and counterclaims in the Prior Action.  *Id.*  Bacardi U.S.A., Inc., the other plaintiff in the present action, was formerly Bacardi-Martini U.S.A., Inc., a named defendant in the Prior Action.  *See* Complaint at ¶ 13.

Defendant Havana Club Holding, S.A., d/b/a HCH S.A. was a plaintiff in the Prior Action.

> 2)  The Present Claims Were Raised, and If Not Might Have Been Raised, In The Prior Action.

Counts II, III, and IV were all litigated in the prior action, and were either raised or could have been raised by Bacardi.

**Count II.**  Bacardi's claim for a declaratory judgment that it has common law rights in the HAVANA CLUB trademark not only *could* have been brought, but *was* brought, in the Prior Action; it is virtually identical to a counterclaim that Bacardi interposed and litigated.

Bacardi now seeks "a declaration that BACO owns the common law rights in the HAVANA CLUB mark for rum and that defendants have no common law or other rights in any mark incorporating or consisting of the words HAVANA CLUB," alleging that Bacardi is the "true owner" of such rights as the successor to JASA, and through its own use of the mark in the United States in 1995 and 1996.  *See* Complaint ¶ ¶ 6, 142, 143.

Bacardi previously sought a declaratory judgment "as to whether [Bacardi is] entitled to use of the term HAVANA CLUB as a trademark for rum in the United States,"  alleging that "long before January 1986 [sic - - this was  apparently meant to read 1996], the HAVANA CLUB name and mark was used on rum produced by or under the authority of Bacardi's predecessor's in interest, including Galleon, S.A. and Arechabala, that was distributed, offered for sale, and

sold in interstate commerce in the United States."[5]  Based on these allegations, Bacardi asked the

court to "declare that [Bacardi] has the prior, superior, and exclusive right to use of the

designation HAVANA CLUB as a trademark for rum in the United States and that [HCH] has

acquired no valid rights in or to use of the words HAVANA CLUB as a trademark for rum in

the United States and cannot stop Bacardi from use of said mark as aforesaid."  *Id*. at ¶ 45.

During litigation of that counterclaim, Bacardi based its alleged prior rights in the HAVANA

CLUB mark both on its status as the successor to JASA and on Bacardi's own use of the mark in

the United States in 1995 and 1996,[6] asserting that it "acquired the U.S. rights to the HAVANA

CLUB Trademark for rum by commercial use of that mark in 1995 and by obtaining the express

assent of the true owners."[7]  On March 31, 1998, the court in the Prior Action denied plaintiffs'

motion to dismiss and held that Bacardi could proceed to litigate its claim for a declaratory

judgment: "Defendants state a valid claim . . . by asserting that they and their predecessors in

interest were the first to use the mark in commerce in the United States."  *Havana Club Holding*,

*S.A.*, 1998 WL 150983, at *6.  *See* Sims Decl. Exhibit 8.

　　　After the district court's decision sustaining Bacardi's counterclaim against HCH's

motion to dismiss, the parties devoted extensive discovery effort to it,  culminating in Bacardi's

January 11, 1999 Pre-Trial Memorandum in the Prior Action, which argued in detail about

Bacardi's alleged acquisition of JASA's rights[8]  and in detail about its own alleged sales of rum

---

[5]  *See* Bacardi's October 17, 1997 Answer, Affirmative Defenses, and Counterclaims to First Amended
Complaint at ¶¶ 40, 42.

[6]  *See* Defendant's Proposed Findings of Fact, March 11, 1999 at pg. 36 – 52, Exhibit 12 to Sims Decl.

[7]  *Id*. at pg. 36.

[8]  *See* Defendants' January 11, 1999 Pre-Trial Memorandum at 10 – 11, Exhibit 11 to Sims Decl.

under the HAVANA CLUB mark in 1995 and 1996.[9]  Bacardi's Pre-Trial Memorandum advised

that "Defendants seek a declaratory judgment pursuant to the Federal Declaratory Judgment

Act, 28 U.S.C. § 2201 (1994).  This counterclaim arises from an actual controversy as to whether

the Bacardi Defendants are entitled to use of the term "Havana Club" as a trademark for rum in

the United States."  *Id.* at 63.

To be sure, after arguing the counterclaim in both its January 11, 1999 Pre-Trial

Memorandum and March 11, 1999 Proposed Conclusions of Law and Ultimate Facts (as

discussed above), Bacardi did not in fact press the court after trial to grant it the full measure of

declaratory relief it had been seeking.[10]  However, deciding not to pursue these claims after two

years of litigation does not allow Bacardi to escape the effect of *res judicata*.  Even a voluntary

dismissal of a counterclaim in the first case (and there was no such dismissal here) does not

shield that claim from a *res judicata*-based dismissal in subsequent action.  *See Flynn v. 3900*

*Watson Place, Inc.*, 63 F. Supp. 2d 18, 23 (D.D.C. 1999).  *See also U.S. Indus., Inc.*, 765 F.2d at 210

("A party who makes a unilateral … determination not to go forward on issues that were

properly in the case does so at its own peril").  Otherwise,  any "litigant whose case has gone

badly could withdraw or request no instructions on the claim it expects to loose and then to

reassert those claims in a later action; obviously such a state of affairs would wreak havoc on

the litigation process."  *Mid-Atlantic Coca-Cola Co.*, 1982 WL 1898, at *2.

The "transactional approach" used in the District of Columbia makes plain that even if

the declaration of superior common law rights Bacardi now seeks were not identical to the relief

---

[9]  *Id.* at 11 – 14.

[10]  Shortly before trial, Bacardi advised the Court that  "Since [HCH] have not and cannot sell HAVANA
CLUB rum in the United States, and indeed may never been [sic] in a position to export HAVANA CLUB
rum from Cuba to the United States, defendants believe that this Court has granted all the relief which
[sic] it is empowered to grant in the absence of Cubaexport and, therefore, there is no basis or need at this
time for further declaratory or injunctive relief . . . ."  Joint Pre-Trial Order at 4, Exhibit 10 to Sims Decl.

it requested back in 1997 — a declaration indicating that it, rather than HCH, possesses exclusive trademark rights to the HAVANA CLUB mark for the sale of rum in the United States, s*ee Havana Club Holding, S.A.*, 1998 WL 150983, at *6 – Bacardi's claim would still be barred. R*es judicata* applies to prevent additional litigation where the new claim and the claims raised in the prior action involve the same cause of action or arise out of the same transaction or occurrence.  *See Lewandowski v. Property Clerk*, 209 F. Supp. 2d 19 (D.D.C. 2002) (granting defendant police department property clerk's motion to dismiss complaint by former criminal defendant for refusal to return his pistol; previous denial of criminal defendant's motion for return of the weapon following his criminal prosecution barred re-litigation of the issue in a civil action, as both claims arose from the single transaction of the refusal to return the pistol); *Stroman v. Blue Cross & Blue Shield Ass'n*, 966 F. Supp. 9, (D.D.C. 1997), *aff'd* 159 F.3d 637 (D.C. Cir. 1998) (granting summary judgment on certain claims in favor of defendant employer sued by former employee for handicap discrimination; *res judicata* precluded plaintiff's claim of failure to reassign -- claim arose from same transactions or occurrences as those that formed the subject matter of plaintiff's prior action against defendant for discrimination and retaliation based on race, sex, and age).

Here, Bacardi's claim for declaratory relief arises out of the same transaction or occurrence at issue in the Prior Action, namely, Bacardi's professed desire to use the Havana Club trademark in the U.S. and its intention of blocking its competitor from ever using the existing HAVANA CLUB mark, used throughout the rest of the world, in the U.S.  The Prior Action arose out of that transaction or occurrence, and in the Prior Action Bacardi sought to acquire exclusive rights to the Havana Club trademark in the United States, through both its own use in 1995 and 1996 and through its alleged acquisition of JASA's rights.  Having failed, for whatever reason, to obtain that relief against HCH in the prior proceeding, Bacardi is

13

attempting to use the current proceeding to obtain essentially the same declaration of exclusive rights to the Havana Club trademark.  Bacardi is clearly barred from doing so on *res judicata* grounds.  *Elliot,* 2004 WL 305593, at *1, *citing Nevada v. United States*, 463 U.S. 110, 129 – 30 (1983); *see also Sherwin,* 955 F. Supp. at 143 (D.D.C. 1997) (plaintiff's clams barred on *res judicata* grounds where plaintiff sought to litigate claims it failed to bring in two prior actions in which it had the opportunity).

**Count III.**  Bacardi's Count III in the present action, seeking "a declaration of non-violation of federal trademark laws," is the mirror image of HCH's § 43(a) claim, complaining of geographic deceptiveness, that was litigated through trial in the Prior Action, and against which Bacardi actively defended.  *Compare*  First Amended Complaint in Prior Action (Exhibt 4 to Sims Decl) at ¶ ¶ 18 – 48, *with* Complaint at ¶ ¶ 148-149.[11]  Bacardi and HCH spent hundreds of hours litigating that claim and submitted extensive proposed findings of fact on it (*see, e.g.,* Bacardi's Proposed Conclusions of Law and Ultimate Facts at 5 – 15 (Exhibit 12 to Sims Decl.).

That the District Court in the end dismissed HCH's § 43(a) claim after agreeing with Bacardi's contention that the embargo deprived HCH of standing does not change the fact that the claim Bacardi asserts here presents precisely the same issues litigated in the Southern District.   Bacardi's request for a declaration of non-violation of federal law is subsumed by, and duplicative of, by the counterclaims that it did assert, seeking a declaratory judgment "as to whether [Bacardi is] entitled to use of the term HAVANA CLUB as a trademark for rum in the

---

[11]  Bacardi seeks a declaration that its use of the HAVANA CLUB mark "does not constitute trademark infringement or unfair competition in violation of Section 32 or Section 43(a) of the Lanham Act, 28 U.S.C. §§ 1114 or 1125(a)"; and that Bacardi's use of HAVANA CLUB "does not infringe under any federal law any mark . . . or constitute unfair competition in violation of any right purportedly owned by Defendants under any federal law." *See* Complaint at ¶¶ 148, 149.   In the Prior Action, HCH claimed that Bacardi's "use and threatened use of the 'Havana Club' trademark and of the aforesaid label constitutes a false designation of origin, false or misleading description of fact, and false or misleading representation of fact. "First Amended Complaint For Injunctive Relief at ¶ 32.

United States."[12]  That declaratory request necessarily presented the geographic deceptiveness issue that the parties litigated, and which would be litigated here yet again were Bacardi's Count III not dismissed as precluded.

In any event, even if the counterclaims in the Prior Action did not duplicate the claim now asserted in Count III, they could have.. In the Prior Litigation Bacardi could have asserted the same declaration of non-violation of federal law it now asserts (and which it litigated by defending against HCH's mirror-image claim).

**Count IV.**  Count IV in this action seeks a declaration that Bacardi's use of the HAVANA CLUB mark "does not infringe under any state law any mark incorporating the words HAVANA CLUB purportedly owned by Defendants, or constitute unfair competition in violation of any right purportedly owned by Defendants under any state law based on a mark or trade name incorporating the words HAVANA CLUB."  Complaint at ¶ 153.  Bacardi's Answer and Counterclaim to the First Amended Complaint in the Prior Action sought a declaratory judgment "as to whether [Bacardi is] entitled to use of the term HAVANA CLUB as a trademark for rum in the United States."[13]  The declaration sought in the present action is a subset of the declaration sought in the Prior Action; had Bacardi prevailed on that counterclaim, it would have obtained the full declaratory relief sought now on Count IV.

Having sought a declaration in the Prior Action that it had the prior, superior, and exclusive right to use the designation HAVANA CLUB as a trademark for rum in the United States,[14]  based both on its alleged priority obtained from JASA and through its own use in 1995

---

[12]  Answer, Affirmative Defenses, and Counterclaims to First Amended Complaint ¶¶ 40, 45 (Exhibit 5 to Sims Decl.).

[13]  Answer, Affirmative Defenses, and Counterclaims to First Amended Complaint, ¶ 40.

[14]  Answer, Affirmative Defenses, and Counterclaims to First Amended Complaint, ¶¶ 40, 45.

and 1996,[15] Bacardi brought, and certainly had the *opportunity* to bring, the claims raised in Count IV of the Complaint in the Prior Action.  As discussed above, *res judicata* applies to not only "every matter which was offered and received to sustain or defeat the claim or demand, **but as to any other admissible matter which might have been offered.**"[16]

3)   Judgment Was Rendered In The Prior Action By A Court Of Competent Jurisdiction.

The United States District Court for the Southern District of New York had competent jurisdiction to hear and decide the Prior Action, including (but limited) to jurisdiction  pursuant to 28 U.S.C. § 1338, which Bacardi admitted in its Answer.  The Southern District had personal jurisdiction over Bacardi because, *inter alia*, Bacardi-Martini USA was authorized to do business in the State of New York and had an address and registered agent for service of process within the Southern District of New York, and Bacardi had sold some of its rum under the HAVANA CLUB mark in New York.  Additionally, Bacardi never contested personal jurisdiction or venue in the Prior Action.

Similarly, there can be no dispute that the United States Court of Appeals for the Second Circuit was a court of competent jurisdiction when it affirmed the district court's decision.  *See Havana Club Holding, S.A. v. Galleon, S.A.*, 203 F.3d 116 (2d Cir. 2000).

4)   The Prior Action Ended With A Final Decision On The Merits.

As discussed above, Bacardi properly pleaded various counterclaims, including a counterclaim for non-violation of HCH's trademark rights and a counterclaim for declaratory relief in response to the complaint by HCH.  Bacardi pursued its counterclaims by successfully

---

[15] *Id*. at 43.

[16] *Elliot*, 2004 WL 305593, at *1 *citing Nevada v. United States*, 463 U.S. at 129 – 30 (1983) (emphasis added).

defending against HCH's motion to dismiss,[17] by including the counterclaim in its January 11, 1999 Trial Memorandum of Law,[18] and by including the counterclaim in its March 11, 1999 Proposed Conclusions of Law and Ultimate Facts.[19]  The District Court granted at least one of Bacardi's counterclaims on its merits, *see Havana Club Holding, S.A.*, 974 F. Supp. at 306-07, *aff'd*, 203 F.3d 116 (2d Cir. 2000) (although as noted above it did not grant Bacardi's counterclaim for a declaratory judgment as Bacardi did not press for that relief after trial.  *See* Point II(B)(2), *supra*).  Because the prior action resulted in a final decision on the merits, the last criterion for the application of *res judicata* is satisfied.

*     *     *

In sum, Bacardi is clearly trying to re-litigate claims that it brought or could have brought and extensively litigated against HCH in the Prior Action, on which the Southern District and the parties spent exhaustive effort (and money).  Bacardi is not entitled to a do-over, or to relitigate these claims yet again.

III.    COUNT V, WHICH SEEKS CANCELLATION OF THE HAVANA CLUB REGISTRATION FOR LACK OF CONSTITUTIONAL POWER TO REGISTER OR MAINTAIN THE MARK, SHOULD BE DISMISSED

A.    Grounds for Cancellation Not Raised in the TTAB May Not Be Raised in a § 1071 District  Court Proceeding

Count V of Bacardi's complaint seeks cancellation of the HAVANA CLUB registration on the ground that that because the Havana Club trademark was never used in interstate or foreign commerce of the United States, Congress had no power under the Constitution to

---

[17] *See Havana Club Holding, S.A.*, 1998 WL 150983, at *6 (holding that Bacardi's request for a declaratory judgment stating that it possess exclusive rights to the Havana Club mark was properly plead).

[18] Defendants' Trial Memorandum of Law at 63.

[19] Defendants' Proposed Conclusions of Law and Ultimate Facts at 36.

empower the U.S. Patent and Trademark Office ("USPTO") to register and maintain any registration of the Havana Club trademark, and the registration must therefore be cancelled. *See* Complaint ¶¶ 156 – 159.   That asserted ground for cancellation could have been asserted to the TTAB but was not, and is therefore precluded.   Although on review of TTAB cancellation proceedings under 15 U.S.C. § 1071 parties may present evidence not presented in the TTAB[20] and join additional legal claims for relief other than cancellation,[21] they may not assert legal grounds for cancellation not presented to the TTAB.   *See* 3 McCarthy on Trademarks 21:21 at 21-29 (4th ed 2003) ("The applicant can present new evidence not presented in the Trademark Office, but cannot raise a legal issue it did not raise below"), citing *Wilson Jones Co. v. Gilbert & Bennett Mfg. Co.*, 332 F.2d 216 (2d Cir. 1964); *see also, e.g., Sprinklets Water Ctr., Inc. v. McKesson Corp.*, 806 F. Supp. 656 , 663 (E.D. Mich. 1992) ("plaintiffs' failure to raise its invalidity defenses before the TTAB bars it from now attempting to do the same"); *Gold Seal Co. v. Weeks,* 129 F. Supp. 928, 937 (D.D.C. 1955) (same), *aff'd*, 230 F.2d 832 (D.C. Cir. 1956).

B.    <u>Both The Commerce Clause And The Treaty Clause Authorize Legislation Providing For Registration And Maintenance Of Foreign Marks Regardless Of Present Use</u>

Even if Bacardi's claim for cancellation based on the asserted lack of Congressional power to provide for registration and maintenance of the HAVANA CLUB mark were properly before this Court, it should be dismissed.   Not even Bacardi denies that the registration is

---

[20] *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 114 (D.D.C. 2003); 3 McCarthy § 21:20, at 21-29 ("although new evidence is permitted to be introduced, the appellant probably cannot deliberately withhold evidence from the Patent and Trademark Office and then present it in the court review") (citations omitted).

[21] *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 670 (7th Cir. 2001) (adding claims for trademark infringement, unfair competition, and dilution under federal and state law); *Material Supply Int'l, Inc., v. Sunmatch Indus. Co.*, LTD., No. Civ. A. 94-1184 (RMU), 1997 WL 243223 at *1 (D.D.C. May 7, 1997), *aff'd in part, remanded by* 146 F.3d 983 (D.C. Cir. 1998) (adding causes of action for federal trademark infringement and unfair competition, common law unfair competition, injunctive relief, breach of contract, breach of fiduciary duty, fraud upon the TTAB, and common law fraud);  3 McCarthy § 21:20, at 21-29.

authorized by Section 44 of the Lanham Act, and that provision, both on its face and as applied, is well within Congress's powers pursuant to both the Foreign Commerce Clause of the Constitution (Article I, § 8, cl. 3) and the Treaty Clause (Article II, § 2, cl. 2) and the Necessary and Proper Clause (Article I § 8, cl. 18).

      1.      <u>Congress Has The Power, Pursuant To The Foreign Commerce Clause, To Authorize Registration and Maintenance of the Havana Club Mark</u>

The Commerce Clause, granting Congress the "Power ... to regulate Commerce with foreign nations, and among the several States, and with the Indian Tribes…," empowers Congress to regulate commerce involving United States citizens abroad, and to further U.S. commerce abroad and obtain reciprocal foreign protection of the intellectual property of various U.S. companies by regulating the property in the United States owned by foreign entities (such as the HAVANA CLUB trademark registration). The Supreme Court has consistently held that Congress has plenary power to regulate trade between subjects of the United States and subjects of a foreign nation. *See, e.g., In re Trade-Mark Cases*, 100 U.S. 82, 96 (1879) ("commerce with foreign nations means commerce between citizens of the United States and citizens and subjects of foreign nations"); *Henderson v. Mayor of New York*, 92 U.S. 259, 270 (1875) (same); *United States v. Holliday*, 70 U.S. 407, 417 (1865) (same).

Bacardi's pleading does not complain that registration of Cubaexport's mark is statutorily unauthorized, but only that the registration of a foreign mark not presently used within the territorial United States somehow exceeds Congress's power. The law does not support that argument, however, and even the one ancient case on which Bacardi presumably relies, *In re Trade-Mark Cases*, lends it no support. That decision struck down the national trademark registration law because it purported to reach purely intra-state commerce; but in holding that the statute went too far, the Supreme Court was careful to make plain that its

decision did not apply to marks (or registrations) authorized by treaty, or related to foreign commerce.  *See, e.g., Trade-Mark Cases*, 100 U.S. at 96 (suggesting a different result had the statute related to commerce "with foreign nations" or to "goods sold by . . . a citizen of a foreign State to a citizen of the United States"); *id.* at 99 ("In what we have here said we wish to be understood as leaving untouched the whole question of the treaty-making power over trade-marks, and of the duty of Congress to pass any laws necessary to carry treaties into effect").

Since that time, Congress and the Executive have repeatedly provided for the protection of marks of United States companies abroad.  Congress has afforded foreign companies reciprocal protection here, such as through the Paris Convention and the Inter-American Convention under which the HAVANA CLUB mark was registered.  Congress has also provided, in Section 44 of the Lanham Act enacted in 1946, for the protection of such foreign marks even absent use in the United States (just as the marks of United States companies, such as Coca-Cola and Ford, are protected in Cuba, despite the fact that such American products are not sold in Cuba).[22]

The term "commerce" is defined in the Lanham Act as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127.  It has repeatedly been held that "commerce under the [Lanham Act] is coterminous with that commerce that Congress may regulate under the Commerce Clause."  *Int'l Bancorp, LLC v. Societe Des Baines De Mer Et Du Cercle Des Etrangers A Monaco*, 329 F.3d 359, 364 (4th Cir. 2003), *cert. denied*, 124 S. Ct. 1052 (2004); *see also United We Stand Am., Inc. v. United We Stand, Am. NY, Inc.*, 128 F.3d 86, 92-93 (2d Cir.

---

[22]  Although the Lanham Act was amended such that it now requires an applicant seeking registration of a trademark based on a foreign registration to demonstrate "a bona fide intention to use the mark in commerce,"  15 U.S.C. § 1126(d)(2) (1988), that amendment does not reflect a lack of constitutional power to support the prior version.

1997), *cert. denied*, 523 U.S. 1076 (1998); *Planetary Motion Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1194 (11th Cir. 2001).

The phrase "use in commerce" is defined in the Lanham Act as follows:

> [T]he bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be used in commerce…
>
> (1) on goods when--
>
> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>
> (B) the goods are sold or transported in commerce,…

15 U.S.C. § 1127.

Bacardi's premise (Complaint ¶ 159) that the HAVANA CLUB mark has not been used in commerce that can be lawfully regulated by Congress is mistaken; the HAVANA CLUB mark is used on rum that, under express regulations of the Department of Treasury, may be purchased and brought back to the United States by United States travelers licensed to travel to Cuba.  Because HAVANA CLUB rum is presently sold to United States travelers licensed to travel to Cuba, under regulations expressly permitting and regulating the quantities of such sales,[23] the HAVANA CLUB mark has been used "in the ordinary course of trade . . . on goods or their containers or the displays associated therewith . . . [that have been] sold . . . in commerce" that the United States may regulate under the Commerce Clause.  In *International Bancorp*, for example, the Fourth Circuit held that Congress could provide for the protection of the "Casino de Monte Carlo" mark of the entity that operated the casino at Monte Carlo in

---

[23]  *See* 31 C.F.R. § 515.560(a)(3) (1977) (prohibiting United States citizens from purchasing merchandise in Cuba to take back to the United states with a foreign market value in excess of $100).

Monaco because it was used in commerce that Congress could regulate – namely, commerce (in Monaco) between U.S. citizens and a foreign company. *Int'l Bancorp*, 329 F.3d at 365-70.    That very rationale provides the constitutional footing for the Trading With the Enemy Act ("TWEA"), Act of Oct. 6, 1917, ch. 106, 40 Stat. 411, and the International Emergency Economic Powers Act ("IEEPA"), Title II, Pub.L. 95- 223, 91 Stat. 1626 et seq., codified at 50 U.S.C. § 1701 *et seq.*, which provide, among other things, for the existing regulations governing trademark registration and transfers of trademarks that have affected ownership of the U.S. HAVANA CLUB registration,[24] as well as for the existing regulations that govern how much rum or other merchandise may be imported by U.S. citizens licensed to travel to Cuba.[25]

The foreign locality in which foreign commercial intercourse occurs does not limit Congress' power under the Constitution to regulate such commerce.  In *Holliday*, when examining the extent of Congress' authority over Indian commerce, the Supreme Court noted that under *Gibbons v. Ogden*, 22 U.S. 1 (1824), the foreign commerce power "must be exercised wherever the subject exists . . . The locality of the traffic can have nothing to do with the power." *Holliday*, 70 U.S. at 417-18.  The subject of foreign trade, as the Supreme Court noted in *Trade-Mark Cases, Henderson*, and *Holliday*, is defined not by where the trade occurs, but by the characteristics of the parties who engage in the trade, just as the *Holliday* Court concluded that the subject of Indian commerce is defined not by whether the commerce occurs on Indian territory, but rather by whether the trade brings United States citizens and tribal Indians together as transacting partners.  *See also United States v. Mazurie*, 419 U.S. 544, 554 (1975) ("This

---

[24] *See, e.g., Havana Club Holding, S.A. v. Galleon, S.A.*, 974 F. Supp. 302, 306-07 (S.D.N.Y. 1997), and 31 CFR 515.527 (licenses for trademark registration).

[25] *See* CFR § 515.560(c)(3); *see also United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (1975) (upholding broad import surcharge on products imported by United States citizens in transactions with Japanese sellers, which regulation was issued by the executive under TWEA's delegation of foreign commerce authority).

Court has repeatedly held that [the Indian commerce clause] affords Congress the power to prohibit or regulate the sale of alcoholic beverages to tribal Indians, wherever situated ..."); *Int'l Bancorp*, 329 F.3d at 365-70.

If Congress has the power – which we do not believe Bacardi would dispute – to regulate the amount of Cuban Havana Club rum that U.S. citizens may purchase in Cuba and bring with them back from Cuba to the United States, then it has the power to maintain the HAVANA CLUB registration.  As Chief Justice Marshall wrote for the Court in *Gibbons*, 22 U.S. at 193-94, "It has, we believe, been universally admitted, that [the foreign commerce clause] comprehend[s] every species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other, to which this power does not extend."); *see also United States v. Marigold*, 50 U.S. 560, 567 (1850) ("The power once conceded, it may operate on any and every subject of commerce to which the legislative discretion may apply it.");  *Int'l Bancorp*, 329 F.3d at 367.[26]   *See also Authors League of Am., Inc. v. Oman*, 790 F.2d 220, 224 (2d Cir. 1986) (even if provision of Copyright Act was beyond Congress's power under the Copyright Clause, it was "clearly justified as an exercise of the legislature's power to regulate commerce with foreign nations").  Given the breadth of the power to regulate commerce with foreign nations recognized in *Gibbons v. Ogden*, the power of Congress to provide for the maintenance of protection of foreign marks, even during times of war and even as to marks owned by companies of embargoed nations with whom the United States is at war, has never been doubted.  *See, e.g., G. H. Mumm Champagne v. Eastern Wine Corp.*, 142 F.2d 499, 502 (2d Cir.) (L. Hand, J.), *cert. denied,* 323 U.S. 715 (1944).

---

[26]  The substantial effects test, applied when purely domestic commerce is involved to ensure that Congress does not exceed its constitutional authority to regulate interstate commerce by enacting legislation that trammels on the rights of states to regulate purely intra-state activity for themselves pursuant to their police power, *see United States v. Morrison*, 529 U.S. 598, 608-09 (2000), has no application to foreign commerce.  *Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434, 448 n. 13 (1979).

2.      The Treaty and Necessary and Proper Clauses Also Empower Congress To Authorize Registration and Maintenance of the HAVANA CLUB Mark

Article II of the Constitution grants the Senate the power to advise and consent to treaties, and Article I affords the additional power to enact all legislation as may be necessary and proper to implement treaties and carry them into effect. *See Whitney v. Robertson*, 124 U.S. 190, 194 (1888); *Missouri v. Holland*, 252 U.S. 416, 432 (1920). As *Missouri v. Holland* expressly held, 252 U.S. at 432, "[i]f the treaty is valid there can be no dispute about the validity of [a] statute [passed] under Article I, Section 8, as a necessary and proper means to execute the powers of the Government"). *See also United States v. Wang Kun Lue*, 134 F.3d 79, 84 (2d Cir. 1997) ("If the Hostage Taking Convention is a valid exercise of the Executive's treaty power, there is little room to dispute that the legislation passed to effectuate the treaty is valid under the Necessary and Proper Clause"). We have not found a single decision holding that a federal statute, enacted to implement a treaty, exceeded congressional power.

As the Supreme Court has held, even statutory regulation that might otherwise appear to exceed federal power under the (domestic) Commerce Clause may be authorized when it concerns a matter of international dimension. Thus, in *Missouri v. Holland*, the Supreme Court upheld the Migratory Bird Treaty Act of 1918, notwithstanding that purely domestic legislation similarly prohibiting the killing of migratory birds within the Untied States had previously been invalidated, because the Act implemented a treaty with Great Britain (regarding Canada). The Supreme Court explained that "[i]t is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could…." 252 U.S. at 433. Accordingly, "[i]f the treaty is valid there can be no dispute about the validity of the statute under Article I, Section 8, as a necessary and proper means to execute the powers of the Government." *Id*. at 432.

Registration of the HAVANA CLUB mark was undertaken pursuant to the Lanham Act's provisions implementing, *inter alia,* the Inter-American Convention.[27]  The Executive has concluded, and Congress has ratified, the international trademark conventions that underlie the Lanham Act and its provision for the registration and maintenance of the HAVANA CLUB mark notwithstanding that the mark is not actively used within the territorial United States.  *See* 15 U.S.C. § 1126 (1962) (providing for registration of a foreign trademark without showing use or intent to use the trademark in commerce.); 15 U.S.C. § 1126(d)(2) (1988) (applicant seeking registration based on a foreign registration must show that it "has a bona fide intention to use the mark in commerce"); *see also In re Compagnie Generale Maritime*, 993 F.2d 841, 847 (Fed. Cir. 1993) (rejecting argument of dissent that domestic use of a foreign trademark is required for registration of foreign mark). The Necessary and Proper Clause affords Congress the power to enact Section 44 of the Lanham Act so as to implement the treaties by providing for the registration and maintenance of foreign marks pursuant to the obligations of the various trademark conventions, regardless of present domestic use.

*   *   *   *   *

Because Congress has power under the Treaty Clause to provide for the registration and maintenance of foreign marks (regardless of actual use) so as to implement treaties and conventions to which the United States is a party and thereby foster international commerce through the reciprocal protection of foreign marks domestically and U.S. marks abroad — and because the Commerce Clause provides an additional, independent source of that power — Bacardi's Count V fails to state a claim on which relief can be granted.

---

[27]  *See Havana Club Holding, S.A. v. Galleon S.A.*, 974 F. Supp. 302, 313 (S.D.N.Y. 1997); *see also* 15 U.S.C. § 1126(b).

IV.  DISMISSAL OF BACARDI'S PETITION TO CANCEL MAY BE UPHELD ON THE ALTERNATIVE GROUND THAT IT WAS REQUIRED AS A SANCTION FOR BACARDI'S REPEATED, FLAGRANT VIOLATIONS OF THE GOVERNMENT IN THE SUNSHINE ACT AND MANIPULATION OF THE ADMINISTRATIVE PROCESS.

After Bacardi prevailed in the Prior Action largely by reason of its successful application of political pressure on the legislative branch (resulting in the just-before-trial enactment of Section 211, which blocked the court from adjudicating HCH's trade name infringement claim) and on the executive branch (resulting in OFAC's withdrawal of a previously granted license), it set out to use comparable tactics in the TTAB to obtain cancellation of the HAVANA CLUB registration.  But the disposition of a cancellation petition is an adjudicative process, not a political one, and Bacardi's tactics were a perversion of that process and grossly unlawful.

Documents obtained through the Freedom of Information Act and its Florida counterpart, which were submitted to the TTAB, establish that Bacardi engaged in a concerted campaign to apply its political connections to pressure senior members of the United States Patent and Trademark Office ("USPTO") by *ex parte* communications to obtain a favorable result in an adjudicative proceeding – including by e-mails, telephone calls, and meetings between Bacardi, Florida Governor Jeb Bush's staff, and USPTO officials and a letter from Governor Bush to USPTO Director James Rogan demanding cancellation of the HAVANA CLUB registration.   As a result, the TTAB should have, pursuant to the Government in the Sunshine Act,  the USPTO's own regulations, and the Due Process Clause, granted HCH's motion to (1) dismiss Bacardi's Amended Petition to Cancel, or, in the alternative, (2) direct full disclosure by Bacardi and USPTO officials of all the *ex parte* communications made by or for Bacardi concerning this proceeding, while suspending resolution of Bacardi's motion for summary judgment.  The TTAB's rejection of that motion was error, which provides an alternative ground for dismissing Bacardi's § 1071 appeal.

A.    Governor Bush's Office Pressured The USPTO *Ex Parte*, On Bacardi's Behalf, To Cancel the HAVANA CLUB Trademark Registration

After the TTAB Proceeding was un-suspended as a result of the conclusion of the Prior Action, Bacardi sought and obtained the assistance of Florida Governor Jeb Bush in January 2002 to pressure the USPTO and ensure that the adjudicated result it was seeking — cancellation — would in fact be forthcoming.  *See* FOIA 12-13[28] (e-mail from Bacardi to Jeb Bush advising him of Bacardi's fight against HCH and saying "I hope you can help us").

From January 2002 through at least September 2002, Governor Bush's office and Bacardi acted in concert and in secret to obtain the cancellation Barcardi was seeking.  They began their campaign with a series of *ex parte* contacts with the USPTO in February and March 2002:

- On February 20, 2002, two of Governor Bush's aides spoke *ex parte* with USPTO attorney Eleanor Meltzer to discuss the HAVANA CLUB cancellation petition and set up a meeting that occurred on February 25th.  (FOIA 34, 35, 43, 121-28.)

- On February 25, 2002, Bacardi President Jorge Rodriguez-Marquez met secretly with USPTO officials, including Deputy Director Jon Dudas and Ms. Meltzer, to discuss the cancellation and press Bacardi's case.  (FOIA 72-73, 42, 44, 146.)  That second meeting focused specifically on Bacardi's arguments as to why the HAVANA CLUB registration should be cancelled.

- Bacardi later complained directly to Governor Bush that, in the February 25 meeting, "female career lawyer" Ms. Meltzer revealed "personal negative feelings about [Bacardi's] case."  (FOIA 42-43.)

- *ex parte* e-mails reflecting Bacardi's effort to have the Commerce Department intervene with the USPTO to have political appointees overrule career USPTO staff because it feared the career staff would be relying on the law and the facts so as to lead to a TTAB resolution that would be unfavorable to Bacardi.  (FOIA 42, 44 – 45; 69, 81, and 85)**.**

- *ex parte* e-mails reflecting Bacardi's assessment (based on *ex parte* communications) that various USPTO employees were somehow not as helpful to it as Bacardi had hoped, and its efforts to get such persons removed from consideration of Bacardi's various demands.  (FOIA 42, 44 - 45).

---

[28] "FOIA ____" refers to the page numbering of documents obtained from the USPTO and Governor Bush's office by request. These documents are attached as Exhibit 17 to the Sims Decl.

- A follow-up call by Mr. Dudas "about the case" in early March 2002, in which he discussed with Governor Bush's Washington aides the expected USPTO "<u>action, which from all indications will be favorable</u>" (*Id.* at FOIA 0044; emphasis added);

- On March 19, 2002, Governor Bush's office informed Deputy Director Dudas of a summary judgment motion that Bacardi filed, and asking if the Governor's Office could be of any help.  (FOIA 69.)

- On March 20, Bacardi's president sent to Travis Thomas, Director of the Commerce Department's Office of Business Liaison, an e-mail with copies of Bacardi's summary judgment motion, along with Bacardi's arguments as to why Cubaexport is not entitled to the HAVANA CLUB registration.  (FOIA 145-46.)

- On March 21, 2002, after speaking with Bacardi's president, Thomas forwarded to Deputy Director Dudas the March 20 e-mail. (FOIA 145.)

Frustrated with the progress of its TTAB Proceeding and *ex parte* efforts, Bacardi

successfully persuaded Governor Bush and his staff to undertake further *ex parte* contacts on its

behalf:

- Bacardi's president requested that Governor Bush help put more "pressure" on the USPTO.  (FOIA 70.)  From April through the beginning of June 2002, Bacardi and the Governor's staff prepared a letter from Governor Bush himself to "get this resolved." (FOIA 75-91; 102-09.)

- The Governor's staff decided to "move up the food chain" to USPTO Director James Rogan, a member of the Board.  (FOIA 78), and on June 13, 2002, Governor Bush personally demanded that the registration be "cancelled immediately" in a letter to Director Rogan:

  > I am writing on behalf of Florida-based Bacardi-Martini, USA, Inc. to ask that the Patent and Trademark Office take a quick and decisive action  on a pending application to expunge the registration of the trademark HAVANA CLUB.  **The *out-dated registration* belongs to a company owned by Fidel Castro called CubaExport and *should be cancelled immediately. . . . A swift resolution to this matter is imperative***.  (FOIA 9-10 (emphasis added).)

- Director Rogan replied on July 3, assuring Governor Bush that the TTAB would afford expeditious action, as requested (FOIA 0002 – 0003).  Governor Bush replied on July 16, thanking Director Rogan for both his own "attention to this matter" and the "continued assistance of [Deputy Director] Jon Dudas." (FOIA 0011) (emphasis added).  Neither Bacardi nor Director Rogan nor Deputy Director Dudas has ever identified the content and extent of that "continued assistance."  Sims Declaration ¶ 20.

- On September 3, 2002, Deputy Director Dudas met yet again in secret with Bacardi representatives to discuss the cancellation proceedings. (FOIA 132.)  There is no information in the record as to what was specifically discussed, and the content of the discussion has never been disclosed.[29]

HCH was not copied on any of these *ex parte* letters and e-mails from or on behalf of Bacardi; was not informed of, or invited to attend, the meetings the USPTO afforded Bacardi and its representatives; and was not or apprised of what Bacardi and its agents said in the (at least) two meetings with Deputy Director Dudas.  Sims Decl. ¶ ¶ 20, 21.  While HCH was able to obtain a handful of documents under the FOIA, and was provided with somewhat more under the Florida freedom of information law, it is indisputable that all of the relevant documents within the USPTO, comprising or reflecting the *ex parte* communications, have been not disclosed.

B.     Bacardi's *Ex Parte* Contacts Violated The Sunshine Act And The Agency's Own Rules And Were Fundamentally Unfair

i.     Bacardi's *Ex Parte* Communications Were Illegal.

Bacardi's secret meetings and correspondence with TTAB officers and representatives, including Director Rogan and Deputy Director Dudas, were improper *ex parte* communications under the Government In The Sunshine Act (the "Act"), which provides in relevant part:

> [N]o interested person outside the agency shall make or knowingly cause to be made to any member of the body comprising the agency, administrative law judge, or other employee who is or may reasonably be expected to be involved in the decisional process of the proceeding, an *ex parte* communication relevant to the merits of the proceeding . . . .   No member of the body comprising the agency, administrative law judge, or other employee who is or may reasonably be expected to be involved in the decisional process of the proceeding, shall make or knowingly cause to be made to any interested person outside the agency an *ex parte* communication relevant to the merits of the proceeding.

---

[29] Additional documents reflecting the improper communications between Governor Bush and Director Rogan include FOIA 76, 85, 92, 94, 96, 99, 130 – 131.

5 U.S.C. § 557(d)(1)(A), (B).)[30]  The communications also violated 37 C.F.R. 10.93(b) and

Trademark Trial and Appeal Board Manual of Procedure § 105, both of which provide that "In

an adversary proceeding, including any *inter partes* proceeding before the Office, a practitioner

shall not communicate or cause another to communicate, as to the merits of the cause with a

judge, official, or Office employee before whom the proceeding is pending, except: (1) In the

course of official proceedings in the cause [and] (2) In writing if the practitioner promptly

delivers a copy of the writing to opposing counsel . . . .").

There is no dispute that the meetings, correspondence, and other communications were

*ex parte*: neither Bacardi (nor the officials) ever informed HCH of the fact or content of the

communications.  HCH was never invited to attend the meetings that Bacardi and its agents

were afforded by Deputy Director Dudas and was never copied on the written or electronic *ex

parte* communications (or any resulting communications).

Director Rogan and Deputy Director Dudas were squarely among those persons barred

by 5 U.S.C. § 557(d)(1)(A)(B) (and 31 CFR 10.93(h)) from receiving or participating in such

communications, and obligated by 5 U.S.C. § 557(d)(1)(C) to disclose those communications

once received (which they still have never done).  *Ex parte* communications may not be made by

or to, and must be disclosed by, "any member of the body comprising the agency,

administrative law judge, or other employee who is or may reasonably be expected to be

involved in the decisional process of the proceeding."  5 U.S.C. § 557(d)(1)(A), (C).  Director

Rogan and Deputy Director Dudas are members of the "body" (the TTAB) under 15 U.S.C. §

1067, and the TTAB's decision otherwise is contrary to the agency's official view and simply

---

[30]  The Sunshine Act defines *ex parte* communication as "an oral or written communication not on the
public record with respect to which reasonable prior notice to all parties is not given, but it shall not
include requests for status reports on any matter or proceeding covered by this subchapter." 5 U.S.C.
§ 551(14).

incorrect.[31]  Additionally, both Rogan and Dudas were "involved in the decisional process of the proceeding" and at a minimum surely could "reasonably be expected" to be so, by virtue of 15 U.S.C. § 1068, which gives the Director the power "in such [TTAB] proceedings . . . [to] cancel the registration", and by virtue of the Director's authority (presumably delegated to his Deputy) to assign TTAB members to the panel deciding Bacardi's petition.  *Cf. In re Alappat*, 33 F.3d 1526, 1536  (Fed. Cir. 1994) (noting the Director's "ability to control Board decisions through his authority to designate Board panels" in patent cases).

The TTAB's holding that the prohibitions do not apply because the Director and Deputy Director were not actually on the particular panel *that eventually decided Bacardi's petition* ignores the plain wording of the Sunshine Act and common sense.  The Director and his Deputy are members of the TTAB ("the body" deciding the case), and indeed considerably more than that, as the Director appoints trademark judges (15 U.S.C. § 1067(b)) and exercises administrative authority over them, including the power to select particular TTAB members (including himself and the Deputy Director) to particular panels.  *Alappat, supra*.  Accordingly, the Director and his Deputy are in precisely the category of officers whom Congress determined should *not* receive *ex parte* communications "relevant to the merits of the proceeding," and who are obligated to disclose such communications when made (which was not done here).  An *ex parte* communication on behalf of Bacardi from the President's brother to the Director warning that "a swift resolution to this matter is imperative" and advising that the registration "***should be***

---

[31]  The USPTO itself acknowledges that the Deputy Director is a statutory TTAB member.  In 2002, Public Law 107-273, § 13203(a) amended 15 U.S.C. § 1067 by directing the addition of "Deputy Commissioner" after the "Commissioner." These were misnomers, intended to add "Deputy Director" after "Director", as acknowledged in the statute currently displayed on the USPTO's own Web site: http://www.uspto.gov/web/offices/tac/tmlaw2.html#_Toc52344300 (click on 15 U.S.C. § 1067).

*cancelled immediately"* cannot be sloughed off, as the TTAB did, as permitted (rather than barred). [32]

Equally absurd is the TTAB's finding fault with the fact that HCH did not provide evidence "of any *ex parte* communications between petitioners and/or their 'agents' and the actual decision makers in this case" or "evidence of any communications between Director Rogan and Mr. Dudas and the actual decision-makers in this case." First, there is no basis for concluding that the *ex parte* communications to Director Rogan and Deputy Director were not to the "actual decision-makers," given their authority and power to have appointed or influenced the panel in question. Second, HCH's inability to supply the record with communications from the Director and Deputy Director to the actual TTAB panel flows directly from the violation by Director Rogan and Deputy Director Dudas of their obligation under 5 U.S.C ¶ 557(d)(1)(c) to disclose to respondents all "written communications" comprising *ex parte* communications to or from Bacardi and "memoranda stating the substance of all such oral communications" and "all written responses, and memoranda stating the substance of all oral responses." *Id.* The lack of such information was grounds for granting the alternative remedy HCH sought, namely "full disclosure by Bacardi and its agents and attorneys, Director Rogan, Deputy Director Dudas, the USPTO (including the TTAB)," relief that has been afforded in numerous (but far less egregious) cases cited to the TTAB, including:

- *Portland Audubon Soc'y v. Endangered Species Committee*, 984 F.2d 1534, 1549-50 (9th Cir. 1993) (evidence of White House *ex parte* communication with Committee members caused Court to order remand for a "vigorous and thorough" adversarial, evidentiary

---

[32] The impropriety of Director Rogan's correspondence with (and assurance to) Governor Bush is only exacerbated by the fact that, mere weeks after his departure from the PTO, he has published an article in The Biloxi Sun Herald on June 9, 2004 which is evidently written expressly for Bacardi, and parrots its demonstrably untrue line that the U.S. Havana Club registration was obtained through seizure (when in fact it was a new mark, applied for well after the original registration had been allowed to lapse and been abandoned). *See* "Law Must Protect What Padlocks Cannot," Biloxi Sun Herald, June 9, 2004, Sims Decl. Exhibit 19.

hearing  "to determine the nature, content, extent, source, and effect of any *ex parte* communications that may have transpired . . . ");

- *Prof'l Air Traffic Controllers Org. v. FLRA*, 672 F.2d 109, 113 (D.C. Cir. 1982) (evidence of *ex parte* communication with FLRA member caused Court to order FLRA to hold an evidentiary hearing, with a specially appointed ALJ from a neutral agency, "to determine the nature, extent, source and effect of any and all *ex parte* communications . . . ");

- *North Carolina Envtl. Policy Inst. v. EPA*, 881 F.2d 1250, 1258 (4th Cir. 1989) (following accusation that EPA made *ex parte* communication, ALJ was obligated to explore the possibility of and protect against taint of the proceeding and, therefore, required disclosure of all proscribed *ex parte* communications before rendering a decision; the Court noted that "an evidentiary hearing to determine the nature, extent, source and effect of any and all *ex parte* communications" may be warranted);

- *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 58 (D.C. Cir.), *cert. denied*, 434 U.S. 829 (1977) (evidence of *ex parte* communication during FCC rulemaking proceeding caused Court to remand to agency with instructions to hold evidentiary hearing, with aid of a specially appointed hearing examiner, "to determine the nature and source of all *ex parte* pleas and other approaches that were made to the [FCC] or its employees [during the rulemaking proceeding at issue]");

- *In re Wright*, CFTC No. 97-2, 1997 CFTC LEXIS 125 (Apr. 2, 1997) ("the Court [i.e., the ALJ] is duty bound to undertake further factual inquiry;" requiring disclosure, and contemplating possibility of "an evidentiary hearing to determine the nature, extent, sources, and effect of any and all *ex parte* communications");

- *American Airlines*, FAA No. CP89EA0119, 1991 FAA Lexis 248 (June 3, 1991) (recounting extensive informal procedures to ventilate *ex parte* communications and their impact, which were held insufficient, and ordering agency to show cause why the matter should not be dismissed with prejudice).

Nor can the communications obtained under the FOIA and its Florida counterpart be disregarded as "mere requests for status reports," as Bacardi contended to the TTAB.  First, the context precludes such an assessment: Bacardi and its counsel plainly *knew exactly* what the status of the proceedings was, and had they been in any doubt could have contacted staff counsel with opposing counsel on the line; the documentary evidence obtained makes clear that what Bacardi wanted from Governor Bush, and what it obtained, was not a status report but pressure to "cancel [the registration] immediately." Second, because the record makes plain that Bacardi and its representatives were afforded at least two meetings and had additional conversations with TTAB members – but no further information about the content of those

meetings and communications has been provided – there is plainly no basis in the record whatever for dismissing those communications as "status reports."

Moreover, even if these contacts could be considered requests for status reports, the requests were relevant to the merits and violate the Sunshine Act, because a request for status may amount to an effort to influence the substantive outcome of a proceeding.  *See Prof'l Air Traffic Controllers Org. v. FLRA* ("*PATCO II*"), 685 F.2d 547, 563 (D.C. Cir. 1982).

     ii.     <u>Bacardi's Ex Parte Communications Violated The USPTO's Own Regulations And Fundamental Fairness.</u>

Even if the Sunshine Act were inapplicable to TTAB adjudicative proceedings, the same result would obtain by reason of the USPTO's own binding regulation mirroring the Sunshine Act's ban on *ex parte* communications and from the obligations of fundamental fairness.  Secret communications between interested parties and an administrative decision-maker are inconsistent "with fundamental notions of fairness implicit in due process and with the ideal of reasoned decision making on the merits which undergirds all of our administrative law."  *Home Box Office,* 567 F.2d at 56.  As another court has held,

> [O]ne of the fundamental premises inherent in the concept of an adversary hearing, particularly if it is of the evidentiary type is that neither adversary be permitted to engage in an *ex parte* communication concerning the merits of the case with those responsible for the decision.[33]

*Camero* v. *United States*, 375 F.2d 777, 780 (Ct. Cl. 1967) (*en banc*) (*citing* Canon 17, ABA Canons of Judicial Ethics; 5 U.S.C. § 1004(c) (1964); and *Sangamon Valley Television Corp.* v. *United States,*

---

[33]  The USPTO recognizes this "fundamental premise" in its own rules.  *See* 37 C.F.R. § 10.93(b) (2002). Section 10.93(b), which governs the conduct of practitioners in adversary or *inter partes* proceedings, prohibits unauthorized *ex parte* communications with a "judge, official or Office employee before whom the proceeding is pending."  *Id.*  A cancellation proceeding before the Board is an *inter partes* proceeding. *See* 37 C.F.R. § 2.116 (2002).

269 F.2d 221 (D.C. Cir. 1959)).  *See also Sullivan* v. *Dep't of the Navy*, 720 F.2d 1266, 1272 n.8 (Fed. Cir. 1983) (following "*Camero* principle").

In *Camero*, a government employee sued for back pay because of an allegedly wrongful termination.  During the review of his termination by the agency grievance committee, an agency lawyer who presented evidence on behalf of the agency against the employee assisted, without the employee's knowledge, in preparing a legal opinion used by the decision maker to ultimately affirm the decision to terminate.  The U.S. Court of Claims, sitting *en banc*, held that the termination decision was invalid because the lawyer's involvement amounted to improper *ex parte* communications that violated fairness and due process:

> It is difficult to imagine a more serious incursion on fairness than to permit the representative of one of the parties to privately communicate his recommendations to the decision makers.  To allow such activity would render the hearing virtually meaningless.  We are of the opinion that due process forbids it.

*Camero*, 375 F.2d at 781; *see also PATCO II*, 685 F.2d at 570.

Bacardi's *ex parte* contacts with the USPTO, to the extent already known – even before obtaining any information as to what was said, promised, or undertaken in the meetings afforded Bacardi's top executives – were considerably more egregious than the *ex parte* communications in *Camero*.  As explained above, Bacardi actively pressed its case, directly and through political pressure by Governor Bush's office to the USPTO without any notice to HCH.  Bacardi sought to influence the result – to gain the particular result prayed for in its petition to cancel – by repeatedly contacting *ex parte* senior members of the USPTO with influence over the Board. [34]

---

[34]  These secret discussions also involved representatives of the USPTO acting on behalf of the Director and Deputy Director.  Eleanor Meltzer, who attended two meetings with Bacardi and who involved the Deputy Director, is an attorney-advisor for the USPTO's Office of Legislative and International Affairs.

C.    Bacardi's Petition to Cancel Should Have Been, and Should Now Be,  Dismissed Or In The Alternative Remanded For Full Disclosure and An Appropriate Remedy.

Secret communications between one party and a decision making body in an adversarial proceeding damage the integrity of the adversarial process.  "To allow such activity would be to render the hearing virtually meaningless." *Camero*, 375 F.2d at 781.  The Sunshine Act and due process therefore both contemplate that, in certain cases, dismissal of a claim is warranted when the prohibition against improper *ex parte* communications is violated.  *See* 5 U.S.C. § 557(d)(1)(D) (authorizing order to party responsible for *ex parte* communications "to show cause why his claim or interest in the proceeding should not be dismissed"); *Camero,* 375 F.2d at 780 (granting judgment for plaintiff on the ground that *ex parte* communications by the respondent's counsel so required as a matter of due process).  The record as it now stands justifies dismissal.  Bacardi's conduct here was egregious, and it has only itself to blame for the improper contacts it decided to make.  By repeatedly and intentionally contacting *ex parte* USPTO officials who serve on the TTAB, appoint its judges, and assign its panels, to demand cancellation – and by sending those messages not only directly but through the President's brother – Bacardi stepped so far over the line that it irretrievably tainted its proceeding and placed the Board in the untenable position of rendering a decision against the backdrop of Bacardi's attempts to influence its outcome.  To discourage such contacts and make plain their impermissibility, the decision dismissing Bacardi's petition should be affirmed on the basis that its misconduct mandates dismissal under the Sunshine Act and pursuant to Due Process.

In the alternative, the matter should be remanded to the TTAB for full disclosure by Bacardi and USPTO personnel of the extent and nature of the *ex parte* contacts and whatever actions and communications Director Rogan and Deputy Director Dudas (or directed by taken) took in response.  As the D.C. Circuit has held, "Section 557(d) contains two possible

36

administrative remedies for improper ex parte communications," either dismissal or "disclosure of the communication and its content." "When these interests of openness and opportunity for response are threatened by an *ex parte* communication, the communication must be disclosed." *PATCO II,* 685 F.2d at 563.

Here, assuming *arguendo* that the extent and nature of *ex parte* contacts known to date were insufficient to support dismissal, the record is worrisomely incomplete.  Deputy Director Dudas had at least two *ex parte* meetings with Bacardi; Governor Bush thanked Director Rogan for Mr. Dudas's "continuing assistance";  Bacardi's *ex parte* communications extended over at least eight months.  For example, Deputy Director Dudas met with Bacardi on September 3, 2002 to discuss the cancellation proceeding (FOIA 132); but we do not know who else partici-pated, or what was discussed.  If the Court does not affirm the TTAB's decision outright, it should at a minimum remand so that the full disclosure contemplated by Congress in the Sunshine Act is afforded.  *See Portland Audubon*, 984 F.2d at 1543, 1549-50.

## CONCLUSION

For all the foregoing reasons, the motion to dismiss should be granted, or, in the alternative, summary judgment should be granted in favor of defendants.

Respectfully Submitted,

PROSKAUER ROSE LLP

s/Bruce E. Boyden/s
Bruce E. Boyden, Esq., Bar # 468710
1233 20th St. N.W., Suite 800
Washington, D.C. 20036-2396
Tel.: 202.416.6800
Fax:  202.416.6899

Of Counsel:

Charles S. Sims, Esq.
Jenifer deWolf Paine, Esq.
Proskauer Rose LLP
1585 Broadway
New York, NY  10036
Tel: 212.969.3000
Fax: 212.969.2900