IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BACARDI & COMPANY LIMITED,<br><br>and<br><br>BACARDI U.S.A., INC.,<br><br><br>Plaintiffs,<br><br>v.<br><br>EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS d/b/a CUBAEXPORT<br><br>and<br><br>HAVANA CLUB HOLDING, S.A. d/b/a HCH, S.A.<br><br><br>Defendants. | Civil Action No. 04 CV 519 (EGS) |

## FIRST AMENDED COMPLAINT

Plaintiffs, by their attorneys, Kelley Drye & Warren LLP and Covington & Burling LLP, allege upon personal knowledge as to their own acts and information and belief as to all other acts, as follows:[1]

### NATURE OF THE ACTION

1.     Plaintiffs sought cancellation of U.S. Registration No. 1,031,651 of the trademark HAVANA CLUB & DESIGN for rum in Cancellation Proceeding No. 92024108, styled *Galleon S.A. et al. v. Havana Club Holding, S.A., et al.* (the "HC Cancellation Proceeding"), before the Trademark Trial and Appeal Board ("TTAB") of the U.S. Patent and Trademark Office ("PTO").

---

[1]     As reflected in the joint status report filed on February 12, 2016 (D.E. 112), Plaintiffs file this amended complaint with Defendants' consent.

On January 29, 2004, the TTAB issued a decision (the "TTAB Decision") dismissing Plaintiffs' Supplemental and Amended Petition to Cancel the aforesaid U.S. Registration.  This is an action seeking:  (a) review of the TTAB Decision and rectification of the PTO records by striking or canceling U.S. Registration No. 1,031,651 of the trademark HAVANA CLUB & DESIGN for rum (henceforth sometimes referred to as the "U.S. HAVANA CLUB Registration"); (b) a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 resolving actual controversies between the parties concerning the use and ownership of the HAVANA CLUB & DESIGN trademark in the United States and the rights arising out of the U.S. HAVANA CLUB Registration; and (c) an injunction prohibiting Defendants from using or registering any mark incorporating the words HAVANA CLUB and from interfering with Plaintiffs' use and registration of the HAVANA CLUB mark.

SUMMARY

2.      This dispute arises from the Cuban government's confiscation of the HAVANA CLUB trademark in Cuba, along with all the assets of the Havana Club rum business, and its subsequent attempts to extend the effects of that confiscation to the HAVANA CLUB trademark in the United States.  The HAVANA CLUB trademark for rum was originally created, registered and used in Cuba, the United States and elsewhere by Jose Arechabala S.A. ("JASA"), a Cuban company owned by the Arechabala family.

3.      In 1960, the Cuban revolutionary government forcibly seized and then purported to expropriate JASA's assets, including the HAVANA CLUB trademark, without compensation. JASA was thus deprived of all means of conducting business and its directors, officers and shareholders were driven into exile or imprisoned.  After the confiscation of JASA's assets, the Cuban government purported to assign the worldwide rights to the HAVANA CLUB mark to defendant Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport"), a

state-owned foreign trade enterprise.  Cubaexport waited until JASA's registrations of the HAVANA CLUB trademark had expired in 1973, and then it obtained U.S. Registration No. 1,031,651 HAVANA CLUB & DESIGN for rum, in a manner that concealed from the PTO that the original Cuban trademark had been confiscated.  The U.S. HAVANA CLUB Registration misleadingly includes the Spanish legend *"Fundada en 1878,"* a phrase copied from JASA's HAVANA CLUB mark, which refers to the year in which the Arechabala family business was founded.

      4.      In 1993, the Cuban government caused Cubaexport to purport to transfer the HAVANA CLUB mark and the U.S. HAVANA CLUB Registration to Havana Rum & Liquors, S.A. ("HRL"), another company controlled by the Cuban government, and from HRL to defendant Havana Club Holding, S.A. ("HCH").  In a subsequent U.S. lawsuit filed by HCH against Galleon S.A. (a predecessor of Bacardi & Company Ltd. ("BACO")) and affiliates, the court nullified that transfer.  *See Havana Club Holding, S.A. et al. v. Galleon, S.A. et al.,* 62 F. Supp. 2d 1085 (S.D.N.Y.), *aff d*, 203 F.3d 116 (2d Cir. 2000), *cert. denied*, 531 U.S. 918 (2000). Neither Cubaexport nor any of its purported successors in interest has ever used the HAVANA CLUB trademark in the United States.  In 1997, BACO became successor in interest to JASA's rights in and to the HAVANA CLUB trademark worldwide.

      5.      In the HC Cancellation Proceedings initiated by BACO to cancel the U.S. HAVANA CLUB Registration, the TTAB refused to strike that Registration from the PTO's records despite Cubaexport's failure to file a timely renewal application, and dismissed BACO's petition to cancel that Registration for failure to state a claim.  The TTAB declined to rule whether Cubaexport's registration should be cancelled because it rested on an uncompensated expropriation of JASA's assets.  The TTAB further stated that Bacardi had not adequately shown

that Cubaexport made material false representations in obtaining, maintaining, and renewing the U.S. HAVANA CLUB Registration.

6.      In this action, Plaintiffs seek:

(a)      Reversal of the TTAB's decision and rectification of the records of the PTO by (i) striking the U.S. HAVANA CLUB Registration from the Principal Register of the PTO on the ground that Cubaexport failed to file the mandatory renewal application and declaration prior to the end of the statutory period in 1996, and failed to file a legally adequate renewal application in 2006, or (ii) alternatively, canceling that Registration on the grounds, among others, that the U.S. HAVANA CLUB Registration was fraudulently obtained, maintained, and renewed; that the registered mark was abandoned; and that the registered mark misrepresents the source of goods;

(b)      A declaration that BACO owns the common law rights in the HAVANA CLUB mark for rum and that Defendants have no common law or other rights in any mark incorporating or consisting of the words HAVANA CLUB;

(c)      A declaration that Plaintiffs' use of the HAVANA CLUB mark does not infringe on any mark owned by the Defendants or otherwise violate any enforceable rights of the Defendants, because longstanding U.S. public policy and Section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, Public Law No. 105-277, 112 Stat. 2681 (Oct. 21, 1998) ("Section 211") preclude recognition and enforcement of purported rights in a trademark or registration that are founded on the Cuban government's expropriation of assets; and

(d)     An injunction prohibiting Defendants from using or registering in the PTO or in any State of the United States any mark incorporating or consisting of the words HAVANA CLUB and from interfering with Plaintiffs' use and registration of the HAVANA CLUB mark.

PARTIES AND RELATED ENTITIES

**Plaintiffs and Related Entities**

7.     Plaintiff Bacardi & Company Limited ("BACO") is a Liechtenstein company having its principal place of business at 267 route de Meyrin, 1217 Meyrin, Switzerland.  BACO is the successor to Compañía Ron Bacardi S.A., a Cuban *sociedad anónima* (joint-stock company) which was headquartered in Santiago de Cuba, Republic of Cuba, until its assets in Cuba were confiscated by the Cuban government in October 1960.

8.     BACO, through its affiliates, licensees, and distributors, produces and markets distilled spirits worldwide.  BACO owns the internationally renowned name and mark BACARDI, together with the registrations of that name and mark and the related business and goodwill, on a worldwide basis.  BACO was a party to the HC Cancellation Proceeding.

9.     Jose Arechabala S.A. ("JASA") was a *sociedad anónima* organized and existing under the laws of the Republic of Cuba.  JASA's headquarters and principal place of business were in Cárdenas, Cuba, until its assets in Cuba were confiscated by the Cuban government in 1960.  Thereafter, JASA's principal place of business was in Vaduz, Principality of Liechtenstein.  JASA was the creator and the original owner of the HAVANA CLUB trademark in Cuba, the United States, and other countries, and the trademark registrations associated therewith.  JASA was owned substantially by members of the Arechabala family.  In 1997, JASA went through the process of voluntary corporate liquidation, by decision of its shareholders, who have formed a substantially mirror-image company, Jose Arechabala International Ltd., to carry on the family's business.

10.    Jose Arechabala International Ltd. ("JAI") is a joint-stock company organized and existing under the laws of the Principality of Liechtenstein, having its principal place of business in Vaduz, Liechtenstein.  JAI was formed in 1997 and is owned substantially by the same persons who were shareholders of JASA.

11.    In April 1997, JASA conveyed to JAI all right, title, and interest in and to the HAVANA CLUB trademark worldwide and certain associated assets and goodwill, including the secret family formula for the HAVANA CLUB rum (the "HAVANA CLUB Assets").  At the same time, persons comprising substantially all of the shareholders and holders of undivided equity interests in JASA conveyed to JAI any and all right, title, and interest that each of them might hold in and to the HAVANA CLUB Assets.  JAI in turn sold to BACO all right, title, and interest in and to the HAVANA CLUB Assets worldwide, including the secret family formula for the HAVANA CLUB rum.  BACO is accordingly the successor in interest to the original owners of the HAVANA CLUB trademark and the other HAVANA CLUB Assets worldwide.

12.    Galleon S.A. ("Galleon"), a wholly owned subsidiary of BACO, was a *sociedad anónima* organized and existing under the laws of the Commonwealth of the Bahamas, with its principal place of business in Nassau, Commonwealth of the Bahamas.  Galleon was also a party to the HC Cancellation Proceeding.  In 1997, Galleon merged into BACO and BACO, as the sole surviving entity, succeeded to all the assets of Galleon and assumed all of Galleon's liabilities. BACO was substituted into the federal court action styled *Havana Club Holding, S.A. et al. v. Galleon, S.A. et al.*, 96 Civ. 9644 (SAS), as the successor to Galleon in respect of the claims and counterclaims asserted therein.

13.    Plaintiff Bacardi U.S.A., Inc. ("Bacardi U.S.A.") (formerly named Bacardi-Martini U.S.A., Inc.) is a Delaware corporation having its principal place of business at 2701 S.

Le Jeune Road, Coral Gables, Florida 33134.  Bacardi U.S.A. owns all the requisite federal and

state permits to import rum and other distilled spirits into the United States and to sell such

distilled spirit products to licensed wholesalers throughout the United States wherever the sale of

distilled spirits is permitted by law.  Bacardi U.S.A. is the exclusive distributor in the continental

United States of BACARDI, CASTILLO, and HAVANA CLUB rums.  Bacardi U.S.A. was a

party to the HC Cancellation Proceeding.  Bacardi U.S.A., BACO, and Galleon will henceforth

be collectively referred to as "Bacardi."

14.     Bacardi U.S.A., under the authority of BACO's predecessor, Galleon, began use

of the HAVANA CLUB trademark for rum in interstate commerce in the United States in 1995,

including advertising, distribution, and sales of HAVANA CLUB rum.  Bacardi U.S.A. engaged

in such use after reaching an interim understanding with JASA's representatives.

15.     BACO is the owner of Application Serial No. 74/572,667 pending in the PTO for

registration of the word mark HAVANA CLUB for rum.  This application was filed on

September 12, 1994 as an intent-to-use application, and later was amended to allege use, with a

first use date as early as 1934.

**Defendants and Related Entities**

16.     Defendant Cubaexport is a Cuban state-owned foreign trade enterprise which was

established in 1965 by the Cuban Ministry of Foreign Commerce for the purpose of exporting

food and other products.  Cubaexport is a "foreign state" within the meaning of 28 U.S.C. § 1603

and a "designated Cuban national" as defined in 31 C.F.R. § 515.305.  Cubaexport's offices are

at Calle 24, n 55, edif. MINCEX, 8vo. piso, Havana, Cuba.  Cubaexport was joined as a party to

the HC Cancellation Proceeding.

17.     Pernod Ricard S.A. ("Pernod") is a *société anonyme* (joint-stock company)

organized and existing under the laws of France, with offices at 142 Boulevard Hausmann, Paris,

France.  Pernod is one of the largest companies engaged in the business of manufacturing, distribution and sale of spirits worldwide.

18.     Havana Rum & Liquors, S.A. ("HRL") is a *sociedad anónima* organized and existing under the laws of the Republic of Cuba, with offices at 305A Miramar, Havana, Cuba. HRL is wholly owned by Cuban nationals and is effectively controlled by the Cuban government.  HRL is a "foreign state" within the meaning of 28 U.S.C. § 1603 and a "designated Cuban national" as defined in 31 C.F.R. § 515.305.

19.     Defendant Havana Club Holding, S.A. ("HCH") is a *société anonyme* organized and existing under the laws of Luxembourg, with offices at 5, Rue Eugene Ruppert L2453, Luxembourg.  HCH is owned equally by Pernod and HRL and each has equal representation on HCH's Board of Directors.  HCH purports to hold title to trademark registrations for HAVANA CLUB rum in countries other than Cuba.  HCH was a party to the HC Cancellation Proceeding. HCH is a "designated Cuban national" as defined in 31 C.F.R. § 515.305.

20.     Havana Club International, S.A. ("HCI") is a mixed company organized and existing under the laws of the Republic of Cuba, controlled equally by HRL and Pernod, with its headquarters and principal place of business in Havana, Cuba.  HCI exports HAVANA CLUB rum from Cuba under an exclusive license by HCH.  HCI is a "designated Cuban national" as defined in 31 C.F.R. § 515.305.

## JURISDICTION

21.     The Court has subject matter jurisdiction under 15 U.S.C. §§ 1071(b), 1119, and 1121; 28 U.S.C. §§ 1330, 1331, 1338(a), 1605(a)(1)–(4), 2201, 2202, and principles of supplemental and pendent jurisdiction.  Venue is proper in this district under 15 U.S.C. § 1071(b) and 28 U.S.C. § 1391.

FACTS ENTITLING PLAINTIFFS TO RELIEF

**A.     JASA Creates and Uses the HAVANA CLUB Trademark**

22.     The Arechabala family business was founded by Jose Arechabala Aldama in 1878.  The business included rum distilling and other enterprises.  JASA, which was incorporated in or around 1924, carried out the family's rum business.

23.     JASA created, registered, and first used the trademark HAVANA CLUB for rum in Cuba, the United States and other countries.  On or about March 19, 1934, JASA obtained Cuban Registration No. 53,614 of the mark HAVANA CLUB for "alcohol, rum, etc."  In August 1935, JASA was issued Cuban Registrations Nos. 54,890 and 54,890-A for HAVANA CLUB Design marks.

24.     JASA produced HAVANA CLUB rum primarily for export, principally to the United States.  JASA began to use the trademark HAVANA CLUB for rum sold in commerce in the United States at least as early as 1934.  On May 14, 1935, JASA registered the words HAVANA CLUB on the Principal Register of the PTO as a trademark for "Ethyl alcohol, rum, etc." under U.S. Registration No. 324,385.  On June 16, 1936, JASA registered a label design including the words HAVANA CLUB on the Principal Register of the PTO as a trademark for "Rum, etc." under U.S. Registration No. 335,919.  The design portion of that registered mark included the words *"Fundada en 1878"* (founded in 1878), a reference to the year in which the Arechabala family business was first established in Cuba.  On August 11, 1953, JASA obtained U.S. Registration Nos. 578,679 and 578,680 on the Supplemental Register of the PTO for label design trademarks incorporating the words HAVANA CLUB.

25.     From 1934 to the end of 1959, JASA continued to export HAVANA CLUB rum for distribution and sale in the United States.  HAVANA CLUB rum sold by JASA in the United States was produced at various times both in Cuba and Puerto Rico.  Before 1959, however,

JASA had discontinued its production of rum in Puerto Rico and all HAVANA CLUB rum was produced in Cuba.

26.     The words "Havana Club" were also used by JASA as a trading style or trade name to identify that part of JASA's business dealing with the production, export, distribution, and sale of HAVANA CLUB rum to the United States and elsewhere.

**B.     The Cuban Revolutionary Government Confiscates JASA's Assets in Cuba, Including the HAVANA CLUB Mark**

27.     On January 1, 1960, troops of the Castro revolutionary government forcibly entered JASA's headquarters in Cardenas, Cuba, taking control of the whole industrial complex, including the rum distillery, other industrial facilities, equipment, offices and business records. The members of the family who ran the rum distillery and other family businesses were expelled and not allowed to remove any papers or other property from their offices.  The Deputy General Counsel and Secretary of the company was arrested and imprisoned for ten years.  All other executives and shareholders were eventually forced to leave Cuba.  The Cuban government designated an administrator to run the business to the exclusion of JASA and its owners.

28.     Under Law No. 890, dated October 13, 1960, the Cuban government purported formally to expropriate the physical assets, property, accounts, business records, and trademarks of a large number of Cuban businesses, including JASA and Compañía Ron Bacardi, S.A.  This expropriation purported to affect all of JASA's tangible and intangible assets in Cuba, which comprised substantially all of the assets owned by the company, and also the trademark rights and related registrations owned by JASA in other countries, including the HAVANA CLUB trademark rights and related registrations in the United States.

29.     Law No. 890 specified that subsequent legislation would provide compensation for owners of property expropriated by Law No. 890.  No such legislation has ever been enacted

and neither JASA nor any of its shareholders has received any compensation for any assets of JASA that were seized by the Cuban government in 1960.  The expropriation of those assets was, therefore, a confiscation.  The value of the assets of JASA confiscated by the Cuban government exceeded 25 million dollars at the time of the confiscation.

30.     On November 1, 1966, the Cuban government purported to transfer to Cubaexport the trade names and registered trademarks that had been confiscated from JASA, including the HAVANA CLUB mark and related registrations.  As a Cuban government enterprise, Cubaexport knew that all these names and marks transferred into its name had been expropriated from JASA under Law No. 890 without payment of any compensation.  Soon thereafter, Cubaexport began selling HAVANA CLUB rum made in the distillery that had been confiscated from JASA.

31.     The Cuban government transferred the physical assets seized from JASA that had been associated with the production of HAVANA CLUB to another Cuban state enterprise, Empresa de Bebidas y Licores.  In 1993, those assets were further transferred to Corporacion Cuba Ron, S.A. ("Cuba Ron"), still another enterprise owned or controlled by the Cuban government.

32.     The Cuban government deprived JASA of its assets, took away its rum and other businesses, seized its funds and corporate records (including records of JASA's trademark registrations abroad and its trademark agents), and imprisoned or intimidated JASA's senior executives and shareholders and eventually drove them into exile in various countries.  As a result, JASA was unable to continue its business in or outside Cuba or to renew or maintain its trademark registrations in the United States.  Despite this adversity, JASA and its shareholders maintained their determination to protect their rights and to resume production and sale of

HAVANA CLUB rum when it became possible, either through political change in Cuba leading to restitution of their confiscated assets or, later, through an arrangement with a suitable partner contributing financial and managerial resources to that venture.

## C.     The Cuban Asset Control Regulations

33.     In 1963, the United States imposed a total embargo of trade between the United States and Cuba under the Trading with the Enemy Act, 50 U.S.C. App. § 1 *et. seq.*  The embargo has been implemented by the Cuban Asset Control Regulations ("CACR"), 31 C.F.R. Part 515, which are administered by the Office of Foreign Assets Control ("OFAC") of the Department of the Treasury.  In 1996, Congress enacted the Cuban Liberty and Democracy Solidarity Act (the "Libertad Act"), which, among other things, codified the Cuban embargo.  28 U.S.C. § 6032(h).

34.     The CACR prohibit, *inter alia*, the importation, distribution, or sale in the United States of rum produced in Cuba.  31 C.F.R. Part 515.  This prohibition has been in effect since the inception of the CACR.

35.     Section 515.201(b)(1) of the CACR prohibits (except as specifically authorized by OFAC) all transfers by any person subject to the jurisdiction of the United States of property (or evidences of ownership of property) in which Cuba or any Cuban national (including a designated Cuban national such as Cubaexport) has had, at any time since July 8, 1963, any interest of any nature whatsoever, direct or indirect.  Section 505.201(b)(2) of the CACR prohibits (except as specifically authorized by OFAC) all transfers outside the United States involving any such property or property interests subject to the jurisdiction of the United States. Accordingly, rights in U.S. trademarks or trademark registrations in which Cuban nationals have an interest cannot be transferred under the CACR without an OFAC license.

36.     Section 515.201(c) of the CACR further prohibits "[a]ny transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions" of Section 505.201(b).  Section 515.203(a) of the CACR provides that any transfer that violates the CACR is null and void and that such transfers "shall not be the basis for the assertion or recognition of any interest in or right, remedy, power or privilege with respect to such property."

**D.      U.S. Public Policy Does Not Recognize Cuba's Confiscatory Acts in Respect of Property in the United States**

37.     As described below, Defendants have claimed certain rights based on actions by the Cuban government purporting to confiscate JASA's property, including the HAVANA CLUB trademark for rum.  Actions by a foreign government that expropriate assets without adequate compensation are repugnant to United States public policy.  Accordingly, the United States will not recognize or give effect to any such confiscatory act that purports to affect property situated in the United States (the "Non-Recognition Doctrine").

38.     On October 21, 1998, Congress passed Section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, Public Law No. 105-277, 112 Stat. 2681 (Oct. 21, 1998) ("Section 211"), codifying, in part, the Non-Recognition Doctrine. Section 211(b) provides that:

> "No U.S. court shall recognize, enforce or otherwise validate any assertion of treaty rights by a designated national or its successor-in-interest under sections 44(b) or (e) of the Trademark Act of 1946 (15 U.S.C. 1126(b) or (e)) for a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of such mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented."

39.     The term "designated national" is defined to mean "Cuba and any national thereof including any person who is a specially designated national."  *See* Section 211(d)(1) and 31 C.F.R. § 515.305. The term "specially designated national" is defined in the CACR to include,

among others, any entity that is owned or controlled by the Cuban government. *See* 31 C.F.R. § 515.306(a)(3). The term "confiscated" is defined in Section 211 to mean "expropriated by the Cuban government on or after January 1, 1959, without payment of adequate and effective compensation." *See* Section 211(d)(2) and 31 C.F.R. § 515.336.

**E.    Cubaexport's Registration of the Confiscated HAVANA CLUB Mark**

40.    After Law No. 890 was issued, the Cuban government or its successors claimed title to property owned by Cuban companies located outside Cuba, including rights to the BACARDI trademark. In a series of cases decided over several years and involving Cuban companies in exile, courts in the United States and elsewhere refused to recognize such claims, including claims to the BACARDI trademark, based on the principles underlying the Non-Recognition Doctrine.

41.    Having failed to obtain worldwide title to the BACARDI trademark, BACARDI being the most popular rum that had been produced in Cuba, the Cuban government then turned to HAVANA CLUB, the mark designating the second most popular Cuban rum. As a result of the earlier court decisions, Cubaexport and the Cuban government knew that their claims to the HAVANA CLUB mark in the United States or any other U.S. mark that Cuba had purportedly confiscated under Law No. 890 would not be recognized in the United States. Cubaexport then engaged in a multifaceted effort (a) to deceive the PTO into believing that Cubaexport had a good-faith claim to ownership of the HAVANA CLUB mark, including by concealing the fact that Cubaexport's claim derived from the Cuban government's confiscation of JASA's assets, and (b) to mislead the U.S. public into believing that Cubaexport's HAVANA CLUB rum, which Cubaexport intended eventually to sell in the United States, was the same as JASA's HAVANA CLUB rum, which had been sold in the United States for more than two decades.

42.     Aware that the United States would not recognize its rights to confiscated marks, Cubaexport waited for JASA's HAVANA CLUB Registrations to expire in order to pursue separate registrations with the intent to conceal the nature of its claimed rights.  On June 12, 1974, shortly after the Registrations expired, Cubaexport applied to the PTO, under Section 44 of the Lanham Act, 15 U.S.C. § 1126, to register a trademark consisting of a label design displaying the words HAVANA CLUB.  The application was based on a newly issued Cuban Registration No. 110,353, dated February 12, 1974.  Although Cubaexport still held Cuban HAVANA CLUB registrations that had been confiscated from JASA, Cubaexport obtained in its own name the new Cuban Registration No. 110,353 and used this new registration as the basis of its U.S. trademark application in order to further conceal from the PTO that Cubaexport's claim of title to the HAVANA CLUB mark was based on the confiscation of JASA's assets.  Contrary to Cubaexport's representations, it knew that it lacked any lawful claim to the HAVANA CLUB mark that could be recognized in the United States.  Cubaexport further knew that JASA was the true owner of rights to the HAVANA CLUB mark, and that the Cuban Government's expropriation and other attacks on the Arechabala family prevented  JASA from using the mark.

43.     In filing this application to register the HAVANA CLUB & DESIGN mark, Cubaexport consented to jurisdiction in the United States and appointed Rabinowitz, Boudin, Standard, Krinsky, & Lieberman, PC as its domestic (U.S.) representative for service of process in proceedings affecting the mark.

44.     The HAVANA CLUB & DESIGN mark that Cubaexport sought to register in the United States prominently displays the Spanish legend "*Fundada en 1878.*"  Cubaexport intentionally copied this legend from the label design that had been registered by JASA in U.S. Registration No. 335,919 in 1936.  Cubaexport was founded in 1965, not in 1878.  Cubaexport

also knew that it would not be deemed to be JASA's successor under U.S. law. The statement *"Fundada en 1878"* was intentionally used by Cubaexport to mislead the American public and the PTO into believing that Cubaexport's HAVANA CLUB rum had a family heritage dating back nearly a century and came from, or was associated with or approved by, JASA, the original producer of the HAVANA CLUB rum that they had previously purchased and enjoyed in the United States. Cubaexport also knew that the HAVANA CLUB mark that it was applying to register still symbolized an invaluable reputation and goodwill as the result of the excellent quality and sales success of JASA's HAVANA CLUB rum in the United States.

45.     When Cubaexport applied to register the HAVANA CLUB & DESIGN mark in the United States, Cubaexport was well aware that JASA had discontinued making HAVANA CLUB rum only because the Cuban government had forcibly seized and confiscated JASA's rum distillery and other assets and because JASA's directors, officers, and shareholders had been driven into exile or imprisoned.

46.     Neither Cubaexport nor the Cuban government ever possessed the secret Arechabala family formula used by JASA to produce the HAVANA CLUB rum sold in the United States and elsewhere. The Cuban government surreptitiously concocted a new formula to produce its ersatz HAVANA CLUB rum, in a manner intended to deceive purchasers of HAVANA CLUB rum into believing that they were buying the same product that JASA had made. At all relevant times, Cubaexport knew that the formula used in the HAVANA CLUB rum it sold was not the one that had been used by JASA. Therefore, Cubaexport's intended use of the HAVANA CLUB mark was designed to deceive U.S. consumers regarding the true source of the rum so marked.

47.     Cubaexport knowingly and intentionally concealed the true facts about the

HAVANA CLUB mark from the PTO, and knowingly made false material representations to the

PTO with the intent to deceive it, in order to obtain the registration.

48.     On January 27, 1976, the PTO issued U.S. Reg. No. 1,031,651 of the HAVANA

CLUB & DESIGN mark (the U.S. HAVANA CLUB Registration) to Cubaexport.

49.     Neither JASA, JAI, their shareholders, nor BACO, as JASA's bona fide successor

in interest, has ever consented to the registration or use of the trademark and trade name

HAVANA CLUB by Cubaexport, HRL, or HCH.

50.     The rights to the HAVANA CLUB & DESIGN mark and the related federal

registration are intangible property rights with a situs in the United States.  Rights in a trademark

in the United States may be acquired only by lawful use of that mark in interstate or foreign

commerce.  Such usage confers common law trademark rights.  The failure to register a mark

does not affect common law trademark rights.  Nor does lapse of a registration, in the event that

one is obtained, affect common law trademark rights.

51.     Under Section 44 and Sections 1 and 45 of the Lanham Act, 15 U.S.C. § 1051 *et

seq.*, a foreign applicant must have a good faith intent to use the mark applied for in commerce in

the United States.  When a foreign national such as Cubaexport registers a mark under Section

44 of the Lanham Act, that registrant must use the registered mark in commerce in the United

States within a reasonable period after filing an application under Section 44 of the Lanham Act.

52.     Cubaexport has never sold rum in the United States under the HAVANA CLUB

& DESIGN mark.  Cubaexport has claimed that its failure to use the trademark is excused by the

Cuban embargo under the excusable-non-use doctrine codified in Section 8(b)(2) of the Lanham

Act, 15 U.S.C. § 1058(b)(2).  Because of its familiarity with the excusable-non-use doctrine,

Cubaexport knew that JASA's non-use of the HAVANA CLUB mark after 1960 has been excused by the Cuban government's seizure of JASA's property and destruction of JASA's organization and management structure.

53.     To maintain its trademark registration, Cubaexport was required to file, between the fifth and sixth years after its HAVANA CLUB & DESIGN mark was registered, an affidavit averring ownership and continued use of the mark.  On or about January 12, 1982, such an affidavit was filed by Cubaexport in the PTO in respect of the U.S. HAVANA CLUB Registration.  This declaration, ostensibly signed by Fausto Alfonso Man, averred that Cubaexport was the owner of said mark and registration, despite knowing that this was untrue, and invoked the embargo and the excusable-non-use doctrine to satisfy the use requirement of Section 8.

54.     For the same reasons set forth above, Cubaexport knew in January 1982 that Cubaexport was not the lawful owner of the HAVANA CLUB & DESIGN mark in the United States and that the United States would not recognize it as such, and, therefore intentionally and knowingly continued to conceal and misrepresent to the PTO the pertinent facts that would have undermined its claims, in order to deceive the PTO and maintain its registration.

**F.     The Joint Venture Between the Cuban Government and Pernod**

55.     In the early 1990s, the Cuban government sought to obtain hard currency by enticing private foreign investments in Cuba.  One prospective partner was Pernod.  In November 1993, Pernod and the Cuban government entered into a joint-venture arrangement to exploit the HAVANA CLUB trademark worldwide.  Pernod knew, prior to concluding this joint-venture with the Cuban government, that the HAVANA CLUB mark, along with the related rum-producing assets, had been confiscated from JASA by the Cuban government.

56.     In anticipation of the transaction with Pernod, the Cuban government caused Cubaexport to transfer all its rights to the HAVANA CLUB trademark outside Cuba and associated assets to HRL, a company controlled by the Cuban government.  Luis Perdomo, a senior Cuban rum industry executive, was named President of HRL, and Vidal Manuel Prieto Espina, who had previously served as managing director of Cubaexport, was made a managing director of HRL.  Other officers were transferred from Cubaexport to HRL.  Accordingly, on October 29, 1993, Cubaexport transferred to HRL its entire business connected with the HAVANA CLUB rum, including the goodwill associated with that business worldwide, and the right to export HAVANA CLUB rum to all territories in the world.  As part of this transfer of the HAVANA CLUB rum business, Cubaexport assigned to HRL its worldwide rights to the HAVANA CLUB trademark, including the rights to the U.S. HAVANA CLUB Registration, together with the goodwill of the business symbolized by that mark.  With this transfer of all its rum assets, Cubaexport left the rum business.

57.     The joint-venture arrangement was implemented in an agreement called *Convenio Asociativo* (Association Agreement) (the "Convenio") dated November 23, 1993, between Pernod and HRL.  The object of the joint-venture was to advertise, distribute, and sell HAVANA CLUB rum worldwide. The parties agreed to create a Luxembourg entity, HCH, owned in equal parts by Pernod and HRL, which was to hold title to registrations of the HAVANA CLUB trademark.  HCH was to be managed by a board of directors in which Pernod and HRL would be equally represented.  Luis Perdomo was appointed Vice President of HCH and one of two Cuban directors on HCH's four-person board.  HCI was established to handle the export of HAVANA CLUB rum from Cuba.

58.     At the closing of the transaction, Pernod paid to HRL a fixed sum (the amount of which has not been publicly disclosed, but which is believed to be many millions of dollars) and agreed to a continuing royalty arrangement.  In exchange, HRL transferred to HCH all of HRL's rights in the HAVANA CLUB trademark for rum outside Cuba, together with the goodwill of the business.  HCI appointed Pernod as the exclusive distributor of HAVANA CLUB rums outside Cuba.

59.     In aid of the joint venture arrangements, Cuba Ron, a state-owned company, was organized in 1993 to distill rum in Cuba.  Since 1993, Cuba Ron has supplied to HCI the rum sold under the HAVANA CLUB mark.  Cuba Control, S.A., another Cuban entity, has been charged with overseeing and controlling the quality of that HAVANA CLUB rum.

60.     By written assignment dated January 10, 1994, Cubaexport purportedly confirmed the prior transfer to HRL of the rights to the U.S. HAVANA CLUB trademark and the U.S. HAVANA CLUB Registration, along with the goodwill of that business.  The assignment was executed by Milda Picos River, who was identified as Manager of Cubaexport.  This purported assignment was recorded in the PTO at Reel 1104, Frame 047 on February 10, 1994. Cubaexport neither applied for nor obtained approval from OFAC for this transfer at that time. Accordingly, the transfer was in violation of the CACR and hence null and void.

61.     Cubaexport, HRL, HCH, and Pernod understood and intended that the November 1993 transfer by HRL to HCH of the worldwide rights to the HAVANA CLUB trademark included such rights in respect of the U.S. HAVANA CLUB trademark and the related federal registration, together with the related goodwill of the business and the exclusive right to distribute HAVANA CLUB rum in the United States.

62.     Cubaexport, HRL, and HCH knew at the time that the CACR prohibited all transfers of U.S.-based intellectual property rights owned by Cuban nationals without the specific prior approval of OFAC.  Such approval could be obtained only through an application to OFAC for a specific license in which the particulars of the transfer were fully and truthfully disclosed.  Further, as OFAC had never granted a license for a transfer and sale which resulted in a substantial monetary payment to the Cuban government, Cubaexport, HRL, and HCH knew in late 1993 or early 1994 that OFAC would not approve an assignment of the U.S. rights to the HAVANA CLUB trademark and the related federal registration from HRL to HCH if full information were disclosed.

63.     In 1993, Pernod caused its Spanish counsel to contact members of the Arechabala family in Spain in an effort to buy their worldwide rights to the HAVANA CLUB trademark. The Arechabalas broke off the talks when it became apparent that Pernod was not prepared to pay a fair price for the mark.  In the course of the discussions, Pernod was advised by the Arechabala family representatives that JASA's prior rights to the HAVANA CLUB mark would be enforced.

64.     The Cuban government, Cubaexport, HRL, and Pernod knew, at the time the Convenio was being concluded, that JASA had discontinued use of the HAVANA CLUB mark only under compulsion and that, rather than abandoning that mark, the Arechabalas were attempting to resume production and sale of HAVANA CLUB rum.  Accordingly, the relationship between the Cuban government, Cubaexport, HRL, and HCH was structured in an attempt to hide that the transfers violated U.S. statutes and regulations and that the chain of title for the HAVANA CLUB mark traced back to JASA.

65.     To this end, Cubaexport, HRL, and HCH took actions that were intended to conceal from OFAC the November 1993 transfer to HCH of the U.S. HAVANA CLUB & DESIGN trademark and related federal registration pursuant to the Convenio, a transfer which was in violation of the CACR.  Their plan called for placing record title to the HAVANA CLUB mark in the United States in HCH's name without revealing the transfer under the Convenio to the PTO or OFAC.  HCH was to apply for a new registration of the HAVANA CLUB trademark in the United States under Section 44 of the Lanham Act, on the basis of a Luxembourg registration that HCH had acquired under the Convenio.  Once HCH's new U.S. registration of the HAVANA CLUB trademark was ready to issue, the U.S. HAVANA CLUB Registration would be renounced or allowed to expire.  Under this scheme, the Defendants would not reveal to OFAC or the PTO the prior November 23, 1993 assignment of the mark to HCH, or the consideration paid to HRL by Pernod.

66.     In furtherance of this scheme, Cubaexport, HRL, and HCH originally chose not to memorialize in a separate U.S. assignment document the purported transfer of the U.S. HAVANA CLUB Registration from HRL to HCH.  On May 15, 1995, HCH did apply for a new U.S. registration of the HAVANA CLUB mark, under Section 44 of the Lanham Act, based on its Luxembourg registration.  But the plan to keep the Convenio transfers secret went awry, as described below, when a cancellation proceeding brought by Jose Maria Arechabala Rodrigo against Cubaexport in the PTO in May 1994 eventually forced Cubaexport to disclose the prior transfers to HRL and HCH.

## G.     Protests by the Arechabala Family

67.     After general information about the Pernod/Cuban joint venture to market HAVANA CLUB rum appeared in the trade press, Ramon Arechabala, individually and on behalf of the other shareholders of JASA, sent a letter to Pernod's Chairman, Patrick Ricard, in

December 1993.  The letter stated, *inter alia*, that the HAVANA CLUB mark belonged to the Arechabala family and had been unlawfully seized without payment of compensation, that Pernod's attempt to acquire rights in the trademark HAVANA CLUB without the consent of JASA and its shareholders would be ineffective, and that JASA and its shareholders were prepared to bring legal claims to vindicate their rights.  In addition, Juan Prado, a senior Bacardi executive, wrote to Mr. Thierry Jacquillat, a senior Pernod executive, in December 1993 to warn Pernod that the rightful owner of the HAVANA CLUB trademark was the Arechabala family.

**H.    The Collapse of the Scheme to Conceal the Transfer from OFAC**

68.    On May 3, 1994, Jose Maria Arechabala Rodrigo filed a cancellation petition against Cubaexport in the PTO, seeking to cancel the U.S. HAVANA CLUB Registration on the ground of abandonment (the "Arechabala Cancellation Proceeding").

69.    As HCH had not yet obtained a new U.S. registration of the HAVANA CLUB mark, the Arechabala Cancellation Proceeding forced HCH publicly to claim ownership of the U.S. HAVANA CLUB Registration as a result of the November 23, 1993 assignment.  HRL and HCH then executed a separate U.S. assignment deed on June 24, 1994, which purported to confirm the prior November 23 transfer from HRL to HCH of the U.S. rights to the HAVANA CLUB & DESIGN mark and the related federal registration, along with the goodwill of that business.  This purported assignment was then recorded in the PTO at Reel 1219, Frame 0428 on September 13, 1994.  This transfer was in violation of the CACR and hence null and void.

70.    After having the assignment to HCH recorded in the PTO, HCH and HRL were substituted for Cubaexport as respondents in the Arechabala Cancellation Proceeding.  HCH and HRL then challenged Mr. Arechabala's standing to contest HCH's U.S. HAVANA CLUB Registration, arguing that HAVANA CLUB rum could not be made outside Cuba because of the alleged geographic significance of the mark.  This contention was made notwithstanding that, at

the very same time, HRL (with the knowledge of HCH and Cubaexport) was having HAVANA

CLUB rum made in Panama with Panamanian rum.  In fact, one out of every five bottles of the

"seven-year" HAVANA CLUB rum produced for sale by HRL in 1994 and 1995 contained

Panamanian rum.  Declarations were filed in the PTO cancellation proceeding making the

knowingly false statements that HCH's HAVANA CLUB rum was exclusively made in Cuba of

Cuban ingredients.

71.     The Arechabala Cancellation Proceeding was ultimately dismissed by the TTAB

on the ground that the non-use of the HAVANA CLUB mark by HRL and HCH did not

constitute abandonment because the Cuban embargo barred these entities from using the mark in

the United States.

**I.     Bacardi's Acquisition of the HAVANA CLUB Mark**

72.     Bacardi had been interested in acquiring JASA's rights to the HAVANA CLUB

mark since the 1970's and renewed that pursuit in 1993.  Bacardi knew that the HAVANA

CLUB mark had been purportedly confiscated from JASA under the same Law No. 890 that

purported to confiscate the BACARDI name and mark, as well as the assets of Compañía Ron

Bacardi S.A.

73.     After an agreement-in-principle between Bacardi and the Arechabala family had

been reached in 1995, the Arechabalas undertook to reactivate JASA and to obtain the requisite

corporate and shareholder approvals for the transaction.  As a consequence of this process, the

JASA shareholders decided to create JAI substantially as a mirror image of JASA, in order to

operate in the future through a more flexible and modern corporate structure established outside

Cuba.  The JASA shareholders then initiated the process of liquidating the company.

74.     In April 1997, JASA, the JASA shareholders, JAI, and BACO reached final

agreements regarding the HAVANA CLUB trademark.  First, JASA transferred to JAI all of its

right, title, and interest in and to the HAVANA CLUB trademark worldwide, the related

goodwill of the business, and certain other related assets such as JASA's secret formula for the

manufacture of HAVANA CLUB rum.  Simultaneously, substantially all of JASA's shareholders

transferred to JAI any and all right, title, and interest that they might hold in the HAVANA

CLUB trademark worldwide, and the related assets transferred from JASA to JAI.  Second, JAI

transferred to BACO all right, title, and interest in and to the HAVANA CLUB trademark

worldwide and such other related assets that JAI had acquired from JASA.

75.    Under the 1997 agreements, BACO is the owner of all title, right, and interest in

and to the mark HAVANA CLUB in the United States, Cuba, and elsewhere that previously

were owned by JASA and its shareholders.

**J.      Bacardi's Sale of HAVANA CLUB Rum in the United States**

76.    In 1995, under the interim understanding with the Arechabalas, Bacardi U.S.A.

imported into the United States rum produced in the Bahamas under the authority of Galleon,

and sold that rum under the HAVANA CLUB trademark in interstate commerce in the United

States.

77.    On July 14, 1995, Bacardi U.S.A. obtained Bureau of Alcohol, Tobacco, Firearms

and Explosives ("BATF") approval for the original labels used on HAVANA CLUB rum.  The

first sales by Bacardi of HAVANA CLUB rum in the United States took place in 1995.  Bacardi

shipped HAVANA CLUB "Light" and HAVANA CLUB "Gold" rum to distributors in New

York, Illinois, California, and Florida.  Those distributors sold the HAVANA CLUB rum to

retailers which, in turn, sold HAVANA CLUB rum to consumers.  During 1996, Bacardi

expanded the sale of HAVANA CLUB rum to licensed wholesalers in other selected markets

across the United States.

**K.      The Southern District of New York HAVANA CLUB Litigation**

78.      On September 12, 1994, Galleon filed an "intent-to-use" application to register the word mark HAVANA CLUB for rum on the Principal Register of the PTO.

79.      In July 1995, Galleon and Bacardi U.S.A. initiated the HC Cancellation Proceeding before the TTAB, seeking cancellation of the U.S. HAVANA CLUB Registration, record title to which was at that time in the name of HCH.  Galleon contended, *inter alia*, that the recorded assignments of the HAVANA CLUB & DESIGN mark and the related federal registration, first from Cubaexport to HRL, and then from HRL to HCH, violated the CACR and that such void transfers, under the language of the CACR, could not serve as "the basis for the assertion or the recognition of any interest in, or right, remedy, power or privilege with respect to such [Registration]."  Cancellation was also sought on the ground that the U.S. HAVANA CLUB Registration was fraudulently obtained, maintained, and renewed, that the registered mark was abandoned, and that the intended use of the registered mark misrepresented the source of the goods.

80.      On October 5, 1995, Cubaexport, HRL, and HCH belatedly applied for a retroactive OFAC license that would authorize the two successive assignments of the HAVANA CLUB trademark.  The application filed with OFAC contained the knowing misstatements that (a) the "aforesaid assignments were part of the reorganization of the Cuban rum and liquors industry" and (b) "each of the assignors and assignees are nationals of Cuba."  The application thus knowingly and intentionally concealed the fact that the HAVANA CLUB mark had been sold to a Luxembourg company, HCH, which was 50% owned by Pernod, a French company, and that neither of these companies were part of the Cuban rum "industry."

81.      On November 13, 1995, OFAC granted License No. C-18147 retroactively for the assignments of the HAVANA CLUB & DESIGN mark and the related federal registration, but

that license was explicitly subject to the conditions that "this license is granted upon the statements and representations made in your application" and "if this license was issued as a result of a willful misrepresentation on the part of the applicant or his duly authorized agent, it may . . . be declared void from the date of its issuance."

82.     The U.S. HAVANA CLUB Registration had to be renewed by early 1996 by its owner or that registration would automatically expire.  On January 18, 1996, HCH filed an application for renewal with a declaration signed by Luis Perdomo, Vice Chairman (the "Renewal Declaration").  The Renewal Declaration did not correct any of the misstatements and omissions that had been made in the previous submissions to the PTO, and the declaration asserted HCH's ownership of the U.S. HAVANA CLUB Registration, explicitly referencing the PTO records showing the assignments to HCH.  On January 27, 1996, the PTO issued a Certificate of Renewal for the U.S. HAVANA CLUB Registration in the name of HCH pursuant to Section 9 of the Lanham Act.

83.     In December 1996, HCH and HCI brought an action in the U.S. District Court for the Southern District of New York styled *Havana Club Holding, S.A. et al. v. Galleon S.A. et al.*, 96 Civ. 9655 (SAS), for infringement of the federally registered HAVANA CLUB & DESIGN trademark, false designations of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and unfair competition.  Bacardi counterclaimed for cancellation of HCH's U.S. HAVANA CLUB Registration on several grounds, including abandonment, fraud, and violation of the CACR.

84.     On March 17, 1997, the HC Cancellation Proceeding was stayed pending disposition of the federal court action, which involved some of the same issues.

85.     On April 17, 1997, OFAC issued a Notice of Revocation of Cubaexport's License

No. C-18147 concerning the assignments of the HAVANA CLUB trademark and the related

federal registration, based on "facts and circumstances that have come to the attention of this

Office that were not included in the application of October 5, 1995."  OFAC, therefore, directed

that "License No. C-18147 issued to Cubaexport on November 13, 1995 is hereby revoked

retroactive to the date of issuance," which was November 13, 1995.

86.     On August 8, 1997, the United States District Court for the Southern District of

New York dismissed HCH's federal trademark infringement claim against Bacardi on the ground

that HCH had never acquired any interest in the HAVANA CLUB & DESIGN registration that

could be infringed, because the purported transfers from Cubaexport were null and void under

the CACR.  *Havana Club Holding, S.A. v. Galleon S.A.*, 974 F. Supp 302 (S.D.N.Y. 1997).

87.     On October 20, 1997, the court entered a Partial Judgment (the "Judgment")

implementing the August 8 decision.  That Judgment ruled that ". . . [HCH] and [HCI] have no

rights to the registered trademark HAVANA CLUB for 'rum' in the United States."  (Judgment

¶ 7).  The Judgment also held:

> "Neither [HRL], [HCH], nor its licensee, [HCI] ever obtained any rights to the
> HAVANA CLUB mark in the United States by transfer." (Judgment ¶ 6)

> "Any rights that [HCH] may have had, may have, or claims to have had in the
> Registration of the HAVANA CLUB trademark (U.S. Reg. No. 1,031,651) from
> forever until today are hereby canceled." (Judgment ¶ 8)

88.     The District Court declined to decide whether Cubaexport had any rights in the

U.S. HAVANA CLUB & DESIGN Registration, because Cubaexport was not a party to the

action and had refused to join as a party.  The Court held:

> "Those provisions of the original transfer agreement relating to transfers of the
> U.S. Rights to the HAVANA CLUB mark and the related U.S. Registration were
> rendered null and void by the CACR, § 515.201(b)(1), and the attempted

assignment of said HAVANA CLUB mark and the related U.S. Registration were invalid and of no force and effect and *void ab initio*." (Judgment ¶ 4)

"As a result, the status quo ante as of the October 29, 1993 date of said abortive original transfer agreement is restored, and Cubaexport retained whatever rights it had in said mark and the related U.S. Registration as of said date, notwithstanding the invalid transfers." (Judgment ¶ 5)

The court added:

"Nothing herein shall prevent Cubaexport, if it so chooses, from asserting or seeking to enforce rights in the trademark HAVANA CLUB rum in the United States and nothing herein shall prevent the defendants or others from contesting those rights or contending that said rights were lost as a result of acts or omissions by Cubaexport." (Judgment ¶ 10)

89.     After a bench trial, the District Court held, among other things, that Section 211 barred HCH from asserting rights in the "Havana Club" trade name, because that name was substantially similar to the HAVANA CLUB mark that was previously used by JASA in association with the business seized by Cuba without payment of compensation and because HCH had not obtained Bacardi's consent to that use as the successor to JASA.

90.     On February 4, 2000, the United States Court of Appeals for the Second Circuit unanimously upheld the trial court's decision.  *See* 203 F.3d 116 (2d Cir. 2000).  The Second Circuit's mandate became final on February 25, 2000, and HCH's petition for a writ of *certiorari* was denied on October 2, 2000.  Under Section 37 of the Lanham Act, 15 U.S.C. § 1119, certified copies of the decisions of the District Court, the Second Circuit, and the U.S. Supreme Court were filed with the PTO.

91.     Instead of implementing the Judgment pursuant to 15 U.S.C. § 1119, the PTO issued an Order to Show Cause on October 26, 2001, giving the parties 14 days to demonstrate why the Director of the PTO should not rectify the PTO's records to reflect the District Court's order invalidating the recorded assignments of the entire interest and goodwill in the U.S. HAVANA CLUB & DESIGN mark and the related federal registration from Cubaexport to HRL

and from HRL to HRH.  The Order to Show Cause omitted any reference to Paragraph 8 of the

Judgment, which cancelled any right or claim that HCH may ever have had, may have, or claims

to have had in the U.S. HAVANA CLUB Registration, and also omitted reference to Paragraph

4, which ruled that Cubaexport's transfers were void *ab initio*.

   92. A Notice of Recordal of an Assignment Document was put in the PTO record,

together with a related Order signed by Lynne Beresford directing the PTO's Assignment

Division to record an assignment of the U.S. HAVANA CLUB Registration to Cubaexport.  The

conveying party was identified as the U.S. District Court for the Southern District of New York

and the conveyance was by court order dated October 20, 1997.  This assignment document did

not restore the *status quo ante* as of the date of the abortive transfer, which was November 23,

1993.

   93. On January 15, 2002, the PTO issued a notice pursuant to 15 U.S.C. § 1119

stating that, having considered the initial submissions and replies from each party, the PTO's

registration records would be rectified to conform with the assignment records.

**L. The Interim Agreement**

   94. In a contract dated March 19, 2002, and purported to be made retroactive to

October 4, 2000, Cubaexport, HRL, HCH, HCI, Cuba Ron, and Pernod agreed to amend the

Convenio and all related agreements so that the HAVANA CLUB & DESIGN mark, the assets

associated with the U.S. HAVANA CLUB rum business and certain other related rights

conditionally reverted back to Cubaexport (the "Interim Agreement").  The parties further agreed

that if (a) they were able to obtain an OFAC license authorizing the transfer of the mark to HCH

or HRL, or (b) the PTO determined that Cubaexport did not own the HAVANA CLUB &

DESIGN mark, or (c) "[a]ny other event [ ] makes possible the realization of the initial intent of

the parties" to transfer the mark to HCH as expressed in the Convenio, then the mark and related

rights would again return to HCH.  Several provisions of the Interim Agreement purport to transfer property rights that are subject to the CACR without OFAC approval and are thus void *ab initio*.

**M.    The TTAB Cancellation Proceeding**

95.    On March 15, 2002, BACO, as successor to Galleon, and Bacardi U.S.A. filed a motion in the HC Cancellation Proceeding to resume the proceeding (which had been stayed during the court action), to substitute parties, and for summary judgment.  On January 21, 2003, the TTAB resumed proceedings, set a briefing schedule, and joined Cubaexport as a defendant along with HCH.

96.    The basis for Bacardi's summary judgment motion was that the U.S. HAVANA CLUB Registration had expired pursuant to 15 U.S.C. § 1059 and Rule 2.183 of the Trademark Rules of Practice, 37 C.F.R. §§ 2.181–2.184 (1995), because Cubaexport had failed to file the mandatory renewal application and declaration.  A Renewal Declaration had been filed by HCH, but the October 20, 1997 Judgment held that any rights that HCH may have had, may have, or claims to have had in the U.S. HAVANA CLUB Registration "from forever until today are canceled" (Judgment ¶ 8) and further held that the attempted assignments of that mark and the related federal registration "were invalid and of no force and effect and void *ab initio*." (Judgment ¶ 114).  As the Renewal Declaration had not been filed by the owner of the registration, the registration had not been validly renewed and had to be stricken from the Principal Register of the PTO.

97.    In a decision mailed on January 29, 2004 (the TTAB Decision), the TTAB denied Bacardi's motion for summary judgment.  The TTAB Decision was in error, as will be demonstrated in this proceeding.  Among other errors, the TTAB mistakenly concluded that, because HCH's Renewal Declaration had presented a complete application that met the formal

requirements for renewal, Cubaexport itself could have filed a renewal application and declaration that would have satisfied those same requirements.  By 1996, however, Cubaexport had left the rum business and could not truthfully aver that, but for the Cuban embargo, it was ready and able to export HAVANA CLUB rum to the United States.

98.     The TTAB agreed with Bacardi that "[a] proper renewal application must be executed and filed by the owner of a registration" (TTAB Decision p. 36) and stated, citing 15 U.S.C. § 1127, that the term "registrant" includes "both the original registrant [Cubaexport] and a person who has acquired ownership through *proper transfer* of title." (TTAB Decision p. 36 n. 23) (emphasis added).  Therefore, the TTAB concluded, "continuity of title from the registrant to the present owner must be shown." (TTAB Decision p. 36).

99.     The TTAB stated that "well before the nine-month renewal period commenced [on July 27, 1995] it appeared that Cubaexport was no longer the owner of the registration." (TTAB Decision p. 37).  This statement disregarded the Judgment, which held that the transfers were void *ab initio* and that the *status quo ante* as of November 23, 1993 was restored. Cubaexport, not HCH, was then the putative owner of the U.S. HAVANA CLUB Registration as of November 23, 1993, and through April 27, 1996, the statutory deadline for filing a valid renewal application and declaration.

100.    The TTAB also stated that "[a]ccording to HCH and Cubaexport, all of the parties concerned considered HCH as the owner of the registration." (TTAB Decision p. 37).  This statement ignored that the U.S. policy expressed in the CACR was also implicated and that HCH and Cubaexport had created their own predicament by knowingly and intentionally violating the CACR.  The Judgment held, among other things, that HCH never "obtained any rights in the HAVANA CLUB mark in the United States by transfer" (Judgment ¶ 6).  Therefore, Cubaexport

was the only party that the TTAB could deem to be the putative "owner" of that registration consistent with the Judgment.

101.    The TTAB then observed that:

"[T]here is no opportunity now for Cubaexport to file a new, substitute or amended renewal application.  The statutory renewal period has long passed, and neither we, nor the parties, may extend or reopen that period." (TTAB Decision p. 38)

But the TTAB went on to conclude, contrary to Section 211 and the Judgment, that HCH had complied with the PTO Renewal Rules when it filed its renewal application in its own name, that it had filed a proper renewal application, that the PTO had acted properly in accepting the renewal application and renewing the application in HCH's name, and that the resulting renewal application was valid.

102.    The TTAB never ruled on Section 211.  The only rationale the TTAB offered for ignoring the nullification of the transfers ordered by the Judgment is that, to avoid confusion and administrative burden on the PTO, the TTAB "must focus on circumstances when the renewal applicant filed its application, not on the circumstances which existed years later." (TTAB Decision p. 38)  This was legal error.  The Judgment conclusively established that HCH never had any claim whatsoever to legal or equitable title to the U.S. HAVANA CLUB Registration, so the TTAB was bound to treat HCH's renewal filing as a nullity.

103.    The TTAB Decision went on to consider whether any of the other claims in Bacardi's 1996 Supplemental and Amended Petition were ones on which the TTAB could grant relief.  The TTAB dismissed Bacardi's claim of fraud in obtaining the registration on the ground that Bacardi did not allege that JASA had used the HAVANA CLUB mark in the United States in 1974 when Cubaexport filed its trademark application.  Similarly, in dismissing Bacardi's claim of fraud in maintaining the registration, the TTAB found that Cubaexport could not have

knowingly made a misrepresentation concerning ownership of the mark in its Section 8 affidavit, since no allegation of JASA's use of the mark in the United States in 1974 was made.  In 1974, however, as the Cuban government and Cubaexport knew full well, JASA was not able to use the mark in the United States because its assets had been confiscated by the Cuban government and because, as a Cuban entity, it was barred by the Cuban embargo from selling rum in the United States.

104.    The TTAB further held that, since OFAC had not explained the reasons for revoking the transfer license, the allegation that Cubaexport and HCH had willfully violated the CACR and that HCH had knowingly filed a false Renewal Declaration failed to state a claim for fraudulent renewal.  This confused the rules for pleading fraud with proof of a fraud allegation. The TTAB declined to determine whether there was a fraudulent transfer of the mark under the CACR on the ground that the TTAB "has little or no experience in determining violation of statutes or regulations that do not directly concern registrations of trademarks." (TTAB Decision p. 51).

105.    The TTAB rejected the abandonment claims on the ground that the assignment-in-gross rule does not apply to this case because Cubaexport, HRL, and HCH never had business assets in the United States that could be separated from the trademark.

106.    Finally, the TTAB refused to consider whether the HAVANA CLUB & DESIGN mark was being used to misrepresent the source of the goods because this "claim is premised on the assumption that Cubaexport is not the true and legitimate owner of the HAVANA CLUB mark, which can only be regarded as a political question based on the premise that the Cuban government is not legitimate." (TTAB Decision p. 55).  The TTAB added that it did not have the authority to answer this question.  The TTAB did not rule on the applicability of the Non-

Recognition Doctrine or the other bases, including Section 211, for concluding that Cubaexport

was not the true owner of the U.S. HAVANA CLUB Registration.

**N.      Expiration of the U.S. HAVANA CLUB Registration in 2006**

107.    The U.S. HAVANA CLUB Registration, which had been maintained on the

PTO's Principal Register despite having expired in 1996, was set to lapse again in July 27, 2006.

108.    On or about January 26, 2005, Cubaexport's litigation counsel at the time, Ropes

& Gray LLP, applied to OFAC for a specific license authorizing Ropes & Gray to receive fees

and expenses in connection with its representation of Cubaexport and HCH in litigation.  The

only legal proceeding described in the January 26, 2005 application was a "complaint []

currently pending in the U.S. District Court for the District of Columbia against our clients

Cubaexport and Havana Club Holdings S.A."  OFAC granted this specific license – License No.

CU-74488 – to Ropes & Gray on March 4, 2005, "based on the statements and representations

made" in the application.

109.    On December 13, 2005, Cubaexport, through its outside counsel, improperly

attempted to renew the U.S. HAVANA CLUB Registration by filing the combined §§ 8/9

affidavit and submitting an unauthorized renewal fee from Ropes & Gray's account.  In this

application, Cubaexport represented that its non-use of the mark was "due solely to" the

embargo, and that it "intends that the mark be used in commerce after the embargo is lifted."

These statements were knowingly and willfully false with the intent to deceive and mislead the

PTO, because Cubaexport knew that it had left the rum business in 1993, but omitted this fact in

its application.

110.    Cubaexport, through its outside counsel, represented to the Commissioner of

Trademarks that payment of the filing fee was being made pursuant to License No. CU-74488

"in order to maintain the status quo by maintaining Registration No. 1,031,651 until a decision

regarding cancellation of the registration can be rendered" in the present action.  Cubaexport's attempt to renew the registration was in direct violation of existing laws and regulations. Cubexport and its counsel knew that renewal of the U.S. HAVANA CLUB Registration was not specifically authorized by OFAC.

111.    On or about April 6, 2006, OFAC informed Cubaexport's counsel and the PTO that License No. CU-74488 "does not authorize Ropes & Gray LLP to pay a filing fee" to the PTO for renewal of the U.S. HAVANA CLUB Registration.  On April 7, 2006, Ropes & Gray wrote to OFAC to request a specific license to incur and receive payment for the expense of renewing the registration.

112.    On or about June 14, 2006, Cubaexport wrote to the PTO again, urging the PTO to renew the registration despite the absence of a specific license from OFAC to pay the required fees.

113.    On July 20, 2006, the Post Registration Examiner issued an Office Action ("July 2006 Office Action") rejecting the renewal application, submitted on December 14, 2005, because the "required fee for the combined fee has not been paid."  The July 2006 Office Action gave Cubaexport 6 months to submit the required fees.  It instructed Cubaexport to inform the PTO during that time whether OFAC granted or denied the license, and noted that if OFAC denied the license, "the registration will be deemed cancelled/expired."

114.    On July 28, 2006, OFAC denied Cubaexport's April 7, 2006 request for a specific license to pay the registration renewal fee, explaining that it received guidance from the State Department that issuing the license would be "inconsistent with U.S. policy."

115.    Thus, on August 3, 2006, the Post Registration Examiner issued the Office Action ("August 2006 Office Action") finding that Cubaexport's renewal filing "cannot be accepted," and "the registration will be cancelled/expired."

116.    On October 4, 2006, Cubaexport petitioned the Director of the PTO to review the Post Registration Examiner's decision.  In its petition to the PTO Director, Cubaexport averred that the August 2006 Office Action should be reversed because it was not "correct" or otherwise amounted to "clear error or abuse of discretion."

117.    Just a week before filing its petition to the Director, Cubaexport commenced a tactical suit against OFAC in an effort to suspend a final decision by the PTO Director on its renewal application.  *See Empresa Cubana Exporiadora de Alimentos y Productos Varios ("Cubaexport") v. U.S. Dep't of Treasury, et. al.*, Case No. 06-cv-1692 (D.D.C.) (the "OFAC Action").  Cubaexport succeeded in delaying review of its petition to the PTO Director.  The Deputy Commissioner for Trademark Examination Policy of the PTO suspended action on the petition pending disposition of the OFAC Action.  The district court in the OFAC Action dismissed Cubaexport's claims on March 30, 2009.  Cubaexport convinced the PTO to continue to suspend a review of its petition pending appeal of the OFAC Action, but on March 29, 2011, the United States Court of Appeals for the District of Columbia Circuit upheld the dismissal of Cubaexport's claims.  By May 2012, Cubaexport exhausted all appeals when the United States Supreme Court denied its petition for a writ of certiorari.  *Empresa Cubana Exportadora De Alimentos Y Productos Varios v. Dep't of Treasury*, 606 F. Supp. 2d 59 (D.D.C. 2009), *aff'd*, 638 F.3d 794 (D.C. Cir. 2011), *cert. denied*, 132 S. Ct. 2377 (May 14, 2012).

118.    On June 8, 2012, rather than simply reporting that it had exhausted all appeals and lost against OFAC, Cubaexport, through its counsel, advanced the frivolous contention that the

PTO would somehow be in violation of the embargo if it reflected the expiration of the U.S.

HAVANA CLUB Registration on the Register.  By Cubaexport's faulty logic, "Cubaexport's

registration remains frozen in its previously existing state – neither renewed nor canceled nor

expired – for the duration of the U.S. embargo of Cuba in the absence of an applicable general or

specific license from OFAC."

119.    On July 11, 2012, Cubaexport wrote to OFAC advising that the PTO was

considering the status of the HAVANA CLUB registration and reiterating its position that the

PTO could not take action without an OFAC license.  Cubaexport requested a meeting to discuss

the matter.  On August 31, 2012, in preparation for that meeting, OFAC asked the PTO to

provide information regarding the cancellation of Cubaexport's registration, "including an

explanation of any applicable statutory requirements, rules and procedures."  On September 27,

2012, the PTO responded by communicating a detailed policy memo regarding the statutory

rules and requirements that the PTO was obligated to follow.  In the memo, the PTO wrote:

> … Renewal requires "payment of the prescribed fee" for each
> class of goods and services and the timely "filing of a verified
> application:" signed by the registrant or the registrant's
> representative….
>
> If the renewal application is not filed within the time periods set by
> statute, or if it is timely filed but unacceptable because it does not
> meet the statutory requirements, *see* 15 U.S.C. § 1059(a), the
> registration "expires" as of the end of its term.  37 C.F.R. §§
> 2.182–2.186.
>
> * * *
>
> The statutory requirements of maintenance and renewal, however,
> are distinct, as are the consequences of an untimely or
> unacceptable filing.  As noted above, if the requirements of § 8 are
> not met, the Director is required by that provision to cancel the
> registration as of the end of its term.  If the requirements of § 9 are
> not met, the registration expires as of the end of its term.
>
> * * *

> The Director has no discretion to waive the requirements of §§ 8
> and 9.  Thus, if a § 8 affidavit, § 9 renewal, or combined § 8/9
> filing is not accompanied by the prescribed fees, the Director has
> no discretion but to issue a refusal stating that the registration will
> be canceled and/or has expired.

120.    On November 30, 2012, OFAC responded to the PTO's request for information and guidance and stated that "no license is required under the CACR for the USPTO actions at issue."  It explained that if a renewal application "does not meet the statutory requirements, the registration expires as of the end of its term."  The PTO's "ministerial record-keeping function" of updating its records "does not alter the registration's legal status," which "changes because the term of the registration ends without the owner meeting the statutory requirements for renewal."

121.    Despite OFAC's confirmation that the CACR posed no barrier to rectifying the register, the PTO did not remove Cubaexport's long dead registration and update its registration records.  During this time, Bacardi's own application to register the HAVANA CLUB mark continued to remain suspended.

122.    Upon information and belief, on or about November 10, 2015, Cubaexport submitted another application to OFAC for a specific license in an effort to improperly revive its long dead U.S. HAVANA CLUB registration.  Cubaexport hoped that despite the expiration of the registration, it might profit from the Government's announcement of a "new course" with the Castro regime, involving normalizing relations and easing restrictions under the longstanding trade embargo.

123.    On January 11, 2016, OFAC abruptly reversed its own prior determination by issuing a specific license to Cubaexport.  Rather than denying the application or rejecting it as moot, the specific license purports to authorize Cubaexport to "engage in all transactions necessary to renew and maintain the HAVANA CLUB trademark registration No. 1,031,651 at the United States Patent and Trademark Office (USPTO), including those related to

Cubaexport's submission filed with the USPTO on or about December 14, 2005, and the

payment referenced therein, as described in the Application."  The PTO received a copy of this

license on January 12, 2016.  Just one day later, on January 13, 2016, the PTO granted a petition

by Cubaexport that had been pending for nearly ten years, and purported to resurrect

Cubaexport's long-dead HAVANA CLUB registration that had expired by operation of law in

2006.

**O.      Continuing Actions By Defendants To Assert Their Claimed Trademark Rights
And Deny Plaintiffs Enjoyment Of Their Rights**

124.     Since the present action was initiated in 2004, Defendants and related entities

have continued to pursue their claimed rights as part of a long-running dispute with Plaintiffs.

For example, Pernod – under the guise of its U.S. subsidiary, Pernod Ricard USA LLC ("Pernod

USA") – sued Bacardi U.S.A. in the District Court of Delaware in August 2006, to prevent

Bacardi's sale of rum under the HAVANA CLUB label in the U.S., alleging violation of Section

43(a) of the Lanham Act.  Judgment was entered in favor of Bacardi U.S.A., Inc. in April 2010,

and later affirmed by the Third Circuit in August 2011.

125.     Despite this loss and HCH's previous litigation defeats, Defendants have

continued to threaten litigation against BACO and its affiliates for rights to the HAVANA CLUB

mark in the United States.  As Pernod's representative told the press:  "*We will continue to fight

for our legitimate ownership of the trademark in the US and are currently studying all our

options*."[2]

---

[2]      *See* http://www.beveragedaily.com/Regulation-Safety/Pernod-Ricard-will-continue-to-fight-Bacardi-for-Havana-Club-US-trademark ("Pernod Ricard will 'continue to fight' Bacardi for Havana Club US trademark.").

126.     Defendants have also aggressively litigated against BACO and its affiliates seeking recognition of its purported right to the HAVANA CLUB mark outside of the United States.

127.     Defendants have also refused to accept Section 211 as a limit on their ability to enforce their purported trademark rights in the United States.  In previous trademark infringement claims launched by HCH, it attempted to avoid application of Section 211 as a barrier to its claims.  Pernod has also extensively lobbied Congress to repeal Section 211 so that HCH and Cubaexport can enforce their purported rights.

128.     HCH also continues to plan for the sale of its ersatz HAVANA CLUB rum in the United States, and in particular seeks to profit from the Government's recent concessions to Cuba.  On February 16, 2016, Pernod's CEO publicly stated that the Government's normalization of relations with Cuba was "big news" for the company, that it hopes the longstanding trade embargo against Cuba will soon be lifted, and that the company will be ready to sell rum in the United States under the HAVANA CLUB mark.[3]  These developments have only increased the threat Defendants pose to Bacardi's rights.

129.     BACO has continued to sell rum under the HAVANA CLUB mark in the United States.  In or around February 25, 2016, the Treasury Department's Alcohol and Tobacco Tax and Trade Bureau approved new labels from BACO for its HAVANA CLUB rum.  BACO is poised to further expand sales of its HAVANA CLUB rum in the United States under this label in the coming months.

---

[3]     *See* http://www.thespiritsbusiness.com/2016/02/bacardi-demands-us-reverses-havana-ruling/?article-source=newsletter&source=626&date=2016-02-16.

130.    Upon information and belief, Defendants and their affiliated companies are continuing to explore all options to try to prevent Bacardi's use of the HAVANA CLUB mark in the United States, including commencing additional lawsuits against BACO.

COUNT I

RECTIFICATION OF REGISTER / CANCELLATION OF REGISTRATION

**A.    The U.S. HAVANA CLUB & DESIGN Registration Must be Stricken Because It Expired When Cubaexport Did Not File the Mandatory Renewal Application and Declaration in 1996.**

131.    Paragraphs 1 through 130 are incorporated herein by reference.

132.    The Judgment voided the recorded transfers and left Cubaexport with whatever rights it had in the HAVANA CLUB & DESIGN mark in the United States and the related federal registration as of November 23, 1993, the date of the void transfers.  The court did not reach the merits of Bacardi's claim for cancellation of the U.S. HAVANA CLUB Registration because Cubaexport, which had a claim to title to that registration, was not a party, and had refused to be joined voluntarily as a party, to the action before Judge Scheindlin.  Therefore, the Judgment provided that "[n]othing herein shall prevent Cubaexport, if it so chooses, from asserting rights in the trademark HAVANA CLUB rum in the United States and nothing shall prevent [Bacardi] from contesting those rights or contending that said rights were lost as a result of acts or omissions by Cubaexport." (Judgment ¶ 10).  As Cubaexport was a party to the HC Cancellation Proceeding, the TTAB was obliged to decide the effect of Cubaexport's omission, as the record owner, to renew the U.S. HAVANA CLUB Registration.

133.    The U.S. HAVANA CLUB Registration nominally owned by Cubaexport was set to expire automatically at the end of its 20-year term (plus the statutory grace period) on April 27, 1996 under Section 9(a) of the Lanham Act, 15 U.S.C. § 1059(a), unless the mandatory renewal application and declaration was filed by its owner prior to that deadline.

134.    Cubaexport did not file a renewal application and declaration on or before April 27, 1996, or thereafter. As a result of this omission by Cubexport, the U.S. HAVANA CLUB Registration expired automatically under the Lanham Act.

135.    On or about January 18, 1996, HCH filed a putative Renewal Declaration in its own name, claiming, under pain of perjury, that HCH owned the U.S. HAVANA CLUB Registration based on the recorded assignments from Cubaexport to HRL and from HRL to HCH.  The Judgment held, however, that those recorded assignments were null and void *ab initio* under 31 C.F.R. § 515.203(a), and also canceled any rights HCH may have had, may have, or claims to have had in the U.S. HAVANA CLUB Registration from forever until the October 27, 1997 date of the Judgment (118).  Therefore, HCH could not satisfy the renewal requirement of continuity of title from Cubaexport and was not at that or any other time the owner of the U.S. HAVANA CLUB Registration.

136.    Furthermore, the HAVANA CLUB trademark that is the subject of the aforesaid federal registration is, as the District Court held, similar to the HAVANA CLUB mark used with the assets of JASA seized by the Cuban government without compensation in 1960, so the TTAB was proscribed from recognizing or enforcing any interest of HCH in said registration.

137.    No renewal application and declaration was ever filed by Cubaexport prior to the statutory deadline for filing such renewal applications and declarations.

138.    Because the requirements of 15 U.S.C. § 1059 were not met, and the U.S. HAVANA CLUB Registration expired, the records of the PTO must be rectified by striking and expunging said registration from the Principal Register of the PTO.

**B.    The U.S. HAVANA CLUB & DESIGN Registration Must be Stricken Because It Expired When Cubaexport Did Not Pay the Mandatory Renewal Fee in 2006.**

139.    Paragraphs 1 through 130 are incorporated herein by reference.

140.     To the extent Cubaexport retained the U.S. HAVANA CLUB & DESIGN

REGISTRATION after 1996, those rights expired when it failed to renew the registration before

the lapse of the statutory deadline or grace period for renewal in 2006.

141.     The Post Registration Examiner correctly deemed the registration canceled and

expired in its August 2006 Office Action.  Defendants attempted to delay rectification of the

Register through litigation against OFAC and frivolous arguments to the PTO concerning the

PTO's authority to remove the Registration.  By 2012, however, Defendants lost their litigation

and OFAC confirmed that the PTO was authorized to remove the Registration.  The PTO

nonetheless declined to perform its ministerial record-keeping duty of updating and removing the

U.S. HAVANA CLUB & DESIGN Registration from the PTO Principal Register.

142.     The Registration expired because Cubaexport failed to correct the deficiency

within the allotted six-month period.  The recent action by the Commissioner for Trademarks,

purporting to accept in 2016 payment for a renewal application that was due in 2006, did not

retroactively cure the defective application or revive the long dead U.S. HAVANA CLUB &

DESIGN Registration.

Because the U.S. HAVANA CLUB Registration expired in 2006 (to the extent it had not

already expired in 1996), the records of the PTO must be rectified by striking and expunging said

registration from the Principal Register of the PTO.

## C.     Fraud in Obtaining and Maintaining Registration by Cubaexport

143.     Paragraphs 1 through 130 are incorporated herein by reference.

144.     The Cuban government, after having first failed to establish rights to sell its

export rum under the BACARDI trademark, then turned in 1974 to the HAVANA CLUB mark,

which had been used by JASA on the second most popular Cuban rum.  Cuba had lost a series of

U.S. court decisions in similar cases under the Non-Recognition Doctrine.  Cubaexport, as an

arm of the Cuban government, knew that its claims to the HAVANA CLUB mark in the United States or any other U.S. mark that Cuba had purportedly confiscated under Law No. 890 would be denied if the facts were fully disclosed to U.S. authorities and that it would not be deemed to be the successor to JASA under U.S. law.

145.     Nonetheless, on June 12, 1974, Cubaexport applied to the PTO, pursuant to Section 44 of the Lanham Act, 15 U.S.C. § 1126, to register a trademark consisting of a label design displaying the words HAVANA CLUB (the "HAVANA CLUB & DESIGN" mark). Although Cubaexport still held Cuban HAVANA CLUB registrations that had been confiscated from JASA, Cubaexport's June 12 application was based on a newly issued Cuban Registration No. 110,353, dated February 12, 1974.  This course of action was adopted to conceal that Cubaexport's claim of title to the HAVANA CLUB mark was based on the previous confiscation of JASA's assets.

146.     The HAVANA CLUB & DESIGN mark that was the subject of Cubaexport's U.S. trademark application prominently displays the Spanish legend *"Fundada en 1878,"* which Cubaexport intentionally copied from the label design that had been registered by JASA in the United States under Registration No. 335,919 in 1936.  Cubaexport's intention in prominently displaying *"Fundada en 1878"* as part of the HAVANA CLUB & DESIGN mark was to mislead the American public into believing that Cubaexport's HAVANA CLUB rum had a family heritage dating back nearly a century and came from, or was associated with, or approved by, JASA, the original producer of the HAVANA CLUB rum that they had previously purchased and enjoyed in the United States.  Cubaexport's decision to adopt the HAVANA CLUB mark for export rum was further based on the determination by senior Cuban rum executives that, in 1974, the HAVANA CLUB mark still had a valuable reputation and goodwill in the United States.

That goodwill had been created by the success of JASA's HAVANA CLUB rum and it rightfully belonged to JASA in the United States.

147.    Moreover, when Cubaexport applied to register the HAVANA CLUB & DESIGN mark with the PTO in 1974, Cubaexport knew that JASA had only discontinued making HAVANA CLUB rum because JASA's rum distillery and other assets had been forcibly seized and confiscated by the Cuban government and its officers, executives, and shareholders had been driven into exile or imprisoned.

148.    Cubaexport never obtained the secret formula used by JASA to produce the HAVANA CLUB rum sold in the United States and elsewhere.  So Cubaexport surreptitiously concocted a new formula for its ersatz HAVANA CLUB rum, which materially changed the character of the rum.  Nonetheless, the HAVANA CLUB & DESIGN mark which Cubaexport had applied to register in the United States was designed by Cubaexport with the intent of misleading prospective purchasers into believing that they were buying the same product that JASA had made and sold in the United States.

149.    Accordingly, Cubaexport knowingly made the following material false statements and omissions in connection with its application to register the HAVANA CLUB & DESIGN mark with knowledge of their falsity and with the intent of deceiving the PTO and keeping material information from coming to their attention:

      a.    That Cubaexport was the owner in the United States of the HAVANA CLUB & DESIGN mark for rum.  This statement was knowingly false because Cubaexport knew:

          i.    that the Cuban trademark registration that formed the basis of its U.S. application was attributable to the confiscation of JASA's assets, and that U.S. policy refuses recognition of rights attributable to such confiscation;

         ii.    that JASA's HAVANA CLUB mark still enjoyed a strong reputation in the United States;

   iii. that JASA continued to have common law trademark rights in the HAVANA CLUB mark for rum in the United States; and

   iv. that the interruption of JASA's use of the HAVANA CLUB mark was caused by the confiscation of JASA's assets by the Cuban government and JASA had no intention of abandoning its United States trademark rights; and

  b. That the label statement "*Fundada en 1878*" ("Founded in 1878") referred to Cubaexport's business, which was founded in 1965.  This statement was knowingly false and intentionally designed to mislead consumers as to the provenance and the source of the rum sold under that mark.

150. On January 27, 1976, U.S. Reg. No. 1,031,651 of the HAVANA CLUB & DESIGN mark was issued to Cubaexport.

151. Neither JASA, JAI, their shareholders, nor Bacardi, as JASA's bona fide successor in interest, has ever consented to the registration or the use of the trademark and trade name HAVANA CLUB by Cubaexport, HRL, or HCH.

152. To maintain the U.S. HAVANA CLUB Registration, Cubaexport was required to file an affidavit between the fifth and sixth year after the registration, averring ownership and continued use of the mark. On or about January 12, 1982, such an affidavit was filed by Cubaexport in the PTO in connection with the U.S. HAVANA CLUB Registration.  This declaration, ostensibly signed by Fausto Alfonso Man, averred that Cubaexport was the owner of said mark and registration and invoked the embargo and the excusable nonuse doctrine to satisfy the use requirement of Section 8.

153. Cubaexport also knew in January 1982 that Cubaexport was not the owner of the HAVANA CLUB & DESIGN mark in the United States; that JASA was the owner in the United States of common law trademark rights in the HAVANA CLUB mark for rum; that JASA's HAVANA CLUB mark for rum still enjoyed a strong reputation; and that if Cubaexport were

allowed to sell its rum labeled with the HAVANA CLUB & DESIGN mark in the United States, American consumers would be deceived as to its quality and source of origin.

154.    On or about December 13, 2005, Cubaexport filed an affidavit in the PTO in connection with renewal of the U.S. HAVANA CLUB Registration.  This declaration, ostensibly signed by Francisco Santiago Pichardo, averred that Cubaexport was the owner of said mark and registration and invoked the embargo and the excusable nonuse doctrine to satisfy the use requirement of Section 8.

155.    Cubaexport knew in December 2005 that its failure to use the mark was not "due solely to" the embargo with Cuba and that it had no intention to use the mark after the embargo is lifted.  Rather, as Cubaexport represented in this litigation, "Cubaexport transferred the worldwide Havana Club business twelve years ago – in 1993," "Cubaexport and HCI/HCH are not sister companies," and "Cubaexport has no ownership shares or financial interest in either HCI or HCH."  In short, Cubaexport's filing of the Combined § 8/9 Affidavit in December 2005 constituted fraud on the PTO.

156.    Wherefore, the U.S. HAVANA CLUB & DESIGN Registration has been fraudulently obtained and maintained in violation of 15 U.S.C. § 1064(3) and should be cancelled.

**D.    Fraud in Obtaining and Renewing Registration by HCH**

157.    Paragraphs 1 through 130 are incorporated herein by reference.

158.    Cubaexport, HRL, and HCH were, at all relevant times in 1993 and 1994, aware of the fact that their purported transfers of the HAVANA CLUB & DESIGN mark and the related federal registration in the United States were prohibited by the CACR absent a specific license from OFAC.  Accordingly, in order to put and maintain the U.S. HAVANA CLUB & DESIGN Registration in HCH's name by false means, Cubaexport, HRL, and HCH deliberately

caused their duly authorized representative to make statements on their behalf in an OFAC

License Application that they all knew contained material misleading omissions and material

affirmative false statements that were made with the intent of deceiving OFAC and putting the

federal registration in the name of HCH by false means.  These statements were as follows:

> a.     That the assignments were made as "part of the reorganization of the
> Cuban rums and liquors industry"; and

> b.     that "each of the assignors and assignees are nationals of Cuba."

159.    Defendant HCH then incorporated and relied on these same misstatements before

the PTO by premising its renewal application on a fraudulently obtained OFAC license.

Specifically, on or about January 18, 1996, defendant HCH knowingly filed a false Renewal

Declaration averring that HCH owned the U.S. HAVANA CLUB & DESIGN mark and the

related federal registration, when Cubaexport, HCH, and HRL all knew that the transfers had

been the subject of false statements that had been made to OFAC and thus were void under the

CACR, because no valid OFAC license therefore had been obtained and that putative title to the

U.S. HAVANA CLUB Registration remained in Cubaexport.

160.    HCH also knew that Bacardi was using the HAVANA CLUB mark for rum in the

United States on and before January 18, 1996 and HCH knew, for that reason as well, that HCH

was not the true owner of the U.S. HAVANA CLUB & DESIGN mark and the related federal

registration in the United States at that time.

161.    Wherefore, the U.S. HAVANA CLUB & DESIGN Registration was falsely and

fraudulently put in HCH's name by Cubaexport and HCH and fraudulently renewed by HCH in

violation of 15 U.S.C. § 1064(3) and should be cancelled.

**E.     Abandonment**

162.    Paragraphs 1 through 130 are incorporated herein by reference.

163.     The HAVANA CLUB mark was not used in commerce in the United States within a reasonable period after Cubaexport's original application was filed in 1976, and indeed has never been used by the original registrant, Cubaexport, in interstate or foreign commerce of the United States.  Cubaexport and HCH have also purported to renew the registration by stating that they possessed a bona fide intent to use the trademark in interstate or foreign commerce of the United States, despite having no bona fide expectation that they would be able to do so within a reasonable period of time.  The U.S. embargo of Cuba, which Cubaexport has advanced as its excuse for this extensive non-use, is directly attributable to the actions of the Cuban government and thus not outside its control.

164.     Under these circumstances Cubaexport has abandoned the HAVANA CLUB & DESIGN mark under the Lanham Act.  Any construction of the Lanham Act allowing Cubaexport to maintain its registration for such a long period of time without any use in commerce would be unconstitutional or at a minimum raise serious constitutional concerns that should be avoided.

165.     Further, on or about November 23, 1993, after assigning the rights to the U.S. HAVANA CLUB & DESIGN mark and the related registration to HRL and transferring its marketing employees to HCI, Cubaexport left the rum business.  From 1993 to the present, a period of more than 3 years, Cubaexport has not advertised, licensed for sale, or sold HAVANA CLUB rum anywhere in the world.

166.     Cubaexport, since 1993, has held bare title to the U.S. HAVANA CLUB Registration but at no time during that period has Cubaexport been ready or able to export HAVANA CLUB rum to the United States or anywhere else in the world.

167.     Cubaexport also abandoned the U.S. HAVANA CLUB Registration and whatever claims it had to rights in the HAVANA CLUB & DESIGN mark in the United States by allowing the aforesaid federal registration to lapse in both 1996 and 2006.

168.     Wherefore, the HAVANA CLUB & DESIGN mark has been abandoned by Cubaexport within the meaning of Section 45 of the Lanham Act, 15 U.S.C. § 1127 and 15 U.S.C. § 1064, and the U.S. HAVANA CLUB Registration should be cancelled.

**F.     Misrepresentation of Goods**

169.     Paragraphs l through 130 are incorporated herein by reference.

170.     Defendant Cubaexport has allowed HCH and/or HCI (a) to prepare and cause advertisements for Defendants' ersatz HAVANA CLUB rum to appear in magazines and publications distributed through the channels of interstate commerce in the United States, and (b) to pay promotional fees or to give other inducements to motion picture producers to cause their HAVANA CLUB rum and their purported HAVANA CLUB & DESIGN mark to be depicted in motion pictures distributed in interstate commerce in the United States, including the film "The Firm."  These advertisements and the use and depiction of said mark in films are designed to induce American consumers into buying Defendants' ersatz HAVANA CLUB rum abroad and to build up a demand for said product in the United States.

171.     Cubaexport's use of the labeling statement incorporated in the HAVANA CLUB & DESIGN mark falsely indicating that the producer was "founded in 1878" is part of a deliberate scheme to pass off Defendants' ersatz HAVANA CLUB rum as being somehow approved by JASA, or as being the same quality as the only HAVANA CLUB rum ever sold legally in the United States, which was produced by JASA.

172.     Furthermore, said advertising and promotional use of said HAVANA CLUB & DESIGN mark and Cubaexport's other aforesaid acts and omissions are intended to confuse the

American public into wrongly believing that Cubaexport is somehow the legitimate successor to the original producer of the HAVANA CLUB rum sold in the United States, JASA.  Indeed, the use of the statement "founded in 1878" as part of the HAVANA CLUB & DESIGN mark can have no other purpose.

173.    Through the aforesaid acts, Cubaexport has used the purported HAVANA CLUB & DESIGN mark as a vehicle for fraud and said mark is being used in violation of 15 U.S.C. § 1064(3) to misrepresent the source of Defendants' ersatz HAVANA CLUB rum.

174.    Wherefore, said mark was used by or with the permission of Cubaexport in violation of § 1064(3) and the registration thereof should be cancelled.

## COUNT II

### DECLARATION OF COMMON LAW RIGHTS IN THE HAVANA CLUB TRADEMARK

175.    Paragraphs 1 through 130 are incorporated herein by reference.

176.    BACO is the true owner of the common law rights in and to the HAVANA CLUB mark as the bona fide successor-in-interest to JASA, the original owner of those rights.  JASA never abandoned its rights in and to the HAVANA CLUB mark; JASA was prevented from using the mark in the United States and elsewhere as a result of the Cuban government's confiscation of JASA's assets in 1960.  At all times prior to BACO's acquisition of the mark, JASA intended to resume use of the mark when it had the means to do so.

177.    BACO also established common law rights in the HAVANA CLUB mark as a result of its own use of the mark in the United States.  BACO began using the mark in the United States in 1995 and 1996, continues to use the mark in the United States, and plans for increased investment in the HAVANA CLUB brand.  Similarly, BACO has not abandoned the common law rights to the HAVANA CLUB mark that it acquired from JASA.

178.     Defendants have no common law or other rights in any mark incorporating the words HAVANA CLUB.  Defendants' alleged rights in any such a mark stem from Cuba's confiscation of JASA's assets.  As a matter of public policy, the United States will not recognize a claim of right in a U.S. trademark that is based in whole or in part on such a confiscation.

179.     Further, Section 211 prohibits any United States court from recognizing, enforcing, or otherwise validating Defendants' assertion of rights in a mark incorporating the words HAVANA CLUB because such a mark is the same as or substantially similar to the HAVANA CLUB mark that JASA used in connection with the assets that were confiscated by the Cuban government in 1960.  Neither JASA nor Bacardi, as JASA's bona fide successor in interest, has consented to Defendants' use of a mark incorporating the words HAVANA CLUB. Accordingly, Defendants have no enforceable rights in any such mark.

180.     An actual controversy exists between the parties with respect to the foregoing claims of common law ownership and the controversy is of sufficient immediacy to warrant the declaratory and injunctive relief requested below.  Plaintiffs have no adequate remedy at law.

## COUNT III

### DECLARATION OF NON-VIOLATION OF FEDERAL TRADEMARK LAWS

181.     Paragraphs 1 through 130 are incorporated herein by reference.

182.     Plaintiffs' use of the HAVANA CLUB mark in connection with the sale, distribution, and advertising of HAVANA CLUB rum in the United States does not constitute trademark infringement or unfair competition in violation of Section 32 or Section 43(a) of the Lanham Act, 28 U.S.C. §§ 1114 or 1125(a).

183.     Plaintiffs' use of the HAVANA CLUB mark does not infringe under any federal law any mark purportedly owned by Defendants, or constitute unfair competition in violation of any right purportedly owned by Defendants under any federal law.

184.    Defendants have not been damaged, and will not in the future be damaged, by Plaintiffs' use of the HAVANA CLUB mark or by any alleged violation of federal law based on Plaintiffs' use of said marks.

185.    An actual controversy exists between the parties with respect to the foregoing claims of non-violation and the controversy is of sufficient immediacy to warrant the declaratory and injunctive relief requested below.  Plaintiffs have no adequate remedy at law.

**COUNT IV**

**DECLARATION OF NON-VIOLATION OF STATE LAW**

186.    Paragraphs 1 through 130 are incorporated herein by reference.

187.    Plaintiffs' use of the HAVANA CLUB mark does not infringe under any state law any mark incorporating the words HAVANA CLUB purportedly owned by Defendants, or constitute unfair competition in violation of any right purportedly owned by Defendants under any state law based on a mark or trade name incorporating the words HAVANA CLUB.

188.    Defendants have not been damaged, and will not in the future be damaged, by Plaintiffs' use of the HAVANA CLUB mark or by any alleged violation of state law based on Plaintiffs' use of said marks.

189.    An actual controversy exists between the parties with respect to the foregoing claims of non-violation and the controversy is of sufficient immediacy to warrant the declaratory and injunctive relief requested below.  Plaintiffs have no adequate remedy at law.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs pray for relief as follows:

190.    Plaintiffs request that this Court enter judgment:

(a)    Adjudging and declaring that Reg. No. 1,031,651 of the HAVANA CLUB & DESIGN mark be cancelled and/or stricken from the Principal Register of the PTO;

(b)     Declaring that BACO owns the common law rights to the HAVANA

CLUB trademark in the United States, that BACO's use of the HAVANA CLUB trademark does

not infringe on any mark owned by Defendants or otherwise violate any enforceable rights of the

Defendants, and that Defendants have no rights in any mark incorporating the words HAVANA

CLUB;

(c)     Enjoining Defendants, their agents, servants, employees, parents,

subsidiaries, affiliates and all persons in active concert with Defendants, from using or

registering in the PTO or in any State of the United States any mark incorporating or consisting

of the words HAVANA CLUB and from interfering with Plaintiffs' use and registration of the

HAVANA CLUB mark;

(d)     Awarding Plaintiffs their costs and attorneys' fees pursuant to 15 U.S.C.

§ 1117 and applicable state law; and

(e)     Awarding Plaintiffs such further relief as the Court may deem just and

proper.

Respectfully submitted,

_____/s/ Emily Johnson Henn_____

Michael C. Lynch*                    Emily Johnson Henn (D.C. Bar No. 417077)
Damon W. Suden*                      COVINGTON & BURLING LLP
KELLEY DRYE & WARREN                 333 Twin Dolphin Drive, Suite 700
101 Park Avenue                      Redwood Shores, CA 94065-1418
New York, New York 10178             (650) 632-4715
(212) 808-7800
*pro hac vice pending                David M. Zionts (D.C. Bar No. 995170)
                                     COVINGTON & BURLING LLP
                                     One CityCenter
                                     850 Tenth St., NW
                                     Washington, DC 20001-4956
                                     (202) 662-5987

Attorneys for the Plaintiffs Bacardi & Company Limited
and Bacardi U.S.A., Inc. f/k/a Bacardi-Martini U.S.A., Inc.