IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BACARDI & COMPANY LIMITED,<br><br>and<br><br>BACARDI U.S.A., INC.,<br><br>                Plaintiffs,<br><br>     v.<br><br>EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS d/b/a CUBAEXPORT,<br><br>and<br><br>HAVANA CLUB HOLDING, S.A., d/b/a HCH, S.A.,<br><br>                Defendants. | Case No. 1:04-cv-00519 (EGS) |

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**PUBLIC REDACTED COPY**

As detailed below, Defendants seek partial summary judgment determining that José Arechabala S.A. ("JASA") (1) abandoned all rights in its old HAVANA CLUB trademarks before the time Cubaexport registered its HAVANA CLUB trademark in 1974, and (2) retained no trademark rights that it could transfer to Plaintiffs in 1995 or 1997. The parties have conducted full discovery on this issue, and the undisputed evidence demonstrates as a matter of law that JASA abandoned all U.S. rights in their HAVANA CLUB trademarks by 1973 at the latest.

This Motion is being made in the alternative to, and in addition to, Defendants' Motion to Dismiss the First Amended Complaint, which is being filed simultaneously with this Motion.  In the event that Defendants' Motion to Dismiss the First Amended Complaint  is not granted in its entirety, Defendants hereby move for an order granting partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure:

(a)     dismissing the claims asserted in Count I of the First Amended Complaint, which seeks cancellation of Cubaexport's HAVANA CLUB trademark registration, to the extent that those claims are based on any allegation that JASA or its shareholders owned rights in the trademark (including any allegation that Defendants misrepresented their rights by reason of JASA's alleged prior rights); and

(b)     dismissing the claims asserted in Counts II, III and IV of the First Amended Complaint, which seek declaratory judgment, to the extent that those claims are based on any allegation (i) that either or both of the Plaintiffs acquired any trademark rights, directly or indirectly, from JASA or its shareholders or any entity formed by JASA's shareholders, or (ii) that Cubaexport's HAVANA CLUB trademark registration should be cancelled on the basis of any allegation that JASA or its shareholders owned rights in the trademark (including any allegation that Defendants misrepresented their rights by reason of JASA's alleged prior rights).

In support of this Motion, Defendants rely on the accompanying Memorandum of Points and Authorities, Statement of Material Facts, and Declaration of Charles W. Baxter together with its exhibits.  A proposed order also is submitted herewith.  The grounds for the Motion are set forth in the Memorandum of Points and Authorities. Defendants request oral argument on this Motion.

Dated:   April 29, 2016

Respectfully submitted,


_____/s/ David H. Bernstein_____
David H. Bernstein (admitted *pro hac vice*)
Carl Micarelli (admitted *pro hac vice*)
Charles W. Baxter (motion for admission
    *pro hac vice* forthcoming)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, N.Y. 10022
Telephone: (212) 909-6696
Email: dhbernstein@debevoise.com
    cmicarelli@debevoise.com
    cwbaxter@debevoise.com


_____/s/ Colby A. Smith_____
Colby A. Smith (D.C. Bar No. 467266)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue N.W., Suite 500
Washington, D.C. 20004
Telephone: (202) 383-8000
Email: casmith@debevoise.com

*Attorneys for Defendants Empresa Cubana Exportadora de Alimentos y Productos Varios and Havana Club Holding S.A.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BACARDI & COMPANY LIMITED, and

BACARDI U.S.A., INC.,

    *Plaintiffs*,

  v.

EMPRESA CUBANA EXPORTADORA
DE ALIMENTOS Y PRODUCTOS VARIOS
d/b/a CUBAEXPORT, and

HAVANA CLUB HOLDING, S.A.,
d/b/a HCH, S.A.,

    *Defendants*.

Case No. 1:04-cv-00519 (EGS)

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

**<u>PUBLIC REDACTED COPY</u>**

David H. Bernstein
Carl Micarelli
Charles W. Baxter
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000
dhbernstein@debevoise.com
cmicarelli@debevoise.com
cwbaxter@debevoise.com

Colby A. Smith
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004
(202) 383-8000
casmith@debevoise.com

*Attorneys for Defendants Empresa Cubana
Exportadora de Alimentos y Productos Varios
and Havana Club Holding S.A.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTS .................................................................................................................... 1

    A.    JASA Registers Trademarks for Its Pre-1960 Rum Business.................................. 1

    B.    JASA Decides to Abandon Its U.S. Trademark Registrations.............................. 3

    C.    The JASA Shareholders Further Demonstrate Their Abandonment of Their Trademark Rights by Deciding Not to Pursue Efforts to Use the Trademark. ........................................................................................................ 4

    D.    JASA Confirms Its Abandonment by Failing to Oppose Cubaexport's Registrations in the United States or Anywhere Else ........................................... 5

    E.    JASA Becomes Aware of Cubaxport's Use of the Mark Throughout the World and Does Nothing to Oppose It. ............................................................... 7

    F.    Pernod Ricard and Corporación Cuba Ron Form a Joint Venture in 1993. ........... 7

    G.    Bacardi Enlists the JASA Shareholders to Help It Interfere with the Joint Venture............................................................................................................... 8

    H.    The Parties Take Full Discovery on JASA's Abandonment in the *Galleon* Litigation, but Bacardi Prevents the Issue from Being Decided on the Merits .............................................................................................................. 9

ARGUMENT ......................................................................................................... 11

  I.    JASA Abandoned Its Rights Before 1974. ................................................... 13

  II.  Bacardi Cannot Delay Resolution by Claiming a Need for Additional Discovery. ......... 17

CONCLUSION...................................................................................................... 18

# TABLE OF AUTHORITIES

CASES
(* indicates cases principally relied upon)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................12

*General Healthcare Ltd. v. Qashat*, 364 F.3d 332 (1st Cir. 2004) ..............................16

*Havana Club Holding, S.A. v. Galleon S.A.*
    974 F. Supp. 302 (S.D.N.Y. 1997) ..............................................................10, 11

*Havana Club Holding, S.A. v. Galleon S.A.*, 62 F.Supp.2d 1085 (S.D.N.Y. 1999) ....................11

*Havana Club Holding S.A. v. Galleon S.A.*, No. 96 Civ. 9655 (SAS) (S.D.N.Y. June 25,
    1999) (Baxter Decl. Ex. 31) ....................................................................11

*Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116 (2d Cir. 2000) ..................................11

\* *Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575 (Fed. Cir. 1990)................13, 14, 15

*In re Bose Corp.*, 580 F.3d 1240 (Fed. Cir. 2009) ........................................................12

*ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135 (2d Cir. 2007)..............................................16

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*,
    69 F. Supp. 3d 175 (D.D.C. 2014) ..............................................................12

\* *Rivard v. Linville*, 133 F.3d 1446 (Fed. Cir. 1998)......................................................14, 16

\* *Silverman v. CBS Inc.*, 870 F.2d 40 (2d Cir. 1989) ....................................................14, 15

*Specht v. Google Inc.*, 747 F.3d 929 (7th Cir. 2014) ....................................................16

STATUTES

15 U.S.C. § 1052(d) ............................................................................6

15 U.S.C. § 1058................................................................................3, 16

15 U.S.C. § 1059................................................................................3

15 U.S.C. § 1063................................................................................6

15 U.S.C. § 1127................................................................................13

Act of July 24, 1965, Pub. L. No. 89-83, 79 Stat. 259....................................................3

Act of Oct. 9, 1962, Pub. L. No. 87-772, 76 Stat. 769......................................................3

Omnibus, Consolidated and Emergency Supplemental Appropriations Act 1999,
    Pub. L. No. 105-277, 112 Stat. 2681 (Oct. 12, 1998)............................................11

Trademark Act of 1946 (Lanham Act), Pub. L. 79-489, 60 Stat. 427 (July 5, 1946)......................3

## RULES AND REGULATIONS

Fed. R. Civ. P. 56(a) ....................................................................................................11

Fed. R. Civ. P. 56(d) ....................................................................................................17

31 C.F.R. § 515.201(b) .............................................................................................6, 7

## OTHER AUTHORITIES

3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 17:1
    (4th ed. 2016) ........................................................................................................6

## PRELIMINARY STATEMENT

This motion, filed in the alternative in the event the Defendants' companion motion to dismiss the First Amended Complaint is not granted in its entirety, is a narrow summary judgment motion targeted at a single issue: whether JASA, at the time it allegedly transferred its rights to Bacardi, had any U.S. trademark rights in the HAVANA CLUB name. The parties already have taken complete discovery on that issue in prior litigation. Because there is no genuine dispute of material fact concerning JASA's abandonment of its rights in the HAVANA CLUB trademark, partial summary judgment in Defendants' favor on that issue is appropriate. Deciding that issue now will promote efficiency and save the resources of the parties and the Court by significantly narrowing the issues for remaining discovery and trial, to the extent that any part of the case survives Defendants' companion motion to dismiss the amended complaint.

## FACTS

### A.     JASA Registers Trademarks for Its Pre-1960 Rum Business.

José Arechabala S.A. ("JASA") was a Cuban corporation owned by members of the Arechabala family. *See* Defendants Statement of Material Facts in Support of Their Motion for Partial Summary Judgment ("SMF") ¶ 1. Its core business was sugar refining, but it and its affiliates also were engaged in a number of related activities, including the production of rubbing alcohol and alcohol-based fuels, shipping, rail transport, and the production of several different spirits and liqueurs, including rum sold under the HAVANA CLUB name. (SMF ¶ 2.)

At some point after the U.S. repealed prohibition in 1933, JASA began exporting rum to some localities in the United States under the HAVANA CLUB name. (SMF ¶ 3.) In connection with those sales, JASA and its U.S. distributor at various times applied for and obtained registrations for several different label designs including the words HAVANA CLUB,

and for the words HAVANA CLUB standing alone, as trademarks at the United States Patent and Trademark Office ("USPTO").  (SMF ¶ 4.)

Immediately prior to the Cuban Revolution, JASA was headed by an Arechabala family member named José María Arechabala y Arechabala ("José Arechabala") (SMF ¶ 5.).  At that time, José Arechabala, like several others in the family, split his time between a home in Cuba and a home in Spain where his wife and children lived.  (SMF ¶ 6.)

Following its 1959 revolution, Cuba took steps to establish state ownership of the means of production.  On December 31, 1959, the Cuban state assumed managerial control over JASA's distillery in Cuba and, in October 1960, adopted a law that formally nationalized many Cuban companies, including JASA.  (SMF ¶¶ 8, 9.)

Although U.S. law, under the Act of State doctrine, requires courts to recognize and give effect to the nationalization of Cuban companies' property located in Cuba, it does not give effect to any effort by Cuba to nationalize property located within the United States (*see* AC ¶ 37). The United States thus would have allowed JASA, under its former ownership and management, to continue to renew its remaining U.S. trademark registrations and sell rum under those trademarks in the United States.[1]  Other former owners of Cuban businesses, most notably Bacardi, did just that.  For a fee of only $25, JASA could have renewed each of its trademark registrations in 1973 for another twenty years and, thereafter, could have continued to renew its

---

[1]  To avoid unnecessary repetition, we hereafter use the term "JASA" to refer to the alleged continuing company under the direction of its former management and shareholders (rather than the nationalized entity owned by the Cuban government), and we refer to the former shareholders of JASA simply as its shareholders.  This usage, which is for purposes of this motion only, should not be construed as a concession that JASA has continued corporate existence or that its former shareholders have the right to speak for JASA generally or with respect to any particular assets.

registrations.[2]  If, as Bacardi now claims, JASA intended to maintain (and not abandon) its rights in the HAVANA CLUB trademark, it could, at a minimum, have taken this inexpensive and easy step.  But, as discussed below, JASA and its shareholders chose not to maintain their trademark registrations.  Instead, according to the uncontradicted testimony of JASA's shareholders, they knowingly chose to let their trademark registrations expire.  The decision to allow their trademark rights to expire demonstrates their intentional abandonment of the HAVANA CLUB trademark and is corroborated by their decision not to try to revive their rum business.

### B.   JASA Decides to Abandon Its U.S. Trademark Registrations.

As of 1960, JASA held three U.S. trademark registrations:  two 1953 registrations for label designs including the words "HAVANA CLUB" (Reg. Nos. 578,679 and 578,680) and a 1956 registration for the words "HAVANA CLUB" (Reg. No. 632,828).  (SMF ¶ 10.)  The USPTO cancelled JASA's 1956 registration in 1962 because JASA failed to file a timely declaration of use or excusable non-use (even though it could have done so under then-existing law for a fee of $10).[3]  (SMF ¶ 11.)  The two 1953 registrations at the USPTO, however, remained in effect, and were due to expire in 1973.  (SMF ¶ 12.)

The JASA shareholders continued to recognize José Arechabala's authority as the head of JASA after JASA was nationalized in 1960 (SMF ¶ 13.); they formally reconfirmed his authority in 1997 (SMF ¶ 14.).  José Arechabala was a prominent and sophisticated business executive:  at

---

[2]   *See* Act of Oct. 9, 1962, Pub. L. 87-772, § 5, 76 Stat. 769, 770 (amending Lanham Act § 9, 15 U.S.C. § 1059, to allow renewal application to assert excusable non-use; setting renewal term at 20 years, later amended to 10 years); Act of July 24, 1965, Pub. L. No. 89-83, § 3, 79 Stat. 259, 260 (amending Lanham Act § 31(a)(2), to set renewal fee at $25).

[3]   *See* Trademark Act of 1946 ("Lanham Act"), Pub. L. 79-489, § 8(a), 60 Stat. 427, 431 (July 5, 1946) (requiring an affidavit of use or excusable nonuse between 5th and 6th years); Act of July 24, 1965, *supra*, § 3, 79 Stat. at 260 (amending Lanham Act § 31(a)(3) to set fee for § 8(a) affidavit at $10).

the time, he was the vice-president of a chain of 19 department stores in Spain owned by his

wife's family, he also served on the board of directors of a Spanish insurance company, and in

the 1970s, he and his wife purchased a condo in Miami that they could use as a refuge if needed

after the death of Francisco Franco in Spain.  (SMF ¶ 7.)

As the 1973 expiration date for JASA's last U.S. trademark registrations was

approaching, José Arechabala was reminded of the impending deadline by his nephew Ramón

María Arechabala y Arechabala ("Ramón"). Ramon asked José Arechabala, the leader of the

family and the head of JASA, what should be done.  (SMF ¶ 20.)  José Arechabala informed

Ramón that he "was not interested" in renewing JASA's U.S. trademark registrations for

HAVANA CLUB.  (SMF ¶ 21.)  Neither Ramón nor any other JASA shareholder challenged

José Arechabala's decision or attempted to submit a renewal application to the USPTO on

JASA's behalf.  (SMF ¶ 22.)  Because JASA elected not to renew the HAVANA CLUB

registrations, those registrations expired in 1973 (SMF ¶ 23), thereby extinguishing all trademark

rights arising under the registrations.

### C.      The JASA Shareholders Further Demonstrate Their Abandonment of Their Trademark Rights by Deciding Not to Pursue Efforts to Use the Trademark.

The JASA shareholders also rebuffed a series of efforts to revive the HAVANA CLUB

rum brand during the 1960s and early 1970s, a time when JASA still could have renewed the

trademark registration.  Ramón testified that, in 1969, he was approached by a business contact

who suggested that he could assist in having rum made under the HAVANA CLUB name in a

distillery in Santo Domingo, Dominican Republic.  (SMF ¶ 16.)  Ramón declined the offer and

did not pursue it further.  (SMF ¶ 16.)

Ramón also testified that ███████████████████████████████████████████

███████████████████████████████████████████ (SMF ¶ 17.)

██████████████████████████████████████████████████████████

████████████████ (SMF ¶ 17.)

In the late 1960s Ramón's brother, José Miguel Arechabala y Arechabala ("José

Miguel"), ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████ (SMF ¶ 15.)

Later, in 1972, José Miguel spoke with another family acquaintance, Orfilio Pelaez, a

senior Bacardi executive who expressed at that time possible interest in discussing a deal with

the Arechabalas.  (SMF ¶ 18.)  José Miguel suggested that Pelaez connect with Ramón, but

neither brother did anything until two years later when, in 1974, Pelaez invited Ramón for a half-

day visit to Bacardi's headquarters in Nassau, Bahamas.  (SMF ¶ 18.)  Following the meeting,

Pelaez sent Ramón a note informing him that a "Company in New York … has registered the

Havana Club Trade Mark" (SMF ¶ 18.).[4]  Neither Ramón nor any other member of the

Arechabala family did anything to follow up at the time (SMF ¶ 2.), or indeed any time in the

next 20 years.  Rather, as is consistent with their express decision to abandon the HAVANA

CLUB trademark, JASA and its shareholders made no efforts to maintain any rights in the

HAVANA CLUB trademark.

### D.    JASA Confirms Its Abandonment by Failing to Oppose Cubaexport's Registrations in the United States or Anywhere Else

After JASA had abandoned the last of its U.S. trademark registrations in 1973, no one

held any registered trademark containing the words HAVANA CLUB in the United States, and

---

[4]    It is unclear what registration Pelaez was referring to.  It cannot have been the Cubaexport application, because that application was filed after the date of the meeting.  In any event, Ramón did nothing with this information – he did not look into the facts or consider challenging the application.  (SMF ¶ 18.)

anyone who was using or intended to use such a trademark was free to register it.  *See* Lanham Act §2(d), 15 U.S.C. § 1052(d); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 17:1 (4th ed. 2016) (abandoned mark "falls into the public domain and is free for all to use," "pav[ing] the way for future possession and property in any other person"). Cubaexport, which had recently begun using the HAVANA CLUB name for rum exports to countries other than the United States, but with a different label design than JASA's, submitted an application to the USPTO in 1974 based on its new label design that it had registered earlier that year in Cuba.  (SMF ¶¶ 24, 25.)

The USPTO published Cubaexport's application for opposition in November 1975. (SMF ¶ 26.)  JASA, and indeed any of the members of the Arechabala family, would have had the right to file an opposition to object to Cubaexport's registration of the HAVANA CLUB mark, *see* Lanham Act § 13, 15 U.S.C. § 1063, but no one filed an opposition or otherwise objected.  (SMF ¶ 27.)  After no one filed an opposition, the USPTO granted the registration in January 1976. (SMF ¶ 28.)  Because of the U.S. embargo prohibiting transactions with Cuban parties, *see* 31 C.F.R. § 515.201(b), and prohibiting importation of goods of Cuban origin, *see id.* § 515.204, Cubaexport has thus far been prevented from using this trademark in the United States.  (SMF ¶ 29.)

JASA also did nothing during this period to oppose Cubaexport's registrations in other countries.  Throughout the 1970s and the 1980s, Cubaexport applied for and obtained new HAVANA CLUB registrations in Mexico, France, Great Britain and nearly 80 other countries. (SMF ¶ 30.)  Yet JASA did not oppose or seek to cancel any of them at the time.

### E.     JASA Becomes Aware of Cubaxport's Use of the Mark Throughout the World and Does Nothing to Oppose It.

During the period from 1972 to 1993, Cubaexport exported rum under the HAVANA CLUB name to Spain and numerous other countries around the world, including multiple countries in Europe and Latin America.  (SMF ¶ 31.)  Ramón Arechabala testified that, in 1976 or 1977, he and family elder José María Arechabala Rodrigo ("José Arechabala Rodrigo")  were aware of and discussed the fact that HAVANA CLUB rum was being sold in Spain, South America and elsewhere. (SMF ¶ 32.)  But again they did nothing for nearly two decades.  (*Id*.)  They did not write a letter of protest to Cubaexport or anyone else.  They did not sue for trademark infringement.  Nor did they commence proceedings anywhere to cancel any of Cubaexport's trademark registrations, either in the United States or anywhere else, for nearly 20 years.

### F.     Pernod Ricard and Corporación Cuba Ron Form a Joint Venture in 1993.

In 1993, the global wine and spirits company Pernod Ricard S.A. entered into a joint venture with a Cuban state-owned enterprise, Corporación Cuba Ron, to export Cuban rum worldwide.  (SMF ¶ 33.)  The joint venture partners decided to sell the rum under the HAVANA CLUB brand, as that was a trademark that, as of 1993, Cubaexport had owned for many years in the United States and other countries around the world and had used in numerous countries without challenge from anyone. As part of the transaction setting up the joint venture, Cubaexport agreed to assign its trademark rights, through an intermediate company, to Havana Club Holding S.A. ("HCH"), an entity associated with the joint venture.  (SMF ¶ 34.)  The joint venture entity that distributes the rum is known as Havana Club International S.A. ("HCI").  (SMF ¶ 33.)

The joint venture was publicly announced in November 1993.  Only after that
announcement, did Ramón write a letter (SMF ¶ 35.), in December 1993—after more than 30
years of silence and inaction, and after more than 20 years of allowing Cubaexport to expend its
efforts developing a name for the HAVANA CLUB brand around the world.  In 1994, JASA,
through family elder José Arechabala Rodrigo, filed a cancellation petition, which was ultimately
unsuccessful, at the USPTO's Trademark Trial and Appeal Board ("TTAB"), claiming that
*Cubaexport* had abandoned the trademark through nonuse (AC ¶ 68; SMF ¶ 36.).  These sudden
and belated steps—all of which might have been taken at any point in the preceding decades of
silence and inaction—further demonstrate that, in the intervening years, JASA had abandoned
the mark and had made no plans to reintroduce it.

## G.    Bacardi Enlists the JASA Shareholders to Help It Interfere with the Joint Venture.

Both in 1993 and today, Bacardi is the world's largest rum seller.  Once Bacardi learned
that a powerhouse competitor, Pernod Ricard, was going to be marketing Cuban rum to compete
with Bacardi's products around the world, Bacardi did everything it could to try to interfere with
the new competition—with or without the aid of the JASA shareholders.

In 1994, Bacardi filed its own application for a HAVANA CLUB trademark registration
at the USPTO.  (SMF ¶ 37.)  That application was not based on JASA's former rights (because
Bacardi had not yet purported to acquire any alleged rights of JASA) but rather on Bacardi's own
stated intention to use the mark in the future.  (SMF ¶ 39.)[5]  In its application, Bacardi declared
under penalty of law that it knew of nobody who held any existing rights in the mark (SMF

---

[5]    The application was filed in the name of Galleon S.A., a Bacardi subsidiary that
subsequently merged into Bacardi & Co. Ltd.

¶ 40.), which necessarily implies that Bacardi had concluded that JASA and its shareholders had abandoned any rights that they may have had in the past.

Then, in July 1995, Bacardi filed a petition at the TTAB to try to cancel Cubaexport's registration so that Bacardi's own application could be processed (SMF ¶ 41.), but again Bacardi did not claim to be a successor to JASA (SMF ¶ 42.)  Indeed, as noted, an Arechabala family member, José Arechabala Rodrigo, had already filed his own cancellation petition, separate from Bacardi's.  (SMF ¶ 36.)  Also in 1995, Bacardi began selling Bahamian rum in token quantities in the U.S. under the HAVANA CLUB name (SMF ¶ 43), which Bacardi now asserts was done with the unwritten "understanding" of the JASA shareholders (AC ¶ 76).

Ultimately, in 1997, Bacardi recruited many of the JASA shareholders to assist it, by paying them to assign to Bacardi whatever rights JASA or the shareholders individually might have retained in the HAVANA CLUB name (SMF ¶ 46), despite JASA's earlier decision to allow its registrations to lapse in 1973.  Tellingly, in the 1997 assignment documents, JASA and its shareholders did not make any representation as to what their "right, title and interest" in those trademarks consisted of, and they expressly acknowledged that Cuba or its successors could have rights in the mark.  (SMF ¶ 47.)  Thus, in the 1997 assignment, the assignors effectively just quitclaimed to Bacardi whatever rights, if any, they might be able to assign.  To the extent they had nothing to assign, Bacardi received nothing.

### H.    The Parties Take Full Discovery on JASA's Abandonment in the *Galleon* Litigation, but Bacardi Prevents the Issue from Being Decided on the Merits

As noted, in 1995, Bacardi began selling its infringing HAVANA CLUB Bahamian rum in token quantities in the United States, while the HCI joint venture was selling authentic HAVANA CLUB Cuban rum in scores of other countries.  In 1996, HCH—which then was the registered owner of the HAVANA CLUB registration—together with HCI commenced a civil

action seeking injunctive relief against Bacardi to restrain its infringing use of the HAVANA

CLUB name.  (SMF ¶ 45.)  The action, captioned *Havana Club Holding, S.A. et al. vs. Galleon,*

*S.A., et al.*, No. 96 Civ. 9655 (SAS) ("*Galleon*") was filed in the United States District Court for

the Southern District of New York.  (SMF ¶ 45.)  In 1997, Bacardi counterclaimed for various

relief including a declaration that, by virtue of its then-recent agreement with certain JASA

shareholders, Bacardi was at that time the true owner of the U.S. rights in the HAVANA CLUB

trademark.  (SMF ¶ 48.)

As might be expected, a central issue in *Galleon* was whether JASA had, in fact,

abandoned its U.S. rights in the HAVANA CLUB mark.  The parties took full discovery on this

issue.  Bacardi produced documents that it claimed constituted all records from all relevant

JASA shareholders.  (Baxter Decl. Ex. 27.)  Six JASA shareholder witnesses appeared for eight

days of deposition testimony in Spain and the United States, in which the abandonment issues

were thoroughly explored.  (Baxter Decl. ¶ 32.)

Although the issue of abandonment was ripe for decision, Bacardi orchestrated a series of

procedural and substantive obstacles that blocked the courts from deciding the issue on the

merits.  First, apparently in response to a request from Bacardi, the Treasury Department's

Office of Foreign Assets Control ("OFAC") in 1997 rescinded the authorization it had earlier

granted allowing Cubaexport to transfer the mark to HCH.  (Ex. 28.)  The District Court in

*Galleon* held that this action by OFAC meant the ownership of the mark reverted to Cubaexport,

and HCH therefore lacked standing to maintain a claim for infringement of the registered

trademark.  *Havana Club Holding, S.A. v. Galleon S.A.*, 974 F. Supp. 302, 312 (S.D.N.Y. 1997).

The court, however, rejected Bacardi's request that the court cancel the trademark registration;

instead, it held that the registration remained valid but had to be returned to Cubaexport. *Id.* at 311-12.

The next year, in 1998, Bacardi obtained passage of a law known as "Section 211,"[6] which (among other things) led to dismissal of HCH's and HCI's treaty-based claims, once again evading a judicial ruling on JASA's abandonment of its trademark rights. *Havana Club Holding, S.A. v. Galleon S.A.*, 62 F.Supp.2d 1085 (S.D.N.Y. 1999). The court dismissed the case, *id.* at 1100, and explained in a June 25, 1999 clarification order that the case was "decided on the grounds of § 211 of the Omnibus Appropriations Act and standing. Thus, this Court had no reason to decide – and did not decide – whether or not the Arechabalas owned a valid trademark in the Havana Club name at the time they entered into an agreement with Bacardi & Co. This Court made no finding on this issue one way or the other." *Havana Club Holding S.A. v. Galleon S.A.*, No. 96 Civ. 9655 (SAS) (S.D.N.Y. June 25, 1999) (Baxter Decl. Ex. 31). On appeal, the Second Circuit affirmed. *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 135 (2d Cir. 2000).

In the present case, filed in 2006, Bacardi has asserted against both HCH and Cubaexport the same declaratory judgment claims that it asserted as counterclaims against HCH in *Galleon*. Thus, the same abandonment issues on which the parties took extensive discovery in *Galleon*— but which the *Galleon* court did not decide—are presented here.

## ARGUMENT

The Federal Rules of Civil Procedure provide that a party is entitled to summary judgment as to a "claim or defense"—or a "part of [a] claim or defense"—if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

---

[6]   Omnibus, Consolidated and Emergency Supplemental Appropriations Act 1999, Pub. L. No. 105-277, § 211, 112 Stat. 2681, 2681-88 (Oct. 12, 1998).

R. Civ. P. 56(a).  The Supreme Court has made clear that the rule requires summary judgment to be granted where, on the admissible evidence (which may be presented in affidavit or deposition form), no reasonable finder of fact could find in the nonmovant's favor. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The allegation that JASA had rights it could assign to Bacardi in 1997 is central to much of Bacardi's complaint.  Bacardi's principal claim of fraud in Cubaexport's registration—which it has the burden of proving by clear and convincing evidence, *e.g., In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 69 F. Supp. 3d 175, 223 (D.D.C. 2014)—is a claim that JASA still owned rights in the mark when Cubaexport filed its registration application in 1974, and that Cubaexport knew that JASA supposedly owned those rights.  (AC ¶¶ 143-156, 160.)  Bacardi's declaratory judgment claims—that it is the owner of the U.S. rights in the HAVANA CLUB trademark, and that its use of the mark does not infringe defendants' rights—also rest in substantial part on Bacardi's assertion that its alleged rights go back to JASA's first use of the HAVANA CLUB trademark in the United States.  (AC ¶ 176.)

Discovery has established that Bacardi's assertion has no support.  Although the Court in *Galleon* was prevented from ruling on this issue, this Court can and should now rule that JASA did in fact abandon all rights in the HAVANA CLUB trademark long before Bacardi obtained in 1997 a purported assignment of whatever rights they might still have.  The parties completed full discovery on that issue, ending in 1998, and no discovery on more recent developments can possibly shed light on the issue.  Thus, to the extent that Bacardi's claims rest on its assertion

that Bacardi is a successor to JASA's rights, Cubaexport is entitled to summary judgment in its favor on those claims.

## I.  JASA Abandoned Its Rights Before 1974.

Under Section 45 of the Lanham Act, a mark is abandoned "[w]hen its use has been discontinued with intent not to resume such use."  Lanham Act § 45, 15 U.S.C. § 1127.  The definition goes on to provide that "[i]ntent not to resume may be inferred from circumstances," and that "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment."  *Id.* In these circumstances, a mark is abandoned even if the original owner still has a trademark registration for the mark.

JASA's express decision in 1973 to allow the last of its U.S. registrations to expire confirms that JASA made a deliberate, voluntary decision to abandon the trademarks.  (SMF ¶ 21.)  José Arechabala, who was accepted as having authority for the Arechabala family and for JASA, expressly stated that he was not interested in preserving the mark, and no one in the family challenged that decision.  (SMF ¶ 21.)

Bacardi may try to argue that some members of the Arechabala family testified that they, individually, had some hope of resuming use at an indefinite point in the future.  Putting aside that these family members did not speak for JASA, and that JASA had already made the decision to abandon the mark, these generalized expressions of hope of resuming use at some point in the future, or a desire to prevent the mark from falling into the hands of another, is not enough to constitute intent "to resume … use."  Lanham Act § 45, 15 U.S.C. § 1127.  As the courts have repeatedly held, "an affirmative desire by the registrant not to relinquish a mark is not determinative of the intent element of abandonment under the Lanham Act," *Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed. Cir. 1990), and a statement of subjective

intent to preserve trademark rights is not enough to overcome the presumption of abandonment if a mark is not being used. *Id.* ("An averment of no intent to abandon … is patently insufficient to preclude summary judgment . . . ."); *Rivard v. Linville*, 133 F.3d 1446, 1449 (Fed. Cir. 1998) ("[a] registrant's proclamations of his intent to resume or commence use in United States commerce during the period of nonuse are awarded little, if any weight"); *Silverman v. CBS Inc.*, 870 F.2d 40, 45-47 (2d Cir. 1989) (testimony that defendant "always intended to resume using" the trademarks "at some point in the future" was insufficient to avoid finding of abandonment). Rather, a party must show either that it is actively "endeavoring to exploit the value of its marks," *Silverman*, 870 F.2d at 46-47, or that there are "special circumstances" preventing use, *Imperial Tobacco*, 899 F.2d at 1581.

"To prove excusable nonuse, the registrant must produce evidence showing that, under his particular circumstances, his activities are those that a reasonable businessman, who had a bona fide intent to use the mark in United States commerce, would have taken." *Rivard*, 133 F.3d at 1449. A reasonable business person with an intent to resume use of JASA's old HAVANA CLUB mark of course would have paid the minimal fee to maintain the registration on learning it was about to expire. A reasonable business person who wished to preserve trademark rights also would have opposed Cubaexport's registration, and at the very least would have promptly objected on learning of Cubaexport's use of the HAVANA CLUB name around the world, instead of letting it go unremarked for nearly two decades. The fact that the Arechabala family—despite all their formidable business acumen—chose not to do so is consistent with only one conclusion:  They had no intention to resume use of the mark.

Indeed, there was more than just an absence of efforts to preserve the trademarks or resume their use; the record is clear that JASA made a deliberate decision not to maintain its

trademark.  JASA was aware that its trademark registrations were about to expire, but the

testimony shows that José Arechabala, the head of the company, explicitly made a decision not

to renew them.  (SMF ¶ 21.)

Even apart from the deliberate decision to let the registrations expire, the testimony of the

JASA shareholders also shows that JASA made no serious efforts "to exploit the value of its

marks" during the period from 1961 to 1974, or indeed at any time before 1994.  *Silverman*, 870

F.2d at 47.  On the contrary, expressions of interest by others who proposed licensing the mark

from JASA were rebuffed, ignored or not pursued.  (SMF ¶¶ 15-18)  The fact that the

shareholders received these offers demonstrates that—contrary to the conclusory allegations of

Bacardi's complaint—the expropriation of JASA's distillery in Cuba did not prevent them from

using their trademark in the United States or third countries.  JASA is not the first party to have

its trademark use interrupted by external circumstances, such as government action, war,

disaster, or financial difficulties.  The law recognizes that possibility by allowing a party to

overcome the presumption of abandonment if it can show either that is diligently trying to

resume use, or that ongoing external circumstances—such as an embargo or pending litigation—

are continuing to prevent it from using the mark.  *See, e.g., Silverman*, 870 F.2d at 47; *Imperial

Tobacco*, 899 F.2d at 1582.  But there is no evidence of that in the case of the Arechabalas.  As

sophisticated and experienced business people, the Arechabalas surely understood that if their

own resources were insufficient to exploit an allegedly valuable trademark, they could have

pursued financing or investment from others.  Or they could have sought opportunities to license

the mark to an existing distiller or distributor, or they could have sold their rights to a third party,

as Bacardi claims they did nearly 30 years later in 1997.  They did none of these things.  Indeed,

JASA's alleged 1997 agreement with Bacardi (Baxter Decl. Exs. 24, 30) demonstrates that it was

not prevented from using its trademark; if JASA wanted to exploit its trademark, it could have

pursued that kind of a deal 30 or more years earlier.  Instead, when potential opportunities were

presented, JASA rebuffed them or treated them with indifference

At a minimum, if the JASA shareholders thought they needed more time to pursue efforts

to return their rum brand to the market, they could have easily spent $10 to file a Section 8

declaration to prevent their 1956 trademark registration from being cancelled in 1963.  They did

not do so.  Or they could have spent $25 to file a renewal to prevent just one of their two 1953

trademark registrations from expiring in 1973 (or $50 for both of them).  They discussed and

considered the possibility and *expressly decided* not to do so, because they were "not interested."

(SMF ¶ 21.)  JASA heard from Bacardi in early 1974 that a registration for HAVANA CLUB

had supposedly been issued, and JASA could easily have learned of Cubaexport's application if

it had made inquiries at USPTO; but it did nothing to oppose the registration when it was

published for opposition in 1975 (SMF ¶ 27), nor sought to cancel the registration at any time in

the next 20 years (SMF ¶ 36.).  *See General Healthcare Ltd. v. Qashat*, 364 F.3d 332, 334, 337-

38 (1st Cir. 2004) (waiting 9 years to seek cancellation of registration undermined claim of

intention to resume use of the mark).

Finally, Bacardi's efforts in the mid-1990s to obtain whatever rights JASA might have

retained cannot negate the fact that JASA had already abandoned the mark by the early 1970s.

Once a trademark has been abandoned, future use cannot cure the prior abandonment.  *See, e.g.,*

*ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 149 n.9 (2d Cir. 2007); *Specht v. Google Inc.*, 747

F.3d 929, 934, 935-36 (7th Cir. 2014).  Indeed, courts have recognized that an attempt to license

a trademark only after litigation has commenced constitutes further evidence for the inference

that the trademark was abandoned in the interim.  *See Rivard*, 133 F.3d at 1450.  The same

applies to JASA's belated assignment of its alleged rights to Bacardi in 1997, as part of an effort by Bacardi to manufacture support for its 1995 petition to cancel Cubaexport's registration.

For all of these reasons, whatever new rights Bacardi claims to have acquired through use after 1994 cannot be tacked on, for purposes of priority, to any rights that JASA previously had, because JASA's rights were long gone.  After not having used its trademark for 35 years, having decided not to take steps to exploit it in the interim, and having made a deliberate decision not to take steps to prevent its trademark registrations from expiring, JASA had nothing left that it could transfer to Bacardi.  This defeats Bacardi's claim for cancellation based on fraud—which requires proof that, among other things, JASA had existing rights in the mark when Cubaexport filed its 1974 application, 1982 declaration of use, or 1996 renewal.  *See* Motion to Dismiss pp. 17-20.  It also defeats Bacardi's claims for declaratory relief, to the extent they claim priority rights in the mark predating Bacardi's own post-1994 use of the marks.  *See* Motion to Dismiss pp. 38-39.

## II.    Bacardi Cannot Delay Resolution by Claiming a Need for Additional Discovery.

To avoid summary judgment on the ground that discovery is not complete, Bacardi has the burden of demonstrating by affidavit or declaration that "for specified reasons, it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d).  But here, Bacardi cannot meet that burden because the parties took full discovery on these very same issues in the *Galleon* case.

The court in *Galleon* ordered JASA and all 31 relevant Arechabala family members to search for and produce all documents in their possession, custody or control concerning the "intentions, activities, discussions, communications, studies, plans and efforts" of JASA from 1960 to 1993.  (Baxter Decl. Ex. 27.)  They found no responsive documents to produce.  (Baxter

Decl. Ex. 27.)  In addition, six Arechabala witnesses were deposed on those very same issues.

(Baxter Decl. ¶ 32).  Any new developments, occurring between the trial in the *Galleon* case in

1998 and today, could not possibly change whether JASA abandoned its HAVANA CLUB

trademark after 1960 and before Cubaexport filed its trademark application in 1974 or before

JASA purported to assign its rights to Bacardi in 1997.  And in any event, if there were any

remaining facts relevant to those issues, they should be in the possession of Bacardi, as the

purported successor in interest to the JASA shareholders.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court grant their

motion for partial summary judgment dismissing all of Plaintiffs' claims to the extent they rest

on (1) the assertion that JASA or its shareholders retained any rights in any HAVANA CLUB

trademark in 1974, when Cubaexport filed its registration application, and/or (2) the assertion

that JASA or its shareholders retained any rights in any HAVANA CLUB trademark in 1993 that

they could then transfer to Bacardi in or about 1997.

Dated:  April 29, 2016

Respectfully submitted,

_____/s/ David H. Bernstein_____
David H. Bernstein (admitted *pro hac vice*)
Carl Micarelli (admitted *pro hac vice*)
Charles W. Baxter (motion for admission
    *pro hac vice* forthcoming)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, N.Y. 10022
Telephone: (212) 909-6000
Email:   dhbernstein@debevoise.com
       cmicarelli@debevoise.com
       cwbaxter@debevoise.com

18

_____/s/ Colby A. Smith_____
Colby A. Smith (D.C. Bar No. 467266)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Ave. N.W., Suite 500
Washington, D.C. 20004
Telephone: (202) 383-8000
Email:    casmith@debevoise.com

*Attorneys for Defendants Empresa Cubana*
*Exportadora de Alimentos y Productos Varios*
*and Havana Club Holding S.A.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BACARDI & COMPANY LIMITED, and

BACARDI U.S.A., INC.,

*Plaintiffs*,

v.

EMPRESA CUBANA EXPORTADORA
DE ALIMENTOS Y PRODUCTOS VARIOS
d/b/a CUBAEXPORT, and

HAVANA CLUB HOLDING, S.A.,
d/b/a HCH, S.A.,

*Defendants*.

Case No. 1:04-cv-00519 (EGS)

**DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT
OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

**<u>PUBLIC REDACTED COPY</u>**

Pursuant to Local Civil Rule 7(h)(1) of this Court, Defendants respectfully submit the

following statement of material facts as to which there is no genuine issue in connection with

their Motion for Partial Summary Judgment (the "Motion").  Factual statements made herein are

supported either by documents or matters of record in this action or in the previous federal court

litigation between Plaintiffs and Defendant Havana Club Holding S.A. in the United States

District Court for the Southern District of New York. The documents and matters of record cited

to herein are annexed as exhibits to the accompanying declaration of Charles W. Baxter, which is

also being filed in support of Defendants' Motion.

1.     José Arechabala S.A. ("JASA") was a corporation organized under the laws of

Cuba and owned by members of the Arechabala family.  (Ex. 1 ¶¶ 28, 59, 60.)[1]

---

[1]     All references to exhibits ("Ex.") are to the exhibits to the Declaration of Charles W. Baxter
dated April 29, 2016.

2.      JASA's core business was sugar refining, but it and its affiliates also were engaged in a number of related activities, including the production of rubbing alcohol and alcohol-based fuels, shipping, rail transport, and the production of several different spirits and liqueurs, including rum sold under the HAVANA CLUB name.  (Ex. 1 ¶ 60; Ex. 2 at 1229-31; Ex. 3 at 10-11; Ex. 4 at 31-32.)

3.      At some time after the U.S. repealed prohibition in 1933, JASA began exporting rum to some localities in the United States under the HAVANA CLUB name.  (Ex. 6; Ex. 7.)

4.      In connection with its U.S. rum sales, JASA and its U.S. distributor at various times applied for and obtained registrations for several different label designs including the words HAVANA CLUB (Ex. 6; Ex. 7; Ex. 9; Ex. 10), and for the words HAVANA CLUB standing alone (Ex. 8), as trademarks at the United States Patent and Trademark Office ("USPTO").

5.      Immediately prior to the Cuban Revolution, JASA was headed by an Arechabala family member named José María Arechabala y Arechabala ("José Arechabala") (Ex. 2 at 1234, 1272.)

6.      At that time, José Arechabala, like several others in the family, split his time between a home in Cuba and a home in Spain where his wife and children lived.  (Ex. 2 at 1275-76, 1413-14.)

7.      José Arechabala was a prominent and sophisticated business executive.  In 1959, he was the vice-president of a chain of 19 department stores in Spain owned by his wife's family, and he also served on the board of directors of a Spanish insurance company.  In the 1970s, he and his wife purchased a condo in Miami that they could use as a refuge if needed after the death of Francisco Franco in Spain.  (Ex. 2 at 1273-76, 1419-25.)

8.      On December 31, 1959, the Cuban state assumed managerial control over JASA's distillery in Cuba.  (Ex. 2 at 1231; Ex. 5 at 48)

9.      In October 1960, Cuba adopted a law that formally nationalized many Cuban companies, including JASA.  (Ex. 1 ¶ 29; Ex. 11.)

10.     As of 1960, JASA held three U.S. trademark registrations that were still in effect: two 1953 registrations for label designs including the words "HAVANA CLUB" (Reg. Nos. 578,679 and 578,680) (Ex. 9; Ex. 10) and a 1956 registration for the words "HAVANA CLUB" (Reg. No. 632,828).  (Ex. 8.).

11.     The USPTO cancelled JASA's 1956 registration in 1962 because JASA failed to file a timely declaration of use or excusable non-use.  (Ex. 1 ¶ 31.)

12.     The two 1953 registrations at the USPTO were due to expire in 1973.  (Ex. 1 ¶ 31.)

13.     The JASA shareholders[2] continued to recognize José Arechabala's authority as the head of JASA after 1960 (Ex. 2 at 1291, 1322-23; Ex. 13; Ex. 14).

14.     The JASA shareholders formally reconfirmed José Archabala's authority as the head of JASA in 1997 (Ex. 14).

15.     In the late 1960s, José Arechabala's nephew José Miguel Arechabala y Arechabala ("José Miguel") ███████████████████████████████████████

████████████████████████████████████████████████████████████

---

[2]   For simplicity, from this point forward, the term "JASA" refers to the alleged continuing company under the direction of its former management and shareholders rather than the nationalized entity owned by the Cuban government, and we refer to the former shareholders of JASA simply as its shareholders.  This usage, which is for purposes of this motion only, should not be construed as a concession with regard to JASA's continued corporate existence, ownership or management.

████████████████████████████████████████████████████

████ (Ex. 4 at 62)

16.     In 1969, another nephew of José Arechabala, Ramón María Arechabala y Arechabala ("Ramón"), was approached by a business contact who suggested that he could assist in having rum made under the HAVANA CLUB name in a distillery in Santo Domingo, Dominican Republic.  (Ex. 2 at 1254-57; Ex. 5 at 88-90.).  Ramón declined the offer and did not pursue it further.  (Ex. 2 at 1254-57; Ex. 5 at 88-90.).

17.     In 1972, ████████████████████████████████████

████████████████████████████████████████ (Ex. 5 at 68, 88.) ████

████████████████████████████████████████████████

████ (Ex. 5 at 68, 75-76, 88.)

18.     Later, in 1972, José Miguel spoke with another family acquaintance, Orfilio Pelaez, a senior Bacardi executive who expressed at that time possible interest in discussing a deal with the Arechabalas.  (Ex. 2 at 1249; Ex. 4 at 95-99.)  José Miguel suggested that Pelaez connect with Ramón, but neither brother did anything until two years later when Pelaez invited Ramón for a half-day visit to Bacardi's headquarters in Nassau, Bahamas in 1974.  (Ex. 2 at 1249; Ex. 5 at 101.)  Following the meeting, Pelaez sent Ramón a note informing him that a "Company in New York … has registered the Havana Club Trade Mark" (Ex. 2 at 1279-80; Ex. 15).  Neither Ramón nor any other member of the Arechabala family did anything to follow up. (Ex. 2 at 1276-79; Ex. 5 at 149-50.)

19.     Neither Bacardi nor any JASA shareholders have any contemporaneous documents concerning any intention, activities, discussions, communications, studies, plans or efforts with respect to the Havana Club trademark, the Havana Club rum business, or any other

business of JASA or the JASA shareholders concerning rum from 1961 to 1993, other than the communications that took place between Orfilio Pelaez and Ramón Arechabala in 1974. (Ex. 27.)

20.     In 1973, as the expiration date for JASA's two remaining U.S. trademark registrations was approaching, Ramón reminded José Arechabala of the upcoming deadline to renew the trademark registrations, and asked him what should be done.  (Ex. 2 at 1282-83; Ex. 4 at 65-66.)

21.     José Arechabala informed Ramón that he "was not interested" in renewing JASA's U.S. trademark registrations for HAVANA CLUB (Ex. 2 at 1282-83; Ex. 4 at 65-66).

22.     Neither Ramón nor any other JASA shareholder challenged José Arechabala's decision at the time or attempted to submit a renewal application to the USPTO on JASA's behalf.  (Ex. 2 at 1282-83; Ex.4 at 65-66.)

23.     Because JASA did not renew the HAVANA CLUB registrations, those registrations expired in 1973. (Ex. 1 ¶ 31.)

24.     In 1974, defendant Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport") submitted an application to the USPTO to register a new HAVANA CLUB trademark.  (Ex. 16.)

25.     Cubaexport's application to the USPTO was based on a new label design that it had registered as a trademark earlier that year in Cuba.  (Ex. 16.).

26.     The USPTO published Cubaexport's trademark registration application for opposition in November 1975. (Ex. 16.)

27.     No one filed an opposition to Cubaexport's trademark registration application with the USPTO.  (Ex. 16.).

28.     The USPTO granted Cubaexport's trademark registration application the registration in January 1976. (Ex. 17.)

29.     The U.S. embargo prohibiting transactions with Cuban nationals and importation of goods of Cuban origin has prevented Cubaexport from using the registered HAVANA CLUB trademark for rum in the United States.  (Ex. 29.)

30.     Throughout the 1970s and the 1980s, Cubaexport applied for and obtained new HAVANA CLUB registrations in Mexico, France, Great Britain and nearly 80 other countries. (Ex. 18.)

31.     During the period from 1972 to 1993, Cubaexport exported rum under the HAVANA CLUB name to Spain and numerous other countries around the world, including multiple countries in Europe and Latin America.  (Ex. 19.)

32.     No later than 1977, JASA shareholders were aware of and discussed the fact that HAVANA CLUB rum was being sold in Spain, South America and elsewhere (Ex. 2 at 1283) but did not, at any time before December 1993, take any action to oppose Cubaexport's use of the HAVANA CLUB mark.  (*See* Ex. 3 at 94; Ex. 4 at 101-02; Ex. 5 at 173; Ex. 20.)

33.     In 1993, the global wine and spirits company Pernod Ricard S.A. entered into a joint venture with a Cuban state-owned enterprise, Corporación Cuba Ron, to export Cuban rum worldwide.  (Ex. 1 ¶¶ 2, 4.)  The joint venture entity that distributes the rum is known as Havana Club International S.A. ("HCI").  (Ex. 1 ¶ 4.)

34.     As part of the transaction setting up the joint venture, Cubaexport agreed to assign its trademark rights, through an intermediate company, to Havana Club Holding S.A. ("HCH"), an entity associated with the joint venture.  (Ex. 1 ¶ 21.)

35.     In December 1993, after the joint venture was publicly announced, Ramón wrote a letter to Pernod Ricard S.A. protesting for the first time the use of the HAVANA CLUB name. (Ex. 20.)

36.     In 1994 José Arechabala Rodrigo, acting on behalf of JASA, filed a cancellation action at the USPTO's Trademark Trial and Appeal Board ("TTAB"), claiming that Cubaexport had abandoned the trademark through nonuse (Ex. 21).

37.     In 1994, Galleon S.A. filed an application for a HAVANA CLUB trademark registration at the USPTO.  (Ex. 22.)

38.     Galleon S.A. was part of the Bacardi group of companies and, since the date of its application, has merged into plaintiff Bacardi & Company Limited ("Bacardi").  (Ex 1 ¶ 3.) Bacardi accordingly is the corporate successor to Galleon S.A.  (Ex 1 ¶ 3.)[3]

39.     Bacardi's 1994 registration application did not purport to be based on any rights acquired from JASA but rather on Bacardi's own stated intention to use the mark in the future. (Ex. 22.)

40.     Bacardi's 1994 registration application included a declaration signed by a Director of the Bacardi entity Galleon S.A., who was authorized to sign on that corporation's behalf, and who declared with respect to the HAVANA CLUB mark "that she believes said corporation to be entitled to use such mark in commerce; that to the best of her knowledge and belief no other person, firm, corporation, or association has the right to use said mark in commerce."  (Ex. 22.)

41.     In July 1995, Bacardi filed a cancellation action at the TTAB seeking to cancel Cubaexport's registration.  (Ex. 23.)

---

[3]     For that reason, we hereafter use the term "Bacardi" to refer to both Bacardi & Company Limited and Galleon S.A.

42.     In its July 1995 filing initiating the cancellation action, Bacardi did not claim to be a successor to any rights of JASA. (Ex. 23.)

43.     In August and September 1995, Bacardi shipped 16 cases of Bahamian rum to four distributors in the U.S. under the HAVANA CLUB name. (Ex. 1 ¶ 19.)

44.     In October 1995, the TTAB granted summary judgment dismissing the cancellation action filed in 1994 by José Arechabala Rodrigo.  (Ex. 29.)

45.     In 1996, HCH and HCI commenced a civil action, captioned *Havana Club Holding, S.A. et al. v. Galleon, S.A., et al.*, No. 96 Civ. 9655 (SAS) (S.D.N.Y.) (the "*Galleon* Action"), in which they sought (among other things) injunctive relief to prevent Bacardi from using the words HAVANA CLUB on alcoholic beverages.  (Ex. 25.)

46.     In 1997, many of the JASA shareholders entered into an agreement by which they purported to transfer any rights held by JASA and the shareholders individually to a newly formed company known as José Arechabala International Ltd. ("JAI"), which in turn purported to assign those alleged rights to Bacardi in exchange for a payment by Bacardi.  (Ex. 24; Ex. 30.)

47.     In the purported assignment agreements, JASA and the shareholders represented to JAI, and JAI represented to Bacardi, that they were "the sole and rightful owner" of "all right. title and interest" in the trademarks, but they (a) explicitly excluded from those representations and warranties any right, title or interest in the marks held by the Republic of Cuba or its successors, and (b) did not make any representations or warranties as to what "right, title and interest" in the marks, if any, still existed of as of the date of the agreement.  (Ex. 30, § 3.1(d); Ex. 24, § 4.6.)

48.     In 1997, Bacardi counterclaimed in the *Galleon* Action for various relief, including a declaration that, by virtue of its then-recent agreement with certain JASA

shareholders, Bacardi was at that time the true owner of the U.S. rights in the HAVANA CLUB

trademark. (Ex. 26.)

* * *

From the foregoing material facts, as to which there is no genuine dispute, it follows as a

matter of law that JASA and its shareholders abandoned any rights they had in the HAVANA

CLUB trademark (1) before Cubaexport submitted its application to register its HAVANA

CLUB trademark in 1974, and (2) before Bacardi purportedly acquired JASA's former rights in

1997.  Thus, as further explained in the accompanying Memorandum of Points and Authorities,

Bacardi cannot claim that the 1974 registration application misrepresented Cubaexport's rights,

or that Bacardi acquired any rights in the HAVANA CLUB trademark from JASA.  For these

reasons, Cubaexport is entitled to partial summary judgment as requested in its motion.

Dated:  April 29, 2016

Respectfully submitted,

_____
/s/ David H. Bernstein
David H. Bernstein (admitted *pro hac vice*)
Carl Micarelli (admitted *pro hac vice*)
Charles W. Baxter (motion for admission
    *pro hac vice* forthcoming)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, N.Y. 10022
Telephone: (212) 909-6000
Email:    dhbernstein@debevoise.com
          cmicarelli@debevoise.com
          cwbaxter@debevoise.com

_____/s/ Colby A. Smith_____
Colby A. Smith (D.C. Bar No. 467266)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Ave. N.W., Suite 500
Washington, D.C. 20004
Telephone: (202) 383-8000
Email:    casmith@debevoise.com

*Attorneys for Defendants Empresa Cubana
Exportadora de Alimentos y Productos Varios
and Havana Club Holding S.A.*

## CERTIFICATE OF SERVICE

I, Charles W. Baxter, associated with Debevoise & Plimpton LLP, attorneys for defendants herein, certify:

I am over eighteen (18) years of age.  On the 29th day of April 2016, I caused to be served copies of the following documents: (1) DEFENDANTS' MOTION FOR LEAVE TO FILE DOCUMENTS UNDER SEAL together with a PROPOSED ORDER; (2) DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT together with a PROPOSED ORDER, DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT thereof, and a DECLARATION OF CARL MICARELLI IN SUPPORT thereof with exhibits; and (3) DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT FILED UNDER SEAL together with a PROPOSED ORDER, DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT thereof FILED UNDER SEAL, DEFENDANTS MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT thereof FILED UNDER SEAL, and a DECLARATION OF CHARLES W. BAXTER IN SUPPORT thereof with exhibits FILED UNDER SEAL.

The foregoing documents were caused to be served by first class mail to counsel for the other parties to this action at the following addresses:

Emily Johnson Henn, Esq.
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, California  94065

Michael C. Lynch, Esq.
Damon Suden, Esq.
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, N.Y. 10178

Pursuant to 28 U.S.C. § 1746, I certify under the penalty of perjury that the foregoing is true and correct.

Executed on April 29, 2016.

_____
Charles W. Baxter