# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

HAVANA CLUB HOLDINGS, S.A., and
HAVANA CLUB INTERNATIONAL, S.A.,

        Plaintiffs,

        v.                         96 Civ. 9655 (SAS)

GALLEON, S.A., BACARDI-MARTINI U.S.A.,
INC., GALLO WINE DISTRIBUTORS, INC.,
G.W.D. HOLDINGS, INC. and PREMIER
WINE AND SPIRITS,

        Defendants.

------------------------------x

                             February 3, 1999
                             10:05 a.m.

Before:

        HON. SHIRA A. SCHEINDLIN

                             District Judge

                APPEARANCES

PROSKAUER ROSE LLP
Attorneys for Plaintiffs
    CHARLES S. SIMS
    Of counsel

BADEN KRAMER HUFFMAN & BRODSKY, P.C.
Attorneys for Plaintiffs
    RICHARD L. HUFFMAN
    Of counsel

```
 1
                  APPEARANCES (Continued)
 2

 3    RABINOWITZ, BOUDIN, STANDARD, KRINSKY & LIEBERMAN, P.C.
      Attorneys for Plaintiffs
 4         MICHAEL KRINSKY
           DEBRA EVENSON
 5         Of counsel

 6
      KELLEY DRYE & WARREN LLP
 7    Attorneys for Defendants
           WILLIAM R. GOLDEN, JR.
 8         PAUL F. DOYLE
           SARAH L. REID
 9         MICHELLE GRAHAM
           FREDERICK WILSON
10         Of counsel

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    the stores involved before the end of 1995?

2         A.    No.

3         Q.    Before the end of January 1996?

4         A.    No.

5         Q.    Does it mean that those bottles were bottled

6    before the end of 1995?

7         A.    Yes.  That could be.  That I agree with.

8         Q.    The other bottles you testified as seeing with

9    the national stamp, national product stamp on them, those

10   bottles would also have been bottled before the end of 1995,

11   isn't that correct?

12        A.    Yes, could be.

13             MR. KRINSKY:  Just one more minute, your Honor.

14             (Pause)

15             MR. KRINSKY:  No further questions.

16             THE COURT:  Mr. Doyle.

17             MR. DOYLE:  No redirect, your Honor.

18             THE COURT:  Thank you.

19             (Witness excused)

20    RAMON ARECHABALA,

21        called as a witness by the Defendants,

22        having been duly sworn, testified as follows:

23             MR. GOLDEN:  Mr. Arechabala speaks English, that

24   is his second language, but we are going to do the

25   deposition in English.

 1            THE COURT:  I hope you are not doing a

 2   deposition; I don't intend to sit through it.

 3            MR. GOLDEN:  I'm sorry, your Honor.

 4            THE INTERPRETER:  He is going to present his

 5   testimony in English.

 6            THE COURT:  All right.

 7            MR. KRINSKY:  Mr. Michael Hirshfield --

 8            THE COURT:  The name?

 9            MR. KRINSKY:  Michael Hirshfield, who worked on

10   this case with us.

11            THE COURT:  Whose firm is he from?

12            MR. KRINSKY:  He is a single practitioner who

13   shares space with our office.  He has worked on this matter

14   and we would like him to sit at counsel table.

15            THE COURT:  That is fine.

16            MR. GOLDEN:  Your Honor, Mr. Arechabala asked me

17   to advise the court that he's had three strokes, and in the

18   last stroke he had to have extensive speech therapy.  So

19   occasionally words come out not the way he wants them.  So

20   he may need to reframe his answers sometimes.

21            THE COURT:  Sure.

22   DIRECT EXAMINATION

23   BY MR. GOLDEN:

24       Q.    Mr. Arechabala, how old are you?

25       A.    I'm 63 years old, sir.

1     Q.    Where were you born?

2     A.    In Madrid, Spain.

3     Q.    Could you tell us briefly what your educational

4  background is.

5     A.    I went to school in Havana.  After some years of

6  high school, I went to Colver Military Academy in Indiana.

7  From Indiana, I went back to Cuba, and then I went to Spain

8  and took a course in business administration in Madrid.

9             THE COURT:  Where was the academy?

10            THE WITNESS:  I took a private course in Madrid.

11            THE COURT:  The academy you mentioned?

12            THE WITNESS:  Colver Military Academy.

13            THE COURT:  That is where?

14            THE WITNESS:  In Indiana.

15            THE COURT:  Which town?

16            THE WITNESS:  It's next to Provo, in a little

17  town called Colver.  C-O-L-V-E-R.

18            THE COURT:  Thank you.

19  BY MR. GOLDEN:

20     Q.    What is your present occupation?

21     A.    My present occupation?  I'm disabled, sir.

22     Q.    Before you became disabled, what was your

23  occupation?

24     A.    I was an automobile salesman.

25     Q.    After you completed your education in Spain, what

1    did you do next?

2         A.    I went back to Cuba and I start working in my

3    family business, which was Jose Arechabala S.A.

4         Q.    What year did you return to Cuba?

5         A.    In 1956.

6         Q.    Would you describe for us what your family

7    business was.

8         A.    Well, it was a pretty complex business.  We had a

9    sugar refinery, alcohol distillery, yeast factory, candy

10   factory, liquor factory, maritime terminal, where we were

11   shipping our goods outside of the country.  We also had a

12   gasoline plant, mixing plant, and we were producing liquors,

13   alcohol and molasses and sugar.

14        Q.    Did the liquor business include a distillery?

15        A.    Yes, sir, it was part of the distillery.  We

16   would distill the alcohol out of the molasses from the

17   refinery, then we would produce alcohol, and after we

18   distilled the alcohol, we produced liquors.  Among the

19   liquors were all the creams and the rum Havana Club.

20        Q.    When you joined Jose Arechabala S.A., what was

21   your position?

22        A.    Well, I was a peon.  I started at the bottom.

23   But after a few months, I start selling with the salesmen.

24   After a year in the company, I became a sales manager of the

25   company.

1    Q.    What products were you selling?

2    A.    We were selling all the liquors in Cuba, the

3    gasoline.  The mixing plant was selling all the gasoline.

4    We were selling the gasoline also in Cuba.  That is what

5    brought me to the sales manager position, because at the

6    beginning we were selling very few gallons of gasoline, but

7    after a while, I raise the sales so high that that is what

8    gave me the position of a sales manager.

9    Q.    What liquor brands did you sell?

10   A.    Pardon me?

11   Q.    What liquor brands did you sell?

12   A.    We were selling rum Havana Club, rum Arechabala,

13   and all the creams and all the products we were making.

14   Q.    What does the word "ron" mean in Spanish, the

15   word R-O-N?

16   A.    I don't understand.

17   Q.    What is the word for rum in Spanish?

18   A.    The word for rum in Spanish, ron.

19   Q.    How long did you act as a sales manager for Jose

20   Arechabala S.A.?

21   A.    Until the day they intervene in the company, they

22   took it over.  The Cuban government came in and took over

23   our company.

24   Q.    And what brands did you view as competitive with

25   Havana Club when you were a sales manager for Jose

1   Arechabala S.A.?

2        A.    Well, in Cuba, we had actually two major rums,

3   which it was Havana Club and Bacardi.  Then we had another

4   two or three rums -- they were not bad at all -- regular

5   rums, but then we have a whole bunch of different kinds of

6   rums, and they were not of any importance at all.

7        Q.    You referred to an intervention in your

8   testimony.  What was the intervention?

9        A.    When was it?

10       Q.    What was it?

11       A.    Well, very simple.  The government sent some

12  people to our company from the special forces from the Che

13  Guevara, and with armed forces they came over and took over

14  the company, and that's it.  That was the business.  They

15  kick us out of there.

16       Q.    When did this take place?

17       A.    That took place December 31, 1959.

18       Q.    Were you present when the soldiers came to Jose

19  Arechabala S.A.?

20       A.    Yes, sir.  We were told December 31, the next

21  day -- it was a holy day, so they don't work on the 1st of

22  January -- they were going to come and take over the

23  company.

24            Then what we did is we went to the International

25  Hotel in Guevara, because it so happens that December 31 is

1    my birthday, and it was a Tuesday, and they came in.  They

2    say OK.  I told my brother and my cousins -- they were there

3    with me -- I tell them, Tomorrow we are going to see what is

4    going on.

5            So we went in next Monday, next day, in the

6    morning, which it was January 1st, to the office.  When we

7    got there, it was already being taken by military force, by

8    people from the Cuban government.  And, we were told, go

9    home.  Come back tomorrow when you see what we do, but today

10   you don't have no business in here.  This company's being

11   seized by the Cuban government and we should see what

12   happens.

13   Q.    Did you know any of the people that were there on

14   behalf of the Cuban government?

15   A.    No, sir, I did not.

16   Q.    What did you do after you left the offices --

17   A.    We went to Varadero --

18   Q.    What did you do after you left the offices of

19   Jose Arechabala S.A. on January 1, 1960?

20   A.    We went back home at Varadero Beach, which is

21   where we were living.

22           THE INTERPRETER:  V-A-R-A-D-E-R-O.

23   A.    I took the phone and called my uncle in New York,

24   Ramon, and I told him, Listen --

25           MR. KRINSKY:  Objection, your Honor.

1      A.     -- they just intervene at Arechabala, don't even

2  come back in here.

3            THE COURT:  Don't what?

4            THE WITNESS:  Don't come back to Cuba because

5  you're going to be put in jail.

6            THE COURT:  I will allow that.

7      A.     And I did the same thing --

8            THE COURT:  While it might be hearsay, it is

9  offered as background only.

10      A.     -- by calling my uncle in Madrid, because they

11  were due back to Cuba in the month of January, and I had to

12  explain to them what was going on.

13      Q.     What did you do the next day on January 2nd?

14      A.     On January 2nd, we went back to work.  We find

15  out the director of the company, which his name was Calixto

16  Lopez, together with the special forces from the Che Guevara

17  unit, his name was Alexis Socarras --

18            THE COURT:  Alexis what?

19            THE WITNESS:  Alexis S-O-C-A-R-R-A-S.

20      A.     -- which told us, From now on, I am -- in other

21  words, he was talking to me.  He told me, From now on, I am

22  Pepe, P-E-P-E, Arechabala and you people will do as I say.

23  I say, OK, no problem, whatever you say, because he was

24  armed with a machine gun.

25            THE COURT:  Does "Pepe" have a meaning?

1          THE WITNESS:  Pardon me?

2          THE COURT:  What does Pepe mean?

3          THE WITNESS:  Pepe is a nickname for Jose, and he

4    was in Spain.  So he said, From now on, I'm Pepe Arechabala

5    and that's it.

6      Q.    Who was Pepe Arechabala?  Did he have a position

7    with Jose Arechabala?

8      A.    Pepe Arechabala is Jose Maria Arechabala, which

9    is my uncle, and he was in Spain, and he was chairman of the

10   board and director of Arechabala Cuba.

11     Q.    You had a discussion with Mr. Lopez, is that

12   correct, on the 2nd?

13     A.    Yes.  I told him, What do you want us to do?  He

14   said, Report to work tomorrow as if nothing had happened,

15   but you will have to be searched every single time you come

16   in and go out of your office because we don't want you to

17   take any paperwork with you.  Well, I don't have any reason

18   to take any papers with me, not even personal, because I

19   don't have any personal papers here.

20     Q.    At that time in early January 1960, what members

21   of the Arechabala family were still in Cuba?

22     A.    My brother Jose, my cousin Javier, which he was a

23   lawyer for the company, and my other cousin, which he was

24   going in and back to Spain, and he was Jose also.  He was

25   the purchasing manager of the company.

1            MR. KRINSKY:  Could we have a full name on that,

2     your Honor?

3            THE COURT:  What was his first name, the

4     purchasing manager?

5            THE WITNESS:  The purchasing manager was Jose

6     Maria Arechabala Rodrigo.  Everybody is the same name.

7            THE COURT:  I understand.

8       Q.   Mr. Arechabala, were you a shareholder in Jose

9     Arechabala S.A.?

10      A.   Yes, sir, I was.

11      Q.   Who were the other shareholders in Jose

12    Arechabala S.A.?

13      A.   The rest of my family.

14      Q.   Were there any nonfamily shareholders?

15      A.   Pardon me?

16      Q.   Were there any nonfamily shareholders?

17      A.   No, sir; everybody was family.  That was a family

18    business.

19      Q.   I believe you referred to your cousin Javier who

20    is the family lawyer.  I mean the company lawyer.

21      A.   He was the company lawyer.  He was my cousin,

22    Javier Marquez Arechabala.

23      Q.   His full name was?  I'm sorry.

24           THE COURT:  He just told you.

25      A.   Javier Marquez Arechabala.  M-A-R-Q-U-E-Z and

1   then Arechabala again.

2       Q.    When Jose Arechabala S.A. was intervened, were

3   you paid any money as a shareholder of the company?

4       A.    No, sir.  We were promised in the future.

5             MR. KRINSKY:  Objection, your Honor.

6             THE COURT:  Sustained.

7             You never got any money?

8             THE WITNESS:  No, ma'am.

9       A.    We were promised --

10            MR. KRINSKY:  Objection, your Honor.  I think,

11  perhaps, the witness needs a little lesson.

12            THE COURT:  You really cannot say what other

13  people said to you.  That is not permitted.

14            THE WITNESS: All right.  Yes, ma'am.

15  BY MR. GOLDEN:

16      Q.    Did you continue to work for Jose Arechabala

17  S.A.?

18      A.    Yes, sir.  I work there for three more months.

19      Q.    At the end of three months --

20      A.    At the end of the three months, I was called and

21  I was told that I could not keep on working in the company

22  because Calixto, which he was the Interventor, told me --

23            MR. KRINSKY:  Objection.

24      A.    -- I been accused of sharing the benefits with

25  you people.

1          THE WITNESS:  When did I send it?  I would be

2    lying to you if I tell you when.

3          THE COURT:  Well, what decade?

4          THE WITNESS:  Well, that was probably at the

5    earliest in ninety.

6          THE COURT:  In the early nineties.

7          THE WITNESS:  Right.

8          THE COURT:  Okay.  Where did you find these

9    papers?

10         THE WITNESS:  I had it at home.

11         THE COURT:  You had it at home?

12         THE WITNESS:  Yes, ma'am.  I still have at home

13   everything from those days.

14         THE COURT:  Where is home, in Miami?

15         THE WITNESS:  Miami, yes, ma'am.

16   BY MR. GOLDEN:

17    Q.    Did you receive the letter from Mr. Pelaez dated

18   February 1974?

19    A.    Yes, correct, sir.

20    Q.    Could you examine the attachment?  Do you know

21   what the attachment is?

22    A.    Well, those are the reports that he had from our

23   trademark here in the States and from the rum Havana Club

24   here in the States.  He says so very clear here, for copies

25   of all paperwork that he find out on the labels of the

1    bottles of rum that were being sold here in the United

2    States.

3        Q.    After you received this letter from Mr. Pelaez in

4    February 1974, what happened next?

5        A.    Well, I called my brother and I told him look --

6              MR. KRINSKY:  Objection, your Honor.

7              THE COURT:  Sustained.  You discussed this with

8    your brother?

9              THE WITNESS:  That's right.

10             THE COURT:  Okay.

11       Q.    After you discussed this with your brother, was

12   there any follow up with Mr. Pelaez?

13       A.    No, we waited for Mr. Pelaez but he got sick and

14   he died.  So I didn't hear any more about them.

15       Q.    After Bill Austin Ford went bankrupt?

16       A.    Yes, sir.

17       Q.    In 1975, is that right?

18       A.    That's correct.

19       Q.    What did you do next?

20       A.    Well, I was out of a job so I got together with

21   another salesman from Bill Austin Ford and we put a place in

22   Miami called the Auto Place which it was a used car lot to

23   sell used automobiles.

24       Q.    How long were you involved in that business?

25       A.    I was involved with that until the end of 1982.

1  Because in 1982 we purchased from a local company in Miami,

2  the Fiat dealership.  Because that was our main goal in

3  order to make some money, brand new franchise, new car

4  franchise.  But Fiat in January 1983 called us up and told

5  us that Fiat business in United States was being taken off,

6  in other words, they were getting away from the United

7  States.  And that was it.  So I have to file for bankruptcy,

8  personally and company wise.  Both ways.

9       Q.    During the period from 1975 to the time the Fiat

10 agency went out of business, did you have any discussions

11 about Jose Arechabala SA with anyone?

12      A.    When I was working in Austin Ford I had a

13 discussion not about Jose Arechabala but about the rum

14 Havana Club with a customer of mine which he was from Santo

15 Domingo, and he offered me --

16           MR. KRINSKY:  Objection, your Honor.

17           THE COURT:  Sustained.

18      Q.    Did you ever attempt to enter into a joint

19 venture to sell rum --

20           MR. KRINSKY:  Objection, leading, your Honor.

21           THE COURT:  Yes, it is leading, but the question

22 isn't harmless if it makes sense here.  I think this

23 question is a fair question to ask to make sure the witness

24 focuses on the next topic, so I will allow it.

25           The question is, have you ever attempted to enter

1    into a joint venture to sell rum?

2              THE WITNESS:  Yes, ma'am, I did.

3              THE COURT:  When was that?

4              THE WITNESS:  When I was working at Austin Ford,

5    but I could not make it, I could not cope with it.  I needed

6    money that I didn't have.

7              THE COURT:  You needed money you didn't have?

8              THE WITNESS:  That I didn't have.

9              THE COURT:  What year was that?

10             THE WITNESS:  Pardon me?

11             THE COURT:  What year was that?

12             THE WITNESS:  That was 1973, '74.

13             THE COURT:  What steps did you take to enter into

14   a joint venture?

15             THE WITNESS:  I tried to.

16             THE COURT:  How?  What did you do?

17             THE WITNESS:  I talked to the man.

18             THE COURT:  What man?

19             THE WITNESS:  The man from Santo Domingo.

20             THE COURT:  Does he have a name?

21             THE WITNESS:  No, he was a military -- military

22   from the Santo Domingo army that -- he was my customer.

23             THE COURT:  Former customer, now he is with the

24   military in Santo Domingo?

25             THE WITNESS:  He was a military in Santo Domingo

1   at that time and he was my customer in Miami.

2           THE COURT:  I see.  Okay.  Thank you.

3   BY MR. GOLDEN:

4       Q.   Did anything come of his effort to form a joint

5   venture in Santo Domingo?

6       A.   Pardon me, sir?  I can't hear you.

7       Q.   Did anything result from this effort to form --

8       A.   Nothing whatsoever, sir.

9       Q.   After your Fiat agency went bankrupt, what did

10  you do next?

11      A.   I took a job with a company in Miami and I went

12  to sell hospitals in Nigeria, in Lagos, in Africa.

13      Q.   How long were you in Nigeria?

14      A.   I was there until 1987.

15          THE COURT:  From when?  When did you start there?

16          THE WITNESS:  In Lagos, Nigeria.

17          THE COURT:  When did you start in Lagos?

18          THE WITNESS:  1983.

19          THE COURT:  So you were there four years?

20          THE WITNESS:  That's correct.  Four long years.

21  BY MR. GOLDEN:

22      Q.   After you left Nigeria, what did you do?

23      A.   I came back to Miami with the same company that

24  they merge with another company in Miami and we tried to do

25  the same thing with Argentina.  But nothing came up through

1   there because when you are dealing with governments, it

2   takes a long time for them to make a decision in favor or

3   against you.  So we never accomplished a thing whatsoever

4   with Argentina at that time.

5        Q.    Did you go back into business for yourself?

6        A.    I went back into business for myself.  I created

7   a freight forwarding company in Miami for household goods

8   and I was clearing customs for friends of mine that has

9   companies in Miami and I have been doing that until I got a

10  stroke that left me without being able to work.  And I got a

11  stroke on January 6, 1997, product of problems I had with an

12  accident of my kid that he got killed the day after

13  Christmas of '96.

14       Q.    So after January 1, 1996, you --

15       A.    Then I got disability.  And I haven't worked any

16  more.

17       Q.    Are you familiar with Juan Prado?

18       A.    Yes, I do.

19       Q.    Who is Mr. Prado?

20       A.    Pardon me?

21       Q.    Could you identify Mr. Prado?

22       A.    He is over there, sitting over there.

23            THE COURT:  Where is he sitting?  Who is -- oh,

24  right, right.  Thank you.

25  BY MR. GOLDEN:

1      Q.    Did you ever have occasion to meet with

2  Mr. Prado?

3      A.    Yes, I have.

4      Q.    Who attended that meeting?

5      A.    Mr. Prado, myself, a gentleman which he was a

6  friend of mine, still is a friend of mine which his name is

7  Luis Lassa.

8      Q.    Do you know who Mr. Lassa is?

9      A.    Mr. Lassa was a retired employee from Bacardi.

10     Q.    What was the purpose of your meeting with Mr. --

11     A.    Mr. Lassa called me up and told me I want you to

12  meet Juan Prado so you can take over, and he got -- take

13  over what it was left when Orfilio Pelaez died.

14          THE COURT:  When did Mr. Lassa call and say all

15  this?

16          THE WITNESS:  That was -- I believe it was in

17  1991 or '92

18          THE COURT:  Approximately 91' or '92?

19          THE WITNESS:  Right.

20          MR. KRINSKY:  I would like to strike the hearsay.

21          THE COURT:  Overruled.

22  BY MR. GOLDEN:

23     Q.    Did there come a time that you learned that

24  Pernod was doing a joint venture with the Cuban government

25  concerning Havana Club?

1      A.     I read it in the paper in Miami.

2             THE COURT:  When?

3             THE WITNESS:  When I -- when it came out in the

4      paper in the United States of America, it came out that

5      Pernod --

6             THE COURT:  Approximately when?  Approximately?

7             THE WITNESS:  I don't know if it was '92, '93.

8             THE COURT:  Okay.

9      BY MR. GOLDEN:

10      Q.     Mr. Arechabala, I would like to show you a

11      document now that might help on the timing.  Could you look

12      at Defendants' Exhibit 488?

13      A.     Give it to me, yes, I would be more than glad to.

14             THE COURT:  Is this being shown solely to refresh

15      recollection?

16             MR. GOLDEN:  Well, I was going to offer it

17      anyhow, your Honor, but it establishes the date as well of

18      his knowledge.

19      Q.     Would you look at the second page of Exhibit 488?

20      A.     Yes, sir.

21      Q.     That appears to be a letter dated December 14,

22      1993, is that right?

23      A.     That's correct.  That's when I wrote Mr. Pernod,

24      Mr. Patrick Richard which he was a chairman of the board of

25      Pernod at that time.

1     Q.    Is the letter dated December 14, 1993?

2     A.    Correct.

3     Q.    Is that your signature on that letter?

4     A.    Yes, sir, it is.

5     Q.    Is that a letter that you sent to Mr. Patrick

6  Ricard?

7     A.    Yes, sir, I did.

8     Q.    What was the purpose of the letter?

9     A.    Well, to make him aware that I had read in the

10  paper in Miami that he was dealing with Fidel Castro with

11  the rum Havana Club and I want him to know so he didn't get

12  caught by surprise that that rum belonged to my family and

13  myself, that it was stolen from us in 1959, that he could

14  get into problems in the later future because I had checked

15  with some people in Miami and they said well, if we get

16  problems, if we get the situation in Cuba solved, Pernod is

17  going to have to give you back every single bottle that he

18  ever produce or sell.

19     Q.    Would you look at the first page of Exhibit 488?

20     A.    Yes, sir.

21     Q.    Is that a letter you received from Mr. --

22     A.    That's a letter that caught me by surprise

23  because I never thought he was going to -- I mean, chairman

24  of the board writing to a poor person in Miami, it was out

25  of the question.  But it caught me by surprise because I

1   received his letter.  And he was telling me yes, no problem,

2   I am relying on your saying is correct but I could care less

3   about it.  Says okay.  No problem.

4        Q.   At this point I would like to show you a copy of

5   a letter that's -- show you Exhibit 497.  On the bottom of

6   497 there appears to be a BCC R. Arechabala.  Did you

7   receive a copy of this letter?

8        A.   Yes, sir, I did.  I received it from Juan Prado.

9        Q.   After this -- after the first meeting you

10  testified about between yourself and Mr. Prado and

11  Mr. Lassa, did you have any subsequent meetings with

12  Mr. Prado?

13       A.   Yes, I was keeping him posted of all the deals I

14  was doing with my family and all the questions I had asked

15  my family about it.  And he was asking me what was going on.

16  I says well, we are trying to see what we can do with the

17  rum --

18            MR. KRINSKY:  Objection.

19       A.   Since I left Cuba I have been trying to make rum

20  myself.

21            THE COURT:  One second, please.

22            (Pause)

23            THE COURT:  Overruled.

24            MR. KRINSKY:  Can I have a foundation, then, as

25  to how he knows what the family was thinking of doing?

Page 1268

1   evidence.

2           MR. KRINSKY:  No objection, your Honor.

3           THE COURT:  All right.

4           (Defendant's Exhibits 488, 564A and 497 received

5   in evidence)

6           MR. GOLDEN:  We would also like to offer

7   Defendants' Exhibit 576A which is an exhibit that was

8   previously marked, and it is a declaration of Debra Evenson

9   who has filed in this case.  That has attached to it Cuban

10  law 890.

11          MR. KRINSKY:  Can we see the exhibit, please?

12          No objection, your Honor.

13          THE COURT:  All right.

14          (Defendant's Exhibit 576A received in evidence)

15  CROSS-EXAMINATION

16  BY MR. KRINSKY:

17      Q.   Mr. Arechabala, were you a member of the board of

18  directors of Jose Arechabala when it was in Cuba?

19      A.   Yes, sir.

20      Q.   You were a member of the board of directors, sir?

21      A.   Yes, sir.

22      Q.   At your deposition, Mr. Arechabala, you were

23  asked the following question.

24           "Were you ever" --

25          THE COURT:  Wait a minute.  Let's go through that

1   a little more slowly.

2           Do you recall being deposed?

3           MR. KRINSKY:  I'm sorry.

4       Q.    You were deposed in this action, Mr. Arechabala,

5   is that correct?

6           THE COURT:  Do you recall being questioned under

7   oath in this action that's called a deposition?

8           THE WITNESS:  Yes, ma'am.

9           THE COURT:  You do recall.  And you recall that

10  that occurred on --

11          MR. KRINSKY:  January 28 and 29 in Miami.

12          THE COURT:  Of this year?

13          MR. KRINSKY:  Of 1998.

14          THE COURT:  Do you recall that was a year ago?

15          THE WITNESS:  Yes.

16          THE COURT:  In January?  You do?

17          THE WITNESS:  Yes.

18          THE COURT:  And you were under oath at that time?

19          THE WITNESS:  Yes, ma'am.

20          THE COURT:  Okay.  Go ahead, Mr. Krinsky.

21  BY MR. KRINSKY:

22      Q.    Do you recall being asked the question, "Were you

23  ever an officer of Jose Arechabala SA," and answering, "Yes,

24  sir, I was the sales manager of the company"?

25      A.    That's correct.

1      Q.    And then you were asked:

2            "Were you a corporate officer of that

3  corporation, Jose Arechabala SA?

4            "What do you mean by corporate officer, a

5  vice-president, for example?

6            "No, sir, I wasn't."

7      A.    No, I was not.

8      Q.    Do you recall that testimony?

9      A.    Yes, I recall that.

10     Q.    You were not a corporate officer, is that

11 correct?

12     A.    Well, not in that sense, no.

13     Q.    In that sense, yes, in that sense.

14     A.    No, sir.

15           THE COURT:  Were you a member of the board of

16 directors?

17           THE WITNESS:  No, ma'am, I wasn't.

18           THE COURT:  You were not?

19           THE WITNESS:  Not on the board of directors.

20           THE COURT:  You just said a minute ago you were.

21           THE WITNESS:  I'm sorry.  I wasn't.

22           THE COURT:  Okay.  But you were a shareholder?

23           THE WITNESS:  Pardon me?

24           THE COURT:  But you were a shareholder.

25           THE WITNESS:  Yes.

1          THE COURT:  Not on the board of directors and not

2    an officer?

3          THE WITNESS:  Not an officer.  I was a sales

4    manager and I was a shareholder and I was representing all

5    the shares of my grandmother because she was living in

6    Spain.  That would give me a privilege of going into every

7    meeting of the board of directors.

8          THE COURT:  I see.  Did you go to meetings of the

9    board?

10         THE WITNESS:  Yes, I did.

11         THE COURT:  Was your grandmother on the board of

12   directors?

13         THE WITNESS:  Yes, sir, she was the president of

14   the company.

15         THE COURT:  What was her name.

16         THE WITNESS:  Carmen Arechabala Hurtado de

17   Mendoza.

18   BY MR. KRINSKY:

19     Q.    And your grandmother was the president of the

20   company, is that correct?

21     A.    Pardon me?

22     Q.    Your grandmother was the president of the

23   company?

24     A.    That's correct.

25     Q.    She lived in Spain, is that correct?

Page 1272

1    A.    That is correct.

2    Q.    Her son, your uncle, Jose Maria Arechabala y

3  Arechabala, he was the first vice-president, is that

4  correct?

5    A.    He was the first vice-president and director of

6  the company.

7    Q.    He was acting as the president in the absence of

8  his mother?

9    A.    That's correct.

10    Q.    There were approximately eleven vice-presidents

11  of the company, isn't that correct?

12    A.    Yes, sir.

13    Q.    Were -- most of them were family members,

14  Arechabala family members?

15    A.    Yes, sir.

16    Q.    You were not among them, were you?

17    A.    No, sir.

18    Q.    Now, in 1960 there were approximately thirty

19  individual shareholders of Jose Arechabala, isn't that

20  correct?

21    A.    That is correct.

22    Q.    Now, after 1960 some of these people died and

23  their shares passed by inheritance to their children, is

24  that correct?

25    A.    That is correct.

Page 1273

1     Q.    Would you agree that between 1960 and 1993 there

2  were approximately 47 people who were shareholders at some

3  point of Jose Arechabala in this way?

4     A.    It would be true, yes.

5     Q.    Your uncle Jose Maria Arechabala y Arechabala,

6  before 1960 he lived in Spain five or six months of the year

7  and the rest of the time in Cuba, isn't that correct?

8     A.    Correct, yes, sir.

9     Q.    He has lived in Spain full-time since 1960, is

10  that correct?

11     A.    Pardon me?

12     Q.    He has lived in Spain full-time since 1960, isn't

13  that correct?

14     A.    Yes, sir.

15     Q.    Now, before 1959 isn't it correct that many of

16  the family members had their principal residences in Spain?

17     A.    Sometimes they were living in Spain four or five,

18  six months, and the rest of the time in Cuba.

19     Q.    Many of them commuted back and forth between

20  Spain and --

21     A.    That's correct.

22     Q.    Now, since the mid 1960s, the whole family has

23  been in Spain, isn't that correct, except for you and your

24  brother in Philadelphia, your cousin Gloria Marquez in

25  Virginia, and Francisco Javier in Cuba, isn't that correct?

1        A.    That is correct.

2        Q.    Now, you testified at your deposition, did you

3   not, that the quote, family headquarters was in Spain after

4   1960, isn't that correct?

5        A.    It is correct.

6        Q.    Now, would you agree with the defendants'

7   characterization of the Arechabala family as a quote,

8   Spanish Cuban family which kept strong roots in Spain?

9        A.    I don't understand you, sir.  I mean, not hear

10  you properly.

11       Q.    I'm sorry.  If you have any difficulty, please --

12       A.    Yes, I do.

13             THE COURT:  Let me just read it back.  I am right

14  here.  He asked you whether you would agree with the

15  defendants' characterization of the Arechabala family as a

16  prominent Spanish Cuban family which kept strong roots in

17  Spain?

18             THE WITNESS:  Yes.

19             THE COURT:  You would agree with that?

20             THE WITNESS:  I agree with that.

21  BY MR. KRINSKY:

22       Q.    Now, your brother Jose Miguel Arechabala has

23  lived in Philadelphia since 1966, is that correct?

24       A.    Yes, I believe so.

25       Q.    Your brother was the eighth vice-president of

1   Jose Arechabala while it was still operating in Cuba, is

2   that correct?

3        A.    That is correct.

4        Q.    He went to the University of Havana law school

5   for two years, is that correct?

6        A.    That is correct.

7        Q.    Then he went to Georgetown University in

8   Washington for one year, is that correct?

9        A.    That is correct.

10       Q.    Now, isn't that correct that after you moved to

11  the United States in 1965 you spoke almost twice a month

12  with your uncle, Jose Maria Arechabala y Arechabala in

13  Spain?

14       A.    Yes, sir, I did.

15       Q.    Is it not true that during this time in the

16  sixties and 1970s that your uncle Jose Maria Arechabala y

17  Arechabala was the vice-president of Gallerias Presiados in

18  Spain?

19       A.    Yes, sir, I believe so.

20       Q.    That was in the 1970s, at least.  Wasn't that a

21  chain of 19 department stores all over Spain including two

22  or three in Madrid?  Is that correct?

23       A.    Could be correct, yes, sir.

24       Q.    Isn't that what you testified at your deposition?

25       A.    Pardon me?

1    Q.    Isn't that what you testified to at your

2  deposition?

3    A.    I probably did, yes, sir.  It's been a long time.

4    Q.    Isn't it true that his wife, Jose Maria

5  Arechabala's wife owned this department store chain?

6    A.    Yes, they did.

7    Q.    Isn't it correct that Jose Maria Arechabala y

8  Arechabala, your uncle, and his wife, purchased a

9  condominium in Miami in the mid 1970s to spend winters

10 there?

11   A.    They did, yes, sir.

12   Q.    Isn't it correct that during the period 1974

13 through 1978 Jose Maria Arechabala y Arechabala and his

14 wife, your uncle, stayed in Miami from approximately

15 February to June or July every year?

16   A.    Yes, sir.  She came for medical reasons.

17   Q.    Isn't it correct that during their stays during

18 those years they would visit you in Miami?

19   A.    Yes, sir.

20   Q.    When you were contacted by Mr. Pelaez in late

21 1973 you told your uncle Jose Maria Arechabala about that,

22 isn't that correct?

23   A.    Yes, I did.

24   Q.    Now, after the meeting in the Bahamas in

25 January 1974 that you testified to with Mr. Pelaez, isn't it

1    true that your uncle Jose Arechabala y Arechabala never

2    inquired of you what happened at that meeting?

3        A.   No, he didn't have to because I told him that

4    nothing happened in the meeting and I was expecting a call

5    from Pelaez.  But that call never came through because he

6    died.

7        Q.   Did you ever after this meeting try to contact

8    Mr. Pelaez?

9        A.   No, sir, I waited until he sent me that letter.

10       Q.   Isn't it correct that you did not try to contact

11   anyone at Bacardi after this meeting?

12       A.   Pardon me?  I don't hear you.

13       Q.   Isn't it correct that you did not try to contact

14   anyone at Bacardi after this meeting.

15       A.   I didn't contact anybody, no, sir.

16       Q.   To your knowledge did -- isn't it true that Jose

17   Maria Arechabala y Arechabala did not try to contact anyone

18   at Bacardi after your meeting?

19       A.   If he tried to contact what?

20       Q.   I withdraw the question.

21          MR. KRINSKY:  I would like to show the witness

22   his deposition testimony, your Honor.

23          THE COURT:  That's fine.

24          (Pause)

25          THE COURT:  Mr. Krinsky?

1        MR. KRINSKY:  Yes.

2    Q.    I would like to direct your attention to page 127

3  of your deposition.

4        On page 127 were you not asked:  "Did you speak

5  to anybody else in your family other than Jose Miguel, your

6  brother, about the meeting after you arrived back in the

7  United States"?

8    A.    No, sir, I did not.

9    Q.    And the answer was, "No, sir, I did not."

10       Was that a truthful statement at that time -- was

11  that a truthful statement?

12   A.    Pardon me?

13   Q.    Was that a correct and truthful testimony in your

14  deposition?

15   A.    Yes, sir, it was.

16   Q.    Could you please turn to page 150?  Do you have

17  150?

18   A.    Yes, I got it.

19   Q.    Were you not asked did any of your relatives in

20  Spain ever inquire of you following that meeting whether you

21  heard back from Bacardi and Company?

22   A.    No, sir, they did not.

23   Q.    And the answer was, "No, sir they did not.

24       "Did any relative in the United States ever

25  inquire of you after that meeting?

1           "No."

2       A.    No.

3       Q.    Were those honest and truthful statements?  Was

4   your testimony at that time correct?

5       A.    It was correct, yes, sir.

6       Q.    Thank you.  Mr. Arechabala, I would like you to

7   look at Defendants' Exhibit 564A.  Do you still have that in

8   front of you?

9           THE COURT:  The one with the handwritten note.

10      Q.    Now, Mr. Arechabala -- I'm sorry, look at the

11  second page.  The letter from Mr. Pelaez to you dated

12  February 20, 1974?

13      A.    Correct.

14      Q.    Now, isn't it correct that Mr. Pelaez never told

15  you what company in New York had, quote, registered the

16  Havana Club trademark, isn't that correct?

17          Was that a yes answer, I take it?

18      A.    He was telling me that, yes.

19      Q.    Did he ever tell you the name of the company that

20  had, quote, registered the Havana Club trademark, the name

21  of the company in New York that had registered the Havana

22  Club trademark?

23      A.    That is correct, sir.

24      Q.    Did he tell you --

25      A.    No, he never did.

Page 1280

1      Q.    He never told you the name?

2      A.    No.

3      Q.    And you never asked him for the name?

4      A.    No, I didn't ask him for the name.

5      Q.    You never tried to find out on your own what

6    company in New York may have registered the Havana Club

7    trademark, is that correct?

8      A.    No, sir, I did not.

9      Q.    Now, after receiving this letter on February 20,

10   1974, you never told anyone else in your family, isn't that

11   correct, that you had received information to the effect

12   that somebody had registered the Havana Club trademark

13   except for your brother Jose Miguel?

14     A.    That's correct.

15     Q.    You didn't keep this letter --

16     A.    Pardon me?

17     Q.    Withdraw the question.

18     A.    What did he say?

19           THE COURT:  He withdrew the question.  No

20   question.

21     Q.    Now, looking at the next page of these exhibits,

22   do you see at the bottom the first of the remainder says BAC

23   O1591?

24           THE INTERPRETER:  Could you please repeat the

25   number?

1          MR. KRINSKY:  I will take care of it.

2          THE COURT:  I didn't hear what you said.  What

3    did you say?

4          MR. KRINSKY:  I am trying to make sure we are all

5    on the same page.

6          THE COURT:  That's all you wanted to do?

7          MR. KRINSKY:  Yes.

8     Q.    Now, these and the subsequent pages in this

9    exhibit were received by you from Mr. Pelaez, isn't that

10   correct?

11    A.    That's correct, yes, sir.

12    Q.    Now, isn't it correct that you testified at your

13   deposition that "he sent me this and I didn't pay any

14   attention to it whatsoever," isn't that correct?

15    A.    Yes, sir, it is correct.

16    Q.    You did not ask -- you also testified at your

17   deposition, did you not, that you didn't know what it meant,

18   these pages?

19    A.    That I didn't know what they meant.

20    Q.    That you did not know what these pages meant, is

21   that correct?

22    A.    That is correct, sir.

23    Q.    You did not ask Mr. Pelaez what they meant?

24    A.    I never talked to Mr. Pelaez.

25    Q.    You did not ask Jose Maria Arechabala about these

1  documents?

2       A.    No, sir, I did not.

3       Q.    Now, isn't it true, Mr. Arechabala, that sometime

4  after you came to the United States you had a conversation

5  with your uncle Jose Maria Arechabala about renewing the

6  company's registration of the Havana Club trademark in the

7  United States?

8       A.    That is correct, yes, sir.

9       Q.    Isn't it correct that he told you he was not

10 interested in renewing the registration?

11      A.    That is correct, because we were going back to

12 Cuba any moment and -- that was our hope, at least.

13           THE COURT:  Well, can we break that down?  Did

14 your uncle tell you he was not interested in renewing the

15 registration?

16           THE WITNESS:  He told me we could not do anything

17 right now with it because let's wait because we might be

18 going to Cuba any moment.

19           THE COURT:  When was this?  When did your uncle

20 say this?

21           THE WITNESS:  When I talked to him back in 1974.

22           THE COURT:  He said that back in '74?

23           THE WITNESS:  Yes.  We were planning to go back

24 to Cuba real quick.  They are very optimistic, you know?

25 But that's the way it is.

1  BY MR. KRINSKY:

2      Q.    You had the same conversation with your brother,

3  isn't that correct, about renewing the registration, and you

4  and your brother decided not to renew the registration,

5  isn't that correct?

6      A.    Sir, I cannot hear you here.

7      Q.    You had the same conversation at the same time

8  with your brother, isn't that correct, about --

9      A.    That is correct, yes, sir.

10     Q.    Now, in 1976 and 1977 -- or 1977, were you not

11  told by one of your family members in Spain that the Cubans

12  were exporting Havana Club from Cuba to Spain and other

13  countries?

14     A.    Yes, sir.

15            THE COURT:  That was twenty years ago they were

16  exporting the Havana Club?

17            THE WITNESS:  Yes, ma'am.  It was a source of

18  income for the Cuban government.

19            THE COURT:  I see.

20            MR. KRINSKY:  Could I have a moment, your Honor?

21            THE COURT:  Yes, certainly.

22            (Pause)

23            MR. KRINSKY:  No further questions, your Honor.

24            THE COURT:  Thank you.

25  REDIRECT EXAMINATION

Page 1284

1    BY MR. GOLDEN:

2        Q.    Mr. Arechabala, was it your understanding that to

3    renew the trademark you had to be currently selling rum

4    under the Havana Club name?

5        A.    Yes, but how could you renew your trademark if

6    you cannot produce the rum?  Then you are doing something

7    wrong against the law.  Because in order to renew your

8    trademark you have to be able to make the rum, to sell the

9    rum, and to distribute the rum.  So I could not, I mean,

10   register the trademark again because I didn't have the

11   facilities for doing that.

12            MR. GOLDEN:  No further questions.

13       A.    That is against the law.

14            THE COURT:  Anything further?

15            MR. KRINSKY:  Just one moment, your Honor.

16            (Pause)

17            MR. KRINSKY:  No further questions, your Honor.

18            THE WITNESS:  Thank you, your Honor.  That's

19   about it?  Thank you so much.

20            (Witness excused)

21            MR. GOLDEN:  Your Honor, our next witness is Luis

22   Arechabala.  I have to go get him.

23            (Pause)

24            MR. GOLDEN:  Your Honor, Mr. Arechabala may need

25   a little help with the translation.

Page 1290

1  death, you were given shares in Jose Arechabala S.A. by your

2  father?

3      A.    Yes.

4      Q.    And you and your brother and sister all received

5  shares, is that correct?

6      A.    Right.   Correct.

7      Q.    Did you ever attend meetings of former

8  shareholders of Jose Arechabala S.A.?

9            MR. KRINSKY:  I would like a time frame, your

10 Honor.

11           THE COURT:  First of all, let's get a yes or no.

12           Did you ever attend meetings of shareholders?

13           THE WITNESS:  Yes, I did.

14     Q.    When was the first such meeting that you

15 attended?

16     A.    1993.

17     Q.    Who called that meeting?

18     A.    I could not tell you who called it.

19           THE COURT:  Where was it held?

20           THE WITNESS:  In Madrid, in Spain.

21     Q.    At whose house was it held?

22     A.    At one of my cousin's house, Victoria Arechabala

23 Fernandez.

24     Q.    Was Jose Maria Arechabala y Arechabala there?

25     A.    Yes, he was.

1      Q.    Who is Jose Maria Arechabala y Arechabala?

2      A.    He is an uncle of mine.

3      Q.    Did he hold a position at Jose Arechabala S.A.?

4      A.    Yes, he did.

5      Q.    What was that position?

6      A.    He was vice president and president when her

7  mother was the president died.

8      Q.    Were there any other officers of Jose Arechabala

9  S.A. there?

10     A.    Yes, my father and -- I could not tell you.

11 There probably were more officers.

12     Q.    What position did your father hold at Jose

13 Arechabala S.A.?

14     A.    Purchasing director.

15     Q.    Was he also an officer --

16           THE COURT:  Hold on.  We are getting back into

17 historical times.

18           MR. KRINSKY:  I think we are back to 1950, your

19 Honor.  That would be a useful point to know when we are

20 talking about.

21           THE COURT:  You say he was purchasing director.

22 Was that since 1993 when you were a shareholder?

23           THE WITNESS:  No, that was when he worked at the

24 factory in Cuba.

25           THE COURT:  How do you know that then?

1         THE WITNESS:  Because I've known through him and

2    through other shareholders of the company.

3         THE COURT:  This is historical information.

4    BY MR. GOLDEN:

5         Q.    You attended this meeting of shareholders in 1993

6    at your cousin's house, is that correct?

7         A.    Yes, it is.

8         Q.    You testified that your father and other members

9    of your family were there; is that true as well?

10        A.    Yes.

11        Q.    What was the purpose of that meeting?

12        A.    It was to get ourselves together, the

13   shareholders of Jose Arechabala S.A., to fight for the

14   rights of the family and towards the companies of the

15   Arechabala group.

16        Q.    Did you learn of the merger between Pernaud and

17   the Cuban government with respect to Havana Club rum?

18        A.    Yes, I learned through specialized press on food

19   and beverages.

20        THE COURT:  When did you learn that?

21        THE WITNESS:  It was --

22        THE COURT:  Approximately.

23        THE WITNESS:  -- around 1994.

24        Q.    And you learned it through reading a trade press,

25   is that correct?

Page 1293

1       A.    Excuse me?

2       Q.    You learned it through reading a publication?

3       A.    Yes.

4       Q.    What was the publication that you read?

5       A.    It was a publication on the food and beverages

6   sector.

7       Q.    Did you read that publication as part of your

8   duties as an insurance --

9       A.    Yes, I did.

10      Q.    After you read of the joint venture between

11  Pernaud in Cuba with respect to Havana Club rum, what did

12  you do?

13      A.    Well, I talked about it to my father and he

14  talked with the rest of the family and we all were worried

15  about the matter.

16      Q.    And what was the nature of your concern?

17      A.    That an asset of the company was being passed

18  onto or sold to a non-Cuban company.

19      Q.    Did your family take any steps to protect its

20  rights?

21      A.    Yes, we did.

22      Q.    What were those steps?

23      A.    The first step we took was to petition the

24  cancellation of the brand Havana Club in the U.S. in the

25  Patent and Trademark Office.

1      Q.     Who was it that petitioned the Patent and

2   Trademark Office to cancel the trademark Havana Club?

3      A.     My father did.

4      Q.     And your father was Jose?

5      A.     Jose Maria Arechabala Rodrigo.

6      Q.     Did the family take any other steps to protect

7   their rights?

8      A.     We kept on having meetings and we were approached

9   by firms in the sector.

10     Q.     Did there come a time that the family formed an

11  association of shareholders?

12     A.     Yes.

13     Q.     Would you explain what that association of

14  shareholders was.

15     A.     Yes.  It was an association of the shareholders

16  of Jose Arechabala and the Arechabala group to protect our

17  rights on those companies.

18     Q.     What was the name of that association?

19     A.     Asociaci¢n de Propietarios de Jose Arechabala,

20  and Ajasa Cuba was the abbreviation.

21     Q.     What was the nature of the association?  Is that

22  a legal entity in Spain?

23     A.     Yes, it is.

24     Q.     Were you represented by an attorney in setting up

25  that association?

1      A.     We had the advice of an attorney, yes.

2      Q.     Who was the attorney that advised you in this

3    matter?

4      A.     An uncle of mine, Jaime Aguirre.

5             THE COURT:  What was the name again?

6             THE WITNESS:  Jaime Aguirre.

7             THE COURT:  I can't catch the last name.

8             THE WITNESS:  Aguirre.

9             MR. KRINSKY:  Could I have the answer read back?

10            THE COURT:  The name?

11            MR. KRINSKY:  The question before.

12            THE COURT:  The advice of an attorney, an uncle

13   of his.

14     Q.     When was this association set up?

15     A.     In 1994.

16            THE COURT:  Mr. Golden, I think we will take our

17   afternoon recess now and reconvene at 10 of 4.

18            MR. GOLDEN:  Thank you.

19            (Recess)

20   BY MR. GOLDEN:

21     Q.     Mr. Arechabala, I believe you testified before

22   the break that Ajasa Cuba was approached by another company,

23   is that correct?

24     A.     Yes, it is.

25     Q.     What company approached Ajasa Cuba?

Page 1296

1     A.    A British company called International Distillers

2  & Vintners.  Before that, we had an approach made by the

3  lawyers of Pernaud Ricard.

4     Q.    Was there a meeting between representatives of

5  the shareholders of Jose Arechabala S.A. in relation to

6  Pernaud Ricard?

7     A.    Yes, there was.

8     Q.    Who attended that meeting?

9     A.    My father, Jose Maria Arechabala Rodrigo, my

10 cousin, Jose Manuel Arechabala Fernandez, and another cousin

11 of mine Jose Pita Salvatella.

12    Q.    You did not attend that meeting, is that correct?

13    A.    No, I did not.

14    Q.    And you testified that you then had a meeting

15 with IDV, is that correct?

16    A.    Yes.

17          MR. KRINSKY:  Could we have a time frame here,

18 your Honor?

19    Q.    When did the meeting with the representatives of

20 Pernaud Ricard take place?

21    A.    In the beginning of '94.

22    Q.    When did the meeting with the representatives of

23 IDV take place?

24    A.    Towards the late spring of '94, early summer.

25          THE COURT:  One second, Mr. Golden.

1          (Pause)

2     Q.    And who attended that meeting?

3     A.    My father and myself.

4     Q.    Who attended the meeting on behalf of IDV?

5     A.    The director of Anglo Espanola de Distribucion,

6     the Spanish subsidiary of IDV.

7     Q.    Were there any other representatives of IDV at

8     that meeting?

9     A.    There was a contact person of IDV, the person

10    that first got in touch with us.

11    Q.    Do you recall what the name -- who that was?

12    A.    I don't remember his name.

13    Q.    Were there any lawyers at that meeting?

14    A.    No, there weren't.

15    Q.    And what was the subject of the meeting?

16    A.    Trying to get an agreement done on the Havana

17    Club mark.

18    Q.    That meeting took place, I believe you testified,

19    in the early spring of 1994?

20    A.    Yes.

21          MR. KRINSKY:  Your Honor, his testimony was late

22    spring of 1994.

23    A.    Late spring, early summer.  I could not tell you

24    an exact date.

25          THE COURT:  I forgot what IDV stands for.  What

1  does that stand for?

2           THE WITNESS:  International Distillers &

3  Vintners.

4      Q.    After this first meeting, did you have any

5  follow-up meeting with representatives of IDV?

6      A.    Yes.  We had a meeting that same year, I think it

7  was the end of August, in London, with the president of IDV,

8  the head of the legal department, another person of the

9  legal department, one executive of the marketing department,

10  and my father and myself.

11     Q.    Did you have any lawyers representing you at this

12  meeting?

13     A.    No, we didn't.

14     Q.    What was the purpose of the meeting in London?

15     A.    To set a time to have an agreement done on the

16  Havana Club mark and set a timetable for the steps to be

17  taken.

18     Q.    And did you enter into a memorandum of

19  understanding with IDV?

20     A.    Yes, we did.

21     Q.    I'd like to show the witness Exhibit 560A.

22           Could you turn to the second page, really the

23  third page of Defendants' Exhibit 560A, which is captioned

24  "Memorandum of Understanding, August 31, 1994."

25     A.    Yes.

1      Q.    Have you seen this document before?

2      A.    Yes, I have.

3      Q.    What is this document?

4      A.    This is the memorandum of understanding we signed

5    in London.

6      Q.    When you say "we signed," is this document signed

7    by yourself and your father?

8      A.    Yes.

9      Q.    After you signed this memorandum of

10   understanding, did you agree on a time schedule to proceed

11   on the project?

12     A.    Yes, we did.

13     Q.    I direct your attention to the first page, really

14   the second page of 560A, it is captioned "Project Ernest

15   Action Plan."

16     A.    Uh-hum.

17     Q.    Have you seen this document before?

18     A.    Yes, I have.

19     Q.    Would you tell us what this document is?

20     A.    This is the schedule we first set up at that

21   meeting for the actions to be taken.

22     Q.    It was a schedule set up by you and your father

23   and IDV, is that correct?

24     A.    Yes.  Correct.

25     Q.    What was Project Ernest?

1       A.      That was the name of the project related to the

2  Havana Club mark, to the joint agreement.

3       Q.      Was action taken pursuant to this Project Ernest

4  Action Plan?

5       A.      Yes, there was.

6       Q.      What steps did you take with IDV with respect to

7  the Havana Club trademark?

8       A.      I remember we sent them some records on

9  historical facts of the companies of the Arechabala group,

10  and we had several meetings after that in Spain.

11      Q.      The meeting in London took place on or around

12  August 31, is that right?

13      A.      Right.

14      Q.      1994?

15      A.      Yes.

16      Q.      When was the next meeting you had with

17  representatives of IDV?

18      A.      It must have been in September or October of that

19  same year.

20      Q.      Where did that meeting take place?

21      A.      In Santa Maria de Huerta, a location two hours

22  away from Madrid in Spain.

23      Q.      Who attended that meeting?

24      A.      The executive I mentioned from the marketing

25  department of IDV, a person from the legal department, a

1   person from the finance department, my father and myself.

2       Q.    Was Mr. Wyndham the representative from the

3   marketing department?

4       A.    Mr. Wyndham Carver, yes.

5       Q.    What was the subject of the meeting you had in

6   Madrid or outside of Madrid?

7       A.    It was to advance on the agreement on the Havana

8   Club mark.

9       Q.    What, if anything, was decided at that meeting?

10      A.    That we had some goals set up to be able to have

11  an agreement signed before December of that year, that we

12  were supposed to go to England with them.

13      Q.    After this meeting you just testified about, when

14  was the next meeting you had with IDV?

15      A.    It must have been a month later.

16      Q.    Of what year?

17      A.    Of that meeting we had at Santa Maria de Huerta.

18  1994.

19      Q.    What took place at this meeting?  Who attended

20  this meeting?

21      A.    From IDV, the person from the legal department,

22  my father and myself.

23      Q.    What was the subject of this meeting?

24      A.    The subject was the troubles they were having,

25  the troubles they were having with Pernaud --

 1            MR. KRINSKY:  Objection, your Honor.  It's

 2   hearsay.

 3            THE COURT:  You were at this meeting?

 4            THE WITNESS:  Yes, I was.

 5            THE COURT:  That was one of the subjects

 6   discussed at the meeting?

 7            THE WITNESS:  Yes.  The general subject was the

 8   Havana Club mark.

 9            THE COURT:  Yes.  And did you discuss Pernaud,

10   Ricard Pernaud?

11            THE WITNESS:  Yes.  We talked about the --

12            THE COURT:  I will allow it as a subject matter

13   of the meeting.

14            THE WITNESS:  Excuse me, your Honor?

15            THE COURT:  I am just allowing you to say it was

16   a subject of the meeting.

17       A.    The subject was the Havana Club mark.

18       Q.    Was there also -- was the subject of Pernaud

19   raised at the meeting?

20       A.    Yes, it was raised.

21       Q.    What was the subject of that discussion?

22       A.    The subject was that several contracts IDV had to

23   renew --

24            MR. KRINSKY:  Objection, your Honor.

25       A.    -- to renew with Pernaud.

1              THE COURT:  It is a little bit beyond listening

2    to the agenda for the meeting.  I understand they discussed

3    the mark and I understand they discussed Ricard Pernaud's

4    participation, but then it began to be a little detailed

5    when they get to the IDV contracts.  Even that is a topic

6    because you have been talking to IDV also.

7              IDV came up also as a topic?

8              THE WITNESS:  Well, IDV was one of the parts

9    attending the meeting.

10             THE COURT:  They were there?

11             THE WITNESS:  Yes.

12             THE COURT:  They participated in the meeting?

13             THE WITNESS:  They participated in the meeting.

14             MR. KRINSKY:  Pernaud was not at this meeting,

15   your Honor.

16             THE COURT:  I was going to ask that.

17             Pernaud was not, but IDV was?

18             THE WITNESS:  Yes.  One of the subjects was IDV's

19   difficulties with Pernaud in some contracts they had

20   together because of the Havana Club.

21             MR. KRINSKY:  Your Honor.

22             THE COURT:  I don't see any harm in this.  This

23   is the subject matter of the meeting.

24             Go ahead, Mr. Golden.

25   BY MR. GOLDEN:

1     Q.    Did you have any further meetings with

2   representatives of IDV after the meeting you just testified

3   about?

4     A.    Yes.

5     Q.    Where did the further meeting take place?

6     A.    In Madrid.

7     Q.    When did that meeting take place?

8     A.    It was late 1994 or beginning 1995.

9     Q.    Who attended that meeting?

10    A.    On the part of IDV, Mr. Wyndham Carver, my

11  father, my brother and myself.

12    Q.    What was the subject of that meeting?

13    A.    Mr. Carver came to tell us that they could not

14  reach an agreement with us because they had some pressures

15  from Pernaud Ricard.

16          MR. KRINSKY:  Objection, your Honor.

17    A.    And --

18          THE COURT:  One second, please.  This fellow is

19  from IDV, Mr. Carver?

20          THE WITNESS:  Yes, Mr. Carver.

21          THE COURT:  He is from IDV?

22          THE WITNESS:  From IDV.

23          THE COURT:  The objection is sustained as to what

24  he said.

25  BY MR. GOLDEN:

1     Q.    At that meeting, was the subject of the

2  memorandum of understanding that you had reached with IDV

3  brought up?  Did you discuss the memorandum of

4  understanding?

5     A.    No.  We discussed that we could not reach an

6  agreement.

7     Q.    The memorandum of understanding envisioned that

8  there would be a final agreement between IDV and the

9  representatives of Jose Arechabala S.A., is that correct?

10          MR. KRINSKY:  It is leading, your Honor.

11    A.    That's correct.

12          MR. KRINSKY:  It is leading.

13          THE COURT:  Overruled.

14          But it failed, right?

15          THE WITNESS:  But it failed, yes.

16    Q.    Was the subject of the meeting why the agreement

17  failed?

18    A.    It was one of the subjects.

19    Q.    What was discussed about why the agreement

20  failed?

21          MR. KRINSKY:  Objection, your Honor.

22          THE COURT:  Sustained.

23    Q.    At this point, I refer you to the last page of

24  Exhibit 560.

25          THE COURT:  Is that 560A?

1          MR. GOLDEN:  560A.  I'm sorry, your Honor.

2          THE COURT:  You're referring to the last page?

3          MR. GOLDEN:  Yes.

4     Q.   Is that a true copy of a letter you received from

5     Elizabeth Dean, secretary, to Kelly Breslin, and was

6     addressed to you?

7     A.   Yes.

8     Q.   Did you receive that letter?

9     A.   Yes, I believe I did.

10          MR. GOLDEN:  At this point, your Honor, I move to

11     introduce into evidence Exhibit 560A.

12          MR. KRINSKY:  No objection, your Honor.

13          THE COURT:  560A is received.

14          (Defendants' Exhibit 560A received in evidence)

15     BY MR. GOLDEN:

16     Q.   After the meeting that you discussed that took

17     place in Madrid with representatives of IDV, did you have

18     any further communications with IDV or from IDV?

19     A.   Yes, we did.

20     Q.   Did you have any further meetings with Wyndham

21     Carver?

22     A.   Not after the last one I talked about.

23     Q.   Who else did you meet with from IDV?

24     A.   Before that last meeting?

25     Q.   After the last meeting you just testified about

1  when you were advised that IDV wasn't going to go through

2  with the agreement, did you have any further communications

3  with IDV?

4     A.   Written communications or telephone

5  conversations, yes.

6     Q.   Did you have any further meetings?

7     A.   No, no meetings.

8     Q.   Did you have any further communications from IDV?

9     A.   Yes.

10     Q.   Did IDV assist you in trying to find another

11  partner?

12     A.   Yes.

13     Q.   How did IDV assist you?

14     A.   They suggested we could reach an agreement with

15  other companies of the sector.

16     Q.   In or around this time -- this time is now early

17  1995, is that correct?

18     A.   Yes.  Correct.

19     Q.   At or about this time, did you have any meetings

20  with representatives of Bacardi?

21     A.   Yes, we did, in that same year.

22     Q.   What was the first such meeting that you

23  attended?

24     A.   I think it was in 19 -- I don't remember the

25  exact date, but I attended a meeting with my father, with

1    our lawyer and with Mr. Cutillas from Bacardi.

2         Q.    Was that meeting before or after the talks had

3    broken off with IDV?

4         A.    After.

5         Q.    You attended that meeting with your father, is

6    that correct?

7         A.    Correct.

8         Q.    Did you have any lawyers present at that meeting?

9         A.    Yes, we did.

10        Q.    Who was representing you at that meeting as an

11   attorney?

12        A.    Mr. Sartorius.

13        Q.    Who attended that meeting for Bacardi?

14        A.    Mr. Cutillas and his lawyer, Gonzalo Ulloa.

15        Q.    Do you know the name of the law firm that lawyer

16   was with?

17        A.    Gomez Acebo y Pombo.

18        Q.    What was the subject of the meeting that you

19   attended with Bacardi?

20        A.    To reach an agreement with Bacardi on the Havana

21   Club mark.

22        Q.    After that initial meeting, did you have any --

23   did you attend any further meetings with Bacardi?

24        A.    Yes, I did.

25        Q.    When was the next meeting you attended after the

Page 1309

1    meeting you testified about with Mr. Cutillas?

2         A.    It must have been a month later than that.

3         Q.    Who attended that meeting?

4         A.    My father, my brother, our attorney,

5    Mr. Sartorius, and myself.

6         Q.    Who attended the meeting on behalf of Bacardi?

7         A.    Mr. Prado and Mr. Ruiz and their lawyer,

8    Mr. Ulloa.

9              MR. KRINSKY:  I'm sorry, your Honor.  I didn't

10   catch the last name.

11        A.    Their lawyer, Mr. Gonzalo Ulloa.

12        Q.    Could you spell that for the record?

13        A.    U-L-L-O-A.  That's the last name.

14        Q.    After this meeting with Bacardi, did you have any

15   meetings with other members of your family?

16        A.    Yes, we did.

17        Q.    What was the purpose of the meetings you had with

18   other members of your family?

19        A.    To inform them, first, on -- we had several

20   meetings with members of our family.  To inform them on the

21   last happenings on this matter.

22        Q.    Were you given powers of attorney by people in

23   your branch of the Arechabala family to represent them in

24   transactions with Bacardi?

25        A.    Yes, I was.

1     Q.     Could you tell us which members of your family

2  gave you powers of attorney to represent them in connection

3  with the transaction with Bacardi?

4     A.     Yes; my grandmother, Teresa Rodrigo Arechabala,

5  my aunt, Maria Rosa Arechabala Rodrigo, my sister, Christina

6  Arechabala Cifuentes, and my brother, Jose Arechabala

7  Cifuentes.

8     Q.     At this point, was your father still alive?

9     A.     No, he wasn't.

10    Q.     All the people you just referred to, were they

11 all shareholders of Jose Arechabala S.A.?

12    A.     Yes, they were.

13    Q.     When was -- at or around this time -- what time

14 frame are we at now with the second meeting with Bacardi?

15    A.     The second meeting must have been, I think it was

16 in the year 1995.

17    Q.     Was there any understanding between the

18 representatives of Jose Arechabala S.A. and Bacardi as to

19 the use of the Havana Club trademark?

20    A.     Yes, there was.

21    Q.     What was that understanding?

22    A.     That they could use the brand Havana Club and

23 there was an understanding between the parties.

24    Q.     What was the next meeting that took place after

25 the meeting you testified about in August 1995 -- excuse me,

1    in mid-1995 with Bacardi?

2              MR. KRINSKY:  Your Honor, I thought he just said

3    1995.  He didn't say the time of the meeting.

4              MR. GOLDEN:  I'm sorry.  I will withdraw the

5    question.

6         A.    There were some --

7              THE COURT:  The question is withdrawn.  He is

8    going to phrase it again.

9         Q.    Did you have a third meeting with representatives

10   of Bacardi?

11        A.    Yes, we did.

12        Q.    When did that third meeting take place?

13        A.    I don't remember the exact time.  There were

14   several meetings with Bacardi that year.

15        Q.    Do you remember approximately when this took

16   place?

17        A.    Probably before the summer of '95.

18        Q.    Ultimately, did -- let me withdraw that question.

19              Who else had been delegated by different branches

20   of the Arechabala family to negotiate on behalf of the

21   Arechabala shareholders?

22        A.    There are the different representatives for the

23   different branches.

24        Q.    Could you identify those representatives that you

25   remember?

1      A.      Jose Manuel Arechabala Fernandez, Gabrielle

2  Mallet Bustamante, Fernando Ruiz Pita, and myself.

3      Q.      All those gentlemen you identified, had they all

4  powers of attorney from respective members of their branch

5  of the Arechabala family?

6      A.      Yes, they did.

7      Q.      Did there come a time that the representatives of

8  the shareholders of Jose Arechabala S.A. came to an

9  understanding with Bacardi about the nature of the

10  transaction that was to take place between Bacardi and Jose

11  Arechabala S.A.?

12      A.      Excuse me.  Could you --

13      Q.      What was the structure of the transaction between

14  Bacardi and Jose Arechabala S.A.?

15      A.      It was an agreement on the rights of the brand

16  Havana Club.

17      Q.      What was done with Jose Arechabala S.A.?

18      A.      It was -- there was -- it went on to a

19  dissolution process trespassing some of the assets of Jose

20  Arechabala S.A. out to Jose Arechabala International.

21      Q.      What were the assets, as you understand them, of

22  Jose Arechabala S.A. at that time?

23      A.      At that time, the assets were all of Jose

24  Arechabala's assets; the factory, the port, all of the trade

25  marks.  It had several.

1      Q.    So there were additional assets other than the

2  Havana Club trademark and related goodwill?

3      A.    Yes.

4            MR. KRINSKY:  Your Honor, where are these assets

5  located?

6            THE WITNESS:  In Cuba.

7            THE COURT:  He says the factory, the port, all of

8  the trademarks.

9            MR. KRINSKY:  It is in Cuba we are talking about?

10           THE COURT:  You are talking about only in Cuba or

11  are they anywhere else?

12           THE WITNESS:  No, in Cuba.

13  BY MR. GOLDEN:

14     Q.    When you are talking about Cuba, you are talking

15  about the physical assets, is that correct?

16     A.    Right.  Correct.

17     Q.    Were there intangible property assets outside of

18  Cuba?

19     A.    Yes.

20     Q.    Do I understand your testimony correctly that a

21  new company called Jose Arechabala International was set up?

22     A.    Yes.

23     Q.    Who were the shareholders of Jose Arechabala

24  International?

25     A.    The same as Jose Arechabala S.A. in the same

1    proportions.

2         Q.    So all the shareholders, the former shareholders

3    of Jose Arechabala S.A., had equity holdings in the new

4    company in the same proportion as their holdings in Jose

5    Arechabala S.A., is that correct?

6         A.    Correct.

7         Q.    Did Jose Arechabala International and the

8    shareholders of former Jose Arechabala S.A. transfer any

9    rights to Bacardi & Company?

10        A.    Yes.

11        Q.    What were the rights they transferred to Bacardi

12   & Company?

13        A.    The rights to the mark Havana Club.

14        Q.    In exchange for the transfer of the rights to the

15   mark Havana Club, did the shareholders of Jose Arechabala

16   S.A. and Jose Arechabala International receive any

17   compensation?

18        A.    Yes, they did.

19        Q.    What was the consideration paid by Bacardi?

20        A.    What was the?

21        Q.    The money that was paid by Bacardi.

22        A.    The amount?

23        Q.    Yes.

24        A.    There was a million and a quarter -- $1,250,000.

25        Q.    Was there other future consideration as well,

1   contingent consideration?

2       A.    Yes.

3       Q.    At this point I'd like to show you Defendants'

4   Exhibit, in evidence, 467A.

5             Do you have that document in front of you?

6       A.    Yes.

7       Q.    Actually, it is a joint exhibit that contains

8   three separate agreements, is that correct?

9       A.    Correct.

10      Q.    Would you examine the agreement that is entitled

11  "Agreement on the purchase and sale of intellectual property

12  and rights and claims concerning thereto by and between Jose

13  Arechabala S.A. (in liquidation), certain holders of direct

14  or indirect beneficial interests in the same, and Jose

15  Arechabala International LTD."

16            Would you examine the signature block on page 26.

17      A.    Yes.

18      Q.    Is that your signature as a director of the

19  purchase of Jose Arechabala International?

20      A.    Yes, it is.

21      Q.    Would you turn to page 27 where it lists

22  "participating interest holders."

23      A.    Yes.

24      Q.    Could you examine the names listed on schedule

25  0.1 on page 27 of that agreement.

1       A.    Yes.

2       Q.    Are those all your relatives?  Are those all

3  relatives of yours?

4       A.    Yes, they are.

5       Q.    Were they all shareholders of Jose Arechabala

6  S.A.?

7       A.    Yes, they were.

8       Q.    Of those shareholders that are listed, were there

9  any that did not give their accent or did not sign on to

10  this agreement, to your knowledge?

11            MR. KRINSKY:  Objection to the question.  It is

12  just the form of it, your Honor.

13            THE COURT:  I can't hear, Mr. Krinsky.

14            MR. KRINSKY:  I'm sorry.  The form of the

15  question, I think, is leading and confusing.  The only

16  signatures that appear on the document are the ones that

17  appear on the document.  I think Mr. Golden is getting into

18  something else.

19            THE COURT:  There is no point asking who signed

20  and who didn't sign because they are on the document.

21            What is it you want to ask him?

22            MR. GOLDEN:  There is one of these shareholders

23  that didn't sign on the document.  I just want him to

24  identify who that shareholder was.

25            THE COURT:  Anybody can do that by looking at the

1    document.

2    BY MR. GOLDEN:

3         Q.    Do you know which shareholder, to your knowledge,

4    which shareholder didn't sign on the document?

5         A.    To my knowledge, Gloria Marquez Arechabala.

6         Q.    Was provision made for her interests?

7         A.    In case of having her sign it, yes.

8         Q.    What provision was made?  What did you do to take

9    care of her interest?

10        A.    There was an escrow settlement made for her.

11        Q.    Could you examine the second agreement, which is

12   entitled "Agreement on the purchase and sale of intellectual

13   property and rights and claims concerning thereto by and

14   between Jose Arechabala International Ltd. and Bacardi &

15   Company Limited."

16        A.    Yes.

17        Q.    I direct your attention to the signature block on

18   page 40.

19        A.    Yes.

20        Q.    Is that your signature, "Luis Arechabala," in the

21   bottom block for the seller?

22        A.    Yes, it is.

23        Q.    The other signatures by directors of Jose

24   Arechabala International, were they signed in front of you?

25        A.    Yes.

Page 1318

1      Q.    Can you identify those other signatures?

2      A.    Yes.  On the top, Gabrielle Mallet and then

3  Fernando Ruiz Pita and Jose Manuel Arechabala.

4      Q.    Did you accent personally and on behalf of the

5  people that you held powers of attorney for to the transfer

6  of the rights of Jose Arechabala S.A. and Jose Arechabala

7  International to Bacardi & Company?

8      A.    Yes.  I signed as a -- with their power of

9  attorney.

10            MR. GOLDEN:  Can I have one second, your Honor?

11            (Pause)

12            MR. GOLDEN:  Your Honor, I have no further

13  questions.

14            THE COURT:  Very good timing.  We are going to

15  stop for today then and reconvene tomorrow at 10 o'clock.

16  Thank you.

17            (Witness excused)

18            (Trial adjourned to January 4, 1999 at 10

19  o'clock)

20

21

22

23

24

25

Page 1320

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

HAVANA CLUB HOLDINGS, S.A., and
HAVANA CLUB INTERNATIONAL, S.A.,

       Plaintiffs,

       v.                    96 Civ. 9655 (SAS)

GALLEON, S.A., BACARDI-MARTINI U.S.A.,
INC., GALLO WINE DISTRIBUTORS, INC.,
G.W.D. HOLDINGS, INC. and PREMIER
WINE AND SPIRITS,

       Defendants.

------------------------------x

                    February 4, 1999
                    10:20 a.m.

Before:

       HON. SHIRA A. SCHEINDLIN

                    District Judge

APPEARANCES

PROSKAUER ROSE LLP
Attorneys for Plaintiffs
    CHARLES S. SIMS
    Of counsel

BADEN KRAMER HUFFMAN & BRODSKY, P.C.
Attorneys for Plaintiffs
    RICHARD L. HUFFMAN
    Of counsel

1                    APPEARANCES (Continued)

2

    RABINOWITZ, BOUDIN, STANDARD, KRINSKY & LIEBERMAN, P.C.
3   Attorneys for Plaintiffs
            MICHAEL KRINSKY
4           DEBRA EVENSON
            Of counsel
5

6   KELLEY DRYE & WARREN LLP
    Attorneys for Defendants
7           WILLIAM R. GOLDEN, JR.
            PAUL F. DOYLE
8           SARAH L. REID
            MICHELLE GRAHAM
9           FREDERICK WILSON
            Of counsel
10

    ALSO PRESENT:
11  Bogumila Michalewicz, Official Court Interpreter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Trial resumed)

2          THE COURT:  Good morning.

3     LUIS ARECHABALA CIFUENTES, resumed.

4  CROSS-EXAMINATION

5  BY MR. KRINSKY:

6     Q.     Mr. Arechabala, I would like to show you

7  Plaintiffs' Exhibit 230, which has already been admitted

8  into evidence.  Take a moment just to examine that.  It is

9  in Spanish and there is an English translation attached.  If

10  you would like to look at either of them, please do.

11          This is the notice of the special general meeting

12  of the shareholders of Jose Arechabala S.A. which was held

13  in April 1997, is that correct?

14     A.     Correct.

15     Q.     It refers to the chairman calling the meeting,

16  and the chairman that is referred to in this notice is Jose

17  Maria Arechabala y Arechabala, that is correct, isn't it?

18     A.     Correct.

19     Q.     I would like to show you Plaintiffs' Exhibit 274.

20  Take a moment to examine that.

21          Now, isn't it correct that these are the minutes

22  of the shareholders meeting of Jose Arechabala S.A. which

23  was called pursuant to the notice I have just shown you, as

24  well as the minutes of the related corporation, Compania

25  Azucara?

1      A.    Yes, it is.

2            MR. KRINSKY:  Your Honor, I would like to offer

3      this in evidence.

4            THE COURT:  One second.

5            MR. GOLDEN:  No objection.

6            THE COURT:  It is received, but I didn't get a

7      chance to really look at it yet.  One second.

8            (Plaintiffs' Exhibit 274 received in evidence)

9            THE COURT:  Go ahead.

10     BY MR. KRINSKY:

11     Q.    You can put that exhibit aside.  Thank you.

12           Now, in yesterday's testimony you stated there

13     was an understanding between representatives of Jose

14     Arechabala S.A. and Bacardi that Bacardi could use the brand

15     Havana Club, and prior to the agreement with -- let me

16     rephrase that.

17           Was your testimony yesterday that in 1995 there

18     was an understanding between representatives of Jose

19     Arechabala and Bacardi that Bacardi could use the brand

20     Havana Club?  There was no written license authorizing them

21     to use the brand, is that correct?

22     A.    Correct.  There was an oral agreement.

23     Q.    There was no written authorization?

24     A.    Not that I know of.

25     Q.    And you know of no written memorandum of

Page 1324

1   understanding?

2       A.   I know that my father told me in a conversation

3   with Mr. Cutillas they had agreed, and I don't know if he

4   personally got a written agreement or not.

5            MR. KRINSKY:  We would move to strike the answer

6   as hearsay, your Honor, and to strike his testimony as to an

7   understanding.

8            THE COURT:  Right.  It was not responsive.

9            He asked if you knew of any written memorandum,

10  and that calls for a yes or a no.

11           You don't know that he got a written memorandum?

12           THE WITNESS:  I don't know of the existence of

13  one.

14      Q.   Your belief as to the existence of an

15  understanding is based upon what your father told you, is

16  that correct?

17      A.   Correct.

18      Q.   Now, in 1995 or 1996, you never tasted or sampled

19  Bacardi's Havana Club rum, is that correct?

20      A.   Correct.

21      Q.   And you have no information about anyone else

22  tasting or sampling Bacardi's Havana Club rum in 1995 or

23  1996, isn't that correct?

24      A.   I don't know of any; nobody has told me.

25           MR. KRINSKY:  I have no further questions, your

1      Q.    Mr. Ruiz, are there any documents that have been

2    prepared, any plans, any drawings, any mockups with respect

3    to this alleged new trade dress you testified with respect

4    to?

5      A.    We're in the process of putting them together,

6    yes.

7      Q.    Has anything been produced to date?

8      A.    No.

9      Q.    No drawings, nothing?

10     A.    No.

11           THE COURT:  Done?

12           MR. GOLDEN:  Yes.

13           THE COURT:  All right.

14           (Witness excused)

15           THE COURT:  Mr. Golden, who is next?

16           MR. GOLDEN:  Next, your Honor, is Jose Manuel

17   Arechabala.

18           THE COURT:  Is he testifying with an interpreter

19   or without?  Where did she go?

20           If you don't understand, let me know.

21    JOSE MANUEL ARECHABALA,

22        called as a witness by the Defendants,

23        having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY MR. GOLDEN:

1      Q.    Mr. Arechabala, would you prefer to testify in

2    English or in Spanish?

3      A.    In English.

4            THE COURT:  Mr. Arechabala, my first question is,

5    how are you related to the two other people who testified at

6    this trial?  One is Luis, he is still sitting there, and one

7    is another gentleman, Ramon.  How are you related to those

8    two?

9            THE WITNESS:  Luis is cousin in second degree,

10   and Ramon is cousin in first degree.

11           THE COURT:  Thank you.

12   BY MR. GOLDEN:

13     Q.    Where were you born, Mr. Arechabala?

14     A.    I was born in Havana, Cuba, 1945.

15     Q.    When did you leave Cuba?

16     A.    1954.  I was nine years old.

17     Q.    Could you briefly give us your educational

18   background.

19     A.    I had been studying law in Spain till the third

20   degree, and then I stop because I want to marry, and I start

21   working in a company of my mother's.  And, I have been

22   studying in two different Spanish universities in Madrid and

23   in the Canary Islands, and I don't know what else to say.

24     Q.    Could you briefly tell us about your professional

25   career.

1      A.     I started to work in Gallerias Preciados.

2  Those were department stores.  I start working there for

3  nine years at the vocational department in a selection of

4  personnel.  And, in the same department store, I moved to

5  the public relations department.  From there, I moved to

6  magazine called Gazeta Ilustrada.  That was a type of -- I

7  think in America the most similar one is Life magazine.

8          From Gazeta, I moved to La Vanguardia, which was

9  a newspaper in Barcelona.  I was a delegate in Madrid for

10  another nine years.  Then I moved to a public relations

11  company called Imagen I.  Then to an advertising agency for

12  three years.  I started to, after that, work basically in

13  our own affairs, mine and my wife.

14      Q.     Would you tell us who your father and mother are,

15  please.

16      A.     I didn't understand.

17      Q.     Could you tell me who your -- could you identify

18  your father and mother for the record.

19      A.     My father was Jose Maria Arechabala y Arechabala,

20  and my mother was Carmen Fernandez Menendez.

21      Q.     Did your father have a position with Jose

22  Arechabala S.A.?

23      A.     Yes.  My father was, between 1956 and 1959, the

24  top executive, number one, top manager during those three

25  years.  I think his title was vice president and general

1   manager.

2        Q.    Are you a shareholder or were you a shareholder

3   in Jose Arechabala S.A.?

4        A.    He was a shareholder of Jose Arechabala, yes.

5        Q.    Is your father still living?

6        A.    Yes.

7        Q.    Are you a shareholder in -- were you a

8   shareholder in Jose Arechabala S.A.?

9        A.    I became a shareholder when my mother died in

10  1983, and as part of the inheritance, the shares passed from

11  my mother to me.

12       Q.    Do you have any sisters?

13       A.    Yes, I have four sisters.

14       Q.    Could you identify them for the record, please.

15       A.    Yes.  My four sisters are Carmen, the other one

16  is Victoria, Elena, and Isabelle.

17       Q.    Do you have any brothers?

18       A.    No, sir.

19       Q.    Who else is in your branch of the Arechabala

20  family that holds stock in Jose Arechabala S.A.?

21       A.    In my family, well, it is a very large family.

22       Q.    I mean your branch of the family.

23       A.    Well, my father and my two aunts; Ramon's mother,

24  and another one whose name was Ignacia.

25       Q.    Did you receive powers of attorney from members

1   Mr. Cuatrecasas?

2       A.    Well, after we signed the agreement in London, we

3   had another meeting in Madrid at the Hotel Ritz with Emilio

4   Cuatrecasas and a lawyer from the Cuatrecasas law firm in

5   Barcelona.

6       Q.    When you say after you signed the agreement in

7   London, is the agreement in London you're referring to the

8   April 1997 agreement with Bacardi?

9       A.    Yes, yes, exactly.

10      Q.    Who asked for the second meeting?

11      A.    I get a phone call from Cuatrecasas.

12      Q.    Did you attend that meeting?

13      A.    Yes, I did.

14      Q.    What was the subject matter of that meeting?

15      A.    I think they wanted to find out what was signed

16  in London.  They were not very sure about the agreement and

17  they wanted to find out the truth of it.

18      Q.    At the first meeting that you had that you said

19  took place, you think, in 1995 with Cuatrecasas, were terms

20  discussed for the purchase of your rights in the Havana Club

21  trademark?

22      A.    Well, I think when we spoke about the historical

23  rights, the difference in what Cuatrecasas was offering and

24  the quantity that the president of our association -- at

25  that time Jose Maria Arechabala -- said was so far away, one

1   from the other, that we didn't have any more meetings with

2   either one because it was too different, the positions.

3   They were too far.

4        Q.   I believe you testified that early in your career

5   you worked for a department store chain in Spain.

6        A.   Uh-hum.

7        Q.   Was that chain a chain that was owned by your

8   mother's family?

9        A.   Yes.  My grandfather was the most important

10   shareholder of that company.

11       Q.   Was your mother also a shareholder in that

12   company?

13       A.   Well, she was --

14            THE COURT:  Why is this relevant?  Why is his

15   mother's line relevant?

16            MR. GOLDEN:  Your Honor, because there was

17   cross-examination of Ramon Arechabala the other day that

18   implied that Jose Manuel's mother was very wealthy and

19   that --

20            THE COURT:  She is.

21            MR. GOLDEN:  -- and that the Arechabalas should

22   have used that money somehow.

23            THE COURT:  Your mother is wealthy, isn't she?

24            THE WITNESS:  My mother is Carmen Fernandez.

25            THE COURT:  She was wealthy, right?

Page 1420

1          THE WITNESS:  She got a good position, but I

2  would say that the rich one was her grandfather.  She had a

3  position of upper, middle class.

4          THE COURT:  And you say her father was wealthy?

5          THE WITNESS:  Yes, her father.  My grandfather.

6  My mother's father.

7          MR. GOLDEN:  Your Honor, what I am trying to

8  establish is that his mother did not have access to that

9  wealth.

10          THE WITNESS:  No.  She had access to maybe the

11  part of the rent --

12          THE INTERPRETER:  Annuity.

13          THE WITNESS:  -- of that, but she couldn't touch

14  the capital.

15          MR. KRINSKY:  I think the word "rent" is not from

16  the English language.  I am not sure it is annuity.  I think

17  it is income or interest.

18          THE COURT:  I think I knew what she meant.

19     Q.    Was your father a wealthy man, Mr. Arechabala?

20     A.    No.

21          My father left Cuba in 1959 and really he had

22  no -- he had a little money at that moment, but just to

23  live.  Then my grandmother from the Arechabala part died in

24  1961 and he got a little more money, but most of the money

25  was in Cuba.  So he was living with that until 1966.  By

1    that time, he was broke.  So my grandfather decided that he

2    should work, and he started to work at the department

3    stores.

4            All that time he was expecting, like most of the

5    Cuban part of the country, to get back, but in 1966 the

6    future was not very clear.  Then he started to work, and he

7    was earning a salary at the department stores and that's the

8    way we -- I mean, he had a good salary.  He was a vice

9    president of the company.  But that was the money to live.

10   Q.    Did the department store chain run into financial

11   problems in the '70s?

12   A.    Well, yes.  We had some problems in the

13   department stores, especially after General Franco's death

14   in 1975.  The shares were getting down and down.  We have

15   some problems with the people at Gallerias Preciados.  We

16   have about 12,000 employees, something like that.

17           You know, the books, during that time in which

18   you write the salaries, they didn't correspond, really, with

19   what they were earning.  It was a bit like that during

20   Franco's time.  So the thing is that after Franco, the trade

21   unions, they forced the company to put the real numbers.  So

22   if someone was earning 100,000 pesetas, you have to write he

23   was earning 100,000 pesetas.  Not like before when that man

24   was maybe earning 100,000 and in the books it was written he

25   was earning 60.  That was a good thing for the company, but

1    it was not good for the employees.

2            Well, anyway, after 1975, you had to put all the

3    books with their real salaries, and so the company had to

4    start paying much more to taxes than they were paying

5    before.  So that was one of the biggest problems.  Then the

6    salaries, they had to go up because the trade unions forced

7    it during that time.  I was saying that to be entrepreneur

8    during Franco's time is like driving in a straight way, you

9    know.

10        Q.    Did there come a time when the company became

11   insolvent?

12        A.    So the thing is that the company starts to go

13   down from a good position.  The number is '74, '75, when

14   Franco died, and '76, '78, and this way in 1979, the

15   position was so horrible.  So the family decided to sell the

16   company.  When they sold the company, it was ten times less

17   of its real worth than it was six years before.

18        Q.    Did your mother have occasion to travel to Miami

19   before her death?

20        A.    Well, yes.  She start coming to Miami 1973 for

21   medical reasons.  She had some problems with dentist, mouth

22   rehabilitation.

23            She started in Spain in 1972, but we didn't find

24   a doctor for her.  So I came 1972 summer to see Ramon, my

25   cousin, in Miami.  I stayed there one or two months.  And, I

```
 1    spoke to Ramon saying, my mother with her teeth and the

 2    Spanish doctors and all that.  He say, Here is a fantastic

 3    doctor, Dr. Kaplan, and he is very well known, especially

 4    for mouth rehabilitation.  So I convince her to come to

 5    Miami.

 6         Q.    So she went to Miami for medical treatment?

 7         A.    Yes.  197 --

 8         Q.    What was the nature of the condition that she

 9    had?

10             THE COURT:  Come on.  You don't have to answer

11    that.  Everybody's mom runs to Florida for medical reasons.

12         A.    It was mouth rehabilitation, dentist mouth

13    rehabilitation.  That's all.

14         Q.    Did your mother buy a condominium in Florida?

15         A.    Well, yeah, she bought a condominium in Miami,

16    but that was more -- in Spain, I hate to speak about Franco

17    again, but during that time the people was a bit afraid of

18    what was going to be happening in Spain.  You know, Spain

19    has had during the 19th century about three or four civil

20    wars, and they had one or two in the 20th century, and so

21    nobody know what was going to happen after Franco's death.

22    So we say you better have something out.  Normally the

23    people in Spain, they had maybe a house in France or a close

24    country, but in our case, as we have relatives in the United

25    States, they say you better get something there.  So they
```

1    bought -- it was sort of an investment, an insurance for you

2    never know what was going to happen after Franco.

3              MR. GOLDEN:  I have no further questions.

4    CROSS-EXAMINATION

5    BY MR. KRINSKY:

6         Q.   Mr. Arechabala, in the 1970s your father was not

7    a member of the board of directors of an insurance company

8    in Spain called Mutual Madrilena Automovilista?

9         A.   Yes.  He was a member of that board.  It is a

10   board; you don't get any money for it.

11        Q.   That was an insurance company involved in

12   automobile financing in some way?

13             THE INTERPRETER:  Could you please repeat the

14   question?

15        Q.   That was an insurance company involved in

16   automobile financing in some fashion, is that correct?

17        A.   No, it was just an insurance company for cars.

18   You pay insurance for having your car there.

19        Q.   And your father was listed in Who's Who in Spain

20   in the 1970s and 1980s, is that correct?

21        A.   Yes.

22        Q.   You were listed in Who's Who in Spain also in the

23   1980s?

24        A.   Yes, I was.

25        Q.   You were deposed in this action, is that correct?

1        A.    Yes, I did.

2        Q.    You testified under oath, is that correct?

3        A.    Yes, I did.

4        Q.    You testified, I believe, is it not correct, that

5   in the 1970s the department store chain was growing and that

6   it grew from 17 stores in 1973 to 24 stores in 1982, is that

7   correct?

8        A.    Yes.  Yes.  That's right.

9              THE COURT:  What year was it sold again?

10             THE WITNESS:  1978 or '79.

11             THE COURT:  So why did you ask him up to '82?

12             MR. KRINSKY:  Because that was his testimony at

13   his deposition.

14       Q.    At your deposition, did you not testify that

15   Emilio Cuatrecasas was interested in buying the rights --

16             MR. KRINSKY:  Excuse me just a minute, your

17   Honor.  It will be easier if I get the deposition

18   transcript.

19             (Pause)

20       Q.    At your deposition transcript, wasn't the

21   following question asked of you:

22             "What did the lawyers of Cuatrecasas say to you

23   at the meeting?"

24             You answered:  "They were interested in buying

25   the rights which could be ours or that could correspond to

1   us so in a way they would have an insurance that in the

2   possible or probable case that a government, a new Cuban

3   government that will replace the totalitarian government and

4   will give back the properties to the Arechabalas definitely

5   they would buy the insurance.  That if they would buy the

6   rights from us, the Cuban government, the new Cuban

7   government will give them the property to their clients who

8   were Pernod Ricard."

9         Was that an accurate statement you had with

10  Mr. Cuatrecasas?

11       A.   Yes, that was part of the position.

12            MR. KRINSKY:  No further questions, your Honor.

13            Let me consult, your Honor, one moment.

14            (Pause)

15            MR. KRINSKY:  No further questions, your Honor.

16            THE COURT:  Anything further?

17            MR. GOLDEN:  No, your Honor.

18            THE COURT:  Thank you.

19            (Witness excused)

20            MR. GOLDEN:  Your Honor, we had agreed that we

21  would call Mr. Jacquillat, who is the president of Pernod,

22  today, but he was here earlier and wasn't feeling well, your

23  Honor, and he left.

24            MR. SIMS:  We both thought that we would get the

25  afternoon to take these witnesses.  I did try to call him