# Exhibit 24

AGREEMENT

ON THE

PURCHASE AND SALE OF INTELLECTUAL PROPERTY

AND RIGHTS AND CLAIMS CONCERNING THERETO

By and Between

JOSE ARECHABALA INTERNATIONAL LTD.

and

BACARDI & COMPANY LIMITED

BAC 01034
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

# TABLE OF CONTENTS

Page

**ARTICLE 1**

DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . 2
1.1   Defined Terms . . . . . . . . . . . . . . . . . . . . . . . 2
1.2   Other Rules of Construction . . . . . . . . . . . . . . . 9
1.3   Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**ARTICLE 2**

PURCHASE AND SALE . . . . . . . . . . . . . . . . . 10
2.1   Purchase and Sale . . . . . . . . . . . . . . . . . . . . . 10
2.2   Reserved Assets . . . . . . . . . . . . . . . . . . . . . . . 11
2.3   Additional Title . . . . . . . . . . . . . . . . . . . . . . . 12
2.4   Initial Purchase Price . . . . . . . . . . . . . . . . . . 12
2.5   Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
2.6   Deliveries at Closing . . . . . . . . . . . . . . . . . . . 13
2.7   Escrow and Consummation of the Transfer of
      Additional Title . . . . . . . . . . . . . . . . . . . . . . . 14

**ARTICLE 3**

MILESTONE AND COMMISSION PAYMENTS . . . 15
3.1   Milestone Payments . . . . . . . . . . . . . . . . . . . . . 15
3.2   Commission Payments . . . . . . . . . . . . . . . . . . . 16
3.3   Withholding Taxes . . . . . . . . . . . . . . . . . . . . . . 18
3.4   Purchaser Authority . . . . . . . . . . . . . . . . . . . . . 18
3.5   Form of Payment of Milestone Payments and
      Commission Payments . . . . . . . . . . . . . . . . . . . 19

**ARTICLE 4**

REPRESENTATIONS AND WARRANTIES OF THE
SELLER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
4.1   Organization . . . . . . . . . . . . . . . . . . . . . . . . . 20
4.2   Authorization . . . . . . . . . . . . . . . . . . . . . . . . . 20
4.3   Enforceability . . . . . . . . . . . . . . . . . . . . . . . . . 20
4.4   Consents and Approvals; No Violations . . . . . . . . 20
4.5   Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
4.6   Title to Assets. . . . . . . . . . . . . . . . . . . . . . . . . 21
4.7   Infringements. . . . . . . . . . . . . . . . . . . . . . . . . 22
4.8   Shareholders, Directors, and Officers. . . . . . . . . . 22
4.9   Representations and Warranties Concerning JASA
      and the Transfer Agreement. . . . . . . . . . . . . . . . 22
4.10  Information. . . . . . . . . . . . . . . . . . . . . . . . . . . 23

H:\GENERAL\IRVIN\IPAGT.016

April 18, 1997

BAC 01035
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- ii -

ARTICLE 5

      REPRESENTATIONS AND WARRANTIES OF THE
      PURCHASER . . . . . . . . . . . . . . . . . . . . . 24
5.1    Corporate Organization and Good Standing . . . . . . . 24
5.2    Authorization. . . . . . . . . . . . . . . . . . . . . . . 24
5.3    Enforceability. . . . . . . . . . . . . . . . . . . . . . . 24
5.4    Consents and Approvals; No Violations. . . . . . . . . 25
5.5    Litigation . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARTICLE 6

      CONDITIONS TO CLOSING . . . . . . . . . . . . . . 25
6.1    Conditions to the Seller's Obligation to Effect the
      Closing. . . . . . . . . . . . . . . . . . . . . . . . . . 25
6.2    Conditions to the Purchaser's Obligation to Effect
      the Closing. . . . . . . . . . . . . . . . . . . . . . . . 26

ARTICLE 7

      COVENANTS OF THE PARTIES . . . . . . . . . . . 27
7.1    Obligation to Effect the Closing. . . . . . . . . . . . . 27
7.2    Information. . . . . . . . . . . . . . . . . . . . . . . . . 28
7.3    Cooperation; Further Assurances . . . . . . . . . . . . 28
7.4    Confidentiality. . . . . . . . . . . . . . . . . . . . . . . 29
7.5    Use of the Name *"Arechabala."* . . . . . . . . . . . . 30
7.6    Endeavors to Obtain Trademark Certificate. . . . . . . 30

ARTICLE 8

      INDEMNIFICATION . . . . . . . . . . . . . . . . . . 31
8.1    Effectiveness of Representations, Warranties and
      Covenants . . . . . . . . . . . . . . . . . . . . . . . . 31
8.2    Indemnification . . . . . . . . . . . . . . . . . . . . . 31
8.3    Third-Party Claims . . . . . . . . . . . . . . . . . . . 32
8.4    Set-Off . . . . . . . . . . . . . . . . . . . . . . . . . . 33
8.5    Contract Remedies Not Exclusive. . . . . . . . . . . . 33
8.6    Pledge of Assets . . . . . . . . . . . . . . . . . . . . 33
8.7    Limitation on Indemnification . . . . . . . . . . . . . 34

ARTICLE 9

      MISCELLANEOUS PROVISIONS . . . . . . . . . . . 35
9.1    Effectiveness . . . . . . . . . . . . . . . . . . . . . . . 35
9.2    Termination . . . . . . . . . . . . . . . . . . . . . . . 35
9.3    Expenses . . . . . . . . . . . . . . . . . . . . . . . . 35
9.4    Execution in Counterparts; Effectiveness . . . . . . . . 35
9.5    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . 35
9.6    Waivers . . . . . . . . . . . . . . . . . . . . . . . . . 37
9.7    Amendment . . . . . . . . . . . . . . . . . . . . . . . 38
9.8    Entire Agreement . . . . . . . . . . . . . . . . . . . . 38



BAC 01036

CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- iii -

9.9     Applicable Law. . . . . . . . . . . . . . . . . . . . . 38
9.10    Arbitration . . . . . . . . . . . . . . . . . . . . . . . 38
9.11    Assignments . . . . . . . . . . . . . . . . . . . . . . 38
9.12    Binding Effect; Benefits . . . . . . . . . . . . . . . . 38
9.13    Schedules, Annexes and Other Agreements . . . . . . . 39
9.14    Compliance with OFAC License and Cuban Assets
        Control Regulations . . . . . . . . . . . . . . . . . . 39

SCHEDULE 2.1(a)  . . . . . . . . . . . . . . . . . . . . . 41
SCHEDULE 2.1(b)  . . . . . . . . . . . . . . . . . . . . . 42
SCHEDULE 2.1(c)  . . . . . . . . . . . . . . . . . . . . . 43
SCHEDULE 2.1(d)  . . . . . . . . . . . . . . . . . . . . . 44
SCHEDULE 2.7 . . . . . . . . . . . . . . . . . . . . . . . 45
SCHEDULE 3.1(a)(iii) . . . . . . . . . . . . . . . . . . . 46
SCHEDULE 3.2(a)(i) . . . . . . . . . . . . . . . . . . . . 47
SCHEDULE 3.2(a)(ii) . . . . . . . . . . . . . . . . . . . . 48
SCHEDULE 3.5 . . . . . . . . . . . . . . . . . . . . . . . 49
SCHEDULE 4.5 . . . . . . . . . . . . . . . . . . . . . . . 50
SCHEDULE 4.6 . . . . . . . . . . . . . . . . . . . . . . . 51
SCHEDULE 4.8 . . . . . . . . . . . . . . . . . . . . . . . 52
SCHEDULE 4.9 . . . . . . . . . . . . . . . . . . . . . . . 53
SCHEDULE 5.5 . . . . . . . . . . . . . . . . . . . . . . . 54
SCHEDULE 9.14 Part 1 . . . . . . . . . . . . . . . . . . . 55
SCHEDULE 9.14 Part 2 . . . . . . . . . . . . . . . . . . . 56

ANNEX 2.5 . . . . . . . . . . . . . . . . . . . . . . . . . 57
ANNEX 6.2(g) . . . . . . . . . . . . . . . . . . . . . . . 58
ANNEX 7.5 Part 1 . . . . . . . . . . . . . . . . . . . . . 65
ANNEX 7.5 Part 2 . . . . . . . . . . . . . . . . . . . . . 66

H:\GENERAL\IRVIN\IPAGT.016                                April 18, 1997

BAC 01037

CONFIDENTIAL - ATTORNEYS'
EYES ONLY

## AGREEMENT

## ON THE PURCHASE AND SALE OF INTELLECTUAL PROPERTY AND RIGHTS AND CLAIMS CONCERNING THERETO

THIS AGREEMENT ON THE PURCHASE AND SALE OF INTELLECTUAL PROPERTY AND RIGHTS AND CLAIMS CONCERNING THERETO, dated as of this 18th day of April, 1997, made as a deed by and between

JOSE ARECHABALA INTERNATIONAL LTD., a corporation organized and existing under the laws of Liechtenstein (hereinafter referred to as the "Seller"), and

BACARDI & COMPANY LIMITED, a corporation organized and existing under the laws of Liechtenstein (hereinafter referred to as the "Purchaser"),

## W I T N E S S E T H :

WHEREAS the Seller represents that, immediately prior to the enactment of Cuban Law No. 890 of October 13, 1960, José Arechabala, S.A. (hereinafter referred to as JASA), a *sociedad anónima* organized and existing under the laws of Cuba (now in a state of liquidation), was the rightful owner of all right, title and interest in and to (i) all inventions, formulae, manufacturing secrets, processes, and know-how concerning the manufacture of certain alcoholic beverages sold under the brand names *"Havana Club"* or *"Arechabala"* and (ii) all intellectual property, trademarks, trade names, labels, symbols, logos, and other devices used in connection with the manufacture, distribution or sale of such products in Cuba and elsewhere and of the goodwill represented thereby;

WHEREAS, pursuant to the aforesaid Cuban Law No. 890 and certain other actions, the Cuban Government has purported to confiscate and expropriate the assets and liabilities of JASA and to assert rights to such assets in certain countries around the world;

H:\GENERAL\IRVIN\IPAGT.016

April 18, 1997

BAC 01038
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 2 -

WHEREAS the Seller represents that (i) it has heretofore acquired from JASA and certain holders of direct or indirect equity interests in JASA all of their respective right, title and interest in and to the aforesaid assets or the claims concerning the same arising out of the confiscation and expropriation of such assets, or any portion thereof, by the Cuban Government, and (ii) the Seller is currently the legal owner and true successor in right, title and interest in respect of such assets or claims;

WHEREAS, pursuant to the terms and subject to the conditions hereof, the Seller desires to sell to the Purchaser, and the Seller desires to purchase from the Seller, all of the Seller's right, title and interest in and to certain of the assets and claims referred to in the preceding clause, as fully described below;

WHEREAS the Purchaser has heretofore received from the Office of Foreign Assets Control of the United States Department of Treasury a license under the Cuban Assets Control Regulations, 31 C.F.R. Part 515, in respect of the transactions contemplated hereby, subject to certain restrictions specified therein, and the Parties wish to incorporate in their agreement such provisions as are necessary to comply with such restrictions;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and intending to be legally bound, the Seller and the Purchaser hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    <u>Defined Terms</u>. Whenever used in this Agreement, the following terms shall have the meanings respectively ascribed thereto:

(a)    "**Additional Title**" has the meaning ascribed thereto in Section 2.3.

H:\GENERAL\IRVIN\IPAGT.016

April 18, 1997

BAC 01039
CONFIDENTIAL · ATTORNEYS'
EYES ONLY

- 3 -

(b)     "**Affiliate**" means, in respect of any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such first Person.

(c)     "**Applicable Commission Factor**" has the meaning ascribed thereto in Section 3.2(a)(i) or Section 3.2(a)(ii), as the case may be.

(d)     "**BACO-Arechabala Confidentiality Agreement**" means a certain letter agreement dated July 24, 1996, entered into by the Purchaser and certain members of the Arechabala family, by their respective attorneys, concerning certain confidentiality obligations of the Purchaser in respect of certain information, to be furnished to the Purchaser, regarding JASA, individual shareholders of JASA or other designated persons, which letter agreement expired by its own terms upon the execution hereof.

(e)     "**Best Knowledge**" means, in respect of a Person, that nothing has, or with reasonable investigation would, come to the attention of that Person that gives or would give such Person knowledge of the existence or absence of any material information or fact bearing on the matter, provided that, when used in respect of the Seller, the term Best Knowledge shall include the Best Knowledge of each director, officer and shareholder of the Seller.

(f)     "**Bill of Sale**" has the meaning ascribed thereto in Section 2.6(a).

(g)     "**Blocked Percentage**" has the meaning ascribed thereto in Section 9.14.

(h)     "**Blocked Person**" means, at any given time, a Person who is a "designated national" other than an "unblocked national" under the Cuban Assets Control Regulations.

(i)     "**Books and Records**" has the meaning ascribed thereto in Section 2.1(e).

(j)     "**CAPSA**" means Compañía Azucarera Progreso, S.A., a *sociedad anónima* organized under the laws of Cuba.

April 18, 1997

BAC 01040
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 4 -

      (k)      "Claim" means a written notice asserting a breach of a representation, warranty or covenant specified in this Agreement, which notice shall reasonably set forth, in light of the information then known to the party giving such notice, a description of and an estimate (if then reasonable to make) of the amount involved in such breach.

      (l)      "Claim Rights" has the meaning ascribed thereto in Section 2.1(f).

      (m)      "Closing" has the meaning ascribed thereto in Section 2.5.

      (n)      "Commission Payments" has the meaning ascribed thereto in Section 3.2(a).

      (o)      "Confidential Information" means any confidential or secret information or data, whether or not reduced to writing, pertaining to the Purchased Assets, including scientific or technical knowledge, expertise, skill, practice, proprietary rights, patented or unpatented inventions, formulas, trade secrets, manufacturing techniques and procedures, analytical methodology, processes, and data.

      (p)      "Confidentiality Agreement Information" means any and all information concerning JASA or CAPSA or their respective past or present shareholders, officers or directors, or other members of the Arechabala family, that has heretofore been furnished to the Purchaser, in writing and marked "CONFIDENTIAL," by or on behalf of the Arechabala Family and pursuant to the BACO-Arechabala Confidentiality Agreement, other than information that (i) was already in BACO's possession at the time of receiving such information, or (ii) was or is or becomes available to the public other than as a result of a disclosure by the Purchaser in violation of the BACO-Arechabala Confidentiality Agreement or this Agreement, or (iii) has become or becomes available to the Purchaser on a non-confidential basis from any source (other than JASA, CAPSA or the Arechabala Family) which is under no obligation of confidentiality to JASA, CAPSA or the Arechabala Family.  For the purposes of the preceding definition, "Arechabala Family" shall have the meaning specified in the BACO-Arechabala Confidentiality Agreement.

H:\GENERAL\IRVIN\PAGT.016                          April 18, 1997

BAC 01041
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 5 -

(q)   "Consumer Price Index" means (i) the Consumer Price Index for All Urban Consumers (CPI-U) for all items as published by the Bureau of Labor Statistics of the United States Department of Labor, or (ii) should such index be discontinued, any successor index or any comparable successor index, or (iii) should there be no such successor index or comparable successor index, any substitute index or formula that the Purchaser may reasonably determine.

(r)   "Control" means, in respect of any Person, the power to control the direction, management and policies of that Person, or to elect a majority of its directors, managing directors, trustees or other governing authorities of that Person.   The verbal forms "controls" and "controlled" shall be interpreted accordingly.

(s)   "Cuban Assets Control Regulations" means the Cuban Assets Control Regulations of the United States, which are currently codified at 31 Code of Federal Regulations Part 515.

(t)   "Damages" means all claims, demands, actions, causes of action, assessments, losses, investigations, proceedings, damages, penalties, fines, costs, expenses and judgments, including, without limitation, interest and penalties and reasonable attorneys' fees, disbursements and expenses.

(u)   "Designs" has the meaning ascribed thereto in Section 2.1(d).

(v)   "Escrow Agent" means Allgemeines Treuunternehmen, a company organized and existing under the laws of Liechtenstein, and any successor thereto or replacement thereof, as determined from time to time by the Purchaser.

(w)   "Escrow Agreement" means the Escrow Agreement dated April 18, 1997, by and between the Purchaser and the Escrow Agent, a copy of which is attached hereto as Schedule 2.7, and any successor agreement by and between the Purchaser and the Escrow Agent.

(x)   "Governmental Authority" means any governmental body, agency or official of any country or political subdivision of any country.

BAC 01042
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 6 -

(y)    "HC Rum" means any rum that may hereafter be manufactured and sold by the Purchaser, or a licensee of the Purchaser, under the trademark or trade name *"Havana Club."*

(z)    "Indemnified Party" means the Person who is entitled to indemnification for, and to be held harmless in respect of, a claim, cause of action or any other proceeding, as provided under the terms and subject to the conditions of this Agreement.

(aa)    "Indemnifying Party" means the party hereto that is obligated to indemnify and to hold harmless another Person in respect of a claim, cause of action or any other proceeding, as provided under the terms and subject to the conditions of this Agreement.

(ab)    "Initial Purchase Price" has the meaning ascribed thereto in Section 2.3.

(ac)    "Intellectual Property" means all intellectual and industrial property, including (i) inventions and patents for inventions, including re-issue thereof and continuation and continuations in part, (ii) computer programs, (iii) copyrights, (iv) designs and industrial designs, (v) trademarks and any word, symbol, icon, logo or other indicia of origin adopted or used in connection with any product or service, and (vi) trade secrets and Confidential Information.

(ad)    "Intellectual Property Rights" means all intellectual and industrial property and other proprietary rights in respect of Intellectual Property, and includes all rights to Intellectual Property.

(ae)    "JASA" has the meaning ascribed thereto in the first Whereas clause of this Agreement.

(af)    "Know-How" has the meaning ascribed thereto in Section 2.1(a).

(ag)    "Lien" means, in respect of any asset, any mortgage, lien, pledge, charge, security interest, restriction or encumbrance of any kind, whether statutory or otherwise, in respect of such asset.



H:\GENERAL\IRVIN\IPAGT.016                                                       April 18, 1997

BAC 01043
CONFIDENTIAL · ATTORNEYS'
EYES ONLY

- 7 -

(ah)   "**Milestone Payments**" has the meaning ascribed thereto in Section 3.1(a).

(ai)   "**Non-Participating Interest Holders**" means the Persons listed on Schedule 3.5(a) other than the Participating Interest Holders.

(aj)   "**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

(ak)   "**OFAC Filing**" means certain filings heretofore made by the Purchaser with OFAC requesting issuance of a license or written confirmation that a license is not needed to carry out certain transactions, including the execution of this Agreement.

(al)   "**Other Countries Commencement Date**" has the meaning ascribed thereto in Section 3.2(a)(ii).

(am)   "**Participating Interest Holders**" means, at any given time, the Persons (other than JASA and the Seller) who are parties to the Transfer Agreement, by original signature or accession. The Participating Interest Holders as of the date hereof are the Persons listed as such on Schedule 3.5(a). A Person who is not a party to the Transfer Agreement by original signature but subsequently becomes a party thereto by accession shall be deemed to be a Participating Interest Holder and shall be noted as such on Schedule 3.5(a) upon the sale, conveyance, and delivery of the respective Additional Title to the Seller and the sale, conveyance, and delivery of such Additional Title by the Seller to the Purchaser.

(an)   "**Person**" means a human being, labor organization, partnership, limited liability company, limited liability partnership, association, undivided estate, joint venture, corporation, legal representative, trustee, trustee in bankruptcy, receiver, Governmental Authority, or any other legal entity whatsoever.

(ao)   "**Products**" means the alcoholic beverages that were manufactured or sold at any time prior to the date hereof under the trademark or brand name *Havana Club* by or on behalf of the Seller or JASA.

H:\GENERAL\IRVIN\IPAGT.016                                        April 18, 1997

BAC 01044
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 8 -

(ap)   "Purchased Assets" has the meaning ascribed thereto in Section 2.1.

(aq)   "Purchaser" has the meaning ascribed thereto in the preamble hereof.

(ar)   "Purchaser Group" means the Purchaser and its Affiliates, and the officers, directors, stockholders, investors, agents, and attorneys of each of the foregoing.

(as)   "Registrations" has the meaning ascribed thereto in Section 2.1(c).

(at)   "Seller" has the meaning ascribed thereto in the preamble hereof.

(au)   "Seller Group" means the Seller and its Affiliates, and the officers, directors, stockholders, investors, agents, and attorneys of each of the foregoing.

(av)   "Set-Off Notice" has the meaning ascribed thereto in Section 8.4(a).

(aw)   "Third-Party Claim" means, in respect of the obligations of each Indemnifying Party hereunder, a claim asserted against or imposed upon the Indemnified Party by any third party, or incurred by the Indemnified Party to any third party.

(ax)   "Trademarks" has the meaning ascribed thereto in Section 2.1(b).

(ay)   "Trademark Certificate" means any certificate of registration (other than a certificate of registration that is provisional by its terms) for the trademark *Havana Club* for rum that is issued in the name of the Purchaser and affirms the Purchaser's enforceable trademark rights regarding such trademark, and that is issued (i) in respect of the United States, by the United States Patent and Trademark Office, or (ii) in respect of any country other than the United States, (A)

H:\GENERAL\IRVIN\TPAGT.016                                          April 18, 1997

BAC 01045
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 9 -

by the Governmental Authority legally authorized and empowered by the laws of such country to issue trademark registrations affirming enforceable trademark rights in such country, or (B) if such country is a member of a multinational organization having a single trademark registration system, by the appropriate multinational authority administering such system.

(az)    **"Transfer Agreement"** means the agreement titled Agreement on the Purchase and Sale of Intellectual Property and Related Rights and Claims, dated April 18, 1997, by and between JASA, the Participating Interest Holders, and the Seller, a copy of which is attached hereto as Schedule 4.6.

(ba)    **"United States Commencement Date"** has the meaning ascribed thereto in Section 3.2(a)(i).

1.2    Other Rules of Construction. The definitions in Section 1.1 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." Unless the context shall otherwise require, all references to "party" and "parties" shall be deemed references to the parties to this Agreement and, to the extent permitted by this Agreement, to a party's successor in title. All references to Sections and Paragraphs shall be deemed references to Sections and Paragraphs of this Agreement, unless the context shall otherwise require. All references herein to Schedules and Annexes shall be deemed to be references to the Schedule(s) and Annex(es) attached to this Agreement. The terms "this Agreement," "hereof," "hereunder," and similar expressions refer to this Agreement as a whole and not to any particular Article or Section or other portion of this Agreement and include any agreement supplemental hereto. The conjunction "or" shall be understood in its inclusive sense (and/or). The expression "any and all" shall be understood to mean "all of those that exist, if any exists."

1.3    Headings. The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

H:\GENERAL\IRVIN\IPAGT.016                                            April 18, 1997

BAC 01046
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 10 -

## ARTICLE 2

## PURCHASE AND SALE

2.1     **Purchase and Sale.**  Upon the terms and subject to the conditions set forth in this Agreement, including in particular Section 2.2, at the Closing the Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser shall purchase and acquire from the Seller, all right, title and interest of the Seller in and to the following (the "Purchased Assets"):

(a)     The confidential and proprietary information, including any formula, pattern, compilation, method, invention, technique or process, that was used at any time by the Seller or JASA in the manufacture or sale of any Products (hereinafter referred to as the "Know-How"), including the Know-How described in Schedule 2.1(a), but only to the extent that the Know-How exists on the date hereof and is in the possession or control of the Seller;

(b)     Any and all trade names, symbols, devices, logos or other words or designations used at any time and anywhere by the Seller or JASA to identify and distinguish the Products, and any combination of such names, symbols, devices, logos or other words or designations (hereinafter referred to as the "Trademarks"), including the Trademarks described on Schedule 2.1(b), together with the goodwill appurtenant to the Trademarks;

(c)     Any and all registrations and applications for registration that may exist anywhere in the name of JASA or the Seller in respect of any Trademarks (hereinafter referred to as the "Registrations"), including the Registrations set forth on Schedule 2.1(c), and all rights pertaining to any Registrations;

(d)     Any and all designs and copyrights for labels, caps, bottles, packages, and other commercial designs used at any time anywhere by the Seller or JASA for or in connection with the Trademarks or the Products (hereinafter referred to as the "Designs"), including the Designs set forth on Schedule 2.1(d);

(e)     Any and all books and records, including all analyses, studies, reports, compilations, notes or other materials, that relate to or embody the Know-How, Trademarks, Registrations or Designs (hereinafter referred to as the

BAC 01047
CONFIDENTIAL - ATTORNEYS
EYES ONLY

- 11 -

"Books and Records"), but only to the extent that the Books and Records exist as of the date hereof and are in the possession or control of the Seller; and

(f)      Any and all rights, rights of action, causes of action, chooses in action, demands, and claims for restitution of a particular or substitute property, compensation, damages or any other form of remedy (including any pre-judgment or post-judgment interest) that the Seller (by its own right or as successor in interest to JASA or any stockholder of JASA) may have at present or may in the future become entitled to, against any Person whatsoever, relating, directly or indirectly, to the Know-How, the Trademarks, the Registrations, the Designs or the Books and Records (such rights, rights of action, causes of action, chooses in action, demands and claims hereinafter referred to as the "Claim Rights"), including any such Claim Rights in whole or in part arising directly or indirectly out of, or based on,

(i)     the expropriation, confiscation, nationalization, forfeiture or any other form of taking or seizure, by any Person under claim of governmental authority, in Cuba or elsewhere in the world, of any property, right, asset, privilege or claim included in or related to or arising in connection with the Know-How, the Trademarks, the Registrations the Designs or the Books and Records (as the Know-How, the Trademarks, the Registrations the Designs or the Books and Records may have existed prior to such expropriation, confiscation, nationalization, forfeiture, taking or seizure, or at any time thereafter); or

(ii)    the use, enjoyment or disposition (of any kind whatsoever) of, or trafficking in, any such property, right, asset, privilege or claim by any Person; or

(iii)   the infringement, violation or impairment by any Person of any such property, right, asset, privilege or claim.

2.2      **Reserved Assets.** Anything in Section 2.1 notwithstanding, the Purchased Assets shall not include any and all claims for damages that the Seller may have at present or may in the future become entitled to against any Person (other than any member of the Purchaser Group), arising out of the inability of the Seller or the Seller's predecessors in title to use and enjoy the Know-How, the Trademarks, the

H:\GENERAL\IRVIN\IPA.GT.016

April 18, 1997

BAC 01048
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 12 -

Registrations, the Designs or the Books and Records during the period beginning on December 31, 1959, and ending on the date hereof.

**2.3     Additional Title.** The Seller agrees to sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser agrees to purchase and acquire from the Seller, as set forth in Sections 2.4(b)(ii) and 2.7, any and all right, title, and interest that the Seller may acquire, after the date of this Agreement, from one or more of the Non-Participating Interest Holders, in and to the Purchased Assets ("Additional Title"). Notwithstanding the foregoing, Additional Title shall not include any right, title, or interest in or to any assets referred to in Section 2.2. The Seller's obligation to sell, transfer, assign, convey, and deliver and the Purchaser's obligation to purchase and acquire established in this Section 2.3 shall continue until the Seller shall acquire Additional Title from all the Non-Participating Interest Holders but the Purchaser shall have the right, to be exercised at its sole discretion, at any time after October 18, 1997, to terminate such obligations by giving notice thereof to the Seller, whereupon such obligations shall terminate on the tenth (10th) calendar day following receipt by the Seller of such notice.

**2.4     Initial Purchase Price.**

(a)     In consideration of the acquisition of the Purchased Assets and as consideration for the acquisition of Additional Title in respect of all Non-Participating Interest Holders, and upon the terms and subject to the conditions set forth in this Agreement, the Purchaser shall pay, deposit, or deliver in escrow, as hereinafter set forth, the aggregate amount of One Million Two Hundred and Fifty Thousand United States Dollars (US$ 1,250,000) (the "Initial Purchase Price").

(b)     The Initial Purchase Price shall be disbursed by the Purchaser as follows:

(i)     Within ten (10) calendar days following the Closing, the Purchaser shall deposit the sum of Thirty-Four Thousand One Hundred and Sixty-Two and Fifty Cents United States Dollars (US$34,162.50) in the Blocked Account, pursuant and subject to the provisions of Section 9.14;

(ii)     At the Closing, the Purchaser shall deliver the sum of Fifty-Three Thousand Nine Hundred and Eighty-Three and Nineteen Cents

BAC 01049
CONFIDENTIAL · ATTORNEYS'
EYES ONLY

- 13 -

United States Dollars (US$53,983.19) to the Escrow Agent, corresponding to the consideration for the acquisition of Additional Title in respect of all of the Non-Participating Interest Holders (other than any Blocked Persons), such sum to be maintained in escrow and further disbursed as provided in Section 2.7 and the Escrow Agreement; and

(iii) At the Closing, the Purchaser shall pay the remainder, which is equal to the sum of One Million One Hundred and Sixty-One Thousand Eight Hundred and Fifty-Four and Thirty-One Cents United States Dollars (US$1,161,854.31) to the Seller, in the form of a cashier's or certified check or wire transfer of immediately available funds to an account previously designated by the Seller in writing.

2.5     Closing. The consummation of the transactions contemplated by Sections 2.1 and 2.4 (b)(ii)-(iii) shall take place simultaneously in a single act (hereinafter referred to as the "Closing") at the offices of Covington & Burling in London, England, United Kingdom, commencing at 10:00 a.m. local time (or at such other place and at such other time as the parties hereto shall agree in writing) as soon as practicable after the date on which the Seller shall have received notice from the Purchaser that the conditions set forth in Section 6.2(d) hereof have been satisfied or waived, but in no event later than the tenth (10th) business day following such date.

2.6     Deliveries at Closing. Subject to the terms and conditions of this Agreement, at the Closing:

(a)     The Seller shall deliver, or cause to be delivered, to the Purchaser, (i) a bill of sale in the form attached hereto as Annex 2.6 (the "Bill of Sale"); (ii) the originals of all Books and Records; (iii) an executed copy of the License Agreement Concerning the "*Arechabala*" Trademark referred to in Section 7.5, Part 1; and (iv) the instrument of assignment referred to in Section 7.5, Part 2.

(b)     The Purchaser shall deliver, or cause to be delivered, the amounts set forth in clauses (ii) and (iii) of Section 2.3(b), as specified therein; and (ii) an executed copy of the License Agreement Concerning the "*Arechabala*" Trademark referred to in Section 7.5, Part 2.

H:\GENERAL\IRVIN\IPA.GT.016          April 18, 1997

BAC 01050
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 14 -

## 2.7     Escrow and Consummation of the Transfer of Additional Title.

(a)     Simultaneously with the execution and delivery of this Agreement, the Purchaser and the Escrow Agent are entering into an agreement (the "Escrow Agreement"), a copy of which is attached hereto as Schedule 2.7. The Escrow Agent shall receive monies from the Purchaser as provided in Sections 2.4(b)(ii) and 3.5(b), and shall hold such monies in escrow until disbursed by the Escrow Agent in accordance with the Escrow Agreement.

(b)     Should the Seller acquire any Additional Title from any Non-Participating Interest Holder who is not a Blocked Person, the Seller shall immediately send to the Escrow Agent, with a copy to the Purchaser, (i) a Notice of Acquisition and Bill of Sale in the form of Schedule B to the Escrow Agreement, attaching thereto an executed copy of the instrument whereby the Seller shall have acquired such Additional Title from such Non-Participating Interest Holder and a certificate in the form of Schedule C to the Escrow Agreement, certifying that such Non-Participating Interest Holder is not a Blocked Person. Upon receipt of such Notice of Acquisition and Bill of Sale and such certificate, the Escrow Agent shall make such disbursements to the Seller, or take such other action, as specified in each case in the Escrow Agreement.

(c)     Nothing in this Agreement shall be construed as impairing the right of the Purchaser to amend or terminate the Escrow Agreement, solely or with the concurrence of the Escrow Agent, or to replace the Escrow Agent, provided, however, that the Purchaser shall not terminate the Escrow Agreement before October 18, 1997. Should the Escrow Agreement be terminated or amended in such a way that, in the Seller's reasonable judgment, the intent of Section 2.7(b) and that of the Escrow Agreement attached hereto as Schedule 2.7 can no longer be carried out, then upon acquiring any Additional Title from any Non-Participating Interest Holder the Seller shall give notice thereof to the Purchaser. Following receipt of such notice by the Purchaser, the parties shall promptly make arrangements for the closing of the sale of such Additional Title by the Seller to the Purchaser. At such closing, the Seller shall deliver to the Purchaser a bill of sale substantially in the form of Annex 2.6, *mutatis mutandis*, and the Purchaser shall pay to the Seller (subject to any payment previously made into the Blocked Account in respect of the interests of such Non-Participating Interest Holder) such portion of the Initial Purchase Price as is

H:\GENERAL\IRVIN\PAGT.016                            April 18, 1997

BAC 01051
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 15 -

allocated to such Additional Title, pursuant to Section 2.8(a)(ii), in respect of the interest of such Non-Participating Interest Holder.

(d)     Should the Seller acquire any Additional Title from any Non-Participating Interest Holder who is a Blocked Person, the Seller shall immediately deliver to the Purchaser a Notice of Acquisition and Bill of Sale in the form of Schedule B to the Escrow Agreement, attaching thereto an executed copy of the instrument whereby the Seller shall have acquired such Additional Title from such Non-Participating Interest Holder. The consideration for such conveyance from the Seller to the Purchaser is included in the deposits to be made by the Purchaser in the Blocked Account pursuant to Section 2.4(b)(i) and Section 3.5(a).

## ARTICLE 3

## MILESTONE AND COMMISSION PAYMENTS

3.1     Milestone Payments.

(a)     In further consideration of the acquisition of the Purchased Assets and as consideration for the acquisition of Additional Title, and upon the terms and subject to the conditions set forth in this Agreement, the Purchaser shall make the following payments (the "Milestone Payments"), in each case to be paid, deposited, or delivered in escrow as specified in Section 3.5:

(i)     In the event that the Purchaser shall obtain a Trademark Certificate in respect of the United States, then not later than sixty (60) days following such event, the Purchaser shall pay the amount of Two Million Two Hundred and Fifty Thousand United States Dollars (US $2,250,000), subject to Consumer Price Index adjustment.

(ii)     In the event that the Purchaser shall obtain a Trademark Certificate in respect of Cuba, then not later than sixty (60) days following such event, the Purchaser shall pay the amount of Two Million United States Dollars (US $2,000,000), subject to Consumer Price Index adjustment.

H:\GENERAL\IRVIN\PAGT.016

April 18, 1997

BAC 01052
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 16 -

(iii)    In the event that the Purchaser shall obtain a Trademark Certificate in respect of any country listed on Schedule 3.1(a)(iii), then not later than sixty (60) days following such event, the Purchaser shall pay the amount set forth on Schedule 3.1(a)(iii) as the Milestone Payment in respect of such country, subject to Consumer Price Index adjustment.

(b)    The Purchaser shall have the right in its sole discretion to waive the conditions specified in paragraph (i), (ii) or (iii) and to accelerate, in whole or in part, the payments specified in each such paragraph.

(c)    For the purposes of this Section 3.1, whenever it is specified that the amount of a Milestone Payment is subject to Consumer Price Index adjustment, such amount shall be multiplied by a fraction, the numerator of which shall be the Consumer Price Index for the calendar year preceding the calendar year in which the conditions for such Milestone Payment shall have been fulfilled, and the denominator of which shall be the Consumer Price Index for calendar year 1994.

**3.2    Commission Payments.**

(a)    In further consideration of the acquisition of the Purchased Assets and as consideration for the acquisition of Additional Title, and upon the terms and subject to the conditions set forth in this Agreement, the Purchaser shall make the following payments (the "Commission Payments"), in each case to be paid, deposited, or delivered in escrow as specified in Section 3.5:

(i)    Should the Purchaser obtain a Trademark Certificate in respect of the United States, the Purchaser shall pay for each calendar year of a period of twenty (20) consecutive calendar years from and after the United States Commencement Date, a Commission Payment equal to the larger of:

(A)    the product of ($\alpha$) the aggregate FOB price (at the distillery) of all cases of HC Rum distilled and sold by the Purchaser (or by a distiller licensed by the Purchaser) in (or for distribution in) the United States during such calendar year, multiplied by ($\beta$) the Applicable Commission Factor; or

H:\GENERAL\IRVIN\IPAGT 016

April 15, 1997

BAC 01053
CONFIDENTIAL · ATTORNEYS'
EYES ONLY

- 17 -

(B)     the product of ($\alpha$) the sum of one United States dollar and forty cents (US\$ 1.40) multiplied by ($\beta$) the total number of nine-liter cases of HC Rum distilled and sold by the Purchaser (or any distiller licensed by the Purchaser) in (or for distribution in) the United States during such calendar year.

For the purposes of this Section 3.2(a)(i), the "Applicable Commission Factor" shall be calculated as specified in Schedule 3.2(a)(i), and the "United States Commencement Date" shall mean the date on which the Purchaser (or any distiller licensed by the Purchaser) shall have commenced distribution of HC Rum in the United States, but not earlier than the date on which the Purchaser shall have obtained such Trademark Certificate in respect of the United States.

(ii)     Should the Purchaser obtain a Trademark Certificate in respect of any country or countries other than the United States, the Purchaser shall pay, for each calendar year of a period of twenty (20) consecutive calendar years from and after the Other Countries Commencement Date, a Commission Payment equal to the larger of:

(A)     the product of ($\alpha$) the aggregate FOB price (at the distillery) of all cases of HC Rum distilled and sold by the Purchaser (or a distiller licensed by the Purchaser) in (or for distribution in) all such other countries during such calendar year, multiplied by ($\beta$) the Applicable Commission Factor; or

(B)     the product of ($\alpha$) the sum of one United States dollar and forty cents (US\$ 1.40) multiplied by ($\beta$) the total number of nine-liter cases of HC Rum distilled and sold by the Purchaser (or any distiller licensed by the Purchaser) in (or for distribution in) all such other countries during such calendar year.

For the purposes of this Section 3.2(a)(ii), the "Applicable Commission Factor" shall be calculated as specified in Schedule 3.2(a)(ii), and the "Other Countries Commencement Date" shall mean the date on which the Purchaser (or any distiller licensed by the Purchaser) shall have commenced export shipments of HC Rum from Cuba, regardless of the date on which the

April 18, 1997

BAC 01054
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 18 -

Purchaser shall have obtained a Trademark Certificate in any such other country.

(b)     For the purposes of Section 3.2 (a), whenever it is specified that the amount of One Dollar and Forty Cents (US$1.40) shall be subject to Consumer Price Index adjustment, such amount shall be multiplied by a fraction, the numerator of which shall be the Consumer Price Index for the first year for which a Commission Payment shall be made pursuant to Section 3.2(a)(i) or 3.2(a)(ii), as the case may be, and the denominator of which shall be the Consumer Price Index for calendar year 1994.

(c)     Each Commission Payment due pursuant to this Section 3.2 shall be made as promptly as reasonably practicable after the end of the calendar year in respect of which such payment has accrued and shall be accompanied by a brief statement setting forth the basis for the calculation of the amount of such payment. The Seller shall have the right to designate an independent firm of auditors to verify, on an annual basis and at the Seller's sole cost and expense, the aggregate FOB price (at the Purchaser's distillery) of HC Rum sold by the Purchaser (or any distiller licensed by the Purchaser) in (or for distribution in) the United States and other countries during the preceding calendar year, and the calculation of the respective Commission Payments.  The designation of such independent firm of auditors shall be subject to the consent of the Purchaser, which consent shall not be unreasonably withheld.

3.3     Withholding Taxes.  The Purchaser shall be entitled to pay to the proper taxing authority and to deduct from any Milestone Payment or Commission Payment any and all withholding taxes or similar charges imposed by any Governmental Authority on any amounts to be paid by the Purchaser pursuant to this Article 3.  The Purchaser shall provide the Seller with such certificates or other evidence as may be reasonably necessary to establish the fact of any such payment. All amounts paid by the Purchaser pursuant to this Section 3.3 shall be credited against any Milestone Payment or Commission Payment to be made pursuant to this Article 3.

3.4     Purchaser Authority.  Without prejudice to Section 7.6(a), the Purchaser shall have sole authority to determine any and all matters relating to the registration and maintenance of the Trademarks or to the manufacture, marketing,

BAC 01055
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 19 -

distribution and sale of HC Rum.  The Purchaser may consult with the Seller on such matters in the Purchaser's sole discretion.

**3.5      Form of Payment of Milestone Payments and Commission Payments.**  Subject to Section 3.3 and all other provisions of this Agreement, each Milestone Payment or Commission Payment that the Purchaser is required to make under this Article 3 shall be made, at the time specified in each case, as follows:

(a)      The Purchaser shall deposit in the Blocked Account, pursuant and subject to the provisions of Section 9.14, an amount equal to the result of multiplying (i) the amount of such Milestone Payment or Commission Payment by (ii) the applicable Blocked Percentage.

(b)      The Purchaser shall deliver to the Escrow Agent an amount equal to the result of multiplying (i) the amount of such Milestone Payment or Commission Payment by (ii) the aggregate percentage, as specified in Schedule 3.5(a), corresponding to all persons who are Non-Participating Interest Holders as of the date of delivery of the monies to the Escrow Agent.  The amount delivered to the Escrow Agent shall be maintained in escrow until disbursed as provided in the Escrow Agreement.  In the event of termination of the Escrow Agreement, such amount shall be withheld by the Purchaser, and the Purchaser shall pay directly to the Seller the portion of the withheld amount corresponding to any Non-Participating Interest Holder who shall become a Participating Interest Holder after such termination.

(c)      The Purchaser shall pay the remainder of such Milestone Payment or Commission Payment to the Seller.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

To induce the Purchaser to acquire the Purchased Assets, the Seller hereby makes the following representations and warranties, as of the date hereof and again as of the Closing, as follows:

BAC 01056
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 20 -

4.1     Organization.  The Seller is a corporation duly organized and validly existing under the laws of Liechtenstein.

4.2     Authorization.  The Seller has all requisite power, authority and capacity (a) to enter into this Agreement, (b) to take, perform and execute all proceedings, acts and instruments required by it to consummate the sale of the Purchased Assets to the Purchaser in accordance with the terms hereof, and (c) to fulfill its obligations hereunder.  The execution and delivery by the Seller of this Agreement and any other documents and instruments to be executed and delivered pursuant hereto, and the consummation by the Seller of the transactions contemplated hereby, have been duly and validly authorized by all necessary organizational action of the Seller.  No other organizational proceeding in respect of the Seller is necessary under any provision of law to authorize the execution and delivery by the Seller of this Agreement and any other documents and instruments to be executed and delivered by the Seller pursuant hereto or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Seller.

4.3     Enforceability.  This Agreement and the documents and instruments to be executed and delivered by the Seller pursuant hereto constitute or, when executed and delivered pursuant hereto, will constitute legal, valid and binding agreements of the Seller, enforceable against the Seller in accordance with their respective terms, except to the extent that (a) such enforcement may be subject to any proceedings, subsequent to the date hereof, under any bankruptcy, insolvency, reorganization, moratorium or other laws, now or hereafter in effect, relating to or limiting creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses or to the discretion of the court before which any proceeding therefor may be brought.

4.4     Consents and Approvals; No Violations.  The execution and delivery by the Seller of this Agreement and the documents and instruments to be executed and delivered by the Seller pursuant hereto, and the consummation by the Seller of the transactions contemplated hereby, do not and will not (a) violate or conflict with the organizational documents of the Seller; (b) violate or conflict with any order, injunction, decree, statute, rule, ordinance or regulation applicable to the Seller or by which any of the Seller's assets may be bound; (c) require any filing with, or permit, consent or approval of, any public governmental or regulatory body, agency or authority, or private person; (d) result in a violation or breach of, or

H:\GENERAL\IRVIN\IPAGT.016                                          April 18, 1997

BAC 01057
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 21 -

constitute, or with giving of notice or lapse of time or both constitute, a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, mortgage, lease, contract, agreement, instrument or other arrangement to which the Seller is a party or by which the Seller or any of the Seller's properties or assets may be bound; or (e) result in the creation or imposition of any Lien on the Purchased Assets.

**4.5** **Litigation.** Except as described in Schedule 4.5, no action, suit, inquiry, audit, proceeding or investigation by or before any court or governmental or other regulatory or administrative agency or commission is currently pending or, to the Best Knowledge of the Seller threatened, against, involving or arising in connection with the Purchased Assets or that questions or challenges the validity of this Agreement or any action taken or to be taken by the Seller pursuant to this Agreement.

**4.6** **Title to Assets.** Immediately prior to the enactment and entry into force of Cuban Law No. 890 of October 13, 1960, JASA was the sole and rightful owner of all right, title and interest in and to the Know-How, the Trademarks, the Registrations, the Designs, and the Books and Records, as each of them existed at the time, free and clear of all Liens. JASA subsequently became the sole and rightful owner of all right, title and interest in and to the Claim Rights, free and clear of all Liens. Pursuant to the Transfer Agreement, a true and correct copy of which is attached hereto as Schedule 4.6, the Seller has validly acquired from JASA and each of the Participating Interest Holders all right, title, and interest of JASA and each Participating Interest Holder in and to the Know-How, the Trademarks, the Registrations, the Designs, the Books and Records, and the Claim Rights, in each case free and clear of all Liens. Schedule 3.5(a) contains a true and correct statement of the direct or indirect beneficial interests of the Participating Interest Holders and the Non-Participating Interest Holders, and there are no Persons, other than the Participating Interest Holders and the Non-Participating Interest Holders, having any direct or indirect beneficial interest in JASA. Except for any right, title or interest that the Cuban State may have acquired in respect of any portion of the Know-How, the Trademarks, the Registrations, the Designs, or the Books and Records as a result of the enactment and entry into force of Cuban Law No. 890, and except for any right, title or interest that any other Person may subsequently have acquired solely as a direct or indirect transferee of any such right, title or interest of the Cuban State, the Seller is the sole rightful owner of all right, title and interest in and to, the Know-

H:\GENERAL\IRVIN\IPAGT.016

April 18, 1997

BAC 01058
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 22 -

How, the Trademarks, the Registrations, the Designs, and the Books and Records, free and clear of all Liens. The Seller is the sole rightful owner of all right, title and interest in and to the Claim Rights, free and clear of all Liens.

**4.7**   **Infringements.** The Seller has granted no Intellectual Property Rights in respect of the Know-How, the Trademarks, the Registrations, the Designs or the Books and Records to any Person. The use by the Purchaser of the Know-How, the Trademarks, the Registrations, the Designs and the Books and Records will not infringe upon or violate any Intellectual Property Right of any Person, other than (i) any Intellectual Property Right that the Cuban State may have acquired in respect of the Know-How, the Trademarks, the Registrations, the Designs, or the Books and Records as a result of the enactment and entry into force of Cuban Law No. 890, and (ii) any Intellectual Property Right that any other Person may have acquired solely as a direct or indirect transferee of any such Intellectual Property Right of the Cuban State.

**4.8**   **Shareholders, Directors, and Officers.** Schedule 4.8 contains (i) a true, correct and complete copy of the instrument of incorporation and by-laws of the Seller; (ii) a true, correct and complete list of all the shareholders of the Seller as of the date hereof, showing the number of shares held by each such shareholder; (iii) a true, correct and complete list of all the directors and officers of the Seller as of the date hereof; and (iv) a true, correct and complete copy of the corporate resolutions of the Seller authorizing the execution and delivery by the Seller of this Agreement and the consummation of the transactions contemplated hereby. Except as set forth in Schedule 4.8, as of the date hereof none of the shareholders, directors or officers of the Seller is a "designated national," other than an "unblocked national," as these terms are defined in the Cuban Assets Control Regulations.

**4.9**   **Representations and Warranties Concerning JASA and the Transfer Agreement.** Without prejudice to the other representations and warranties of the Seller set forth in this Article 4, or to the generality thereof, the Seller makes the following specific representations and warranties concerning JASA and the Transfer Agreement: (a) as of December 31, 1959, JASA was a *sociedad anónima* duly organized and validly existing under the laws of Cuba, having its corporate domicile in Cárdenas, Cuba; (b) as more fully described in Schedule 4.9, Part 1, following the confiscation of JASA's assets and liabilities in Cuba by Cuba's revolutionary government, and a period of inactivity, a special meeting of

BAC 01059
CONFIDENTIAL · ATTORNEYS'
EYES ONLY

- 23 -

shareholders of JASA held on April 16, 1997, resolved, *inter alia*, to dissolve the company and to appoint liquidators, and to establish provisional corporate domicile in Liechtenstein, while maintaining JASA's *pro forma* corporate domicile in Cárdenas, Cuba; (c) without prejudice to the generality of the foregoing and except as described in Schedule 4.9, Part 2, JASA has never been in a state of bankruptcy, reorganization or suspension of payments and has never been subject to any intervention or receivership or any proceeding or condition having the same or similar effect as any of the foregoing; (d) the execution and delivery by JASA and the Seller of the Transfer Agreement and the consummation of the transactions contemplated thereby have been duly and validly authorized by all necessary organizational action of JASA and the Seller, respectively; (e) the Transfer Agreement has been duly and validly executed and delivered by JASA, the Seller, and each of the Participating Interest Holders and constitutes the legal, valid and binding agreement of JASA, the Seller, and the Participating Interest Holders; (f) the Transfer Agreement and the instruments executed and delivered pursuant thereto have validly transferred and conveyed to the Seller all of the respective right, title and interest of JASA and the Participating Interest Holders in and to the Know-How, the Trademarks, the Registrations, the Designs, the Books and Records, and the Claim Rights. Schedule 4.9, Part 3, contains (i) a true, correct, and complete copy of the by-laws of JASA, (ii) a true, correct, and complete list of all the shareholders of JASA as of the date of the Transfer Agreement, showing the number of shares held by each such shareholder, (iii) a true, correct and complete list of all the directors and officers of JASA as of the date of the Transfer Agreement, (iv) a true, correct, and complete copy of the corporate resolutions of JASA and the Seller authorizing the execution and delivery by JASA and the Seller, respectively, of the Transfer Agreement and the consummation of the transactions contemplated thereby, and (v) a true, correct and complete copy of any and all other public deeds, minutes of meetings, and corporate resolutions executed, held or adopted by JASA or any shareholders or corporate organs thereof, concerning the reactivation or dissolution of JASA or the Transfer Agreement or the transactions contemplated thereby.

    **4.10**   <u>Information</u>.  The Seller has provided the Purchaser with all material information that is in the control of or otherwise available to the Seller and relates to the maintenance and existence of, or the Seller's ownership and corporate or individual authority and ability to dispose of, any of the Purchased Assets.

H:\GENERAL\IRVIN\IPAGT.016

April 18, 1997

BAC 01060
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 24 -

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

To induce the Seller to sell the Purchased Assets to the Purchaser, the Purchaser hereby represents and warrants to the Seller, as of the date hereof and again as of the Closing, as follows:

**5.1     Corporate Organization and Good Standing.** The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of Liechtenstein. The Purchaser is a subsidiary of Bacardi International Limited, which is a subsidiary of Bacardi Limited.

**5.2     Authorization.** The Purchaser has all requisite power, authority and capacity (a) to enter into this Agreement, (b) to take, perform and execute all proceedings, acts and instruments required by it to consummate the purchase of the Purchased Assets from the Seller in accordance with the terms hereof, and (c) to fulfill its obligations hereunder. The execution and delivery by the Purchaser of this Agreement and any other documents and instruments to be executed and delivered pursuant hereto, and the consummation by the Purchaser of the transactions contemplated hereby, have been duly and validly authorized by all necessary organizational action of the Purchaser. No other organizational proceeding in respect of the Purchaser is necessary under any provision of law to authorize the execution and delivery by the Purchaser of this Agreement and any other documents and instruments to be executed and delivered by the Purchaser pursuant hereto or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Purchaser.

**5.3     Enforceability.** This Agreement and the documents and instruments to be executed and delivered by the Purchaser pursuant hereto constitute or, when executed and delivered pursuant hereto will constitute, legal, valid and binding agreements of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, except to the extent that (a) such enforcement may be subject to any proceedings, subsequent to the date hereof, under any bankruptcy, insolvency, reorganization, moratorium or other laws, now or hereafter in effect, relating to or limiting creditors' rights generally and (b) the remedy of specific performance and

BAC 01061
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 25 -

injunctive and other forms of equitable relief may be subject to equitable defenses or to the discretion of the court before which any proceeding therefor may be brought.

**5.4**    <u>Consents and Approvals; No Violations.</u>    The execution and delivery by the Purchaser of this Agreement and the documents and instruments to be executed and delivered by the Purchaser pursuant hereto, and the consummation by the Purchaser of the transactions contemplated hereby, do not and will not (a) violate or conflict with the organizational documents of the Purchaser; (b) violate or conflict with any order, injunction, decree, statute, rule, ordinance or regulation applicable to the Purchaser or by which any of the Purchaser's assets may be bound; (c) require any filing with, or permit, consent or approval of, any public governmental or regulatory body, agency or authority, or private person; (d) result in a violation or breach of, or constitute, or with giving of notice or lapse of time or both constitute, a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, mortgage, lease, contract, agreement, instrument or other arrangement to which the Purchaser is a party or by which the Purchaser or any of its properties or assets may be bound.

**5.5**    <u>Litigation</u>.    Except as described in Schedule 5.5, no action, suit, inquiry, audit, proceeding or investigation, by or before any court or governmental or other regulatory or administrative agency or commission is currently pending or, to the Best Knowledge of the Purchaser threatened, against, involving or arising in connection with, the Purchaser that questions or challenges the validity of this Agreement or any action taken or to be taken by the Purchaser pursuant to this Agreement.

## ARTICLE 6

## CONDITIONS TO CLOSING

**6.1**    <u>Conditions to the Seller's Obligation to Effect the Closing</u>.    The obligation of the Seller to effect the Closing shall be subject to the fulfillment at or prior to the Closing, or the waiver in writing by the Seller, of the following additional conditions:

H:\GENERAL\IRVIN\IPAGT.016                                                    April 18, 1997

BAC 01062
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 26 -

(a)     Each representation and warranty of the Purchaser contained in this Agreement shall be true in all material respects as of the date such representation and warranty is made.

(b)     The Purchaser shall have performed in all material respects each obligation and agreement and complied in all material respects with each covenant to be complied with by it hereunder at or before the Closing.

(c)     No action, suit, inquiry, audit, proceeding or investigation by or before any court or governmental or other regulatory or administrative agency or commission shall be pending or threatened that questions or challenges the validity of this Agreement or the transactions contemplated hereby, and no statute, rule or regulation shall have been enacted by any Governmental Authority of competent jurisdiction that makes the consummation of the Closing illegal.

6.2     Conditions to the Purchaser's Obligation to Effect the Closing. The obligation of the Purchaser to effect the Closing shall be subject to the fulfillment at or prior to the Closing, or the waiver in writing by the Purchaser, of the following additional conditions:

(a)     Each representation and warranty of the Seller contained in this Agreement shall be true in all material respects as of the date such representation and warranty is made.

(b)     The Seller shall have performed in all material respects each obligation and agreement and complied in all material respects with each covenant to be complied with by it hereunder at or before the Closing.

(c)     The Purchaser shall have received a certificate, signed by all the officers and directors of the Seller, certifying (i) a list of all the officers and directors of the Seller as of the date of the Closing, (ii) a list of all shareholders of the Seller as of the date of the Closing showing the number of shares held by each such shareholder, and (iii) that the conditions specified in paragraphs (a) and (b) of this Section 6.2 have been fulfilled.

(d)     No action, suit, inquiry, audit, proceeding or investigation by or before any court or governmental or other regulatory or administrative agency

April 18, 1997

BAC 01063
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 27 -

or commission shall be pending or threatened that questions or challenges the validity of this Agreement or the transactions contemplated hereby, and no statute, rule or regulation shall have been enacted by any Governmental Authority of competent jurisdiction that makes the consummation of the Closing illegal.

(e)    The Purchaser shall have been provided with such information and documentation as the Purchaser in its sole discretion shall deem satisfactory for the purposes of the Closing, that JASA (i) was the rightful owner of the *"Havana Club"* trademark for rum immediately prior to the enactment and entry into force of Cuban Law No. 890, (ii) was successfully reactivated, through appropriate corporate procedures, prior to its entering into the Transfer Agreement, and (iii) has been legally able to enter into the Transfer Agreement and to dispose of the Purchased Assets.  A decision by the Purchaser to deem this condition fulfilled for the purposes of the Closing shall not constitute a waiver of or otherwise impair the representations, warranties, or covenants made by the Seller in this Agreement or the rights and remedies of the Purchaser hereunder.

(f)    The Seller shall have duly executed and delivered to the Purchaser an instrument of assignment substantially in the form of Annex 7.5, Part 2, as provided in Section 7.5.

(g)    JASA shall have duly executed and delivered to the Purchaser a Guaranty substantially in the form of Annex 6.2(g).

## ARTICLE 7

### COVENANTS OF THE PARTIES

7.1    <u>Obligation to Effect the Closing</u>.    The Seller shall exert all reasonable endeavors to satisfy all the conditions set forth in Section 6.2 hereof and to effect the Closing at the earliest practicable date.  The Purchaser shall exert all reasonable endeavors to satisfy all the conditions set forth in Section 6.1 hereof and to effect the Closing at the earliest practicable date.

April 18, 1997

BAC 01064
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 28 -

**7.2**     Information. Prior to the Closing, and without prejudice to Section 7.3 of this Agreement, the Seller shall provide the Purchaser with all material information that is within the control of or otherwise available to the Seller and relates to the maintenance and existence of, or the Seller's ownership and corporate or individual authority and ability to dispose of, any of the Purchased Assets.

**7.3**     Cooperation; Further Assurances.

(a)     Each party shall cooperate reasonably with the other in preparing and filing all notices, applications, reports and other instruments and documents which are required by any statute, rule, regulation or order of any Governmental Authority in connection with the transactions contemplated by this Agreement, including the transfer, assignment and conveyance of the Trademarks, the Registrations or the Designs to the Purchaser. Without limitation of the foregoing, from and after the date of this Agreement, each party shall from time to time, at the request of the other party and without further cost or expense to such requesting party, execute and deliver such other instruments of conveyance and transfer and take such other actions as such other party may reasonably request in order more effectively to carry out this Agreement and to vest in the Purchaser good and marketable title to the Purchased Assets.

(b)     Without limitation of the foregoing, the Seller shall cooperate with the Purchaser in the Purchaser's efforts to reclaim all rights in respect of the Know-How, the Trademarks, the Registrations, the Designs and the Claim Rights, including participation, at the Purchaser's request and at the Purchaser's sole cost and expense, in any legal proceedings aimed at obtaining registration of the Trademarks in the Purchaser's name or cancellation of similar registrations in the name of other Persons.

(c)     Without limitation of the foregoing, should the Seller in the future obtain, receive or be granted, from or by any Person whatsoever and for any reason whatsoever, any right, title or interest in or to the Know-How, the Trademarks, the Registrations, the Designs or the Claim Rights, the Seller shall immediately give notice thereof to the Purchaser and shall forthwith convey, transfer and deliver all of such right, title or interest to the Purchaser without any consideration other than the consideration provided for in this Agreement.

BAC 01065
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 29 -

(d)     Without limitation of the foregoing, should the Seller learn of any plan, program, approach, offer or negotiation pursuant to which the Cuban government might be prepared to return the *"Havana Club"* trademark to the original owner or such owner's successor in title, or otherwise to transfer such trademark, whether or not in conjunction with any of the physical assets confiscated from JASA or any other assets, the Seller shall immediately notify the Purchaser, and the Seller and the Purchaser shall consult with each other concerning any resulting lawful opportunity for the Purchaser to recover such trademark or for the Seller to recover any other asset (including the reserved assets referred to in Section 2.2) in respect of which the Seller may have a claim.

### 7.4     Confidentiality.

(a)     The parties hereto shall keep all information relating to the Purchased Assets, this Agreement or the transactions contemplated hereby strictly confidential, except that (i) disclosure of such information shall be permitted in the event and to the extent that such disclosure is required by applicable law, and (ii) the Purchaser may disclose such information to the extent the Purchaser, in its sole discretion, deems such disclosure to be necessary or advantageous in connection with the maintenance of the Purchased Assets, the registration, prosecution or maintenance of any Intellectual Property related to the Purchased Assets, or the manufacture, distribution or sale of HC Rum.

(b)     Without prejudice to the provisions of Section 7.4(a), the Purchaser shall not, without the prior written consent of the Seller, use any Confidentiality Agreement Information for any purpose other than (i) preparing and filing with OFAC any written or oral submissions additional or related to the OFAC Filing, or (ii) exercising any of the rights or performing any of the obligations of the Purchaser under this Agreement or any of the agreements or transactions contemplated hereby, including the evaluation to be conducted by the Purchaser pursuant to Section 6.2(e) and the endeavors of the Purchaser referred to in Section 7.6(a).   Except as may be required by law or by the order of any court or administrative tribunal, or may be authorized by the Seller, the Purchaser shall not disclose any Confidentiality Agreement Information to any third party other than (i) OFAC or any official or employee thereof, or (ii) the Purchaser's directors, officers, employees, counsel or consultants who may participate in any aspect of the Purchaser's exercise or its rights or discharge of its obligations under this Agreement

H:\GENERAL\IRVIN\IPAGT.016                                    April 18, 1997

BAC 01066
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 30 -

or the agreements or transactions contemplated hereby.  The Purchaser shall have no responsibility or liability for any use or disclosure of Confidentiality Agreement Information that may have been made or may be made by OFAC or any other governmental agency.

(c)     Should the Purchaser be required by legal process to disclose any Confidentiality Agreement Information, the Purchaser shall give prompt notice thereof to the Seller and the Seller shall have the right, at its sole cost and expense, to seek an appropriate protective order or other remedy.  Should no such protective order or other remedy be obtained, the Purchaser shall be free to disclose such Confidentiality Agreement Information as, in the written opinion of the Purchaser's legal counsel, the Purchaser is legally required to disclose.

(d)     It is agreed that, in the event of a material breach of any of the obligations set forth in this Section 7.4, money damages may not be an adequate remedy therefor and that, accordingly, the party not in breach shall also be entitled to specific performance or injunctive relief as a remedy for such breach.

(e)     Notwithstanding any other provision of this Agreement, the obligations established on this Section 7.4 shall expire on July 24, 2006.

7.5     Use of the Name *"Arechabala."*   At the Closing, the Seller and the Purchaser shall enter into an agreement entitled "License Agreement Concerning the '*Arechabala*' Trademark" substantially in the form of Annex 7.5, Part 1.  At the Closing, the Seller shall execute an instrument of assignment substantially in the form of Annex 7.5, Part 2.

7.6     Endeavors to Obtain Trademark Certificate.

(a)     The Purchaser shall exert commercially reasonable endeavors to obtain a Trademark Certificate for the United States.  The Purchaser shall be deemed to have discharged this obligation by continuing to prosecute the trademark-cancellation action captioned *Galleon S.A.* et al. v. *Havana Club Holdings S.A.* et al. (Cancellation No. 24,108) before the Trademark Trial and Appeal Board of the United States Patent and Trademark Office, and pursuing any appeals from the decision of such agency that may be available to the Purchaser as a matter of right.

BAC 01067
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 31 -

(b)   The Purchaser shall have the right to choose, in its sole discretion, whether to pursue a Trademark Certificate in respect of any country other than the United States; provided, however, that with respect to any such country, if the Purchaser shall so determine not to pursue, or to abandon the pursuit of, a Trademark Certificate in such country, the Purchaser shall grant to the Seller or its designee, on such terms as shall be negotiated in good faith by the parties, a license of such rights as may be reasonably required to allow the Seller, acting as licensee and in the name of the Purchaser but at the Seller's sole cost and expense, to pursue a Trademark Certificate in respect of such country and after obtaining such certificate to sell HC Rum in such country.

## ARTICLE 8

## INDEMNIFICATION

**8.1**   **Effectiveness of Representations, Warranties and Covenants.** All representations, warranties and covenants made by either party in this Agreement shall remain in effect after the execution of this Agreement and the consummation of the transactions contemplated hereby and shall continue in effect for so long as the obligations of the parties hereunder shall have not been fully discharged.

**8.2**   **Indemnification.**

(a)   The Seller hereby agrees to indemnify and to hold harmless each member of the Purchaser Group from and against all Damages asserted against, imposed upon or incurred by any such member of the Purchaser Group, directly or indirectly, by reason of or resulting from, any breach or inaccuracy of any representation, warranty or covenant of the Seller set forth in this Agreement.

(b)   The Purchaser hereby agrees to indemnify and to hold harmless each member of the Seller Group from and against all Damages asserted against, imposed upon or incurred by any such member of the Seller Group, directly or indirectly, by reason of or resulting from (i) any breach or inaccuracy of any representation, warranty or covenant of the Purchaser set forth in this Agreement, or (ii) the manufacture or sale of HC Rum by the Purchaser or a licensee thereof after the Closing, including any Damages resulting from any product-liability claim arising

April 18, 1997

BAC 01068
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 32 -

out of such manufacture or sale, or (iii) any third-party claim arising out of the use of the *"Havana Club"* trademark by the Purchaser or a licensee thereof after the Closing, or (iv) any third-party claim arising out of any use of the *"Havana Club"* trademark by the Purchaser or an Affiliate of the Purchaser prior to the Closing.

      **8.3**      <u>Third-Party Claims</u>. The obligations and liabilities of each party to this Agreement under Section 8.2 related to Third-Party Claims shall be subject to the following terms and conditions:

      (a)      Upon receipt of written notice of any Third-Party Claim, the Indemnified Party shall notify the Indemnifying Party in writing. The Indemnifying Party shall be entitled, at its own expense, to participate in and, upon notice to the Indemnified Party, to undertake the defense thereof in good faith by counsel of the Indemnifying Party's own choosing, which counsel shall be reasonably satisfactory to the Indemnified Party, provided that (i) the Indemnified Party shall at all times have the option, at its own expense, to participate fully therein (without controlling such action), and (ii) if in the Indemnified Party's reasonable judgment a conflict of interest exists between such Indemnified Party and the Indemnifying Party in respect of such Third-Party Claim, such Indemnified Party shall be entitled to select counsel of its own choosing, reasonably satisfactory to the Indemnifying Party, and the Indemnifying Party shall be obligated to pay the reasonable fees and expenses of such counsel.

      (b)      If within thirty (30) days after written notice to the Indemnified Party of the Indemnifying Party's intention to undertake the defense of any Third-Party Claim the Indemnifying Party shall fail to defend the Indemnified Party against such Third-Party Claim, the Indemnified Party shall have the right (but not the obligation) to undertake the defense, compromise or settlement of such Third-Party Claim on behalf of, and for the account and at the risk of, the Indemnifying Party.

      (c)      The Indemnifying Party shall provide the Indemnified Party with access to all records and documents within the Indemnifying Party's possession, custody or control relating to any Third-Party Claim. The Indemnified Party shall provide the Indemnifying Party with access to all records and documents within the Indemnified Party's possession, custody, or control relating to any Third-Party Claim.

H:\GENERAL\IRVIN\IPAGT.016                                      April 18, 1997

BAC 01069
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 33 -

Nothing in this provision shall be deemed to constitute a waiver of any attorney-client, work-product or joint-defense privilege.

### 8.4    Set-Off.

(a)    In the event of a material breach by the Seller of any of the representations, warranties, covenants or other obligations of the Seller under this Agreement, which the Seller shall have failed to cure within sixty (60) calendar days after receiving, in accordance with Section 9.4, notice of such breach, the Purchaser shall have the right to set off (i) the amount of any Damages that the Purchaser shall reasonably determine to have been incurred or suffered by the Purchaser Group, directly or indirectly, by reason of or as a result of such breach, against (ii) any one or more Milestone Payments or Commission Payments due by the Purchaser to the Seller under this Agreement.  Should the Purchaser wish to avail itself of such right of set-off, it shall give prior written notice thereof to the Seller (hereinafter referred to as the "Set-Off Notice"), stating with reasonable particularity the reasons therefor. Any set-off pursuant to this provision shall not limit or otherwise affect the other remedies available to the Purchaser at law or in equity or otherwise under this Agreement.

(b)    Any set-off pursuant to Section 8.4(a) shall become final and binding on the Seller upon the expiration of a ninety (90) calendar-day period following the day on which the Seller shall have received, in accordance with Section 9.4, the Set-Off Notice, except to the extent that such set-off shall have been contested by the Seller in arbitration proceedings (under Section 9.8) initiated by the Seller before the expiration of such period.  To the extent that the set-off shall be so challenged, it shall be deemed to have been made provisionally and to be subject to any award to be rendered in such arbitral proceedings.

### 8.5    Contract Remedies Not Exclusive.  Except as expressly provided in this Agreement, the remedies of either party hereunder are in addition to any other remedies at law or in equity to which such party may be entitled under the applicable law.

### 8.6    Pledge of Assets.  Without prejudice to any other provision of this Agreement, the Seller pledges all of its present and future assets, including any amounts that may be recovered on any of the claims referred to in Section 2.2 and

BAC 01070
CONFIDENTIAL - ATTORNEYS
EYES ONLY

- 34 -

any assets that may be recovered on any claim arising out of the confiscation by the Cuban government of JASA's physical assets, for the payment of any indemnification that the Seller may owe under or in connection with this Agreement. For the avoidance of doubt, nothing in this provision shall impair the right of the Seller to use or dispose of any such assets in any manner whatsoever, as long as there shall be no pending Claim against the Seller for indemnification under this Agreement.

**8.7    Limitation on Indemnification.**  Notwithstanding anything in this Agreement to the contrary, but without prejudice to the right of each party to equitable remedies, the obligation of the parties to indemnify under this Agreement (other than in respect of Third Party Claims) shall be subject to the following limitations:

(a)    Any indemnification amount to be paid by the Seller under this Agreement at any given time shall be subject to reduction to such extent as may be necessary so that such amount, added to the aggregate amount theretofore paid by the Seller as indemnification under this Agreement, shall not exceed the aggregate amount of the Initial Purchase Price and all Milestone Payments and Commission Payments received by the Seller from the Purchaser until such time. Any Claim that remains unpaid, in whole or in part, by reason of the operation of this provision shall remain an obligation of the Seller for the duration of this Agreement, to be set off against any Milestone Payments or Commission Payments that the Purchaser may thereafter be required to make.

(b)    Any indemnification amount to be paid by the Purchaser under this Agreement at any given time shall be subject to reduction to such extent as may be necessary so that such amount, added to the aggregate amount theretofore paid by the Purchaser as indemnification under this Agreement, shall not exceed the aggregate amount of the Initial Purchase Price and all Milestone Payments and Commission Payments paid by the Purchaser to the Seller until such time. Any Claim that remains unpaid, in whole or in part, by reason of the operation of this provision shall remain an obligation of the Purchaser for the duration of this Agreement, to be paid to the extent of any Milestone Payments or Commission Payments that the Purchaser may thereafter be required to make.

BAC 01071
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 35 -

## ARTICLE 9

## MISCELLANEOUS PROVISIONS

**9.1     Effectiveness.**   This Agreement shall enter into force on the date hereof and, except as set forth in Section 7.4(e), shall remain in effect until terminated in accordance with Section 9.2.

**9.2     Termination.**  This Agreement may be terminated at any time by either party if (i) at any time before or after the Closing, the other party shall have breached in any material respect any of its representations, warranties, covenants or other obligations under this Agreement, or (ii) the Closing shall not have occurred by May 1st, 1997.  Any termination pursuant to this Section 9.2 shall not limit or otherwise affect the remedies available to the terminating party at law or in equity or otherwise under this Agreement.

**9.3     Expenses.**  Each party shall pay its own costs and expenses relating to this Agreement and the transactions contemplated hereby.

**9.4     Execution in Counterparts; Effectiveness.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   This Agreement shall become effective upon execution and delivery by both parties.

**9.5     Notices.**

(a)     All notices, requests, demands and other communications which are required or may be given pursuant to the terms of this Agreement shall be in writing and shall be deemed delivered (i) on the date of delivery when delivered by hand, (ii) on the date of transmission when sent by facsimile transmission during normal business hours with telephone confirmation of receipt, (iii) on the date following the date of transmission, when sent by facsimile transmission after normal business hours, (iv) two (2) days after dispatch when sent by a reputable courier service that maintains records of receipt, or (v) five (5) days after dispatch when sent by certified mail, postage prepaid, return-receipt requested; provided that, in any such case, such communication shall be addressed as provided in the immediately following paragraph (b).

BAC 01072
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 36 -

(b)     All notices, requests, demands and other communications which are required or may be given pursuant to the terms of this Agreement shall be addressed as follows:

(i)     If to the Seller:

Jose Arechabala International Ltd.
c/- LGT Treuhand AG
Städtle 18-22
Vaduz
Liechtenstein

with a copy to:
Bufete Sartorius y Asociados
c/- Covarrubias No. 7, 3o. IZQ
Madrid
Spain

Attention: Jacobo Sartorius
Telephone: 34-1-447-45-66
Facsimile: 34-1-447-48-91

(ii)    If to the Purchaser:

Bacardi & Company Limited
P.O. Box N-4880
Millar Road off Carmichael Road
New Providence, Nassau,
Commonwealth of the Bahamas

Attention:
Telephone: 242-362-1271
Facsimile: 242-362-9918

H:\GENERAL\IRVIN\PAGT 016

April 18, 1997

BAC 01073
CONFIDENTIAL · ATTORNEYS
EYES ONLY

- 37 -

(ii)   with a copy to:

Covington & Burling
1201 Pennsylvania Avenue, N.W.
Box 7544
Washington, D.C. 20044

Attention: Oscar M. Garibaldi, Esq.
Telephone: (202) 662-5624
Facsimile: (202) 778-5624

or to such other address as any party shall have designated by notice in the foregoing manner to the other parties.

9.6    Waivers.

(a)    No waiver of any provision, condition or covenant of this Agreement shall be effective as against the waiving party unless such waiver shall be in writing and signed by the waiving party.  Waiver by a party as provided in this Section shall not be construed as, or constitute, either a continuing waiver of such provision, condition or covenant or a waiver of any other provision, condition or covenant hereof.  Without limitation of the foregoing, it is expressly agreed that a waiver by the Seller or the Purchaser, respectively, of any of the conditions set forth in Sections 6.1 or 6.2 hereof shall not be construed as, or constitute, a waiver of any of the representations and warranties set forth in Article 4 or 5 of this Agreement. The failure of any party at any time to require performance by the other party of any provision, condition or covenant of this Agreement shall in no way affect its right thereafter to enforce the provision, condition or covenant.

(b)    The Seller hereby forever waives any and all claims or Damages that the Seller may have had in the past, may currently have or may acquire in the future against any member of the Purchaser Group arising, directly or indirectly, from any use by the Purchaser or any of its Affiliates, at any time prior to the Closing Date, of the trademarks or trade names *"Havana Club"* or *"Arechabala"* or any variations thereof or designs related thereto.

BAC 01074
CONFIDENTIAL · ATTORNEYS'
EYES ONLY

- 38 -

**9.7**    Amendment. This Agreement may be modified, supplemented or amended only by a written instrument executed by the parties thereto.

**9.8**    Entire Agreement. This Agreement (together with the Schedules and the Annexes expressly identified in this Agreement) constitutes the entire agreement of the parties with respect to the subject matter hereof and thereof, and supersedes all prior agreements and understandings of the parties, oral and written, in respect of such subject matter.

**9.9**    Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the Islands of Bermuda without regard to conflict-of-laws principles.

**9.10**    Arbitration. Any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be referred to final and binding arbitration, to the exclusion of any other court, forum or jurisdiction, and the arbitral award shall be enforceable in any court having jurisdiction thereof.   Such arbitration shall be conducted under the rules of the International Chamber of Commerce (ICC) in effect from time to time, which rules are deemed to be incorporated by reference into this clause.   The tribunal shall consist of three arbitrators.  Each of the parties shall nominate one arbitrator and the ICC shall designate the Chairman.  The place of arbitration shall be Geneva and the language to be used in the arbitral proceedings shall be English.  Unless the arbitral tribunal shall determine otherwise, the costs of the arbitration shall be borne by the parties equally and each party shall bear its other legal costs, including the fees of its attorneys.

**9.11**    Assignments. This Agreement may not be assigned by any party hereto without the prior written consent of the other party.

**9.12**    Binding Effect; Benefits. This Agreement shall redound to the benefit of, and be binding upon, the parties hereto and their respective successors and permitted assigns.  Except for the provisions of Article 8, nothing contained in this Agreement, express or implied, is intended to confer upon any Person other than the parties hereto and their respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement.

BAC 01075
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 39 -

9.13    <u>Schedules, Annexes and Other Agreements</u>.   The Schedules, Annexes and other agreements specifically referred to in, and delivered pursuant to, this Agreement are an integral part of it.

9.14    <u>Compliance with OFAC License and Cuban Assets Control Regulations</u>.   The parties acknowledge that this Agreement is entered into pursuant to certain license from OFAC attached hereto as Schedule 9.14, Part 1, and confirm their intent to comply in all respects with the Cuban Assets Control Regulations. To this end, notwithstanding any other provision of this Agreement:

(a)    Each payment to be made by the Purchaser to the Seller or any member of the Seller Group shall be made as follows:

(i)    The Seller shall give prior notice to the Purchaser of the aggregate percentage of equity interests in the Seller held, directly or indirectly, by Blocked Persons (the "Blocked Percentage"). The period within which the payment is to be made shall not run pending receipt of such notice by the Purchaser. The Seller hereby gives notice to the Purchaser that the Blocked Percentage for the purposes of payment of the Initial Purchase Price and the respective Blocked Persons shall be as set forth in Schedule 9.14, Part 2.

(ii)    The Purchaser shall open a blocked account in a United States financial institution in accordance with the Cuban Assets Control Regulations and shall give notice thereof to the Seller.

(iii)    The Purchaser shall pay into such blocked account a portion of such payment equal to the result of multiplying the total amount of such payment by the Blocked Percentage, and shall pay the remainder as otherwise provided in this Agreement.

(b)    The parties shall comply in all other respects with the Cuban Assets Control Regulations and any license, ruling, order, or instruction issued thereunder.

April 18, 1997

BAC 01076
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 40 -

**IN WITNESS WHEREOF**, this Agreement has been executed as a deed by the parties hereto, all as of the date first above written.

**SELLER:**

[Seal]

JOSE    ARECHABALA    INTERNATIONAL LTD.

Witness

By:
Name:
Title:

Witness

By:
Name: F. RUIZ PIN
Title:

Witness

By:
Name: JOSE M. ARECHABALA
Title:

Witness

By: Luis Arechabala
Name:
Title:

**PURCHASER:**

[Seal]

BACARDI & COMPANY LIMITED

Witness

By:
Name: Juan Prado
Title:

H:\GENERAL\IRVIN\IPAGT.016

April 18, 1997 5:20pm

BAC 01077

CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 41 -

## SCHEDULE 2.1(a)

## KNOW-HOW

The attached formula was transcribed in 1960 by José María Arechabala, then First Vice President and Acting President of José Arechabala S.A, and to the best of his recollection at the time (shortly after leaving Cuba), it is the exact formulation used by the Company for the manufacture of Havana Club rum.

April 18, 1997

BAC 01078
CONFIDENTIAL · ATTORNEYS
EYES ONLY

- 42 -

## SCHEDULE 2.1(b)

## TRADEMARKS

Single item: Trademark *"Havana Club"* for rum and/or rum products, and any variant thereof.

April 18, 1997

BAC 01079
CONFIDENTIAL - ATTORNEYS
EYES ONLY

- 43 -

## SCHEDULE 2.1(c)

## REGISTRATIONS

[See attached]

April 18, 1997

BAC 01080
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 44 -

## SCHEDULE 2.1(d)

## DESIGNS

[See attached]

April 18, 1997

BAC 01081
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 45 -

## SCHEDULE 2.7

## ESCROW AGREEMENT


Attached is a copy of the executed agreement.

April 18, 1997

BAC 01082
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 46 -

## SCHEDULE 3.1(a)(iii)

### MILESTONE PAYMENTS IN RESPECT OF CERTAIN COUNTRIES

| Country | Milestone Payment |
|---------|-------------------|
| Spain | US$ 1 million (one million dollars) |
| Italy | US$ 0.4 million (four hundred thousand dollars) |
| Mexico | US$ 0.4 million (four hundred thousand dollars) |
| Germany | US$ 0.2 million (two hundred thousand dollars) |

April 18, 1997

BAC 01083

CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 47 -

## SCHEDULE 3.2(a)(i)

### CALCULATION OF THE APPLICABLE COMMISSION FACTOR
### FOR THE PURPOSES OF SECTION 3.2(a)(i)

For the purposes of Section 3.2(a)(i), the Applicable Commission Factor shall be calculated in accordance with the following formula:

$$ACF = \frac{US\$ \ 1.40 \ [CPI \ adj.]}{(0.90 \ x \ PRR) + (0.10 \ x \ PPR)}$$

In the preceding formula the following terms have the meanings specified in each case:

ACF means the Applicable Commission Factor.

PRR means the average FOB price in U.S. dollars of a nine (9) liter case of regular HC Rum at the Purchaser's distillery for shipments to the United States during the calendar year in respect of which the first payment pursuant to Section 3.2(a)(i) shall be made.

PPR means the average FOB price in U.S. dollars of a nine (9) liter case of premium HC Rum at the Purchaser's distillery for shipments to the United States during the calendar year in respect of which the first payment pursuant to Section 3.2(a)(i) shall be made.

[CPI adj.] means that the sum of US$ 1.40 is subject to Consumer Price Index adjustment in accordance with Section 3.2(b).

Example: Assuming that PRR is US$ 40; PPR is US$ 60; and US$ 1.40 as adjusted by the Consumer Price Index is US$ 1.42, the ACF will be equal to 0.0338.

For the avoidance of doubt, the Applicable Commission Factor shall be calculated, as set forth in this Schedule, at the time that the first payment under Section 3.2(a)(i) shall become due, and once so calculated shall remain fixed for the duration of the period specified in Section 3.2(a)(i).

BAC 01084
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 48 -

## SCHEDULE 3.2(a)(ii)

## CALCULATION OF THE APPLICABLE COMMISSION FACTOR
## FOR THE PURPOSES OF SECTION 3.2(a)(ii)

For the purposes of Section 3.2(a)(ii), the Applicable Commission Factor shall be calculated in accordance with the following formula:

$$ACF = \frac{US\$ \ 1.40 \ [CPI \ adj.]}{(0.90 \ x \ PRR) \ + \ (0.10 \ x \ PPR)}$$

In the preceding formula the following terms have the meanings specified in each case:

ACF means the Applicable Commission Factor.

PRR means the average FOB price in U.S. dollars of a nine (9) liter case of regular HC Rum at the Purchaser's distillery for shipments from Cuba to countries other than the United States during the calendar year in respect of which the first payment pursuant to Section 3.2(a)(ii) shall be made.

PPR means the average FOB price in U.S. dollars of a nine (9) liter case of premium HC Rum at the Purchaser's distillery for shipments from Cuba to countries other than the United States during the calendar year in respect of which the first payment pursuant to Section 3.2(a)(ii) shall be made.

[CPI adj.] means that the sum of US$ 1.40 is subject to Consumer Price Index adjustment in accordance with Section 3.2(b).

Example: Assuming that PRR is US$ 40; PPR is US$ 60; and US$ 1.40 as adjusted by the Consumer Price Index is US$ 1.42, the ACF will be equal to 0.0338.

For the avoidance of doubt, the Applicable Commission Factor shall be calculated, as set forth in this Schedule, at the time that the first payment under Section 3.2(a)(ii) shall become due, and once so calculated shall remain fixed for the duration of the period specified in Section 3.2(a)(ii).

BAC 01085
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 49 -

## SCHEDULE 3.5a

## PARTICIPATING AND NON-PARTICIPATING INTEREST HOLDERS

| Participating Interest Holders | % |
|---|---|
| José María Arechabala y Arechabala | 9.235 |
| José Miguel Arechabala y Arechabala | 8.493 |
| María Josefa Arechabala y Arechabala | 4.243 |
| María Catalina Arechabala y Arechabala | 4.243 |
| Ramón María Arechabala y Arechabala | 4.318 |
| María del Carmen Arechabala Fernández | 0.296 |
| José Manuel Arechabala Fernández | 0.296 |
| María Eugenia Elena Arechabala Fernández | 0.296 |
| Isabel Arechabala Fernández | 0.296 |
| Nicolás Pita Arechabala | 2.607 |
| Carmen Pita Arechabala | 2.607 |
| Hispana Pita Arechabala | 2.607 |
| Clara María Pita Arechabala | 2.607 |
| María Elisa Pita Arechabala | 2.607 |
| Gerardo Pita Arechabala | 2.607 |
| Teresa Rodrigo Cabrales de Prat | 1.775 |
| María Rosa Arechabala Rodrigo | 1.100 |
| Mercedes Babé-Gónzalez Pita | 0.521 |
| José María Riestra Pita | 0.521 |
| Antonio Riestra Pita | 0.521 |
| María Riestra Pita | 0.521 |
| Raimundo Riestra Pita | 0.521 |
| María Concepción Pérez Lombard | 3.133 |

BAC 01086

CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 49a -

| | |
|---|---|
| Manuel Malet y Bustamante | 2.094 |
| Gabriel Malet y Bustamante | 2.094 |
| María José Malet y Bustamante | 2.094 |
| Cristina Arechabala Cifuentes | 0.367 |
| Luis Emilio Arechabala Cifuentes | 0.367 |
| José Arechabala Cifuentes | 0.367 |
| Compañía Azucarera Progreso S.A. | 17.525 |
| **Non-Participating Interest Holders** | **%** |
| María Victoria Arechabala Fernández | 0.296 |
| José Antonio Márquez Arechabala | 1.116 |
| Gloria María Márquez Arechabala | 2.299 |
| Francisco Javier Márquez Arechabala | 2.324 |
| Estate of Francisco Javier Peralta Heydrich | 0.025 |
| Estate of Cornelio Lartitegui y Achirica | 1.800 |
| Estate of José Antonio Arechabala y Hurtado de Mendoza | 1.025 |
| Estate of Ramón Arechabala y Torrontegui | 0.825 |

BAC 01087

CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 50 -

## SCHEDULE 4.5

## LITIGATION

<u>Pending Litigation</u>:

1.      *Jose Ma. Arechabala Rodrigo* v. *Havana Rum and Liquors, S.A. dba H.R.L., S.A.*, filed in the United States Patent and Trademark Office before the Trademark Trial and Appeal Board (Cancellation No. 22,881; Registration No. 1,031,651 (on appeal)).

2.      *Galleon S.A., Bacardi-Martini U.S.A., Inc.* and *Bacardi & Company Limited* v. *Havana Club Holdings, S.A.* and *Havana Rum & Liquors, S.A. dba H.R.L., S.A.*, filed in the United States Patent and Trademark Office before the Trademark Trial and Appeal Board (Cancellation No. 24,108; Registration No. 1,031,651).

3.      *Havana Club Holdings, S.A.* and *Havana Club International, S.A.* v. *Galleon S.A., Bacardi-Martini U.S.A., Inc., Gallo Wine Distributors, Inc., G.W.D. Holdings, Inc.* and *Premier Wine and Spirits*, filed in the United States District Court for the Southern District of New York (Civil Action No. 96-Civ.-9655 (SAS)).

April 18, 1997

BAC 01088

CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 51 -

## SCHEDULE 4.6

## TRANSFER AGREEMENT

Attached is a copy of the Transfer Agreement and related transfer documentation.

April 18, 1997

BAC 01089

CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 52 -

## SCHEDULE 4.8

## CERTAIN CORPORATE DOCUMENTS

See attached documents.

April 18, 1997

BAC 01090

CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 53 -

## SCHEDULE 4.9

## CERTAIN DOCUMENTS CONCERNING JASA
## OR THE TRANSFER AGREEMENT

### Part 1

The description set forth in the minutes of the special meeting of shareholders of JASA held on April 16, 1997, a copy of which has heretofore been delivered to the Purchaser, is incorporated by reference herein.

### Part 2

Although it appears that the Cuban revolutionary government may have purported to justify its takeover of JASA on an alleged insolvency or bankruptcy of the company, the attached balance sheets of JASA show such allegations to be untrue.

### Part 3

Attached are copies of the documents specified in Section 4.9.

BAC 01091
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 54 -

## SCHEDULE 5.5

## LITIGATION

Pending Litigation:

    1.        *Jose Ma. Arechabala Rodrigo* v. *Havana Rum and Liquors, S.A. dba H.R.L., S.A.*, filed in the United States Patent and Trademark Office before the Trademark Trial and Appeal Board (Cancellation No. 22,881; Registration No. 1,031,651 (on appeal)).

    2.        *Galleon S.A., Bacardi-Martini U.S.A., Inc.* and *Bacardi & Company Limited* v. *Havana Club Holdings, S.A.* and *Havana Rum & Liquors, S.A. dba H.R.L., S.A.*, filed in the United States Patent and Trademark Office before the Trademark Trial and Appeal Board (Cancellation No. 24,108; Registration No. 1,031,651).

    3.        *Havana Club Holdings, S.A.* and *Havana Club International, S.A.* v. *Galleon S.A., Bacardi-Martini U.S.A., Inc., Gallo Wine Distributors, Inc., G.W.D. Holdings, Inc.* and *Premier Wine and Spirits*, filed in the United States District Court for the Southern District of New York (Civil Action No. 96-Civ.-9655 (SAS)).

BAC  01092

CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 55 -

## SCHEDULE 9.14

### Part 1

## LICENSE FROM OFFICE OF FOREIGN
## ASSETS CONTROL

[Attached]

April 18, 1997

BAC 01093
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 56 -

## SCHEDULE 9.14

### Part 2

### BLOCKED PERCENTAGE FOR PURPOSES OF PAYMENT OF INITIAL PURCHASE PRICE

The Seller hereby gives notice to the Purchaser that the Blocked Persons and the Blocked Percentage for the purposes of payment of the Initial Purchase Price are as follows:

| Blocked Persons | Blocked Percentage |
|---|---|
| Francisco Javier Márquez Arechabala | 2.733% |

April 18, 1997

BAC 01094
CONFIDENTIAL · ATTORNEYS
EYES ONLY

- 57 -

## ANNEX 2.5

## FORM OF THE BILL OF SALE

This **BILL OF SALE** made, executed, and delivered as of April 18, 1997, by **JOSE ARECHABALA INTERNATIONAL LTD.**, a corporation organized and existing under the laws of Liechtenstein (hereinafter referred to as the "Seller") to and in favor of **BACARDI & COMPANY LIMITED**, a corporation organized and existing under the laws of Liechtenstein (hereinafter referred to as the "Purchaser");

## W I T N E S S E T H:

WHEREAS the Seller and the Purchaser have heretofore entered into a certain agreement titled Agreement on the Purchase and Sale of Intellectual Property and Rights and Claims Concerning Thereto, dated as of April 18, 1997 (hereinafter referred to as the "Agreement"), pursuant to which the Seller has agreed to sell, assign, convey, and deliver to the Purchaser certain assets described with particularity in Section 2.1 of the Agreement and the respective schedules thereto (hereinafter referred to as the "Purchased Assets");

NOW THEREFORE:

KNOW ALL MEN BY THESE PRESENTS, that the Seller, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, has conveyed, granted, bargained, transferred, set over, assigned, alienated, remised, released, delivered and confirmed, and by this Bill of Sale does convey, grant, bargain, transfer, set over, assign, alienate, remise, release, deliver and confirm, unto the Purchaser, its successors and assigns forever, all of the Seller's right, title and interest to all of the Purchased Assets.

TO HAVE AND TO HOLD all of the Purchased Assets unto the Purchaser, and its successors and assigns, to its and their own use forever, and the Seller does for itself, its successors and assigns, covenant and agree, to the extent provided for in the Agreement, to warrant and defend the assignment and conveyance of the Purchased Assets to the Purchaser, its successors and assigns, against all and every person and persons whomever claiming an interest therein.

BAC 01095
CONFIDENTIAL · ATTORNEYS'
EYES ONLY

- 58 -

## ANNEX 6.2(g)

## FORM OF GUARANTY

**THIS GUARANTY**, made and entered into this ____ day of April, 1997, by

**JOSÉ ARECHABALA, S.A.,** a *sociedad anónima* organized and existing under the laws of Cuba and currently in liquidation (hereinafter referred to as the "Guarantor"),

to and for the benefit of

**BACARDI & COMPANY LIMITED,** a corporation organized and existing under the laws of Liechtenstein (hereinafter referred to as "BACO") and BACO's Indemnified Affiliates (as defined herein),

## W I T N E S S E T H:

**WHEREAS,** simultaneously with the execution and delivery of this Guaranty, BACO and Jose Arechabala International, Ltd., a Liechtenstein company ("JAI") are entering into an agreement titled Agreement on the Purchase and Sale of Intellectual Property and Rights and Claims Concerning Thereto, dated April 18, 1997 (the "Havana Club Agreement") pursuant to which JAI is selling, transferring and delivering a portion of the aforesaid assets to BACO; and

**WHEREAS** it is a condition precedent to the obligation of BACO to consummate the transactions contemplated by the Havana Club Agreement that the Guarantor guarantee the due and punctual performance and discharge of all the obligations and liabilities of JAI under such agreement and the other agreements to which JAI and BACO are parties contemplated thereby;

**NOW, THEREFORE,** in consideration of the premises, the Guarantor hereby agrees as follows:

## ARTICLE I

## INTERPRETATION AND APPLICATION

**1.01**   **Effectiveness.** This Guaranty shall remain in effect for so long as any of the Obligations shall remain in effect or outstanding.  If, as a result of any bankruptcy, dissolution, reorganization, intervention, arrangement or liquidation proceedings (or proceedings similar in purpose or effect), or if for any other reason, any payment received by any Beneficiary in respect of the Obligations shall be rescinded or must be returned by the Beneficiary, the guarantee provided by the Guarantor under this Guaranty shall continue to be effective as if such payment had not been made.

BAC 01096
CONFIDENTIAL - ATTORNEYS
EYES ONLY

- 59 -

1.02     Definitions. Unless otherwise provided in this Guaranty, capitalized terms used herein have the meanings assigned to them in the Havana Club Agreement.  The following terms have the meanings specified in each case:

(a)     "Affiliate" shall mean, in respect of BACO, any Person that controls, is controlled by, or is under common control with, BACO.

(b)     "Beneficiaries" shall mean BACO and its Indemnified Affiliates.

(c)     "Guarantor" shall have the meaning ascribed thereto in the Preamble to this Guaranty.

(d)     "Indemnified Affiliates" shall mean, in respect of BACO, its past, present, and future shareholders, directors, officers, employees, agents, representatives, and Affiliates.

(e)     "Obligations" shall have the meaning ascribed thereto in Section 2.01 of this Guaranty.

(f)     "Person" shall mean a human being, labor organization, partnership, limited liability company, limited liability partnership, association, undivided estate, joint venture, corporation, legal representative, trustee, trustee in bankruptcy, receiver, Governmental Authority, or any other legal entity whatsoever.

1.03     Rules of Construction. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  All references to Sections and Paragraphs shall be deemed references to Sections and paragraphs of this Guaranty, unless the context shall otherwise require.  The terms "this Guaranty," "hereof," "hereunder," and similar expressions refer to this Guaranty as a whole and not to any particular Article or Section or other portion of this Guaranty and include any Guaranty supplemental hereto. The conjunction "or" shall be understood in its inclusive sense (and/or).

1.04     Effects. This Guaranty shall be binding upon the Guarantor and its successors and permitted assigns. Except as otherwise expressly provided herein, this Guaranty shall not create or confer, or be construed as creating or conferring, any right, remedy, claim or benefit upon any Person other than the Beneficiaries and their respective successors and assigns.

1.05     Assignment. This Guaranty may not be assigned by the Guarantor nor may the obligations undertaken by the Guarantor hereunder be delegated without the prior written consent of BACO.  Any attempted assignment contrary to this Section 1.05 shall be void and of no effect.

BAC 01097
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 60 -

**1.06** <u>Waivers and Amendments</u>. This Guaranty may not be amended or supplemented without the prior written consent of BACO. A waiver by any of the Beneficiaries of its rights under any of the terms or conditions of this Guaranty on any particular occasion shall be in writing and shall not in any way be construed as a waiver of its rights on any subsequent occasion.

**1.07** <u>Severability</u>. In the event that any one or more of the provisions contained in this Guaranty shall be determined to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in any other respect and the remaining provisions of this Guaranty shall not be in any way impaired.

**1.08** <u>Governing Law</u>. This Guaranty shall be governed by and construed in accordance with the laws of the Islands of Bermuda, without regard to the conflict-of-laws rules thereof.

**1.09** <u>Entire Guaranty</u>. This Guaranty contains the entire guaranty with respect to the subject matter hereof and supersedes all prior arrangements or understandings in respect thereof.

ARTICLE II

GUARANTY

**2.01** <u>Guaranty</u>. The Guarantor absolutely, unconditionally and irrevocably guarantees to each of the Beneficiaries the due and punctual performance, discharge and satisfaction of any and all covenants, agreements, indemnities and other obligations of JAI under or pursuant to the Havana Club Agreement and the other agreements to which JAI and BACO are parties and any other covenants and obligations of JAI under such other agreements (the "Obligations"). Each Beneficiary may proceed directly against the Guarantor to enforce the rights of such Beneficiary under this Guaranty without proceeding against or joining any other Person. Notwithstanding any of the above provisions, the obligations of the Guarantor hereunder shall in no event exceed the obligations of JAI, and the Guarantor shall be entitled to the benefits of all exculpations, limitations, setoffs, counterclaims and other defenses to which JAI may be entitled in respect of the Obligations.

**2.02** <u>Waiver of Reliance</u>. The Guarantor irrevocably waives, to the fullest extent permitted by law (a) proof of reliance by the Beneficiaries upon this Guaranty in creating the Obligations, and (b) diligence in enforcing any of the rights of the Beneficiaries under the Havana Club Agreement.

**2.03** <u>Consent</u>. Without notice to, or further consent of, the Guarantor and without in any way affecting the liability of the Guarantor hereunder, the Guarantor agrees that BACO may (a) modify or release the Obligations, and (b)

April 18, 1997

BAC 01098

CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 61 -

exercise or refrain from exercising any right of BACO under the Havana Club Agreement and the other agreements, covenants and obligations contemplated thereby.

2.04    Collection Costs. The Guarantor shall be liable to the Beneficiaries for, and shall pay to the Beneficiaries on demand, all costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Beneficiaries in enforcing the performance of this Guaranty or in collecting any amounts due under this Guaranty.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF THE GUARANTOR

3.01    Representations and Warranties. The Guarantor represents and warrants to the Beneficiaries that, as of the date hereof:

(a)    Organization and Standing of the Guarantor. The Guarantor is a *sociedad anónima en liquidación*, organized and existing under the laws of Cuba, with provisional domicile in Liechtenstein and *pro forma* corporate domicile in Cárdenas, Cuba.

(b)    Authorization and Binding Effect. All proceedings required by the charter and by-laws of the Guarantor or otherwise for the execution and delivery of this Guaranty have been duly taken. The Guarantor has full right, power, and authority to execute, to deliver, and to perform this Guaranty. This Guaranty constitutes the legal, valid, and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms, except that such enforceability may be limited by bankruptcy, reorganization, insolvency, and similar laws of general application relating to or affecting the enforcement of the rights of creditors and, further, except that the availability of equitable remedies is subject to the discretion of the court, arbitrator or tribunal before which any proceeding may be brought.

(c)    No Violation. The execution, delivery, and performance by the Guarantor of this Guaranty will not (i) constitute a violation of any provision of the charter or by-laws of the Guarantor, (ii) conflict with, result in a breach of, or constitute a default under any agreement, instrument, or commitment to which the Guarantor is a party or by which the Guarantor is otherwise bound, or (iii) constitute a violation of any judgement, order, or decree of any court, governmental authority, or arbitrator, or any statute, ordinance, rule, or regulation applicable or relating to the Guarantor.

BAC 01099
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 62 -

## ARTICLE IV

## MISCELLANEOUS PROVISIONS

**4.01**   **Cumulative Remedies.**  The rights or remedies of the Beneficiaries hereunder are cumulative and not exclusive of any rights and remedies provided by law.

**4.02**   **Notices.**

(a)   All notices, requests, demands and other communications which are required or may be given pursuant to the terms of this Guaranty shall be in writing and shall be deemed delivered (i) on the date of delivery when delivered by hand, (ii) on the date of transmission when sent by facsimile transmission during normal business hours with telephone confirmation of receipt, (iii) on the date following the date of transmission, when sent by facsimile transmission after normal business hours, (iv) two (2) days after dispatch when sent by a reputable courier service that maintains records of receipt, or (v) five (5) days after dispatch when sent by certified mail, postage prepaid, return-receipt requested; provided that, in any such case, such communication shall be addressed as provided in the immediately following paragraph (b).

(b)   All notices, requests, demands and other communications which are required or may be given pursuant to the terms of this Guaranty shall be addressed as follows:

(i)   If to the Guarantor:

Jose Arechabala S.A. *en liquidación*
Jose Arechabala International Ltd.
c/- LGT Treuhand AG
Städtle 18-22
Vaduz
Liechtenstein

with a copy to:

Bufete Sartorius y Asociados
Covarrubias, 7 - 3, izqda.
28010 Madrid, Spain_
Attention: Jacobo Sartorius
Telephone: 34-1-447-45-66
Facsimile: 34-1-447-48-91

April 18, 1997

BAC 01100
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 63 -

(ii)     If to BACO or the Beneficiaries:

Bacardi & Company Limited
P.O. Box N-4880
Millar Road
Off Carmichael Road
New Providence, Nassau Bahamas
Attention: Company Secretary
Telephone: 242-362-1271
Facsimile: 242-362-9918

with a copy to:

Covington & Burling
1201 Pennsylvania Avenue, N.W.
Box 7544
Washington, D.C. 20044
Attention: Oscar M. Garibaldi, Esq.
Telephone: (202) 662-5624
Facsimile: (202) 778-5624

or to such other address as any party shall have designated by notice in the foregoing manner to the other parties.

    4.03     <u>Arbitration</u>. Any dispute arising out of or in connection with this Guaranty, including any question regarding its existence, validity or termination, shall be referred to final and binding arbitration, to the exclusion of any other court, forum or jurisdiction, and the arbitral award shall be enforceable in any court having jurisdiction thereof. Such arbitration shall be conducted under the rules of the International Chamber of Commerce (ICC) in effect from time to time, which rules are deemed to be incorporated by reference into this clause. The tribunal shall consist of three arbitrators. Each of the parties shall nominate one arbitrator and the ICC shall designate the Chairman. The place of arbitration shall be Geneva and the language to be used in the arbitral proceedings shall be English. Unless the arbitral tribunal shall determine otherwise, the costs of the arbitration shall be borne by the parties equally and each party shall bear its other legal costs, including the fees of its attorneys.

    **IN WITNESS WHEREOF**, this Guaranty has been duly executed by the Guarantor as of the date first above written.

    **JOSÉ ARECHABALA, S.A.** *en liquidación*


By: _____
      Name:

H:\GENERAL\IRVIN\IPAGT.016                              April 18, 1997

BAC 01101
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 64 -

Title: Liquidator


By: _____
    Name:
    Title:  Liquidator


By: _____
    Name:
    Title:  Liquidator


By: _____
    Name:
    Title:  Liquidator

April 18, 1997

BAC 01102
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 65 -

ANNEX 7.5

Part 1

FORM OF LICENSE AGREEMENT CONCERNING
THE "ARECHABALA" TRADEMARK

[Attached]

BAC 01103
CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 66 -

## ANNEX 7.5

## Part 2

## FORM OF ASSIGNMENT OF CERTAIN COVENANTS

THIS DEED OF ASSIGNMENT made, executed, and delivered as of April 18, 1997, by JOSE ARECHABALA INTERNATIONAL LTD., a corporation organized and existing under the laws of Liechtenstein (hereinafter referred to as the "Assignor") to and in favor of BACARDI & COMPANY LIMITED, a corporation organized and existing under the laws of Liechtenstein (hereinafter referred to as the "Assignee"),

### WITNESSETH:

WHEREAS the Assignor has heretofore entered into a certain agreement titled Agreement on the Purchase and Sale of Intellectual Property and Rights and Claims Concerning Thereto, dated as of April 17, 1997 (hereinafter referred to as the "Transfer Agreement"), by and between the Assignor, José Arechabala S.A., a corporation organized and existing under the laws of Cuba and now in a state of liquidation (hereinafter referred to as "JASA"), and certain holders of direct or indirect beneficial interests in JASA (hereinafter collectively referred to as the "Participating Interest Holders");

WHEREAS, pursuant to the Transfer Agreement, the Assignor has heretofore acquired from JASA and each Participating Interest Holder all of their respective right, title, and interest in and to certain rights and claims concerning the trademark and trade names *"Havana Club"* and *"Arechabala"*;

WHEREAS in Article 5 of the Transfer Agreement JASA has made certain covenants (which are incorporated by reference herein and hereinafter referred to as "JASA's Covenants"); and JASA has further agreed that JASA's Covenants are made for the benefit of the Assignor and any transferee of the Assignor's rights, including the Assignee, and that they may be assigned by the Assignor to the Assignee;

WHEREAS in Article 5 of the Transfer Agreement each of the Participating Interest Holders has made certain covenants (which are incorporated by reference herein and hereinafter referred to as the "Participating Interest Holders' Covenants"); and the Participating Interest Holders have further agreed that the Participating Interest Holders' Covenants are made for the benefit of the Assignor and any transferee of the Assignor's rights, including the Assignee, and that they may be assigned by the Assignor to the Assignee;

WHEREAS, simultaneously with the execution of this instrument, the Assignee is acquiring from the Assignor all of the Assignor's right, title, and interest in and to certain rights and claims concerning the trademark and trade name *"Havana*

BAC 01104
CONFIDENTIAL - ATTORNEYS
EYES ONLY

- 67 -

*Club"*, pursuant to a certain agreement between the Assignor and the Assignee titled Agreement on the Purchase and Sale of Intellectual Property and Rights and Claims Concerning Thereto, dated as of April 18, 1997 (hereinafter referred to as the "Havana Club Transfer Agreement"); and

WHEREAS, simultaneously with the execution of this instrument, the Assignor and the Assignee are entering into a certain agreement titled *"Arechabala"* Trademark License Agreement (hereinafter referred to as the "Arechabala License Agreement"), whereby the Assignor is granting to the Assignee a license concerning the use of the trademark and trade name *"Arechabala"* for certain purposes, as specified in said agreement;

NOW, THEREFORE:

KNOW ALL MEN BY THESE PRESENTS that the Assignor, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, by this Deed of Assignment does assign unto the Assignee, its successors and assigns forever, all rights and benefits of the Assignor under JASA's Covenants and the Participating Interest Holders' Covenants.

TO HAVE AND TO HOLD the benefit of JASA's Covenants and the Participating Interest Holders' Covenants unto the Assignee, and its successors and assigns, to its and their own use forever, and the Assignor does for itself, its successors and assigns, covenant and agree, to warrant and defend such assignment to the Assignor, its successors and assigns, against all and every person and persons whomever claiming an interest therein.

IN WITNESS WHEREOF, the Assignor has caused this Deed of Assignment to be executed and delivered as a deed as of the date and year first above written.

JOSE ARECHABALA INTERNATIONAL LTD.

[SEAL]

By: _____
Title:

Witness _____

By: _____

H:\GENERAL\IRVIN\IPAGT.016

April 18, 1997

BAC 01105

CONFIDENTIAL - ATTORNEYS'
EYES ONLY

- 68 -

Title:

_____

Witness

By: _____
Title:

_____

Witness

By: _____
Title:

_____

Witness

H:\GENERAL\IRVIN\IPAGT.016

April 18, 1997

BAC 01106

CONFIDENTIAL - ATTORNEYS'
EYES ONLY