**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BACARDI & COMPANY LIMITED, and <br><br> BACARDI U.S.A., INC., <br><br>     Plaintiffs, <br><br>   v. <br><br> EMPRESA CUBANA EXPORTADORA <br> DE ALIMENTOS Y PRODUCTOS VARIOS <br> d/b/a CUBAEXPORT, and <br><br> HAVANA CLUB HOLDING, S.A., <br> d/b/a HCH, S.A., <br><br>     Defendants. | Case No. 1:04-cv-00519 (EGS) |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

Michael C. Lynch (admitted *pro hac vice*)
Damon Suden (admitted *pro hac vice*)
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
(212) 808-7800
mlynch@kelleydrye.com
dsuden@kelleydrye.com

Emily Johnson Henn (D.C. Bar No. 417077)
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, California 94065
(650) 632-4700
ehenn@cov.com

David M. Zionts (D.C. Bar No. 995170)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., NW
Washington, DC 20001
(202) 662-5987
dzionts@cov.com

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 3

    A.    The Arechabala Family's Successful Havana Club Rum Brand ........................... 3

    B.    The Cuban Government's Confiscation And Scheme To Profit From The Stolen HAVANA CLUB Trademark ................................................................ 3

    C.    The Cuba-Pernod Ricard Joint Venture And OFAC Maneuvers ........................... 5

    D.    The Arechabala-Bacardi Agreement And Return Of Havana Club Rum To The United States ....................................................................................... 7

    E.    The *Galleon* Litigation, OFAC Revocation, and Congressional Action ................ 8

    F.    The PTO Proceedings ......................................................................... 10

STANDARD OF REVIEW ............................................................................................ 12

ARGUMENT .................................................................................................................. 12

I.    The Complaint States Valid Claims For Cancellation And Rectification ........................ 12

    A.    Cubaexport's Trademark Registration Must Be Stricken Because Cubaexport Twice Failed To Renew It As Required By Statute ......................... 12

            1.    Cubaexport Failed To Renew The Registration In 1996. ......................... 12

            2.    Cubaexport Failed To Timely Pay The Statutory Fee Necessary To Renew The Registration In 2006. ............................................ 18

    B.    The Complaint States A Valid Claim Of Cancellation For Fraud ....................... 22

            1.    Cubaexport Knowingly Misrepresented That It Owned The HAVANA CLUB Mark. ................................................................. 22

            2.    HCH Knowingly Misrepresented That It Owned The HAVANA CLUB Mark. ................................................................. 28

    C.    The Complaint States A Valid Claim Of Cancellation For Misrepresentation Of The Source Of Goods ....................................................... 30

    D.    The Complaint States A Valid Claim Of Cancellation For Abandonment ........... 33

            1.    Cubaexport Has Sold Its Rum Business And Cannot Retain Bare Title To The Marks. ..................................................... 33

i

2.     Cubaexport's Decades-Long Non-Use Constitutes Abandonment ........... 35

II.     The Complaint States Valid Claims For Declaratory Relief ............................................. 36

     A.     Bacardi Has Superior Common Law Rights In The Trademark ........................... 36

     B.     HCH Is A Proper Defendant In The Declaratory Claims ..................................... 40

CONCLUSION ...................................................................................................................... 42

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*,
    525 F.3d 8 (D.C. Cir. 2008) ...................................................................39

*ALPO Petfoods, Inc. v. Ralston Purina Co.*,
    913 F.2d 958 (D.C. Cir. 1990) ...............................................................39

*Bond v. United States*,
    134 S. Ct. 2077 (2014) ...........................................................................36

*Bonilla v. Volvo Car Corp.*,
    150 F.3d 62 (1st Cir. 1998) ....................................................................30

*Cat Tech LLC v. TubeMaster, Inc.*,
    528 F.3d 871 (Fed. Cir. 2008).................................................................40

*Checkers Drive-In Rests., Inc. v. Comm'r of Patents and Trademarks*,
    51 F.3d 1078 (D.C. Cir. 1995) ...................................................14, 17, 21

*Coahoma Chemical Co., Inc. v. Smith*,
    113 U.S.P.Q. 413, 1957 WL 7113 (Comm'r Pat. & Trademarks 1957)................................25

*Compania Ron Bacardi, S.A. v. Bank of Nova Scotia*,
    193 F. Supp. 814 (S.D.N.Y. 1961) .........................................................24

*Crash Dummy Movie, LLC v. Mattel, Inc.*,
    601 F.3d 1387 (Fed. Cir. 2010)...............................................................27

*Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.*,
    457 F. Supp. 1090 (S.D.N.Y. 1978).........................................................32

*Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*,
    841 F. Supp. 1339 (E.D.N.Y. 1994) .......................................................34

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
    12 U.S.P.Q.2d 1657, 1989 WL 159628 (E.D. Cal. 1989).......................34

*El Paso Nat. Gas Co. v. United States*,
    632 F.3d 1272 (D.C. Cir. 2011) ..............................................................18

*Ervin & Assocs., Inc. v. Dunlap*,
    33 F. Supp. 2d 1 (D.D.C. 1997) ..............................................................14

*F. Palicio y Compania, S.A. v. Brush*,
    256 F. Supp. 481 (S.D.N.Y. 1966), *aff'd*, 375 F.2d 1011 (2d Cir. 1967) .........................23, 26

*Fed. Treasury Ent. Sojuzplodoimport v. SPI Spirits Ltd.*,
   726 F.3d 62 (2d Cir. 2013)......................................................................................15

*First Int'l Servs. Corp. v. Chuckles, Inc.*,
   5 U.S.P.Q.2d 1628, 1988 WL 252292 (T.T.A.B. 1988)..................................1, 24, 37

*Galleon S.A. et al. v. Havana Club Holding, S.A. et al.*,
   Cancellation No. 92024108, 2004 WL 199225 (T.T.A.B. 2004) ............................10

*Gen. Cigar Co. v. G.D.M. Inc.*,
   988 F. Supp. 647 (S.D.N.Y. 1997) .......................................................................34

*Global Maschinen GmbH v. Global Banking Sys., Inc.*,
   227 U.S.P.Q. 862, 1985 WL 71943 (T.T.A.B. 1985).......................................31, 32

*Havana Club Holding, S.A. v. Galleon S.A.*,
   203 F.3d 116 (2d Cir. 2000)...............................................................................9, 14

*Havana Club Holding, S.A. v. Galleon, S.A.*,
   62 F. Supp. 2d 1085 (S.D.N.Y. 1999)................................................................37, 38

*Havana Club Holding, S.A. v. Galleon S.A.*,
   96 Civ. 9655 (S.D.N.Y. Dec. 24, 1996)............................................................ *passim*

*Havana Club Holding, S.A. v. Galleon S.A.*,
   974 F. Supp. 302 (S.D.N.Y. 1997) ................................................................... *passim*

*Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.*,
   811 F.2d 1470 (Fed. Cir. 1987)............................................................................38

*In re Blair Holdings Inc.*,
   61 U.S.P.Q.2d 1382, 1998 WL 1991583 (Comm'r Pat. & Trademarks 1998).......................15

*In re Bose Corp.*,
   580 F.3d 1240 (Fed. Cir. 2009) ("To renew a registration, the *owner* must file
   an Application for Renewal . . . [and] the *owner* must file a Section 8
   Declaration of Continued Use." (emphasis added)) .........................................13, 24

*In re Caldon Co. Ltd. P'ship*,
   37 U.S.P.Q.2d 1539, 1995 WL 805094 (Comm'r Pat. & Trademarks 1995)........13, 14, 15, 16

*In re Culligan Int'l Co.*,
   915 F.2d 680 (Fed. Cir. 1990).............................................................16, 19, 20, 22

*In re Holland Am. Wafer Co.*,
   737 F.2d 1015 (Fed. Cir. 1984).........................................................................13, 17

*In re Rath*,
    402 F.3d 1207 (Fed. Cir. 2005)................................................................24

*In re Societe D'Exploitation de la Marque le Fouquet's*,
    67 U.S.P.Q.2d 1784, 2003 WL 22021944 (T.T.A.B. 2003) ....................36

*In re Trade-Mark Cases*,
    100 U.S. 82 (1879).................................................................................35

*Johanna Farms, Inc. v. Citrus Bowl, Inc.*,
    468 F. Supp. 866 (E.D.N.Y. 1978) .......................................................34

*Judicial Watch, Inc. v. U.S. Secret Service*,
    726 F.3d 208 (D.C. Cir. 2013) ..............................................................36

*Kowal v. MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994) ..............................................................12

*Li'l Red Barn, Inc. v. Red Barn Sys., Inc.*,
    322 F. Supp. 98 (N.D. Ind. 1970) .........................................................34

*Liquid Glass Enters., Inc. v. Liquid Glass Indus. of Canada, Ltd.*,
    14 U.S.P.Q.2d 1976, 1989 WL 222653 (E.D. Mich. 1989)...................34

*Maltina Corp. v. Cawy Bottling Co., Inc.*,
    462 F.2d 1021 (5th Cir. 1972) ..............................................................23

*Marcin v. Reliance Standard Life Ins. Co.*,
    50 F. Supp. 3d 23 (D.D.C. 2014) ..........................................................12

*Marshak v. Green*,
    746 F.2d 927 (2d Cir. 1984)..................................................................34

*Maryland Cas. Co. v. Pac. Coal & Oil Co.*,
    312 U.S. 270 (1941)..............................................................................40

*Material Supply Int'l, Inc. v. Sunmatch Indus. Co., Ltd.*,
    146 F.3d 983 (D.C. Cir. 1998) ..............................................................12

*Mathy v. Republic Metalware Co.*,
    35 App. D.C. 151 (D.C. Cir. 1910)........................................................27

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007)..............................................................................40

*Nat'l Fed. of Indep. Bus. v. Sebelius*,
    132 S. Ct. 2566 (2012) (Roberts, C.J.)..................................................35

*New York Univ. v. Autodesk, Inc.*,
    466 F. Supp. 2d 563 (S.D.N.Y. 2006) (Rakoff, J.) ...........................................................21, 24

*Otis Elevator Co. v. Echlin Mfg. Co.*,
    187 U.S.P.Q. 310, 1975 WL 21258 (T.T.A.B. 1975) ...............................................................34

*Saratoga Vichy Spring Co. v. Lehman*,
    625 F.2d 1037 (2d Cir. 1980)...................................................................................................27

*SCM Corp. v. Langis Foods Ltd.*,
    539 F.2d 196 (D.C. Cir. 1976) .................................................................................................39

*United States v. A 2000 Jeep Grand Cherokee*,
    No. 07-cv-4114, 2009 WL 1586016 (N.D. Iowa June 4, 2009) ...............................................38

*United States v. Lopez*,
    514 U.S. 549 (1995).................................................................................................................36

*United States v. Philip Morris USA*,
    316 F. Supp. 2d 6 (D.D.C. 2004) .............................................................................................27

*Zwack v. Kraus Bros. & Co.*,
    237 F.2d 255 (2d Cir. 1956).....................................................................................................23

## Statutes

Fed. R. Civ. P. 12(b)(6)...................................................................................................................12

15 U.S.C. § 1057............................................................................................................................39

15 U.S.C. § 1058.....................................................................................................................17, 18

15 U.S.C. § 1059.................................................................................................................16, 18, 19

15 U.S.C. § 1064.....................................................................................................................17, 30

15 U.S.C. § 1119.....................................................................................................................12, 20

15 U.S.C. § 1126.................................................................................................5, 24, 32, 35, 39

15 U.S.C. § 1127............................................................................................................................27

## Other Authorities

First Written Submission of the United States, *United States-Section 211 Omnibus
    Appropriations Act*, WT/DS176 (Dec. 21, 2000) ...................................................................9

McCarthy on Trademarks and Unfair Competition (4th ed.) ........................................... *passim*

Responses of the United States, *United States-Section 211 Omnibus Appropriations Act*, WT/DS176 (Feb. 5, 2001) ....................................................................26

31 C.F.R. § 515 .......................................................................................................................5

31 C.F.R. § 515.201(b) ...........................................................................................................6

31 C.F.R. § 515.203(c)...........................................................................................................22

31 C.F.R. § 515.527 ...............................................................................................................37

37 C.F.R. § 2.182 ...................................................................................................................13

37 C.F.R. § 2.184(c)...............................................................................................................17

64 Fed. Reg. 25,223, 25,233 ..................................................................................................20

83 A.L.R. Fed. 295 (1987)......................................................................................................26

**INTRODUCTION**

In 1960, the Cuban government violently seized the Arechabala family's rum business, confiscating their assets and driving the family into exile.  With the Arechabalas sidelined, the Cuban government sought to profit from their popular Havana Club brand.  A key part of this strategy was to claim the valuable HAVANA CLUB trademark in the United States, thereby extending the effects of the expropriation into this country.  Through a series of fraudulent actions, Defendant Cubaexport, a Cuban state-owned entity, obtained and maintained a United States registration for the trademark—a mark that does not and cannot belong to it.

Plaintiff Bacardi is the successor-in-interest to José Arechabala, S.A. ("JASA"), the Arechabala family's business.  Bacardi brings this action to cancel or otherwise strike Cubaexport's HAVANA CLUB registration, and for a declaration that Bacardi owns the mark. The complaint identifies several grounds for the relief Bacardi seeks, and supports them with detailed and plausible factual allegations.

*First*, Cubaexport's registration has expired—twice.  As a consequence of both its own machinations and U.S. foreign policy toward Cuba, Cubaexport has been unable to renew its registration in compliance with the Lanham Act.  Accordingly, the registration has expired and must be removed from the Register.

*Second*, Cubaexport's registration is the product of a fraud on the Patent and Trademark Office ("PTO").  Cubaexport testified that it owned the mark, despite knowing (a) that its ownership claim was the fruit of a confiscation that cannot be recognized in the United States, and (b) that JASA was the real owner of the mark.  Defendant Havana Club Holdings, Inc. compounded the fraud when it purported to renew the registration based on additional misrepresentations.

1

*Third*, Cubaexport misrepresented the source of its goods.  As part of its blatant effort to trade on the reputation of genuine Havana Club rum, Cubaexport stole the Arechabalas' "Founded in 1878" legend—even though Cubaexport was founded in 1965—thereby falsely representing that its rum was from the same source as the Arechabalas' product.

*Fourth*, Cubaexport abandoned whatever rights in the mark it had.  In 1993, Cubaexport completely exited the rum business while purporting to hold bare title to the HAVANA CLUB registration—an assignment in gross that is fatal to continued trademark rights.  Moreover, neither the Lanham Act nor the Constitution allows a registrant to hold a trademark registration in reserve *for generations* without ever using the mark in commerce.

For all of the above reasons, Cubaexport's registration should be cancelled or otherwise stricken.  But independent of the status of the registration, Bacardi has stated a claim for a declaration that it holds common law rights in the HAVANA CLUB mark.  JASA long ago established those rights.  Yet Cubaexport has the audacity to claim abandonment based on the Arechabalas' difficulty resuming production, *which was a consequence of the Cuban government's own misconduct*.  As the complaint plausibly alleges, the Arechabalas always intended to overcome the adversity of the confiscation, retain the HAVANA CLUB mark, and return genuine Havana Club rum to the U.S. market.  Moreover, even if, contrary to fact, JASA had abandoned its rights, Bacardi has established valid rights through its own use.

Plaintiffs and Defendants agree on one point: "the time is ripe" for this case to move forward.  Defs.' Mem. in Supp. of Mot. to Dismiss ("MTD") at 1.  But the "reckoning" Defendants call for, *id.*, should not be cut off at the threshold.  More than 55 years after the violent confiscation of the Arechabala family's rum business, the time is ripe for their rights to be vindicated on the merits.

2

# BACKGROUND

## A.      The Arechabala Family's Successful Havana Club Rum Brand

The Arechabala family rum business was founded by José Arechabala Aldama in 1878.

Compl. ¶ 22.  In 1924, JASA was formed as a *sociedad anónima* under the laws of the Republic

of Cuba to carry out the Arechabalas' business.  *Id.* ¶¶ 9, 22.  Beginning in the early 1930s,

JASA produced Havana Club rum for export, principally to the United States.  *Id.* ¶ 24.  In 1934

and 1935, JASA obtained Cuban registrations for the HAVANA CLUB trademark, and in 1935

and 1936 it registered the HAVANA CLUB trademark and design on the Principal Register of

the U.S. PTO.  *Id.* ¶¶ 23–24.  JASA's U.S. registrations included the HAVANA CLUB label,

featuring the Spanish legend "*Fundada en 1878*" ("Founded in 1878").  *Id.* ¶ 24.

Havana Club rum developed a reputation for excellent quality and enjoyed successful

sales in the United States.  *Id.* ¶ 44.  It became the second most popular Cuban rum, after

Bacardi.  *Id.* ¶ 41.  JASA produced Havana Club rum using the secret Arechabala family formula

at distilleries in Cuba and, for a time, Puerto Rico.  *Id.* ¶¶ 25, 27.  By 1959, JASA produced its

rum only in Cuba.

## B.      The Cuban Government's Confiscation And Scheme To Profit From The Stolen HAVANA CLUB Trademark

Defendants euphemistically describe the "nationalization" of JASA as part of an

economic "transition" in Cuba.  MTD at 4.  What the complaint actually alleges is a violent

confiscation effected by armed government forces.  On January 1, 1960, Special Forces of Fidel

Castro's revolutionary government took control of JASA's offices and facilities, including its

rum distillery.  Compl. ¶ 27.  Members of the Arechabala family who ran the business were

expelled from the premises and prevented from removing their papers and other business

records.  *Id.*  JASA's executives and shareholders were intimidated and ultimately forced to

leave Cuba, while one high-ranking company officer was imprisoned for ten years.  *Id.*  In

October 1960 the Castro government issued Law No. 890, which formalized the expropriation of

JASA's assets, including its trademark rights; while the law promised compensation, the Cuban

government never delivered.  *Id.* ¶ 29.

Forced into exile and dispossessed of its assets, JASA was unable to continue production

of Havana Club rum or to renew its U.S. registration for the HAVANA CLUB mark.  *Id.* ¶ 32.

Although members of the Arechabala family attempted to resume production and sale of Havana

Club rum, they were without a distillery and unable to raise the capital to build one, so their

continued efforts were unavailing.  *Id.* ¶¶ 32, 64.  JASA and its shareholders nevertheless

maintained their determination to protect their rights and resume production as soon as it became

possible, either through political change in Cuba or an arrangement with a suitable business

partner.  *Id.* ¶ 32.  JASA is presently constituted as a Liechtenstein company with its principal

place of business in Switzerland.  *Id.* ¶ 7.

Meanwhile, the Cuban government launched a campaign to profit from the good will the

Arechabala family had built in the Havana Club name.  The Castro government transferred

JASA's physical assets to a state-owned enterprise.  *Id.* ¶ 31.  In 1965, the Government

established another state enterprise, Empresa Cubana Exportadora de Alimentos y Productos

Varios d/b/a/ Cubaexport ("Cubaexport"), and in 1966 purported to transfer to Cubaexport

JASA's HAVANA CLUB trademarks.  *Id.* ¶ 30.  Soon thereafter, Cubaexport began selling rum

it called "Havana Club."  *Id.*  Although this knock-off Havana Club rum was produced at the

distillery stolen from JASA, it was not made using the Arechabala family's secret formula, or

with the permission of the Arechabalas.  *Id.* ¶¶ 30, 46, 49.

4

Cubaexport was barred from selling its ersatz Havana Club rum in the United States because the United States imposed a total embargo on trade with Cuba under the Trading with the Enemy Act, implemented by the Cuban Asset Control Regulations ("CACR"). *Id.* ¶ 33; *see* 50 U.S.C. App. 1 *et seq.*; 31 C.F.R. Part 515.  Cubaexport nonetheless sought to claim the HAVANA CLUB trademark in the United States.  Aware that the United States would refuse to recognize it as JASA's lawful successor, Cubaexport waited for JASA's existing U.S. registrations to expire in 1973.  Compl. ¶¶ 3, 42.  It then sought a new registration through Section 44(e) of the Lanham Act, under which the PTO grants a U.S. registration to an eligible applicant based on its registration of the same mark in a foreign country.  15 U.S.C. § 1126(e). But Cubaexport declined to base its application on the Cuban registration that had been confiscated from JASA, again aware that the United States would not recognize it as the owner of a registration that had been expropriated.  Compl. ¶ 42.  Instead, Cubaexport obtained a new registration in Cuba under its own name, and used that registration as the basis of a Section 44(e) application that concealed its chain of title.  *Id.*

As part of its application to the PTO, Cubaexport represented that it owned the HAVANA CLUB mark, despite knowing that its claim was the fruit of a confiscation that could not be given effect in the United States, and that JASA was the true owner.  *Id.* ¶ 42.  Cubaexport also submitted a label design that intentionally copied the Arechabala family's "*Fundada en 1878*" legend from the design JASA had registered in 1936.  *Id.* ¶ 44.  On January 27, 1976, the PTO issued U.S. Reg. No. 1,031,651 for the HAVANA CLUB & DESIGN mark (the "U.S. Registration" or "HAVANA CLUB Registration").  *Id.* ¶ 48.

### C.    The Cuba-Pernod Ricard Joint Venture And OFAC Maneuvers

In the early 1990s, the Cuban government sought to obtain hard currency by turning state enterprises, including the state rum monopoly, into joint ventures with foreign investors.  Compl.

¶ 55.  Pernod Ricard ("Pernod"), a French liquor conglomerate, entered negotiations with Cuba to exploit the HAVANA CLUB mark worldwide.  *Id.*  The Cuban government organized Havana Rum and Liquors, S.A. ("HRL"), a Cuban company controlled by the government, to act as Cuba's representative in the joint venture. *Id*. ¶ 56.  On October 29, 1993, Cubaexport transferred to HRL its entire Havana Club rum business and the good will associated with the HAVANA CLUB mark, and purported to transfer the U.S. Registration.  *Id.*  Cubaexport then left the rum business.  *Id.*

Pernod knew of Cuba's confiscation of JASA's assets and unsuccessfully attempted to negotiate the purchase of the Arechabalas' worldwide rights to the HAVANA CLUB trademark. *Id.* ¶¶ 63–64.  During the discussions, Arechabala family representatives warned Pernod that JASA's superior rights to the HAVANA CLUB mark would be enforced.  *Id.* ¶ 63.  Pernod nonetheless proceeded with the joint venture.

HRL and Pernod implemented the joint venture through an agreement called the *Convenio Asociativo* (the "Convenio"), dated November 23, 1993.  *Id.* ¶ 57.  Under the Convenio, Pernod paid to HRL a fixed sum believed to be many millions of dollars and agreed to a continuing royalty arrangement for the right to advertise, distribute, and sell HAVANA CLUB rum worldwide.  *Id.* ¶¶ 57–58.  The parties agreed to create Havana Club Holding, S.A. ("HCH"), a Luxembourg company owned equally by HRL and Pernod.  *Id.* ¶¶ 19, 57.  HRL transferred to HCH its rights to the HAVANA CLUB trademark outside Cuba, together with the good will of the business, as well as the purported rights to the U.S. Registration HRL had obtained from Cubaexport.  *Id.* ¶ 58.

The CACR prohibited the purported transfers of the U.S. Registration without a specific license from the Office of Foreign Assets Control ("OFAC").  31 C.F.R. § 515.201(b); Compl.

¶¶ 35, 62.  However, Cubaexport, HRL, and HCH knew that OFAC would never license a transfer that would result in a substantial payment to the Cuban government.  Compl. ¶ 62.  They therefore entered into the transaction without seeking a license, intending to conceal it from OFAC and the PTO.  *Id.* ¶ 65.  As with Cubaexport's initial scheme to register the mark, HCH planned to obtain yet another foreign registration (this time in Luxembourg) and apply for a new U.S. registration under Section 44(e), while Cubaexport would allow its existing registration to expire.  *Id.*  This plan was thwarted, however, by a cancellation proceeding brought by the Arechabala family in the PTO, which forced Cubaexport to disclose the purported transfers.  *Id.* ¶ 66.

On October 5, 1995, Cubaexport, HRL, and HCH belatedly applied for an OFAC license to retroactively authorize the assignments of the HAVANA CLUB trademark.  *Id.* ¶ 80.  The application concealed Pernod's role and the large infusion of cash to the Cuban Government.  *Id.* Instead, it represented that the assignments were merely part of a "reorganization" of the Cuban rum industry, and that each party to the transaction was Cuban.  *Id.*  OFAC granted the license, but cautioned that its approval was based on the representations made in the application, and that it could be retroactively invalidated.  *Id.* ¶ 81.

In January 1996, HCH purported to renew the U.S. Registration, which otherwise would have expired.  *Id.* ¶ 82.  The renewal application represented that HCH was the owner of the trademark.  *Id.*

### D.    The Arechabala-Bacardi Agreement And Return Of Havana Club Rum To The United States

Around the same time the Cuban Government was conspiring with Pernod, the Arechabala family reached an agreement with Bacardi & Company Limited ("Bacardi," together with exclusive distributor Bacardi U.S.A., Inc.) that would allow for the return to the United

States of genuine Havana Club rum. *Id.* ¶¶ 72–75.  The agreement, reached in principle in 1995

and finalized in 1997, transferred to Bacardi all right, title, and interest in and to the HAVANA

CLUB trademark worldwide and related assets. *Id.*  In 1995, under an interim understanding

with the Arechabalas, Bacardi produced Havana Club rum in the Bahamas and sold it under the

HAVANA CLUB mark in interstate commerce in the United States. *Id.* ¶ 76.  Bacardi shipped

Havana Club rum initially to distributors in New York, Illinois, California, and Florida, and in

1996 expanded sales to wholesalers in other selected markets across the United States. *Id.* ¶ 77.

E.     The *Galleon* Litigation, OFAC Revocation, and Congressional Action

In December 1996, HCH and its distributor sued Bacardi in the Southern District of New

York for alleged infringement of the HAVANA CLUB trademark and trade name. *Havana Club

Holding, S.A. v. Galleon S.A.*, 96 Civ. 9655 (S.D.N.Y. Dec. 24, 1996); Compl. ¶ 83.[1]  Bacardi

counterclaimed for cancellation of HCH's HAVANA CLUB registration in the United States.

Compl. ¶ 83.

Shortly after the litigation commenced, OFAC revoked Cubaexport's license authorizing

the transfer of the mark to HCH, citing "facts and circumstances that have come to the attention

of this Office that were not included in the application." *Id.* ¶ 85.  OFAC specified that the

withdrawal was "retroactive to the date of issuance" of the license. *Id.*

In light of OFAC's action, the *Galleon* court concluded that the purported transfers

violated the CACR, and that HCH "ha[d] no rights to the Havana Club trademark." *Havana

Club Holding, S.A. v. Galleon S.A.*, 974 F. Supp. 302, 311 (S.D.N.Y. 1997).  The court entered a

partial judgment, which confirmed that "the attempted assignment of [the] HAVANA CLUB

---

[1] Galleon S.A. is a predecessor of Bacardi & Company Limited.  Compl. ¶ 4.  For simplicity, we refer to Galleon as "Bacardi."

mark and the related U.S. Registration [to HCH] were invalid and of no force and effect and *void ab initio*." *Havana Club Holding*, 96 Civ. 9655, Dkt. No. 63 (S.D.N.Y. Oct. 20, 1997), at ¶ 4 ("Partial Judgment") (attached as Ex. 2 to the Declaration of Michael C. Lynch ("Lynch Decl.")); Compl. ¶ 88.  Because Cubaexport was not a party to the litigation and had an interest in the outright cancellation of the registration, the court denied that relief, while expressly preserving Bacardi's ability to challenge Cubaexport's claimed rights.  *Galleon*, 974 F. Supp. at 311–12; Partial Judgment ¶ 10.

In 1998, while HCH's claims regarding the HAVANA CLUB trade name were still pending, Congress passed Section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105-277, 112 Stat. 2681 (Oct. 21, 1998) ("Section 211").  Section 211 provides, *inter alia*, that U.S. courts may not recognize any assertion of rights under Section 44(e) of the Lanham Act in a mark or trade name that is the same or similar to a mark or trade name used in connection with confiscated assets.  *Id.* § 211(b).  As the U.S. Government has explained in international trade proceedings, "Section 211 was enacted to reaffirm" the "principle of non-recognition of foreign confiscations," and to "reaffirm and clarify the rights of the legitimate owners" of marks and names associated with expropriated businesses.  *See* First Written Submission of the United States, *United States-Section 211 Omnibus Appropriations Act*, WT/DS176, ¶ 13 (Dec. 21, 2000) ("WTO First Submission").[2]  The *Galleon* court applied Section 211 in a bench trial and held that HCH had no enforceable rights in the "Havana Club" name.  Compl. ¶ 89.

The Second Circuit affirmed the district court in all respects.  *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116 (2d Cir. 2000).

---

[2] *Available at* http://tinyurl.com/US211WTO.

F.      **The PTO Proceedings**

Bacardi first asked the PTO to cancel the U.S. Registration in 1995.  Compl. ¶ 79.  The proceeding before the Trademark Trial and Appeal Board ("TTAB") was stayed pending the *Galleon* litigation, but resumed in 2003.  *Id.*  On January 29, 2004, the TTAB issued a non-precedential decision denying Bacardi's summary judgment motion, which had argued that Cubaexport's registration was not properly renewed and therefore expired.  *Galleon S.A. et al. v. Havana Club Holding, S.A. et al.*, Cancellation No. 92024108, 2004 WL 199225 (T.T.A.B. 2004) ("TTAB Decision") (attached as Ex. A to MTD).  The Board also acted *sua sponte* to dismiss all of Bacardi's claims for cancellation.  *Id.*

Cubaexport's registration was again due to expire in 2006 (assuming it had not already expired in 1996).  Compl. ¶ 107.  On December 13, 2005, Cubaexport attempted to renew the U.S. Registration by filing a renewal affidavit and application, and submitting the mandatory fee through its counsel Ropes & Gray LLP, without first obtaining a necessary OFAC license.  *Id.* ¶ 109.  However, on April 6, 2006, OFAC informed the PTO and Cubaexport that Ropes & Gray was not authorized to pay the filing fee to the PTO.  *Id.* ¶ 111.  The next day Cubaexport applied for the required license, specifically informing OFAC that "failure to pay the fee will result in cancellation of the registration."  *Id.*; Letter from Vincent N. Palladino, Ropes & Gray, to Licensing Division, Office of Foreign Assets Control (Apr. 7, 2006) ("Palladino Letter") (attached as Ex. 9 to Lynch Decl.).  While this license application was pending, the Post Registration Examiner at the PTO rejected Cubaexport's renewal application because the "required fee . . . has not been paid."  Compl. ¶ 113.  The Examiner notified Cubaexport that if OFAC did not grant the license within a six-month grace period, "the registration will be deemed cancelled/expired."  *Id.*

On July 28, 2006, OFAC denied the license, explaining that the State Department had determined that permitting the renewal transactions would be "inconsistent with U.S. policy." *Id.* ¶ 114.  The Post Registration Examiner subsequently confirmed that Cubaexport's renewal finding "cannot be accepted," and that "the registration will be cancelled/expired."  *Id.* ¶ 115.

Cubaexport filed a petition to the Director of the PTO challenging this action, and took a series of steps to delay resolution of its own petition.  *Id.* ¶¶ 116–17.  First, Cubaexport filed a district court action and then an appeal challenging OFAC's exercise of discretion in denying the license.  *Id.* ¶ 117.  After it lost and all appeals were exhausted in 2012, Cubaexport next argued that the PTO could not strike the HAVANA CLUB registration from the Register without violating the CACR.  *Id.* ¶ 118.  The PTO explained to OFAC that cancellation and expiration of the registration for failure to renew were automatic, and on November 30, 2012, OFAC informed the PTO that it was free to undertake the "ministerial record-keeping function" of removing the registration.  *Id.* ¶¶ 119–20.

Although Cubaexport no longer had a basis for arguing that its registration should be preserved, the PTO took no action on its petition for an additional four years.  *Id.* ¶¶ 121–23. On November 10, 2015, Cubaexport submitted another application to OFAC for a specific license to pay the renewal fee, and this license was granted on January 11, 2016.  *Id.* ¶ 122–23. Cubaexport informed the PTO of its license, and authorized the PTO to accept the renewal fee from an account maintained by its new counsel.  Letter from David H. Bernstein, Debevoise & Plimpton, to Mary Boney Dennison, Commissioner for Trademarks (Jan. 12, 2016) ("Bernstein Letter") (attached as Ex. 11 to Lynch Decl.).  The PTO then granted Cubaexport's petition and treated the registration as renewed.  Compl. ¶ 123.

**STANDARD OF REVIEW**

"When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in the plaintiff's favor, and the Court should grant the plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Marcin v. Reliance Standard Life Ins. Co.*, 50 F. Supp. 3d 23, 26 (D.D.C. 2014) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). Because the TTAB did not make any findings of fact, its decision is reviewed *de novo*. *Material Supply Int'l, Inc. v. Sunmatch Indus. Co., Ltd.*, 146 F.3d 983, 990 (D.C. Cir. 1998).

**ARGUMENT**

**I.     The Complaint States Valid Claims For Cancellation And Rectification**

This Court "may determine the right to registration, order the cancelation of registrations, . . . and otherwise rectify the register with respect to the registrations of any party to the action." 15 U.S.C. § 1119. Bacardi's factual allegations, which must be accepted as true, state a claim for canceling or otherwise striking Cubaexport's registration of the HAVANA CLUB trademark on several grounds.

> **A.     Cubaexport's Trademark Registration Must Be Stricken Because Cubaexport Twice Failed To Renew It As Required By Statute**

> > **1.     Cubaexport Failed To Renew The Registration In 1996.**

> > > a)     The Lanham Act Required Cubaexport, Not HCH, To Renew The Registration.

As Defendants do not dispute, only the owner of a trademark registration is entitled to renew it. *See* 15 U.S.C. §§ 1058, 1059. Thus, "[t]o secure renewal of a trademark registration under Section 9(a), application must be 'made' to the [PTO] by the *owner* of the registration." *In re Holland Am. Wafer Co.*, 737 F.2d 1015, 1018 (Fed. Cir. 1984) (emphasis added); *see also In re Bose Corp.*, 580 F.3d 1240, 1242 n.1 (Fed. Cir. 2009) ("To renew a registration, the *owner*

must file an Application for Renewal . . . [and] the *owner* must file a Section 8 Declaration of Continued Use." (emphases added)).  If the actual owner does not renew it within the statutory deadline, "the registration will expire."  37 C.F.R. § 2.182.  And if a party who "was not the owner of the registration" purports to file the affidavit required for renewal, "a substitute affidavit in the name of the true owner cannot be filed unless there is time remaining in the statutory filing period."  *In re Caldon Co. Ltd. P'ship*, 37 U.S.P.Q.2d 1539, 1995 WL 805094, at *2 (Comm'r Pat. & Trademarks 1995).

Cubaexport never renewed the HAVANA CLUB registration at the end of its term in 1996.  Instead, HCH purported to renew it.  Compl. ¶ 82.  Defendants maintain that this renewal was effective, because "the registration had been transferred" to HCH in 1995 "under a specific [OFAC] license that was—at the time—valid and in effect."  MTD at 26.  They concede, however, that the transfer was later "invalidated."  *Id.*  Thus, the critical premise of Defendants' position is that this invalidation was only forward-looking, and had no effect on HCH's rights at the time of the purported renewal.  As the TTAB put it, the reason HCH's renewal was effective was the existence of a valid transfer "in effect when the renewal applicant filed its application."  TTAB Decision at 38.

The trouble with this premise is that it is refuted by both OFAC and the *Galleon* court, which established that the transfer was *never* "in effect."  In 1997, OFAC revoked the license authorizing the transfer, "*retroactive* to the date of issuance."  Compl. ¶ 85 (emphasis added).  In light of this revocation, the *Galleon* court determined that "the attempted assignment" and HCH's related registration "were invalid and of no force and effect and *void ab initio*."  *Id.* ¶ 88; Partial Judgment ¶ 4.  "*Ab initio*," of course, means "[f]rom the beginning."  Black's Law Dictionary (10th ed. 2014); *see also Ervin & Assocs., Inc. v. Dunlap*, 33 F. Supp. 2d 1, 13

(D.D.C. 1997) (quoting Webster's Dictionary definition of "void ab initio," meaning "from the beginning; from the instant of the act; at the outset").  A transfer that was "void ab initio" could not have been valid or "in effect" at any time, including when HCH attempted its renewal. Because HCH never received a valid transfer of the registration, it could not renew it.  As the Second Circuit held, "only Cubaexport . . . has the authority to renew the 'Havana Club' trademark."  *Galleon*, 203 F.3d at 124.  Cubaexport's failure to do so means the registration expired.

Defendants believe this straightforward application of the Lanham Act "makes no practical sense."  MTD at 26.  In their view, "nobody knew" at the time that HCH was not a proper registrant, so Cubaexport should not be faulted for failing to renew the registration.  *Id.* As an initial matter, this is irrelevant.  Cubaexport was required by statute to renew the registration itself, and the statutory consequence for failing to do so was expiration.  The PTO "has no authority to waive a requirement of the statute" that the actual registrant file the renewal, even "where an extraordinary situation exists" and it is argued that "justice requires" it.  *Caldon*, 1995 WL 805094, at *3; *see also Checkers Drive-In Rests., Inc. v. Comm'r of Patents and Trademarks*, 51 F.3d 1078, 1085 (D.C. Cir. 1995) ("[I]n establishing cancellation as the penalty for failure to file the required affidavit, Congress made no exception for the innocent or the negligent.").[3]

---

[3] In *Caldon*, an affidavit by "Caldon, Inc." was insufficient to maintain a registration that was owned by "Caldon Company Limited Partnership," because they were "separate entities."  1995 WL 805094, at *1.  A later decision, cited by Defendants, agreed with the result in *Caldon*, but identified an exception where the affidavit is filed by a "predecessor, successor or assign."  *In re Blair Holdings Inc.*, 61 U.S.P.Q.2d 1382, 1998 WL 1991583, at *3 (Comm'r Pat. & Trademarks 1998).  Defendants argue that HCH should be treated as such, because Cubaexport "*intended* to assign the trademark" to it.  MTD at 27 (emphasis added).  Mere "intent" to assign, without an actual valid assignment, cannot make one a predecessor, successor, or assign.  *Cf. Fed. Treasury Ent. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 76 (2d Cir. 2013) ("purported assignee"

But even if Defendants were entitled to a "practical" exception to the statutory renewal requirements, they overlook their own responsibility for the dilemma they faced in 1996. OFAC revoked the license (and invalidated the transfer) because facts came to light "that were not included in [Cubaexport's] application." Compl. ¶ 85. In other words, Cubaexport made material omissions to the U.S. Government in attempting to circumvent the Embargo. The *Galleon* court interpreted OFAC's action the same way: "Although OFAC failed to elaborate on its decision to revoke Plaintiffs' specific license, the 'facts and circumstances' which later came to the attention of OFAC apparently concerned the incorporation of Pernod into the ownership of HC Holding and HCI." *Galleon*, 974 F. Supp. at 310 n.7. Consistent with both OFAC's decision and the *Galleon* court's interpretation thereof, the complaint plausibly alleges that Defendants acted in bad faith in obtaining the OFAC license, intentionally omitting material facts that they knew would prohibit the assignment under U.S. law, and thus knew that the purported transfer to HCH was null and void. *See infra*, at 22–30. If Defendants' own machinations left them in an awkward position when the time came to renew the registration, that is their responsibility—not an equitable ground for excusing Cubaexport from its statutory obligation to renew.[4]

---

could not be treated as an "assign" of the registrant, because the purported assignor retained "too many rights" in the mark).

[4] Defendants also argue that Cubaexport had a "statutory right to correct the deficiency after receiving notice from the USPTO" of the defective renewal attempt. MTD at 27 (citing 15 U.S.C. § 1059(a)). Again, the reason Cubaexport never received such notice stems from its own bad faith with OFAC. But in any event, the Federal Circuit has squarely held that "there is no obligation for the Commissioner to notify the registrant of potential defects within the statutory period" for correcting such defects, and lack of notice does not allow the PTO to accept an untimely correction. *In re Culligan Int'l Co.*, 915 F.2d 680, 682 (Fed. Cir. 1990); *see also Caldon*, 1995 WL 805094, at *3 ("While the Office regrets that Petitioner was not earlier notified of the statutory deficiency, it is the Registrant who is ultimately responsible for filing proper documents.").

Finally, Defendants argue that Plaintiffs are precluded from raising the 1996 expiration, because they "litigated and lost" it in *Galleon*.  MTD at 27–28.  Not so.  The *Galleon* court never reached the merits of cancellation, finding that Cubaexport was "a necessary party to this action" that was "not before this court."  *Galleon*, 974 F. Supp. at 311–12.  The court's reference to Cubaexport's "rights" was simply a recognition that Cubaexport "inevitably has an interest in the outcome of the registration issue," which the court expressly declined to resolve.  *Id.* at 311.  The *Galleon* Judgment expressly confirmed that Bacardi retained the right to contest Cubaexport's purported rights, and to "contend[] that said rights were lost as a result of acts or omissions by Cubaexport."  Partial Judgment ¶ 10; Compl. ¶ 88.

A similar error infected the TTAB's decision.  Central to the Board's refusal to strike the registration was its view that "the [*Galleon*] District Court . . . contemplated that the registration would continue to exist."  TTAB Decision at 34–35.  But that court "contemplated" this result only insofar as Cubaexport was not before it, such that only further proceedings with all affected parties present could resolve the issue.  The TTAB thus abdicated its responsibility to determine the validity of the renewal based on what it incorrectly believed the *Galleon* court had decided.  Instead, the Board should have given effect to what the *Galleon* court *actually* decided—that the transfer was "void ab initio," meaning the registration was never renewed by a proper owner.  That is what this Court should hold now.

>    b)    This Court Has Authority To Strike A Registration That Has Expired By Operation Of Law.

Even though the TTAB reached the expiration issue on the merits, TTAB Decision at 31–35, Defendants maintain that it should escape review by this Court.  Characterizing Plaintiffs' claim as a request for cancellation based on "wrong party renewal," Defendants object that this

ground is not specifically enumerated in Section 14(3) of the Lanham Act.  MTD at 28.  That is a red herring.

Section 14 governs the grounds that may be raised in a "petition to cancel a registration" before the PTO.  15 U.S.C. § 1064.  Those grounds are unlimited within the first five years of the registration, but limited thereafter.  *Id.* § 1064(1), (3).  Expiration of the registration—based on "wrong party renewal" or otherwise—is not one of the listed grounds, for a simple reason: the PTO is supposed to excise a lapsed registration *without* a petition to cancel.

The Lanham Act dictates that a mark "shall be canceled" if it is not properly maintained, and "expir[es]" if it is not properly renewed.  15 U.S.C. § 1058(a).  Likewise, regulations and PTO procedures stipulate that a registration that is not properly renewed "will expire," and should be automatically removed from the Register.  37 C.F.R. § 2.184(c); TMEP § 716.02(e) (Apr. 2016) ("The USPTO's automated records are updated 30 days after the grace period expires to indicate that a registration is cancelled or expired if" no affidavit or renewal application is filed within the "six-month grace period following the expiration of the previous term of registration."); *see also Checkers Drive-In Rests.*, 51 F.3d at 1085 ("[T]he Commissioner had no discretion to do other than cancel Checkers's service mark registration in this case."); *In re Holland Am. Wafer Co.*, 737 F.2d at 1017 (PTO recognized the "expiration of [a] registration" because of the "failure of [the registrant] to file a timely renewal application").  Because Section 14(3) does not limit the PTO's authority (indeed, its obligation) to strike a lapsed registration, it does not limit this Court's power to do the same.  *See* McCarthy on Trademarks and Unfair Competition § 30:112 (4th ed.) ("McCarthy") ("The courts are limited *by the same grounds* for cancellation as is the Patent and Trademark Office." (emphasis added)).

Defendants' argument also attempts to transform Section 14(3) from "a kind of statute of limitations," McCarthy § 20:55, into a much more aggressive restriction of judicial review. Congress limited the grounds on which one can reopen the initial registration of a trademark many years after the fact, while ensuring that a five-year period of time is available for the registration to be challenged on any ground.  A failure to renew within the time allotted by the statute would necessarily take place long after Section 14(3)'s five-year limitations period. *See* 15 U.S.C. § 1058 (affidavits of use required six and ten years after registration); 15 U.S.C. § 1059 (renewal required ten years after registration).  By Defendants' logic, an improper renewal done in violation of the statute is immune from judicial review *the day it happens*.  That result makes no sense and would subvert, not advance, the "balance" Congress struck between "stability" and "the public interest in compliance with the Lanham Act."  MTD at 28. Defendants' effort to insulate a legally insufficient renewal similarly contradicts "the strong presumption that Congress intends judicial review of administrative action."  *El Paso Nat. Gas Co. v. United States*, 632 F.3d 1272, 1276 (D.C. Cir. 2011) (internal quotation mark omitted).

> **2.      Cubaexport Failed To Timely Pay The Statutory Fee Necessary To Renew The Registration In 2006.**

Even if HCH's purported renewal managed to spare Cubaexport's registration in 1996, Cubaexport was again required to renew it in 2006.  Yet it failed to timely submit a complete renewal application.  Accordingly, the registration expired as a matter of law, and cannot properly be maintained on the Register.

The Lanham Act requires a renewal to be accompanied by "payment of the prescribed fee."  15 U.S.C. § 1059(a).  As the Federal Circuit has held, the timely submission of the fee is a statutory requirement: "the Commissioner does not have the discretion to accept the application

fee after the [six] month grace period." *In re Culligan Int'l*, 915 F.2d 680, 681 (Fed. Cir. 1990);[5] *see also id.* at 682 (agreeing with the PTO that "[t]he fee is a statutory element of the complete application for renewal, and pursuant to the statute, a complete application must be filed within the time limit set forth").  The PTO itself has explained that if a renewal "filing is not accompanied by the prescribed fees, the Director has no discretion but to issue a refusal stating that the registration will be canceled and/or has expired."  Compl. ¶ 119; Memorandum from U.S. Patent and Trademark Office to Office of Foreign Assets Control, U.S. Dep't of the Treasury (Sept. 27, 2012) (attached as Ex. 7 to Lynch Decl.).

Cubaexport attempted to renew its license in 2006 without OFAC authorization, but because it lacked a license to pay the prescribed fee, its request was denied.  Compl. ¶¶ 107–13. The Post Registration Examiner determined that the "required fee . . . has not been paid," and that if OFAC did not grant a license enabling Cubaexport to pay the fee within the statutory six-month grace period, "the registration will be deemed cancelled/expired."  *Id.* ¶ 113.  After OFAC denied Cubaexport's license request as "inconsistent with U.S. policy," the PTO found that Cubaexport's renewal filing "cannot be accepted," and that "the registration will be cancelled/expired."  *Id.* ¶ 114–15.  Cubaexport nonetheless persuaded the PTO to refrain from striking its expired registration while it unsuccessfully appealed OFAC's denial, and then while it pursued an argument that PTO's ministerial correction of the Register would somehow violate the Embargo.  *Id.* ¶¶ 117–18.  But by November 2012, OFAC made clear that the PTO was free to rectify the Register to remove Cubaexport's long-expired registration.  *Id.* ¶¶ 120–21.

---

[5] *Culligan* refers to a three-month grace period.  The Lanham Act has subsequently been amended to provide for a six-month grace period.  15 U.S.C. § 1059(a).

The PTO failed to do so, taking no action on the expired registration for four years. *Id.* ¶¶ 121–23. Then, after Cubaexport obtained a license in 2016, it submitted the renewal fee ten years after it was due, and on that basis the PTO purported to resurrect the registration. *Id.* ¶ 123. But as the Federal Circuit has squarely held, the PTO had no discretion to accept a payment outside of the six-month statutory grace period. *Compare* HAVANA CLUB and Design, Registration No. 1,031,651, Petition to Director Granted (Jan. 13, 2016), at 3 ("PTO Petition Decision") (attached as Ex. 8 to Lynch Decl.) ("Non-payment . . . of the fee for a combined § 8/9 filing is a deficiency that can be corrected, even after the statutory time period . . . .") *and* MTD at 33 ("[T]he Commissioner has broad discretion to allow the subsequent correction of defects."), *with Culligan*, 915 F.2d at 681 ("[T]he Commissioner did not have the discretion to accept the application fee after the [statutory] grace period had expired.").[6] This Court should accordingly "rectify the register" to reflect that the registration was not renewed and therefore has expired. 15 U.S.C. § 1119.

The reason for Cubaexport's failure to renew is irrelevant—expiration is the consequence for such a failure, and "Congress made no exception for the innocent or the negligent." *Checkers Drive-In Rests.*, 51 F.3d at 1085. Even so, it bears noting that there was nothing trivial about Cubaexport's inability to renew its registration within the statutory deadline. Cubaexport informed OFAC that "failure to pay the fee will result in cancellation of the registration," and

---

[6] In support of their view that the PTO has discretion to accept late payments, Defendants cite, *inter alia*, 37 C.F.R. § 2.185 ("Correcting Deficiencies in Renewal Application."). They fail to mention the PTO's explanation upon adopting § 2.185: "There are now some deficiencies that can be corrected after the statutory deadline for filing the renewal application . . . . Other requirements, such as the renewal fee, *must be met before the end of the statutory filing period, or the registration will expire.*" Trademark Law Treaty Implementation Act Changes, 64 Fed. Reg. 25,223, 25,233 (proposed May 11, 1999) (to be codified at 37 C.F.R. pts. 1–3 & 6) (emphasis added) (citing *Culligan*, 915 F.2d 680).

that without action from OFAC, the registration "would otherwise expire on July 27, 2006." *See* Palladino Letter (Lynch Decl. Ex. 9). Yet OFAC refused, concluding (upon consultation with the State Department) that "authorizing transactions related to the renewal of the HAVANA CLUB trademark" "would be inconsistent with U.S. policy." Letter from J. Robert McBrien, Acting Director, Office of Foreign Assets Control, to Vincent Palladino, Ropes & Gray LLP (July 28, 2006) (attached as Ex. 10 to Lynch Decl.). Defendants would nullify the foreign policy determination made in 2006 that the registration should be allowed to expire at that time.

Defendants offer a series of unpersuasive objections to this Court recognizing that the registration expired in 2006. They first contend that the PTO's refusal to excise an expired registration must "escape review by the TTAB or the courts." MTD at 32. That view, which contradicts the strong presumption of judicial review, fails for the reasons explained above. *See supra*, at 16–18. If a registration expires and the PTO declines to exercise its statutory *duty* to remove it, this Court has the power to act. *Cf. New York Univ. v. Autodesk, Inc.*, 466 F. Supp. 2d 563, 564 (S.D.N.Y. 2006) (Rakoff, J.) (rejecting argument that "the PTO's decision to revive plaintiff's [patent] application is not subject to judicial review and therefore cannot be the basis for any affirmative defense or counterclaim" in private litigation).

Defendants next argue that the purported renewal of the registration "remained an open issue" in 2016 because Cubaexport had filed a petition challenging the rejection of its application. MTD at 32. That simply assumes a false premise: that the PTO had any discretion to grant a petition accepting a renewal fee after the statutory time for doing so expired. *See Culligan*, 915 F.2d at 681. If Defendants were correct, the statutory deadline could be circumvented—effectively extending it for ten years in this case—by the mere filing of a petition as a delay tactic.

Finally, Defendants argue that the PTO was "obligated" by a 2016 OFAC license to retroactively accept Cubaexport's original attempted fee payment.  MTD at 33.  It is one thing for a license to retroactively "validate [a] transfer," 31 C.F.R. § 515.203(c), but quite another to pretend that a never-completed transfer actually took place.  Cubaexport's attempt to pay was *rejected*.  In fact, Cubaexport's counsel represented to the PTO that the deposit account in which the renewal fee had previously been tendered was closed, and therefore "request[ed] that the USPTO charge" a different account, in 2016, for the renewal fee.  Bernstein Letter (Lynch Decl. Ex. 11); *see also* PTO Petition Decision at 3 (Lynch Decl. Ex. 8) (stating that the fee requirement was satisfied by Cubaexport "authorizing the USPTO to charge any uncollected fees to its [new] counsel's USPTO deposit account").  It is therefore clear that the statutory fee was in fact paid only in 2016, ten years after the Lanham Act required it.

**B.     The Complaint States A Valid Claim Of Cancellation For Fraud**

**1.     Cubaexport Knowingly Misrepresented That It Owned The HAVANA CLUB Mark.**

The facts alleged in the complaint establish that Cubaexport obtained its original registration in 1974 by fraud.  Cubaexport's application contained two material, knowing misstatements.  First, Cubaexport represented that it believed it owned the U.S. HAVANA CLUB mark, despite knowing that its only claim to the mark was based on a confiscation in Cuba that could not be recognized or given effect in the United States.  Compl. ¶¶ 42, 149.  Second, Cubaexport represented that it knew of no one else with a right to use the mark, despite knowing that JASA had longstanding trademark rights that it had not abandoned.  *Id.* ¶¶ 42, 45,

149.  For both of these independent reasons, Plaintiffs have stated a claim of cancellation based on fraud.[7]

          a)      Cubaexport Knew That The United States Would Not Recognize Trademark Rights Attributable To A Confiscation.

Cubaexport claimed in 1974 to be the owner of the mark, as it was required to do to obtain the registration.  But that claim to ownership stemmed from the Castro regime's violent seizure of JASA's rum business and all of its assets.  *Id.* ¶¶ 27–32.  As a consequence, it could be given no effect in the United States, under this country's longstanding policy of not giving any effect to a foreign government's expropriation of property.  *See, e.g.*, *Zwack v. Kraus Bros. & Co.*, 237 F.2d 255, 259 (2d Cir. 1956) (recognition would frustrate "the public policy of [the United States] against confiscation"); *Maltina Corp. v. Cawy Bottling Co., Inc.*, 462 F.2d 1021, 1027 (5th Cir. 1972) (recognizing the expropriation of Cuban nationals' trademarks without compensation "would violate bedrock principles" of U.S. law and policy); *F. Palicio y Compania, S.A. v. Brush*, 256 F. Supp. 481, 488 (S.D.N.Y. 1966), *aff'd*, 375 F.2d 1011 (2d Cir. 1967) ("[O]ur courts will not give 'extraterritorial effect' to a confiscatory decree of a foreign state, even where directed against its own nationals.").

The complaint alleges that Cubaexport was well aware that its claim to ownership was tainted by the expropriation, and that its registration could not have been accepted if that fact were disclosed.  By 1974, Cubaexport not only had access to ample precedent codifying the non-recognition policy, but had also witnessed its application firsthand as U.S. courts refused Cuban claims to the BACARDI trademark.  Compl. ¶ 40; *see Compania Ron Bacardi, S.A. v. Bank of Nova Scotia*, 193 F. Supp. 814, 815 (S.D.N.Y. 1961).

---

[7] Thus, while Defendants are wrong that JASA abandoned the mark, they are also wrong that establishing JASA's continued ownership is the only way for Plaintiffs to state a fraud claim.

Moreover, Cubaexport's awareness of the non-recognition policy is the only plausible explanation for its actions to disguise the nature of its claimed rights. As the complaint alleges, Cubaexport waited for JASA's registration to expire before seeking its own registration in the United States. Compl. ¶ 42. Cubaexport also declined to use an already-existing Cuban registration for the HAVANA CLUB mark, which had been confiscated from JASA, as the basis for its Section 44(e) application in the United States. *Id.* Instead, Cubaexport obtained a *new* registration to submit to the PTO. *Id.* This naked attempt to launder its claimed trademark rights leads to a logical inference: Cubaexport knew that an application betraying the link to JASA and the expropriation would be denied. These specific allegations amply demonstrate Cubaexport's intent to deceive the PTO. *See Bose*, 580 F.3d at 1244 (Fed. Cir. 2009) ("[I]ntent must often be inferred from the circumstances and related statement made.") (quoting *First Int'l Servs. Corp. v. Chuckles, Inc.*, 5 U.S.P.Q.2d 1628, 1988 WL 252292, at *10 (T.T.A.B. 1988)).

Despite its clear awareness of the problem at the time, Cubaexport now maintains that the confiscatory origins of its claimed rights are irrelevant—it could have openly disclosed these facts to the PTO and still obtained the registration. The basis for this flawed argument is a hair-splitting distinction. While Cubaexport does not dispute that an expropriation of U.S. marks cannot be recognized, it claims that its registration did not rely on the confiscation—it was based solely on the fact that the mark was "duly registered in Cuba" in its name. MTD at 23. But the link between the confiscation and the U.S. registration is not so easily severed. A Section 44(e) application based on a foreign registration can only be accepted if the mark is otherwise "eligible" to be registered. 15 U.S.C. § 1126(e); *see In re Rath*, 402 F.3d 1207, 1212 (Fed. Cir. 2005) ("[T]he principal register was available to foreign registrants [under Section 44(e)] and United States citizens on equal terms—both had to meet the eligibility requirements of United

States law.").  One whose claim to a mark is derived from an expropriation is not "eligible."

Any other result would give effect to Cuba's confiscation in the United States—in flat

contravention of this country's public policy.  Put differently, since Cubaexport plainly could not

gain rights in the United States directly from a confiscation, it cannot gain such rights indirectly.

*See* WTO First Submission, at ¶ 10 n.15 ("Courts refuse to allow the confiscating State to obtain

*indirectly* an extraterritorial effect that it cannot obtain directly." (emphasis added)).

The PTO's decision in *Coahoma Chemical Co., Inc. v. Smith*—which predates the 1974

registration—confirms that Cubaexport had no legitimate claim to ownership of the mark.  113

U.S.P.Q. 413, 1957 WL 7113 (Comm'r Pat. & Trademarks 1957).  In *Coahoma*, the registrant

claimed trademark rights based on its use in commerce, but that use constituted "unlawful

shipments in interstate commerce."  *Id.* at *6.  This, the PTO held, was "not use of a mark in

commerce *which the Patent Office may recognize*," for the "obvious" reason that "property rights

[may not] be acquired as a result of unlawful acts."  *Id.* (emphasis added).  It is equally obvious

that Cubaexport's Cuban registration, the fruit of an expropriation this country condemns, was

not a foreign registration *which the PTO may recognize* and give legal effect to in the United

States, as a basis for U.S. trademark rights.

   b)  Cubaexport Knew That JASA Owned And Had Not Abandoned
      The HAVANA CLUB Mark.

The complaint states a fraud-on-the-PTO claim for the independent reason that

Cubaexport knew that JASA was the true owner.  Remarkably, Defendants respond that JASA

had lost its rights to the mark *because of the Cuban government's own actions*.  They go on to

suggest that Cubaexport was entitled to assume that JASA had no intent to rebuild its business,

because the Arechabalas failed to inform *their persecutors* about their plans.  These arguments

fail.

Defendants begin their argument by observing that JASA "discontinued all use of the HAVANA CLUB name in the U.S. after 1960."  MTD at 18.  Of course, the complaint alleges that this was not a *voluntary* discontinuation.  Compl. ¶¶ 27–32.  "[C]ourts and boards have uniformly rejected a finding of abandonment based on discontinuance of use with intent not to resume use in cases in which the discontinuance of use was involuntary and beyond the control of the trademark holder."  83 A.L.R. Fed. 295, § 2 (1987); *see also* Responses of the United States, *United States-Section 211 Omnibus Appropriations Act*, WT/DS176, ¶ 4 (Feb. 5, 2001) ("WTO Responses")[8] (Where "the original Cuban owner's cessation of use was the result of a forcible takeover of his business . . . no issue of abandonment would be raised."); Pls.' Opp. to Defs.' Mot. for Partial S.J. at 9–10 ("SJ Opp.") (citing additional authorities).  The Arechabalas' cessation of use, which Plaintiffs allege was caused by the violent seizure of their business by the Cuban government, cannot give rise to abandonment.

Defendants nonetheless argue that a trademark owner that has been driven out of business must "promptly" seek to resume use, or else the expropriator is free to claim its intellectual property.  *But see F. Palicio y Compania*, 256 F. Supp. at 488 ("The mere fact that [a] taking has been so complete as to impose substantial barriers to the resumption of business by the former owners does not establish that they are without right to do so.").  Even if that were an accurate statement of the law, Plaintiffs do allege that:

> JASA and its shareholders maintained their determination to protect their rights and to resume production and sale of HAVANA CLUB rum when it became possible, either through political change in Cuba leading to restitution of their confiscated assets or, later, through an arrangement with a suitable partner contributing financial and managerial resources to that venture.

---

[8] *Available at* http://tinyurl.com/US211WTOResp.

Compl. ¶ 32.  Not only is this allegation not "conclusory," but it is backed up by substantial

evidence illustrating the Arechabalas' efforts to overcome adversity and resume selling Havana

Club rum in the United States.  *See* SJ Opp. at 11–16.[9]

Defendants' claim of abandonment is especially ill-suited to resolution on a motion to

dismiss.  Abandonment depends on "intent not to resume . . . use," 15 U.S.C. § 1127, and

"questions of intent are rarely appropriate for summary judgment," let alone a motion to dismiss,

*United States v. Philip Morris USA*, 316 F. Supp. 2d 6, 12 n.4 (D.D.C. 2004).  Moreover,

Defendants' burden is exceedingly high—it must prove abandonment by "clear and convincing"

evidence.  McCarthy § 17:12 & n.2; *Mathy v. Republic Metalware Co.*, 35 App. D.C. 151, 156

(D.C. Cir. 1910).  Defendants cannot meet that burden simply by relying on a "presumption,"

because "[n]on-use only creates a rebuttable presumption that disappears in the face of contrary

evidence."  *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980).  As the

complaint alleges and Plaintiffs' opposition to the partial summary judgment motion details,

there is ample contrary evidence that JASA did not abandon the mark.

Defendants fare no better with their factual argument that Cubaexport *believed* that JASA

had abandoned the mark.  The complaint alleges that Cubaexport, a state-owned entity, knew

that the Cuban government had expropriated JASA.  It therefore knew that JASA had ceased use

of its trademark *involuntarily*, not because it intended to cease using its rights.  Moreover, no

facts alleged in the complaint suggest any reason Cubaexport would have had to believe JASA

had decided not to resume use.  To the contrary, the allegations concerning the expropriation and

---

[9] Defendants suggest that the expiration of JASA's trademark supports a finding of abandonment
as a matter of law.  MTD at 18–20.  That view has been squarely rejected.  *See Crash Dummy
Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1391 (Fed. Cir. 2010) ("[C]ancellation of a trademark
registration does not necessarily translate into abandonment of common law trademark rights.
Nor does it establish its owner's lack of intent to use the mark."); *see also* SJ Opp. at 14–15.

subsequent persecution of the Arechabalas support the inference that Cubaexport must have understood that it was this adversity that prevented JASA from immediately returning to the market.  Cubaexport cannot claim that it *assumed* abandonment simply because the Arechabalas had not "spoken to [it] . . . to discuss their supposed plans to resume using the mark."  MTD at 20–21.  Having just dispossessed, jailed, and exiled the Arechabalas, the Cuban government cannot reasonably have expected them to consult their persecutors about their future plans.[10]

If Cubaexport can point to some evidence that in 1974 it had reason to believe JASA intended not to resume use, it may present that evidence at trial.  But on a motion to dismiss, with all reasonable inferences made in Plaintiffs' favor, Cubaexport is not entitled to a factual finding that it honestly believed JASA had abandoned its trademark.

### 2.    HCH Knowingly Misrepresented That It Owned The HAVANA CLUB Mark.

As explained above, HCH's purported renewal of the registration in 1996 had no effect.  *See supra*, at 12–18.  But even if that improper renewal were not a basis for challenging the registration, Plaintiffs have nonetheless stated a claim for cancellation based on HCH's fraudulent misstatements in the renewal application.  The complaint alleges that HCH falsely claimed ownership of the HAVANA CLUB mark, despite knowing that the transfer it had received was null and void.  Compl. ¶ 159.  Specifically, HCH knew that an OFAC license authorizing the transfer had been obtained by making false statements, and that the transfer purporting to give it ownership was invalid.  *Id.* ¶¶ 158–59.  HCH nonetheless represented that it

---

[10] Defendants also argue, asking the Court to draw another inference in their favor, that Bacardi "itself had concluded" that JASA had abandoned the mark when it applied for a registration in 1994.  MTD at 21.  Of course, anything an innocent third-party might have concluded in 1994 has no bearing on what the expropriator itself would have believed twenty years earlier.  More fundamentally, Bacardi's statement that no one else owned the mark is most naturally read to reflect its progress in acquiring JASA's rights—otherwise there would have been no reason even to negotiate with JASA about those rights.

owned the mark, as if the license had been validly obtained and the transfer was not a nullity.  It made this false statement despite a warning from OFAC that the license was "granted upon the statements and representations made in your application."  *Id.* ¶ 81.  These allegations are sufficient to state a claim that the renewal was fraudulently obtained.

Defendants largely miss the point, arguing that "false statements to OFAC" are not a basis for a fraudulent renewal claim.  MTD at 29.  But those statements are not the basis of Plaintiffs' fraudulent renewal claim; HCH's false claim of ownership is.  Plaintiffs rely on the misrepresentations to OFAC simply to establish *why* it was knowingly false for HCH to hold itself out to the PTO as the owner of the mark.  If, as Plaintiffs allege, HCH knew that the claims underpinning the OFAC license were fraudulent, it follows that the representation of ownership in the renewal application was fraudulent.[11]

As for the underlying misrepresentations to OFAC, Defendants simply offer a different interpretation of the facts, one that is inappropriate on a motion to dismiss.  They argue it was accurate to refer to HCH, a Luxembourg joint venture 50%-owned by French company Pernod Ricard, as a "national of Cuba," and to describe the transfer as reflecting nothing more than a "reorganization" of the Cuban liquor industry.  MTD at 29–30.  At best, these were "half truth[s], *i.e.*, . . . statement[s] that [are] literally true but [are] made misleading by a significant omission."  *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 69 (1st Cir. 1998).  From Defendants' description of a mere reorganization among Cuban nationals, OFAC could not have ascertained that the transfer involved a massive influx of cash to the Cuban government from a foreign investor—a fact

---

[11] Similarly, it is irrelevant whether Plaintiffs would have "standing" to bring a standalone claim premised on the misrepresentations to OFAC.  MTD at 30–31.  Plaintiffs are not attempting to enforce the CACR; the misrepresentations to OFAC simply form the factual background to HCH's fraud on the PTO, a claim Plaintiffs plainly do have standing to raise.

Defendants knew would have defeated the application.  Compl. ¶ 62.  Indeed, the *Galleon* court observed that the true (but hidden) purpose of the transaction "flies in the face of the CACR's aim to limit the flow of funds into Cuba."  *Galleon*, 974 F. Supp. at 310.  And when OFAC ultimately retracted the license, it pointedly referred to "facts and circumstances" that "*were not included in the application.*"  Compl. ¶ 85 (emphasis added); *see also* 974 F. Supp. at 310 n.7.

Moreover, as with Cubaexport's original fraud, *see supra*, at 22–28, the circumstances surrounding the purported transfer and renewal bolster the allegations of intent to deceive.  Defendants initially plotted to circumvent OFAC altogether, consummating the transfer without a license and then planning to secure a new Section 44(e) registration for HCH.  Compl. ¶¶ 65–66.  Only after developments at the PTO forced their hands did Defendants seek a retroactive license for the transfer, and conceal material facts in order to obtain it.  *Id.* ¶ 66.  These are not the actions of entities that believed they could obtain a license from OFAC without hiding critical facts.

### C.   The Complaint States A Valid Claim Of Cancellation For Misrepresentation Of The Source Of Goods

A registration must be cancelled if the registrant "misrepresent[s] the source of the goods . . . in connection with which the mark is used."  15 U.S.C. § 1064(3).  Cubaexport did just that.  When Cubaexport applied for its registration, it deliberately appropriated the Havana Club branding that consumers in the United States associated with the Arechabala family's rum, falsely implying continuity and authorization from the long-time sellers of authentic HAVANA CLUB rum.  Compl. ¶ 146.  Perhaps most glaringly, the design submitted by Cubaexport prominently featured the Spanish legend, "*Fundada en 1878*"—Founded in 1878.  *Id.*  Just as Cubaexport did not have authorization from JASA and did not possess the secret Arechabala family formula, it plainly was not "founded in 1878"; it was created in 1965.  *Id.* ¶ 149.  What

*was* established in 1878 was the Arechabala family business.  *Id.* ¶ 22.  Cubaexport thus blatantly

stole the "*Fundada en 1878*" legend from the label design that JASA had registered and used in

the United States.  *Id.* ¶ 44.  This is a paradigmatic case where "th[e] registrant deliberately

sought to pass off its goods as those of [another]."  McCarthy § 20:60.  Indeed, there is no reason

why Cubaexport and HCH would blatantly lie to create an association with the Arechabala

family legacy, if not to trade on the good will established in genuine Havana Club rum.

Defendants' primary response is that anyone with a "colorable claim" to ownership is

incapable of misrepresenting the source of its goods.  MTD at 37.  As discussed above, the facts

alleged in the complaint show that Cubaexport knew its claim to ownership was illegitimate.  *See*

*supra*, at 25–28.  But in any event, the statute speaks only in terms of misrepresentation of the

source of goods; it does not forgive such a misrepresentation if it is made by one with even a

colorable claim to ownership.  Even if Cubaexport honestly believed the HAVANA CLUB mark

had been abandoned, its attempt to associate its newly-minted product with the Arechabala

family legacy would be no less a misrepresentation.

The TTAB adopted Defendants' "claim of ownership" defense, but it did so based on a

misreading of its own decision in *Global Maschinen GmbH v. Global Banking Systems, Inc.*, 227

U.S.P.Q. 862, 1985 WL 71943 (T.T.A.B. 1985).  *Global Maschinen* explained that a registration

could be "evidence" of a "colorable ownership claim," rather than a "deliberate and blatant

misrepresentation."  1985 WL 71943, at *2 n.3.  But while the Board recognized that "ownership

of the trademark GLOBAL is disputed" (between the registrant, a seller of coin-handling

machines, and the petitioner, its former supplier), it did not stop there.  *Id.*  Critically, the Board

went on to stress that "all of the machinery sold by registrant in the United States, whether

acquired from petitioner or from other sources, carried name plates and other markings *clearly*

*identifying the manufacturing source . . . .*" *Id.* (emphasis added).  In other words, the Board

declined to infer a misrepresentation of source from the registrant's use of a disputed trademark

alone, because the registrant took care *not* to mislead consumers into believing its product was

associated with the other putative owner.  Here, by contrast, even if Cubaexport did have a

colorable claim to ownership, it had no colorable claim to carry on a legacy dating back to 1878,

and yet blatantly sought to pass off its ersatz Havana Club rum as such.

Defendants' remaining arguments are meritless.  First, they claim that because they have

never used the HAVANA CLUB mark in commerce, they cannot be guilty of a

misrepresentation of source.  MTD at 37.  But Cubaexport's registration reflected exactly how it

intended to use the mark in commerce—in a way plainly calculated to create a false association

with the Arechabala family and authentic Havana Club rum.  Since Cubaexport had never used

the mark in commerce prior to its registration, it was required to testify to a bona fide intent to do

so.  15 U.S.C. § 1126(e).  If its sworn statements were truthful, Cubaexport must be held to its

word that it intended to use the mark in a misleading way.  Indeed, Cubaexport's argument

merely underscores the oddity of maintaining a registration for four decades without using the

mark once.  *See infra*, at 33–36.  If, as Defendants insist, this inaction should be overlooked for

purposes of abandonment, it cannot also be a *defense* to misrepresentations of source made on

the face of the original application.  *Cf. Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.*, 457 F.

Supp. 1090, 1100 n.43 (S.D.N.Y. 1978) ("inequitable" to invoke non-use to prevent victim of

Cuban confiscation from raising cancellation claims).

Second, Defendants attempt to spin the complaint's allegations of HCH's advertising as a

"conce[ssion]" that it intended to build new brand recognition, rather than trade on JASA's

existing good will.  MTD at 37–38.  That is simply not a fair reading of the complaint.

Advertising to reach new customers while drawing on good will that already exists is not an either/or proposition (many companies with well-established reputations advertise). There is nothing inconsistent in the complaint's allegations that Defendants did both.

Finally, Defendants argue that there is "no reason to think that U.S. consumers would associate being founded in 1878 with Bacardi's product rather than HCI's." MTD at 38. The complaint alleges a very good reason to think that. Unlike Defendants, Bacardi can honestly claim to continue the Arechabala family legacy dating back to 1878, including its use of the secret family formula for making genuine Havana Club rum. Compl. ¶ 11.

 **D.  The Complaint States A Valid Claim Of Cancellation For Abandonment**

  **1.  Cubaexport Has Sold Its Rum Business And Cannot Retain Bare Title To The Marks.**

Cubaexport, the complaint alleges, has entirely left the rum business. Compl. ¶ 56. It conveyed to HRL all the assets related to HAVANA CLUB rum, including the good will associated with the trademark. *Id.* It did not, however, effect an assignment of the trademark registration itself, as the *Galleon* judgment confirmed. Partial Judgment ¶ 4. As a result, since 1993 Cubaexport has held bare title to the HAVANA CLUB Registration, without any ability to produce or sell rum in the United States or anywhere else in the world. Compl. ¶ 166.

This is a classic assignment in gross that results in abandonment of the trademark. A trademark has no economic value on its own, but rather is intertwined with "good will," which "signifies the favorable reputation of a business, product or service." McCarthy § 18:2. As McCarthy explains, "[g]ood will and its trademark symbol are as inseparable as [conjoined] [t]wins who cannot be separated without death to both." *Id.*; *see Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984) ("There are no rights in a trademark apart from the business with which the mark has been associated; they are inseparable."). Thus, "if there is a dissociation or

separation of the business from the mark, there is nothing left for the mark to signify and hence it . . . is abandoned," and a corresponding registration is cancelled. *Otis Elevator Co. v. Echlin Mfg. Co.*, 187 U.S.P.Q. 310, 1975 WL 21258, at *4 (T.T.A.B. 1975); *see also Gen. Cigar Co. v. G.D.M. Inc.*, 988 F. Supp. 647, 659 (S.D.N.Y. 1997) ("[A]bandonment may be found where a mark has been assigned in gross."); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1354–55 (E.D.N.Y. 1994) ("A mark may be deemed abandoned by virtue of an assignment in gross."); *Liquid Glass Enters., Inc. v. Liquid Glass Indus. of Canada, Ltd.*, 14 U.S.P.Q.2d 1976, 1989 WL 222653, at *7 (E.D. Mich. 1989) (trademark "cancellable" based in part on "lack of goodwill in the assignment of the [mark]"); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 12 U.S.P.Q.2d 1657, 1989 WL 159628, at *20 (E.D. Cal. 1989) ("An assignment in gross is deemed to be an abandonment of the trademark.").[12]

Defendants do not dispute that Plaintiffs have alleged an assignment in gross, or that such an assignment generally results in abandonment. Their sole response is that Cubaexport "still intends to exploit its U.S. trademark by transferring it to an entity in the rum business" in the future. MTD at 35. But "good intentions will not breathe life back into the devitalized mark." *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F. Supp. 866, 879 (E.D.N.Y. 1978). Defendants wish to invent an exception to abandonment, under which a registrant can divest itself of all relevant assets and good will and hold bare title to a trademark for nearly 15 years, so long as it intends a further assignment of the registration in the future. Unsurprisingly, Defendants cite nothing in support of this novel view.

---

[12] One district court has found that an assignment in gross does not result in "abandonment per se" if the putative assignor does not "stop[] using his mark." *Li'l Red Barn, Inc. v. Red Barn Sys., Inc.*, 322 F. Supp. 98, 107 (N.D. Ind. 1970). Cubaexport, which purports to retain bare title despite having completely exited the rum business, qualifies for abandonment even under this standard.

### 2.    Cubaexport's Decades-Long Non-Use Constitutes Abandonment.

Cubaexport abandoned the mark for the separate reason that it has never used it in the United States over more than 40 years.  Compl. ¶ 163.  While the Embargo may have been an excusable ground for some period of non-use, a trademark cannot lie dormant indefinitely.  *See* McCarthy § 29:11 ("While use as a mark in the United States is not required to obtain a registration under § 44 . . . , use is required within a reasonable time or the protection is subject to cancellation for abandonment.").  However long it would be reasonable to hold a trademark registration in reserve without ever exploiting it economically, four decades is much too long.

This interpretation of the Lanham Act is bolstered by serious constitutional concerns.  The Supreme Court long ago held that Congress's power to regulate trademarks depends on their use in foreign or domestic commerce.  *In re Trade-Mark Cases*, 100 U.S. 82, 92 (1879); *see* McCarthy § 6:2 ("[T]he Supreme Court held that Congress has power over trademarks only under its Constitutional power to regulate commerce with foreign nations, among the States and with Native American Tribes.  Up to the present day, federal jurisdiction over trademarks generally extends only to marks used in interstate and foreign commerce.").  Section 44 offers foreign registrants a limited dispensation to obtain a U.S. registration without prior use, provided they have a "bona fide intention to use the mark in commerce." 15 U.S.C. § 1126(e).  But if that provision were construed to allow registration of marks that are never used over the course of generations, the reasonable nexus to foreign or interstate commerce that the Constitution demands would not be present.  *See Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2586 (2012) (Roberts, C.J.) ("The [constitutional] power to *regulate* commerce presupposes the existence of commercial activity to be regulated.").  This Court should interpret the abandonment provisions of Lanham Act to avoid this constitutional problem.  *See Judicial Watch, Inc. v. U.S.*

*Secret Service*, 726 F.3d 208, 226 (D.C. Cir. 2013) (statutes should be construed to "avoid deciding difficult constitutional questions" where fairly possible).[13]

Even apart from this constitutional concern, "Section 44 should be construed narrowly." *In re Societe D'Exploitation de la Marque le Fouquet's*, 67 U.S.P.Q.2d 1784, 2003 WL 22021944, at *4 (T.T.A.B. 2003). In adopting this rule of construction, the TTAB recognized the anomaly that "foreign applicants are given substantial advantages over U.S. citizens, most particularly, the right to obtain U.S. registrations for goods and services for which they have not yet used the marks in commerce." *Id.* Congress could not have intended that special treatment to be so significant that foreign registrants can monopolize a mark *indefinitely* without engaging in any economic activity in this country.

## II.     The Complaint States Valid Claims For Declaratory Relief

### A.     Bacardi Has Superior Common Law Rights In The Trademark

Bacardi pleads two sources of trademark rights that are superior to anything Defendants may claim. Bacardi acquired JASA's rights in the HAVANA CLUB mark, and therefore has priority of use dating back to the 1930s. For the reasons explained above and in Plaintiffs' separate opposition to the motion for partial summary judgment, Defendants have not established that JASA abandoned those rights. *See supra*, at 25–28; SJ Opp. at 9–16.

---

[13] Defendants dramatically overstate congressional power when they claim that the sole question is whether *the entire Lanham Act* sufficiently regulates commerce. MTD at 36 n.11. *Gonzalez v. Raich* allows Congress to regulate activities that do not affect interstate or foreign commerce where "the regulatory scheme could be undercut unless the intrastate activity were regulated." 545 U.S. 1, 24 (2005) (quoting *United States v. Lopez*, 514 U.S. 549, 561 (1995)). Allowing Cubaexport's registration to sit unused for decades serves no such objectives, but rather contravenes the longstanding congressional policy that trademark rights depend on use. Cubaexport also fails to explain what treaty provision requires Congress to allow trademarks to be held indefinitely without use. Even if it could, a statute passed under the Treaty Power will not be construed to upset the usual constitutional balance without at least a clear statement. *See Bond v. United States*, 134 S. Ct. 2077, 2088–90 (2014).

Even if Bacardi had not acquired rights from JASA, it gained its own common law rights through use.  Compl. ¶ 72–77; *see* McCarthy § 16:1.  Although Defendants have never used the mark in the United States, they nonetheless invoke the 1974 registration as the basis of trademark rights superior to Bacardi's.  For the reasons explained above, Plaintiffs have adequately pleaded several grounds for why that registration must be cancelled or stricken.  But even if Plaintiffs were not to prevail on those claims, Cubaexport's claim to superior trademark rights fails for two further reasons.  *First*, recognition of priority based on Cubaexport's registration of a confiscated mark is foreclosed by Section 211.  *Second*, Cubaexport has not acquired ownership rights over a trademark it has not used in more than 40 years, notwithstanding its purported registration of that mark.

Section 211 provides that "[n]o U.S. Court shall recognize, enforce or otherwise validate any assertion of rights" based on a registration of a trademark that was confiscated, or is "substantially similar to a mark . . . that was used in connection with a [confiscated] business."[14] This prohibition applies here because "the Revolutionary Cuban Regime confiscated the physical assets, property and business records of JASA, the original owner of the Havana Club trademark."  *Havana Club Holding, S.A. v. Galleon, S.A.*, 62 F. Supp. 2d 1085, 1092 (S.D.N.Y. 1999).

Cubaexport's asserted rights of priority are based on its registration, and are thus exactly the type of rights Congress determined could not be recognized, enforced, or otherwise validated.  As the *Galleon* court explained, "Congress made clear its intention to *repeal rights in marks*"

---

[14] Two distinct subsections of Section 211 apply here.  Subsection (a)(2) prohibits recognition of "any assertion of rights" tied to a registration obtained under 31 C.F.R. § 515.527, the general license for intellectual property transactions under which Cubaexport filed its application in 1974.  Subsection (b) prohibits the recognition of "any assertion of treaty rights" under Section 44(e) of the Lanham, under which Cubaexport obtained its registration.

stemming from any registration covered by the statute.  *Id.* (emphasis added); *cf. United States v. A 2000 Jeep Grand Cherokee*, No. 07-cv-4114, 2009 WL 1586016, at *5 (N.D. Iowa June 4, 2009) (under statutory directive that "no court shall recognize" an individual's claim to a vehicle if he lacks a certificate of title, those lacking title are not the owners as a matter of law).  Thus, any priority contest in this case pits Bacardi's post-1995 use, which gives rise to enforceable trademark rights, against Cubaexport's registration, which as a matter of law gives rise to no rights.  There is therefore no barrier to recognizing Bacardi's common law rights, and no superior rights belonging to Cubaexport.

While Section 211 codifies this result, it also follows from the United States' long-established policy of not giving effect in this country to foreign confiscations.  *See supra*, at 23–25.  As the U.S. Government has explained, "section 211 did not meaningfully change the legal situation" with respect to "the substantive law concerning the ownership and protection of" covered trademarks.  WTO Responses, ¶ 57.  Under the longstanding non-recognition policy, as under Section 211 itself, Cubaexport cannot claim rights of priority based on the HAVANA CLUB registration, a trademark that belonged to a business the Cuban Government expropriated.

Bacardi's post-1995 common law rights prevail for a second reason: Defendants have never used the HAVANA CLUB mark in U.S. commerce.  Under the traditional rule, "[t]he common law and the Lanham Act require that trademark ownership be accorded to the first bona fide *user*."  *Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470, 1472 (Fed. Cir. 1987) (emphasis added); *see also* McCarthy § 16:1.50 ("Apart from the statutory provision of a 'constructive use,' it is not registration, but only actual use of a designation as a mark that creates rights and priority over others.").

In 1989, Congress added Section 7(c) to the Lanham Act, which creates "constructive use" for priority purposes dating to the filing of the application for registration.  15 U.S.C. § 1057(c); *see* McCarthy § 16:17 (describing constructive use as "a new concept to U.S. law"). "However, the constructive use benefits of § 7(c) are only available to those registrations that resulted from applications filed after the effective date of the Trademark Law Revision Act: November 16, 1989."  McCarthy § 26:38 & n.1.10 (explaining the "indicat[ions of] legislative intent to restrict the benefits of § 7(c) constructive use" to future applications); *see also ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 963 n.6 (D.C. Cir. 1990) (holding that the Trademark Law Revision Act does not apply retroactively).  Cubaexport filed its application in 1974, and so is subject to the traditional rule: to gain priority of use, it had to actually use the mark.  Because Cubaexport has never used the HAVANA CLUB mark in the United States, Bacardi is the first user and has established superior trademark rights.[15]

Even if Section 7(c) did apply, it still would not give rise to a priority claim for Cubaexport under the circumstances of this case.  "[T]he ability of a § 44 registrant of an unused mark to achieve 'priority' over another's actual use in the U.S. is uncertain and in doubt

---

[15] Defendants appear to rely on Section 44(d) (15 U.S.C. § 1126(d)) in support of their claim to priority.  *See* MTD at 39.  Section 44(d) allows a foreign trademark registrant to use the date of filing a foreign registration to establish "priority in *registering* th[e] trademark" at the U.S. PTO. *SCM Corp. v. Langis Foods Ltd.*, 539 F.2d 196, 197 (D.C. Cir. 1976) (emphasis added); *see also* S. Rep. No. 100-515, 1988 U.S.C.C.A.N. 5577, 5581 (describing pre-1989 law as allowing foreign applicants "a *filing* priority" in "obtaining trademark *registration* rights" (emphases added)).  An applicant that is able to register its mark pursuant to Section 44(d) still requires the added benefit of Section 7(c) to receive "for priority purposes a constructive use."  McCarthy § 29:17; *see also id.* § 16:1 (describing Section 7(c) as creating, "since 1989," the "only exception" to the requirement of use to establish priority); *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 19 (D.C. Cir. 2008) ("Constructive use can arise *under § 7(c)*, which grants priority, based on a filing date, to a U.S. application or to a foreign application that was followed by a timely U.S. application under § 44(d)." (emphasis added)).

because there is, in theory, no 'trademark' yet created."  McCarthy § 29:21.  While Section 7(c) protects investments by allowing a period of priority that predates use, that rule is premised on the understanding that any registration, even one under Section 44, will be followed by "use . . . within a reasonable time."  *Id.* § 29:11.  Any interpretation of the Lanham Act that would allow Cubaexport to acquire superior rights in a trademark—without ever using that mark over the course of forty years—would raise serious constitutional issues and should be rejected. *See supra*, at 35–36.

> **B.     HCH Is A Proper Defendant In The Declaratory Claims**

Defendants do not dispute that this Court has jurisdiction to decide Plaintiffs' claims for a declaratory judgment against Cubaexport.  They argue, however, that the claims against HCH should be dismissed, either for lack of jurisdiction or as barred by res judicata.  As Defendants correctly recognize, however, even if HCH were dismissed from this case, they would still be bound by any determination of Bacardi's rights.  *See* MTD at 17 ("[W]hether Cubaexport would have any rights to transfer to HCH . . . can be decided through the claims now pending against Cubaexport.").  The only apparent purpose of HCH's effort to exclude itself from this case is to frustrate Plaintiffs' ability to take complete discovery.  In any event, Defendants' arguments fail.

Jurisdiction exists in a declaratory judgment action when "the facts alleged, under all the circumstances, show that there is a substantial controversy" between the parties.  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)); *see also Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 880 (Fed. Cir. 2008) (*MedImmune* created a "more lenient legal standard").  That flexible standard is met here.  As Defendants admit, Cubaexport "intends" to transfer its purported trademark rights to HCH "as soon as U.S. law allows."  MTD at 35.  Moreover, the complaint alleges that HCH (and its 50% owner Pernod) are working to effect such changes in U.S. law,

and are otherwise laying the groundwork for selling infringing rum in the United States.  Compl.

¶ 124–30.  Under *MedImmune*'s all-the-circumstances standard, Plaintiffs do not need to wait for

HCH to get any closer to its avowed goal before pursuing declaratory relief.

Equally unavailing is HCH's res judicata argument.  Defendants observe that Bacardi

initially pursued similar declaratory claims in the *Galleon* litigation, but "ultimately elected not

to pursue those claims."  MTD at 14.  They fail to mention why.  As noted above, the *Galleon*

court found that it could not decide the registration issue because Cubaexport, which was not

present, "ha[d] an interest in the outcome."  974 F. Supp. at 311.  HCH's plan to sell Havana

Club rum depends on Cubaexport's rights in the mark, so Bacardi recognized that if Cubaexport

was a necessary party for deciding the registration issue, it was likewise necessary for deciding

the declaratory issue.  *See Havana Club Holding, S.A. v. Galleon S.A.*, 96 Civ. 9655 (S.D.N.Y.

Feb. 11, 1999), Trial Tr. at 1798:12–17 (attached as Ex. 1 to Lynch Decl.) ("We are not asking

that the court declare that Bacardi has the exclusive right to the mark because we think in view of

the prior holdings in the case with respect to Cuba Export and the fact that Cuba Export is not in

the case right now, that probably would be unfair to ask the court to do.").  It is well-settled that

a claim is not barred by res judicata if there was an obstacle to raising it in the previous

proceeding.  *See* 18 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure

§ 4412 (2d ed.).[16]

---

[16] Defendants also object to the inclusion of HCH in Count I of the complaint.  Plaintiffs
included HCH in this count because both Cubaexport and HCH were parties to the cancellation
proceeding before the TTAB.  Compl. ¶ 95.  In light of Defendants' concession that HCH has no
rights in the HAVANA CLUB registration, and their apparent agreement that HCH does not
need to be a party in order to grant Plaintiffs complete relief on Count I, Plaintiffs have no
objection to dismissing Count I as to HCH only.

Finally, in light of Defendants' concession that they have not claimed any state law rights in the
HAVANA CLUB mark, Plaintiffs do not object to the dismissal of Count IV (*Id.* ¶¶ 186–189)

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.


Dated: July 1, 2016                              Respectfully submitted,

                                                  /s/ Emily Johnson Henn

Michael C. Lynch (admitted *pro hac vice*)        Emily Johnson Henn (D.C. Bar No. 417077)
Damon Suden (admitted *pro hac vice*)             COVINGTON & BURLING LLP
KELLEY DRYE & WARREN LLP                           333 Twin Dolphin Drive, Suite 700
101 Park Avenue                                    Redwood Shores, California  94065
New York, NY 10178                                 (650) 632-4700
(212) 808-7800                                     ehenn@cov.com
mlynch@kelleydrye.com
dsuden@kelleydrye.com                              David M. Zionts (D.C. Bar. No. 995170)
                                                   COVINGTON & BURLING LLP
                                                   One CityCenter
                                                   850 Tenth St., NW
                                                   Washington, DC 20001
                                                   (202) 662-5987
                                                   dzionts@cov.com

---

without prejudice to reinstating these claims if a dispute over state law arises in the future, or if Plaintiffs learn of further information that would give rise to such a dispute.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2016, I electronically transmitted the foregoing using the

CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF

registrants for this case.

Dated: July 1, 2016

 /s/ Emily Johnson Henn
Emily Johnson Henn (D.C. Bar No. 417077)
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, California  94065
(650) 632-4700
ehenn@cov.com