**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| BACARDI & COMPANY LIMITED, and | ) |
| BACARDI U.S.A., INC., | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) Case No. 1:04-cv-00519 (EGS) |
| EMPRESA CUBANA EXPORTADORA | ) |
| DE ALIMENTOS Y PRODUCTOS VARIOS | ) |
| d/b/a CUBAEXPORT, and | ) |
|  | ) |
| HAVANA CLUB HOLDING, S.A., | ) |
| d/b/a HCH, S.A., | ) |
|  | ) |
| Defendants. | ) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Michael C. Lynch (admitted *pro hac vice*)
Damon Suden (admitted *pro hac vice*)
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
(212) 808-7800
mlynch@kelleydrye.com
dsuden@kelleydrye.com

Emily Johnson Henn (D.C. Bar No. 417077)
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, California  94065
(650) 632-4700
ehenn@cov.com

David M. Zionts (D.C. Bar No. 995170)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., NW
Washington, DC 20001
(202) 662-5987
dzionts@cov.com

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 2

     A.     JASA's Successful Sale Of Havana Club Rum In The United States ................... 2

     B.     The Cuban Government's Seizure Of JASA And Persecution Of The
            Arechabala Family ......................................................................................... 3

     C.     The Arechabalas' Efforts To Rebuild Their Business And Return Havana
            Club Rum To The Market .................................................................................. 4

     D.     The Bacardi-JASA Partnership To Produce And Sell Havana Club Rum ............ 6

STANDARD OF REVIEW .................................................................................................. 7

ARGUMENT ................................................................................................................... 7

I.     Defendants Cannot Meet Their Burden Of Proving Abandonment Based On
     Undisputed Facts ............................................................................................................. 7

     A.     JASA's Involuntary Cessation Of Use Because Of The Cuban
            Expropriation Cannot Be The Basis Of Abandonment ........................................ 9

     B.     Evidence Of The Arechabalas' Reasonable Efforts To Resume Production
            Precludes Summary Judgment ............................................................................ 11

II.    Even If Abandonment By JASA Could Be Established, Defendants Would Not Be
     Entitled To Summary Judgment ...................................................................................... 16

CONCLUSION ................................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Boykin Anchor Co. v. AT & T Corp.*,
  825 F. Supp. 2d 706 (E.D.N.C. 2011)...................................................................21

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
  372 F.3d 471 (2d Cir. 2004)..............................................................................13

*Coleman v. Dist. of Columbia*,
  794 F.3d 49 (D.C. Cir. 2015)............................................................................12

*Crash Dummy Movie, LLC v. Mattel, Inc.*,
  601 F.3d 1387 (Fed. Cir. 2010)....................................................................19, 20

*Cuban Cigar Brands N. V. v. Upmann Int'l, Inc.*,
  457 F. Supp. 1090 (S.D.N.Y. 1978), *aff'd sub nom.*, *Cuban Cigar Brands N.V.
  v. Upmann Int'l, Inc.*, 607 F.2d 995 (2d Cir. 1979) ..............................................17

*Emmpresa Cubana Del Tabaco v. Culbro Corp.*,
  213 F.R.D. 151 (S.D.N.Y. 2003) ......................................................................14

*F. Palicio y Compania, S.A. v. Brush*,
  256 F. Supp. 481 (S.D.N.Y. 1966) ....................................................................17

*Franklin-Mason v. Penn*,
  259 F.R.D. 9 (D.D.C. 2009)..............................................................................21

*Havana Club Holding, S.A. v. Galleon, S.A.*,
  62 F. Supp. 2d 1085 (S.D.N.Y. 1999)................................................................15

*Havana Club Holding, S.A. v. Galleon S.A.*,
  96 Civ. 9655 (S.D.N.Y.) ..............................................................................7, 15

*Haviland & Co. v. Johann Haviland China Corp.*,
  269 F. Supp. 928 (S.D.N.Y. 1967) ....................................................................14

*L.A. Triumph, Inc. v. Ciccone*,
  No. CV 10-06195, 2011 WL 5562810 (C.D. Cal. Aug. 31, 2011)..........................20

*Martin v. City of Reading*,
  118 F. Supp. 3d 751 (E.D. Pa. 2015) ..................................................................21

*Mathy v. Republic Metalware Co.*,
  35 App. D.C. 151 (D.C. Cir. 1910).................................................................12, 13

*P. A. B. Produits et Appareils de Beaute v. Satinine Societa in Nome Collettivo di S.A. e. M. Usellini,*
  570 F.2d 328 (C.C.P.A. 1978) ............................................................................................16

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,*
  324 U.S. 806 (1945).............................................................................................................15

*Rivard v. Linville,*
  133 F.3d 1446 (Fed. Cir. 1998)..........................................................................................16

*Saratoga Vichy Spring Co. v. Lehman,*
  625 F.2d 1037 (2d Cir. 1980).......................................................................................14, 16

*Seidelmann Yachts, Inc. v. Pace Yacht Corp.,*
  14 U.S.P.Q.2d 1497, 1989 WL 214497 (D. Md. 1989), *aff'd,* 898 F.2d 147
  (4th Cir. 1990)....................................................................................................................14

*Servicios Especiales Al Comercio Exterior v. Johnson Controls, Inc.,*
  791 F. Supp. 2d 626 (E.D. Wis. 2011).................................................................................21

*Sterling Brewers, Inc. v. Schenley Indus., Inc.,*
  441 F.2d 675 (C.C.P.A. 1971) ...........................................................................................14

*United States v. Philip Morris USA,*
  316 F. Supp. 2d 6 (D.D.C. 2004) ........................................................................................13

*Who Dat Yat Chat, LLC v. Who Dat, Inc.,*
  Nos. 10-1333, 10-2296, 2012 WL 1118602 (E.D. La. Apr. 3, 2012).....................................20

**Statutes**

Fed. R. Civ. P. 56(a) ...............................................................................................................16

15 U.S.C. § 1127.............................................................................................................12, 16

**Other Authorities**

McCarthy on Trademarks and Unfair Competition (4th ed.) ............................................. *passim*

83 A.L.R. Fed. 295, § 2 (1987)...............................................................................................14

27A Am. Jur. 2d *Equity* § 98 (2d ed. 2015)...............................................................................15

## INTRODUCTION

In 1960, the Cuban government forcibly dispossessed the Arechabala family of their business producing the popular Havana Club brand of rum.  Cuba stole all of the assets and records belonging to José Arechabala, S.A. ("JASA"), drove the Arechabalas into exile, and with the family in disarray sought to profit from their famous trademark.  Now Defendants— instrumentalities of the Cuban government—have the temerity to argue that by failing to overcome this devastation quickly enough, the Arechabalas abandoned the mark that their family had made famous.  This Court should not reward Cuba for its successful heist.

Considered on its own terms, the motion for partial summary judgment fails.  Defendants cannot establish the first element of abandonment—voluntary discontinuation of use—because the expropriation of JASA's assets by armed special forces was quite involuntary.  They also cannot establish the second element of abandonment, intent not to resume use.  Although Defendants cherry-pick quotations and place their own spin on the facts, there is ample evidence that JASA always intended to resume selling Havana Club rum, and in fact took reasonable steps to make that intention a reality.  Defendants cannot meet their heavy burden of proving, by clear and convincing evidence and on the basis of undisputed facts, that JASA abandoned the mark.

The summary judgment motion also fails for the independent reason that it is procedurally improper.  As set out in more detail in Defendants' opposition to Plaintiffs' motion to dismiss, even if JASA had no remaining rights to transfer to Bacardi, Bacardi has acquired its own common law trademark rights that are superior to any rights Cubaexport can claim.  Thus, a ruling on JASA's alleged abandonment would simply decide one factual issue without resolving the question of Bacardi's ownership or rights in the mark, making summary judgment inappropriate.

## BACKGROUND

The full background of this litigation is set out in Plaintiffs' opposition to the motion to dismiss.  *See* Pls.' Opp. to Defs.' Mot. to Dismiss at 3–11 ("MTD Opp.").  The following addresses the facts and evidence relevant to Defendants' claim that José Arechabala, S.A. ("JASA") "[a]bandoned its rights" in the HAVANA CLUB trademark "[b]efore 1974."  Defs.' Mem. in Supp. of Mot. for Partial S.J. at 13 ("SJ Mot.").

### A.     JASA's Successful Sale Of Havana Club Rum In The United States

The Arechabala family rum business was founded by José Arechebala Aldama in 1878. *Havana Club Holding, S.A. v. Galleon S.A.*, 96 Civ. 9655 (S.D.N.Y.), Trial Tr. vol. 1, 161:6–23 (attached as Ex. 1 to Declaration of Michael C. Lynch ("Lynch Decl.")).[1]  JASA was organized to carry out the Arechabalas' business as a *sociedad anónima* under the laws of the Republic of Cuba, with its principal offices in Cardenas.  Compl. ¶ 9.  It was owned by members of the Arechabala family.  Trial Tr. vol. 9, 1229:2–19 & 1235:8–13; Trial Tr. vol. 10, 1322:6–14 (Lynch Decl. Ex. 1); Baxter Decl.[2] Ex. 13.

In the early 1930s, JASA adopted and began to use the trademark HAVANA CLUB for its rum, which it produced principally for export to the United States.  Compl. ¶ 23–24.  JASA used the mark in commerce in the United States at least as early as 1934.  Ramón Arechabala Dep. 23:3–12 (Lynch Decl. Ex. 4).  In 1935 and 1936, the U.S. Patent and Trademark Office ("PTO") issued registrations for the HAVANA CLUB and HAVANA CLUB and Design trademarks, respectively.  Baxter Decl. Ex. 6, 7, 9, 10.  Until the confiscation in 1960, JASA

---

[1] For simplicity, all further references to the bench trial record in *Havana Club Holding, S.A. v. Galleon S.A.*, 96 Civ. 9655 (S.D.N.Y. 1999) ("*Galleon*") are identified as "Trial Tr."

[2] References to "Baxter Decl." are to the Declaration of Charles W. Baxter, dated April 29, 2016, and filed with Defendants' Motion for Partial Summary Judgment.

exported Havana Club rum for distribution and sale throughout the United States.  Ramón

Arechabala Dep. 20:9, 27:15–19, 123:23–124:1 (Lynch Decl. Ex. 4).

### B.   The Cuban Government's Seizure Of JASA And Persecution Of The Arechabala Family

Defendants euphemistically allege that following the Castro revolution, "Cuba took steps

to establish state ownership of the means of production" and "assumed managerial control over

JASA's distillery in Cuba."  SJ Mot. at 2.  The record, however, shows that these "steps" were

the violent seizure of JASA's business without compensation, and the imprisonment,

intimidation, and exile of the Arechabala family.  Toting machine guns, Cuban special forces

entered JASA's distillery in Cardenas on January 1, 1960, and forcibly took control of all of its

property and physical assets.  Trial Tr. vol. 9, 1231:7–1233:24 (Lynch Decl. Ex. 1).  The special

forces prevented the Arechabalas from keeping any of their documents or records.  *Id.* at

1234:13–17.  Later, the Cuban government passed a law formally purporting to nationalize the

physical assets, property, accounts, and business records of JASA.  But while future

compensation was promised, none was ever paid to JASA or its owners.  *Id.* at 1236:2–8,

1237:11–16.

Following the theft, members of the Arechabala family were systematically jailed,

persecuted, or forced to flee the country.  For example, Ramón Arechabala, a JASA shareholder

and sales manager, has testified that he was repeatedly harassed until he fled Cuba in 1963,

having been jailed and informed that he must either leave the country or remain imprisoned

"with some cause that we will figure out."  *Id.* at 1241:5; *see also id.* at 1236:16–41:12.  Even on

his way into exile, the Cuban government confiscated his baby's diaper bag at the airport.  *Id.* at

1242:9–16; Ramón Arechabala Dep. 47:18–24, 250:15–23, 253:23–24 (Lynch Decl. Ex. 4)

(testifying that the company's lawyer, Javier Arechabala, was jailed for ten years).

While many JASA employees continued to work under the government's new ownership, JASA's owners and leadership scattered around the globe—some in Spain, some in Miami, some elsewhere. *See, e.g.*, Trial Tr. vol. 7, 933:11–13; Trial Tr. vol. 9, 1241:1–1242:1 (Lynch Decl. Ex. 1). Without money, a rum distillery, manufacturing capabilities, a distribution system, company records, or employees, JASA was robbed of its ability to produce and sell Havana Club rum under the Arechabalas' famous trademark using their famous family recipe.

**C.     The Arechabalas' Efforts To Rebuild Their Business And Return Havana Club Rum To The Market**

José Maria Arechabala, JASA's company chairman who was residing in Spain, expected the Castro regime to collapse, and planned to return to Cuba and "build[] the whole company again." Ramón Arechabala Dep. 59:13 (Lynch Decl. Ex. 4). Ramón Arechabala, who maintained continuous contact with his uncle José Maria, Trial Tr. vol. 9, 1264:5–13 (Lynch Decl. Ex. 1), eventually moved to the United States, where he "tr[ied] for several years" to resume production of Havana Club rum, Ramón Arechabala Dep. 113:13 (Lynch Decl. Ex. 4). In the late 1960s, Ramón and his brother José Miguel communicated with Nomacio Alvarae, an MIT engineer who had worked at Bacardi and understood the rum industry. José Miguel Arechabala Dep. 61:1–17 (Lynch Decl. Ex. 3). However, after multiple conversations with Mr. Alvarae, the Arechabalas determined that due to the Castro regime's expropriation of JASA's assets they lacked the funds to proceed. *Id.* at 62:9–63:10.

Unable to finance rum production on its own, JASA considered potential joint ventures to return Havana Club to the market. In 1972, a general from the Dominican Republic approached Ramón Arechabala about partnering to produce Havana Club rum. Ramón Arechabala Dep. 88:16–89:21 (Lynch Decl. Ex. 4). It was unclear whether these potential partners had the resources necessary to pursue the opportunity, *An Examination of Section 211 of the Omnibus*

4

*Appropriations Act of 1998: Hearing Before S. Comm. on the Judiciary*, 108th Cong. 8 (2004) (testimony of Ramón Arechabala) ("Ramón Arechabala Testimony") (Lynch Decl. Ex. 6), and the Dominican proposal also involved expropriating a distillery already in operation in that country, Ramón Arechabala Dep. 89:6–9 (Lynch Decl. Ex. 4).  Ramón, unwilling to be complicit in the expropriation of someone else's business and concerned that the Dominican government would eventually dispossess the Arechabalas yet again, declined the offer.  *Id.* at 89:10–15.

JASA pursued two additional joint venture opportunities in the early 1970s, only to be rebuffed by its prospective partners.  In 1972, Ramón worked with Chester Davis, an individual he knew from Cuba, to present a proposal to Gulf & Western Industries to produce Havana Club rum.  *Id.* at 68:8–70:23.  Ramón, his brother José Miguel, and Mr. Davis developed a memorandum that was presented to Gulf & Western laying out their proposal, but it "didn't go through" because "Gulf & Western was not interested."  *Id.* at 70:14–15.

In 1973, José Miguel spoke with Orfilio Pelaez, a senior Bacardi executive and acquaintance of the Arechabala family, about another potential deal to re-launch Havana Club rum.  José Miguel put Mr. Pelaez in touch with Ramón, and Ramón relayed the opportunity to his uncle José Maria, who confirmed Ramón's "authority of getting into a commitment to make Rum Havana Club with Bacardi."  *Id.* at 98:11–100:24, 107:13–14; Trial Tr. vol. 9, 1249:3–1250:6 (Lynch Decl. Ex. 1).  Ramón then traveled to Cuba in early 1974 (on a ticket that Bacardi paid for because Ramón lacked the funds), where he discussed the possible partnership with Mr. Pelaez.  Trial Tr. vol. 9, 1250:18–24 (Lynch Decl. Ex. 1).  Following the meeting, Mr. Pelaez sent Ramón a letter that Bacardi was investigating a New York company that had apparently registered the HAVANA CLUB trademark and promised to "get in touch" "[a]s soon as this information is complete."  SJ Mot. Ex. 15.  However, while Ramón "never dreamed" of rejecting

5

the Bacardi opportunity, he never heard back from Mr. Pelaez.  Ramón Arechabala Dep. 134:7–10, 138:17–18 (Lynch Decl. Ex. 4).

In 1973, around the same time the Arechabalas were pursuing possible joint ventures to produce Havana Club rum, their trademark registration came up for renewal at the PTO.  However, JASA received bad legal advice, and incorrectly believed that it could not renew the registration if it was not presently able to sell rum.  Trial Tr. vol. 9, 1284:2–13 (Lynch Decl. Ex. 1); Ramón Arechabala Testimony, at 8 (Lynch Decl. Ex. 6).  No member of the Arechabala family ever indicated that they allowed the registration to expire because they had no intention of returning to the rum business in the future.  As explained in more detail in the opposition to the motion to dismiss, Cubaexport immediately sought to take advantage of the situation by obtaining its own registration for the HAVANA CLUB mark.  *See* MTD Opp. at 4–5.

### D.   The Bacardi-JASA Partnership To Produce And Sell Havana Club Rum

During the 1970s and 1980s, Cubaexport sold an inauthentic version of Havana Club rum, primarily in Communist countries.  SJ Mot. Ex. 19.[3]  In 1993, however, with the Cold War over and the Cuban government in need of cash, Cuba entered an arrangement with French liquor conglomerate Pernod Ricard ("Pernod") to exploit the HAVANA CLUB mark worldwide.  Trial Tr. vol. 1, 36:22–37:6, 69:5–11 (Lynch Decl. Ex. 1).  Shortly after learning of Cubaexport's attempt to expand sales, Ramón Arechabala sent a letter on behalf of JASA informing Pernod of its rights to the trademark.  *Id.* at 38:6–39:3.  Recognizing JASA's rights, Pernod offered to buy them, but JASA refused Pernod's offer.  *Id.*

---

[3] Defendants misleadingly cite a "chart of sales" for the proposition that Cubaexport exported its rum to Spain and various other countries "[d]uring the period from 1972 to 1993."  SJ Mot. at 7. That chart is unauthenticated hearsay and contains no data for any year earlier than 1984.  SJ Mot. Ex. 19.  Moreover, the chart confirms that Cubaexport focused on the eastern bloc, and sold comparatively little rum to Spain and other western countries in the 1980s.  *See id.*

6

JASA instead decided to partner with Bacardi.  In 1995, after years of efforts by JASA to find a suitable and willing business partner, it reached an agreement-in-principle for Bacardi to acquire the rights to the HAVANA CLUB trademark.  Bacardi filed an application in the USPTO to register the HAVANA CLUB mark in 1994 in anticipation of its agreement with JASA and in 2000 amended its application to clarify that it asserted prior use dating back to JASA's use of the mark in 1934.  Manuel Cutillas Dep. 86:6–24 (Lynch Decl. Ex. 5); HAVANA CLUB, No. 74-572667, Bacardi & Co. Ltd. Amendment (Lynch Decl. Ex. 12).

Shortly after reaching agreement with JASA, Bacardi began selling genuine Havana Club rum, produced using the secret Arechabala family formula, in the United States.

## STANDARD OF REVIEW

"Summary judgment may only be granted when there is no genuine dispute as to any material fact," with "all reasonable inferences from the evidence [drawn] in favor of the nonmoving party."  *Coleman v. Dist. of Columbia*, 794 F.3d 49, 57 (D.C. Cir. 2015).  The basis of Defendants' motion for summary judgment is trademark abandonment, which must be established by "clear and convincing" evidence.  McCarthy on Trademarks and Unfair Competition § 17:12 (4th ed.) ("McCarthy"); *Mathy v. Republic Metalware Co.*, 35 App. D.C. 151, 156 (D.C. Cir. 1910).

## ARGUMENT

### I.     Defendants Cannot Meet Their Burden Of Proving Abandonment Based On Undisputed Facts

To establish abandonment, Defendants must prove that JASA's use of the HAVANA CLUB mark was "discontinued with intent not to resume such use."  15 U.S.C. § 1127.  The U.S. Government, specifically addressing the situation of Cuban expropriations, has summarized the standard for abandonment as having "two components, both of which must be proved": "First,

the use of the mark must have been voluntarily discontinued.  Second, the discontinuation must be with the intent not to resume use."  Responses of the United States, *United States-Section 211 Omnibus Appropriations Act*, WT/DS176, ¶ 4 (Feb. 5, 2001) ("WTO Responses").[4]  Defendants cannot prove either element of abandonment.  *First*, a finding of abandonment is improper because JASA's use was "discontinued" only involuntarily, because of the Cuban government's own actions.  *Second*, there is evidence sufficient for a fact-finder to conclude that JASA intended to resume use, including by taking reasonable steps to return Havana Club rum to the U.S. market.

Defendants' burden in attempting to establish otherwise is exceedingly high.  Most courts, including the D.C. Circuit, hold that "evidence of the elements of abandonment must be clear and convincing."  McCarthy § 17:12 & n.2; *see Mathy*, 35 App. D.C. at 156 ("Abandonment being in the nature of a forfeiture, it is incumbent upon the person alleging it to prove by clear and convincing evidence that the right claimed has been relinquished.").  Moreover, intent to resume use, including whether the trademark owner's non-use is excusable, is a highly factual inquiry.  Accordingly, "federal procedural law would normally render the issue of intent to abandon inappropriate for summary judgment."  *Capitol Records, Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 483 (2d Cir. 2004); *see also United States v. Philip Morris USA*, 316 F. Supp. 2d 6, 12 n.4 (D.D.C. 2004) ("[C]ases that involve questions of intent are rarely appropriate for summary judgment.").  This is not the rare case in which the undisputed factual support for abandonment is so compelling that summary judgment could be warranted.

---

[4] *Available at* http://tinyurl.com/US211WTOResp.

### A.     JASA's Involuntary Cessation Of Use Because Of The Cuban Expropriation Cannot Be The Basis Of Abandonment

The violent seizure of JASA's rum business cannot give rise to a claim of abandonment—particularly not by these Defendants, as instrumentalities of the government that effected the confiscation.  "[C]ourts and boards have uniformly rejected a finding of abandonment based on discontinuance of use with intent not to resume use in cases in which the discontinuance of use was involuntary and beyond the control of the trademark holder."  83 A.L.R. Fed. 295, § 2 (1987); *see also Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980) (involuntary non-use resulting from a decision of the state legislature was "completely inconsistent with an intent to abandon the mark"); *Sterling Brewers, Inc. v. Schenley Indus., Inc.*, 441 F.2d 675, 680 (C.C.P.A. 1971) (facts did not support abandonment where "[t]he closing of the brewery was the result of a strike and not a voluntary act by Cook").  Accordingly, courts have declined to find abandonment based on "forced withdrawal from the market due to causes such as war, import problems, or some other involuntary action."  *Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F.R.D. 151, 157 (S.D.N.Y. 2003) (citing McCarthy § 17.04); *see also Haviland & Co. v. Johann Haviland China Corp.*, 269 F. Supp. 928, 954 (S.D.N.Y. 1967) (forced withdrawal from the American market during World War II was not an abandonment of the mark).  Courts have further recognized that "intent to resume business operations was not required" following an involuntary discontinuation.  *Seidelmann Yachts, Inc. v. Pace Yacht Corp.*, 14 U.S.P.Q.2d 1497, 1989 WL 214497, at *8 (D. Md. 1989), *aff'd*, 898 F.2d 147 (4th Cir. 1990).

Applying this principle, the U.S. Government has explained precisely how a court should evaluate trademark abandonment in the case of expropriations by the Cuban revolutionary government.  Where "the original Cuban owner's cessation of use was the result of a forcible

9

takeover of his business, it would appear that the discontinuation of use was not voluntary, and was not accompanied by an intent not to resume use.  Therefore, *no issue of abandonment would be raised*."  WTO Responses, ¶ 4 (emphasis added).  Moreover, "a court could [also] determine that the nonuse of a trademark in the United States because its original Cuban owner had his production facility in Cuba forcibly expropriated is excusable nonuse and does not result in an abandonment of that expropriation victim's U.S. trademark rights."  *Id.* ¶ 5.

There is no question that JASA stopped using the HAVANA CLUB mark involuntarily.  As the *Galleon* court concluded after a full trial, "the Revolutionary Cuban Regime confiscated the physical assets, property and business records of JASA, the original owner of the Havana Club trademark."  *Havana Club Holding, S.A. v. Galleon, S.A.*, 62 F. Supp. 2d 1085, 1092 (S.D.N.Y. 1999).  Defendants' summary judgment motion does not attempt to establish otherwise.  Accordingly, JASA's involuntary discontinuation of use as a consequence of the expropriation does not satisfy the first element of abandonment.

Equitable principles reinforce this result.  Even if some innocent third party could argue that JASA abandoned the mark, such a claim cannot be advanced by the very government responsible for the confiscation.  One may "not be permitted to take advantage of his or her own wrong."  27A Am. Jur. 2d *Equity* § 98 (2d ed. 2015); *see also Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) ("[H]e who comes into equity must come with clean hands.");  McCarthy § 31:48 (inequitable conduct regarding the trademark issue bars a party from claiming rights in the mark).  Defendants are a Cuban state enterprise and a joint venture 50%-owned by the Cuban Government.  To this day, Defendants have profited from the assets stolen from JASA.  Their claim of abandonment is akin to a thief robbing a house, driving

10

its occupants away, and then claiming it by adverse possession.  As a construction of the Lanham Act and a simple application of equity, this Court should not countenance such a result.

### B.  Evidence Of The Arechabalas' Reasonable Efforts To Resume Production Precludes Summary Judgment

Even if the forcible expropriation could meet the discontinuation element of abandonment, Defendants cannot establish intent not to resume use.  They rely on JASA's non-use following the expropriation as "prima facie evidence of abandonment."  SJ Mot. at 13 (quoting 15 U.S.C. § 1127).  But any inference of abandonment is "readily rebutted by a showing that such nonuse was due to special circumstances which excuse the same and not due to any intention to abandon the mark."  *P. A. B. Produits et Appareils de Beaute v. Satinine Societa in Nome Collettivo di S.A. e. M. Usellini*, 570 F.2d 328, 334 (C.C.P.A. 1978).  "[N]on-use only creates a rebuttable presumption that disappears in the face of contrary evidence."  *Saratoga Vichy Spring Co.*, 625 F.2d at 1044.  Here there is a both a special circumstance excusing the non-use—the expropriation and resulting adversity JASA faced—as well as ample evidence that the Arechabalas intended to resume making and selling Havana Club rum.

At its core, Defendants' argument is that JASA, having been run out of business and its own country by the Cuban Government, should have reconstituted itself and returned to the market more rapidly.  If that argument is cognizable at all, *but see supra*, at 9–11, it raises questions of intent that must be decided by the finder of fact.  Indeed, Defendants admit that there is no set formula for how quickly the Arechabalas should have returned to selling rum; they simply had to take "reasonable" steps to resume use.  SJ Mot. at 14 (quoting *Rivard v. Linville*, 133 F.3d 1446, 1449 (Fed. Cir. 1998)).  What is reasonable, of course, depends on all the circumstances.  Here those circumstances include the fact that the Cuban Government took all of JASA's assets, Trial Tr. vol. 9, 1231:7–15 (Lynch Decl. Ex. 1), intimidated and drove the

11

Arechabalas into exile, *id.* at 1236:16–1241:18, and left them scattered and disorganized in diaspora. "The mere fact that [a] taking has been so complete as to impose substantial barriers to the resumption of business by the former owners does not establish that they are without right to do so." *F. Palicio y Compania, S.A. v. Brush*, 256 F. Supp. 481, 493 (S.D.N.Y. 1966).

Defendants nonetheless argue that by failing to quickly reenter the market, JASA abandoned its trademark by 1974. One court, however, held that a cigar company that "was intervened [i.e., confiscated] by the Cuban government and thus prevented from exporting [cigars] to this country" from 1960 to 1975 had not abandoned its mark. *Cuban Cigar Brands N. V. v. Upmann Int'l, Inc*., 457 F. Supp. 1090, 1101 (S.D.N.Y. 1978), *aff'd sub nom*., *Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.*, 607 F.2d 995 (2d Cir. 1979). The fifteen years of excusable non-use in *Cuban Cigar Brands* is even longer than what Defendants allege establishes abandonment here. A fact-finder could find that JASA's attempts to resume use were as reasonable as could be expected for a victim of expropriation stripped of its assets.

The evidence of the Arechabalas' bona fide attempts to resume use further supports this conclusion. In the early 1960s, José Maria Arechabala and Ramón Arechabala discussed their plans to "build[] the whole company again" when the Castro regime (which many thought would be short-lived) fell. Ramón Arechabala Dep. 59:13 (Lynch Decl. Ex. 4). As time passed, JASA explored production in the United States. Ramón Arechabala testified that he "tr[ied] for several years" in the aftermath of the confiscation "to make Rum Havana Club in the United States." *Id.* at 113:12–15; *see also id.* at 67:25–68:1 ("I was trying to get the rum to be[] produced in the [United] States."). Initially JASA attempted to reconstitute the business on its own. To this end, Ramón and his brother José Miguel met with Nemacio Alvarae, an MIT-educated engineer who had previously worked with Bacardi and understood the rum business. José Miguel Arechabala

Dep. 61:1–17 (Lynch Decl. Ex. 3).  JASA "want[ed] to know how much it would cost to produce

the rum here," but learned that it would be prohibitively expensive, even with a bank loan.  *Id.* at

62:11–17.

The Arechabalas therefore pursued potential joint ventures as an alternative means of

exploiting their trademark.  In 1972, Ramón and José Miguel submitted a proposal for such a

venture to Gulf & Western Industries.  Ramón Arechabala Dep. 68:8–70:23 (Lynch Decl. Ex. 4).

However, "Gulf & Western was not interested."  *Id.* at 70:14–15.  Ramón also was approached

by Orfilio Pelaez, a Bacardi executive, who had learned that the Arechabalas were interested in

producing Havana Club rum.  *Id.* at 98:11–100:24, 107:13–14.  Ramón, with his uncle José

Maria's blessing, jumped at the opportunity, and in early 1974 traveled to the Bahamas to

propose a joint venture.  Trial Tr. vol. 9, 1250:18–24 (Lynch Decl. Ex. 1).[5]  As with Gulf &

Western, Bacardi failed to pursue the partnership at that time: Ramón testified that he "never

dreamed" of rejecting this opportunity, but he never heard back from Bacardi.  Ramón

Arechabala Dep. 134:7–10, 138:17–18 (Lynch Decl. Ex. 4).[6]

---

[5] Defendants off-handedly suggest, without any citation or argument, that the Arechabala family members who pursued these opportunities "did not speak for JASA."  SJ Mot. at 13.  But Ramón testified directly to his "authority of getting into a commitment to make Rum Havana Club with Bacardi."  Ramón Arechabala Dep. 107:13–14 (Lynch Decl. Ex. 4).  That fact, together with Ramón's frequent communications with José Maria (who Defendants describe as the ultimate authority for JASA), amply supports the conclusion that Ramón pursued these opportunities on behalf of the company.  More fundamentally, Defendants cannot credibly hold the Arechabalas' relative disorganization against them—when it was the Cuban government's own actions that left them in that state.

[6] Following the meeting, Mr. Pelaez wrote to Ramón that a New York company had registered the HAVANA CLUB trademark, and that Bacardi was investigating whether this company was doing business under that label.  SJ Mot. Ex. 15.  The letter concluded by assuring Ramón that "[a]s soon as this information is complete I will get in touch with you."  *Id.*  Defendants fault the Arechabalas for failing to "follow up."  SJ Mot. at 5.  Yet it is clear from the letter that *Mr. Pelaez* was supposed follow up.

A willing partner did emerge when a general from the Dominican Republic offered to expropriate a distillery to produce Havana Club rum with the Arechabalas. *Id.* at 88:16–89:21. However, JASA reasonably declined to victimize another business, particularly since the family knew that such a government would likely turn on them and eventually confiscate any business they built together. *Id.* at 89:11–15. A reasonable decision not to pursue a business opportunity does not establish an intent not to resume use. *See Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1391 (Fed. Cir. 2010) ("Although Mattel did not ultimately enter into the KB Toys agreement, no evidence suggests that Mattel rejected the business opportunity because it decided to abandon the marks.").

Defendants' attempt to spin these efforts as reflecting "indifference," SJ Mot. at 16, is (at best) a contestable reading of the record. If Defendants believe Ramón was lying when he testified that he spent years attempting to resume production of Havana Club, they may challenge that evidence at trial. If they believe the evidence can somehow be read to show that it was JASA—not Gulf & Western and Bacardi—that declined to pursue potential partnerships, they may advance that interpretation at trial. And if Defendants believe that any reasonable victim of Cuban expropriation would have jumped at the opportunity to cast its lot with a different expropriator, they may argue that as well. But it is simply not an undisputed fact that "JASA rebuffed [opportunities] or treated them with indifference." *Id.*

Defendants also place great weight on the expiration of JASA's trademark registration. *Id.* at 13–16. In doing so they ignore the settled rule that "[a]llowing a federal registration to expire does not by itself prove abandonment." McCarthy § 20:57 (failure to renew "should not be confused with 'abandonment'"); *Crash Dummy Movie*, 601 F.3d at 1391 ("[C]ancellation of a trademark registration does not necessarily translate into abandonment of common law

14

trademark rights.  Nor does it establish its owner's lack of intent to use the mark.").  Ramón

testified at trial that the decision not to renew was based on JASA's incorrect understanding that

the registration could not be renewed without current use.  Trial Tr. vol. 9, 1284:2–13 (Lynch

Decl. Ex. 1).  Ramón has further testified that this misunderstanding was based on bad legal

advice.  Ramón Arechabala Testimony, at 8 (Lynch Decl. Ex. 6).[7]

      JASA's innocent mistake falls into the same category as failure to renew due to

"inadverten[ce]" or because the owner "simply forgot," neither of which gives rise to

abandonment.  *Who Dat Yat Chat, LLC v. Who Dat, Inc.*, Nos. 10-1333, 10-2296, 2012 WL

1118602, at *11 (E.D. La. Apr. 3, 2012); *L.A. Triumph, Inc. v. Ciccone*, No. CV 10-06195, 2011

WL 5562810, at *5 (C.D. Cal. Aug. 31, 2011).  Moreover, while Ramón's explanation must be

accepted as true on summary judgment, it is also corroborated by JASA's contemporaneous

actions.  A company that intended to abandon its trademark would not have actively pursued

joint ventures to use the trademark at essentially the same time.[8]

---

[7] Defendants cherry-pick a single line of Ramón's trial testimony stating that José Maria was "not interested" in pursuing renewal.  They fail to mention that Ramón immediately went on to explain that José Maria "told me we could not do anything *right now*."  Trial Tr. vol. 9, 1282:16–18 (Lynch Decl. Ex. 1) (emphasis added).  Reading Ramón's testimony fairly and in context, the reason the Arechabalas were "not interested" in renewal was because they were not producing rum and incorrectly believed they were not entitled to renew the registration for that reason.

[8] Defendants also cite Bacardi's 1994 application to register the HAVANA CLUB mark and ask the Court to infer that "Bacardi had concluded that JASA and its shareholders had abandoned any rights."  SJ Mot. at 9.  Defendants ignore, however, that Bacardi and JASA were at that time in talks for Bacardi to acquire the mark, and Bacardi subsequently amended its application to clarify that it was based on JASA's prior use.  Manuel Cutillas Dep. 52:12–22 (Lynch Decl. Ex. 5); HAVANA CLUB, No. 74-572667, Bacardi & Co. Ltd. Amendment (Lynch Decl. Ex. 12).  Of course, if Bacardi had actually concluded that JASA abandoned the mark, it would have had no reason to negotiate with JASA.  The better inference—and the only one that may be credited on Defendants' motion for summary judgment—is that Bacardi's 1994 application reflected its anticipation of acquiring the mark.

Remarkably, Defendants fault the Arechabalas for not safeguarding their rights in a more "sophisticated" way.  SJ Mot. at 15.  But JASA's inability to obtain sound legal advice on renewal, like its inability to fund production in the United States or to find a suitable partner, simply reflects the compromised position in which the Cuban government placed the family.  On this summary judgment record, Defendants cannot seriously maintain that there is undisputed evidence, meeting the clear and convincing standard, that JASA intended to abandon the trademark.  The substantial evidence that the Arechabalas intended to resume use of the HAVANA CLUB mark deserves a fair hearing at trial.

## II.     Even If Abandonment By JASA Could Be Established, Defendants Would Not Be Entitled To Summary Judgment

While a finding that JASA abandoned the trademark by 1974 is not warranted by either the law or the facts, the Court should also deny summary judgment because Defendants are not entitled to seek it.  Rule 56(a) allows motions for partial summary judgment to resolve "part of [a] claim or defense."  The rule does not, however, permit an "attempt to dispose of an *allegation* rather than the underlying claim."  *Boykin Anchor Co. v. AT & T Corp.*, 825 F. Supp. 2d 706, 709 (E.D.N.C. 2011).  Partial summary judgment is not a mechanism to "request[] only an order declaring a lack of dispute as to a pure question of fact."  *Servicios Especiales Al Comercio Exterior v. Johnson Controls, Inc.*, 791 F. Supp. 2d 626, 632 (E.D. Wis. 2011); *see also Martin v. City of Reading*, 118 F. Supp. 3d 751, 783 (E.D. Pa. 2015) ("[A] request for summary judgment[] does not allow a party to bring a motion for a mere factual adjudication.") (internal quotation marks omitted); *Franklin-Mason v. Penn*, 259 F.R.D. 9, 11 (D.D.C. 2009) (partial summary judgment not appropriate to resolve "seven of the eight alleged acts of retaliation in the case").

16

Defendants nonetheless ask this Court to enter judgment against Bacardi "*to the extent* [its] claims are based on any *allegation* that JASA or its shareholders owned rights in the trademark." SJ Mot. at 1 (emphases added). As this awkward formulation suggests, summary adjudication of this factual question would not resolve any claim or defense, or even an element of a claim or defense.

JASA's alleged abandonment of the HAVANA CLUB mark is relevant to two issues but dispositive of neither. *First*, Defendants contend that because JASA abandoned the mark, Cubaexport did not mislead the PTO when it represented itself as the owner of the trademark. Not only does the complaint allege multiple grounds for cancellation, but the fraud-on-the-PTO ground is not dependent on JASA remaining the owner in 1974. As Plaintiffs' opposition to the motion to dismiss explains, the fraud claim is based on two independent grounds: that the mark was already owned by JASA, *and* that Cubaexport's claimed rights were based on a confiscation and therefore could not be recognized in the United States. *See* MTD Opp. at 22–28. Summary adjudication of JASA's alleged abandonment would not even resolve Plaintiffs' claim of fraud, let alone their broader claim for cancellation of the registration.

*Second*, Defendants contend that Plaintiffs' declaratory claims should fail because Cubaexport, on the strength of its registration, has superior rights in the HAVANA CLUB mark. Again, a ruling on the abandonment issue would address only one alternate way for Plaintiffs to prevail. Even if JASA no longer had rights to convey to Bacardi, Bacardi has still established common law trademark rights through its own use. While Defendants maintain that their bare registration of the HAVANA CLUB mark trumps Bacardi's rights flowing from actual use, SJ Mot. at 17, Plaintiffs' opposition to the motion to dismiss explains why this assertion fails. Defendants' claim to superior rights fails because recognition of priority based on Cubaexport's

17

registration of a confiscated mark is foreclosed by Section 211 of the Omnibus Appropriations Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681, *see* MTD Opp. at 37–38, and because Cubaexport has never used the mark in over forty years and therefore has not acquired ownership, notwithstanding its purported registration. *See id.* at 38–40.

In sum, Defendants' motion for partial summary judgment does not ask this Court to resolve a claim or even a part of a claim—it impermissibly requests only a factual ruling on one of Plaintiffs' allegations.  Partial summary judgment is therefore unavailable.

## CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment should be denied.


Dated: July 1, 2016                                     Respectfully submitted,


                                                         /s/ Emily Johnson Henn

Michael C. Lynch (admitted *pro hac vice*)              Emily Johnson Henn (D.C. Bar No. 417077)
Damon Suden (admitted *pro hac vice*)                   COVINGTON & BURLING LLP
KELLEY DRYE & WARREN LLP                                 333 Twin Dolphin Drive, Suite 700
101 Park Avenue                                          Redwood Shores, California  94065
New York, NY 10178                                       (650) 632-4700
(212) 808-7800                                           ehenn@cov.com
mlynch@kelleydrye.com
dsuden@kelleydrye.com                                    David M. Zionts (D.C. Bar. No. 995170)
                                                         COVINGTON & BURLING LLP
                                                         One CityCenter
                                                         850 Tenth St., NW
                                                         Washington, DC 20001
                                                         (202) 662-5987
                                                         dzionts@cov.com


18

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2016, I electronically transmitted the foregoing using the

CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF

registrants for this case.


Dated: July 1, 2016                         /s/ Emily Johnson Henn
                                           Emily Johnson Henn (D.C. Bar No. 417077)
                                           COVINGTON & BURLING LLP
                                           333 Twin Dolphin Drive, Suite 700
                                           Redwood Shores, California  94065
                                           (650) 632-4700
                                           ehenn@cov.com