**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BACARDI & COMPANY LIMITED,<br><br>and<br><br>BACARDI U.S.A., INC.,<br><br>     Plaintiffs,<br><br> v.<br><br>EMPRESA CUBANA EXPORTADORA<br>DE ALIMENTOS Y PRODUCTOS<br>VARIOS d/b/a CUBAEXPORT,<br><br>and<br><br>HAVANA CLUB HOLDING, S.A.,<br>d/b/a HCH, S.A.,<br><br>     Defendants. | Case No. 1:04-cv-00519 (EGS) |

**<u>MEMORANDUM OPINION</u>**

Bacardi & Company Limited and Bacardi U.S.A., Incorporated (collectively "Bacardi"), bring this action under the Trademark Act of 1946 ("Lanham Act"), 60 Stat. 427, as amended, 15 U.S.C. § 1051 (1988), *et seq.* seeking review of the decision by the Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office ("PTO") dismissing its Supplemental and Amended Petition to Cancel U.S. Registration No. 1,031,651 of the trademark HAVANA CLUB & DESIGN for rum in Cancellation Proceeding No. 92024108 (the "HC Cancellation Proceeding"), rectification of the PTO records by striking or canceling that registration, and declaratory and injunctive relief. *See*

*generally* Am. Compl., ECF No. 114. Defendants Empressa Cubana Exportadora De Alimentos Y Productos Varios d/b/a Cubaexport ("Cubaexport") and Havana Club Holdings, S.A., d/b/a HCH, S.A. ("HCH") move to dismiss Bacardi's Amended Complaint. *See generally* Defs.' Mot. to Dismiss ("MTD"), ECF No. 122. Defendants also move for partial summary judgment based on discovery conducted in another case, asking the Court to rule that the entity that assigned the HAVANA CLUB mark to Bacardi abandoned its right to the mark prior to that assignment. *See generally* Defs.' Mot. for Partial Summary J. ("MSJ"), ECF No. 124.[1]

Upon careful consideration of the motions, oppositions, and replies thereto, and for the reasons explained below, Defendants' Motion to Dismiss, ECF No. 122, is **GRANTED IN PART and DENIED IN PART**; and its Motion for Partial Summary Judgment, ECF No. 124, is **DENIED.**

## I. Background

The Court assumes the facts alleged in the Amended Complaint to be true for the purposes of the Motion to Dismiss and construes them in Bacardi's favor. *See Baird v. Gotbaum*, 792 F.3d 166, 169 n.2 (D.C. Cir. 2015).

---

[1] The unredacted version of the Motion for Partial Summary Judgment is located at ECF No. 127-1.

## A. JASA's Creation and Use of the HAVANA CLUB Mark

In 1878, Jose Arechabala Aldama founded the Arechabala family business, which included distilling rum. Am. Compl., ECF No. 114 ¶ 22. In or around 1924, Jose Arechabala, S.A., ("JASA") was incorporated to carry out the family's rum business. *Id*. "JASA created, registered, and first used the trademark HAVANA CLUB for rum in Cuba, the United States, and other countries." *Id*. ¶ 23. In 1934 and 1935, JASA obtained three Cuban registrations for the HAVANA CLUB mark. *Id*. In 1935, 1936 and 1953, JASA obtained four U.S. trademark registrations. *Id.* The design portion of the 1936 mark included the words "*Fundada en 1878*" (founded in 1878), a reference to the year in which the Arechabala family business was first established in Cuba. *Id*.

From 1934 to the end of 1959, JASA continued to export HAVANA CLUB rum for distribution and sale in the United States. *Id*. ¶ 25. It was produced using the secret Arechabala family formula in distilleries in Cuba and Puerto Rico, *id*. ¶¶ 25, 27; but by 1959 was produced only in Cuba, *id*. ¶ 25. HAVANA CLUB became the second most popular Cuban rum, with Bacardi being the most popular. *Id.* ¶ 41.

**B. The Cuban Government Expropriates JASA's Assets in Cuba, Registers the HAVANA CLUB Mark in Cuba and the United States, and Sells HAVANA CLUB Rum in Certain Countries**

On or about January 1, 1960, the Cuban government seized control of JASA's offices and facilities by force, including the rum distillery, and prevented members of the family who ran the business from removing any papers or other property from their offices. *Id*. ¶ 27. Two officers of the company were imprisoned for ten years, all other executives and shareholders were eventually forced to leave Cuba, and the Cuban government designated an administrator to run the business. *Id.*

Pursuant to Law No. 890 of October 13, 1960, the Cuban government formally expropriated the physical assets, property, accounts, business records, and trademarks of a large number of Cuban businesses, including JASA. *Id*. ¶ 28. This law provided that pursuant to subsequent legislation, the owners of expropriated property would be compensated. *Id*. ¶ 29. However, no such law was ever passed. *Id*.

JASA was unable to continue production of HAVANA CLUB rum due to family members, executives, and shareholders having been exiled. *Id*. ¶ 32. At the present time, JASA is incorporated as a Liechtenstein company with its principal place of business in Switzerland. *Id*. ¶ 7.

In 1965, the Cuban government established Cubaexport, a state enterprise, and in 1966 the government purported to

transfer to Cubaexport JASA's HAVANA CLUB marks. *Id*. ¶ 30. According to the Amended Complaint, as a Cuban government enterprise, Cubaexport knew that the trademarks had been expropriated from JASA under Law No. 890 without payment of any compensation. *Id*. Thereafter, Cubaexport began selling rum it called HAVANA CLUB that was made in the distillery that had been confiscated from JASA. *Id*. However, the rum was not made using the Arechabala family secret formula, nor with the permission of the Arechabalas. *Id*. ¶¶ 46, 49.

Cubaexport was barred from selling its HAVANA CLUB rum in the United States because in 1963, the United States imposed a total embargo on trade between the United States and Cuba under the Trading with the Enemy Act, implemented by the Cuban Asset Control Regulations ("CACR"). *Id*. ¶ 33; 50 U.S.C. App. § 1 *et. seq*. 31 C.F.R. Part 515.

In 1973, JASA's existing U.S. registrations with the PTO expired. Am. Compl., ECF No. 114 ¶ 42. Thereafter, Cubaexport, on June 12, 1974, applied to the PTO to register a mark consisting of a label design with the words HAVANA CLUB. *Id*. Cubaexport's application was based on a new Cuban registration dated February 12, 1974 that it had obtained. *Id*. The mark Cubaexport sought to register in the United States displays the Spanish legend "Fundada en 1878," which Cubaexport intentionally copied from the 1936 JASA registration. *Id*. ¶ 44. On January 27,

1976, the PTO issued to Cubaexport U.S. Reg. No. 1,031,651 for the HAVANA CLUB & DESIGN mark. *Id.* ¶ 48. Due to the embargo, however, Cubaexport has never sold rum in the United States under the HAVANA CLUB & DESIGN mark. *Id.* ¶ 52.

**C. The Cuba-Pernod Ricard Joint Venture and OFAC Licenses**

In the early 1990s, the Cuban government entered into joint ventures with foreign investors in an effort to obtain hard currency. *Id.* ¶ 55. To that end, Pernod Ricard, S.A. ("Pernod"), a French company that distributes alcohol internationally, entered into negotiations with Cuba to exploit the HAVANA CLUB mark worldwide. *Id.* The Cuban government organized Havana Rum & Liquors, S.A., ("HRL") a Cuban company controlled by the Cuban government to act as Cuba's representative in the joint venture. *Id.* ¶ 56. On October 29, 1993, Cubaexport transferred to HRL its entire HAVANA CLUB rum business, including the goodwill associated with the HAVANA CLUB mark, and purported to transfer the U.S. registration. *Id.* Cubaexport then left the rum business. *Id.*

Pernod and HRL agreed to create HCH, owned equally by Pernod and HRL, to advertise, distribute, and sell HAVANA CLUB rum from Cuba worldwide and which would hold title to the registrations of the HAVANA CLUB trademark. *Id.* ¶ 57. To that end, HRL transferred to HCH all of HRL's rights in the HAVANA CLUB trademark for rum outside Cuba, together with the goodwill

of the business. *Id.* ¶ 58. This transfer purported to include Cubaexport's U.S. registration.

However, the CACR prohibited the purported transfers of the U.S. registration without a specific license from the Office of Foreign Assets Control ("OFAC"). 31 C.F.R. § 515.201(b). Cubaexport, HRL, and HCH entered into the transaction without seeking such a license. Am. Compl., ECF No 114 ¶ 65. Thereafter, the Arechabala family brought a cancellation proceeding in the PTO, which forced Cubaexport to disclose the purported transfers. *Id.* ¶ 66. On October 5, 1995, Cubaexport, HRL, and HCH applied for an OFAC license to retroactively authorize the assignments of the HAVANA CLUB registration. *Id.* ¶ 80. OFAC granted the license, but cautioned that its approval was based on the representations made in the application, and that it could be retroactively invalidated. *Id.* ¶ 81. Thereafter, HCH filed an application for renewal, and on January 27, 1996, the PTO issued a Certificate of Renewal for the U.S. HAVANA CLUB Registration in the name of HCH. *Id.*

**D. The Arechabala Family-Bacardi Agreement**

In the mid-1990s, the Arechabala family reached an agreement with Bacardi that would allow for the sale of genuine HAVANA CLUB rum in the United States. *Id.* ¶¶ 72-75. The agreement, reached in principle in 1995 and finalized in 1997, transferred to Bacardi all right, title, and interest in and to

7

the HAVANA CLUB mark worldwide as well as related assets. *Id*. In
1995, under an interim understanding with the Arechabalas,
Bacardi produced HAVANA CLUB rum in the Bahamas and sold it
under the HAVANA CLUB mark in interstate commerce in the United
States. *Id*. ¶ 76. Bacardi shipped HAVANA CLUB rum initially to
distributors in New York, Illinois, California, and Florida; and
in 1996 expanded sales to wholesalers in other selected markets
across the United States. *Id*. ¶ 77.

**E. The *Galleon* Litigation and OFAC Revocation**

In December 1996, HCH and its distributor sued Bacardi[2] for
alleged infringement of the HAVANA CLUB mark and trade name.
*Havana Club Holding, S.A, v. Galleon S.A.*, 96 Civ. 9655
(S.D.N.Y. Dec. 24, 1996); Am. Compl. ¶ 83. Bacardi
counterclaimed for cancellation of HCH's HAVANA CLUB
registration in the United States. Compl. ¶ 83. Shortly after
the *Galleon* litigation commenced, OFAC, on April 17, 1997,
revoked Cubaexport's license authorizing the transfer of the
mark and related registration to HCH, citing "facts and
circumstances that have come to the attention of this Office
that were not included in the application." *Id.* ¶ 85. OFAC

---

[2] The Defendants in the Galleon litigation are Galleon S.A.,
Bacardi-Martini USA, Inc., Gallo Wine Distributors, Inc., G.W.D.
Holdings, Inc and Premier Wine and Spirits. For ease of
reference, the Court will refer to the Defendants as "Bacardi."

specified that the withdrawal was "retroactive to the date of issuance" of the license. *Id.*

In light of OFAC's action, the *Galleon* court concluded that the purported transfers violated the CACR, and that HCH "ha[d] no rights to the HAVANA CLUB trademark." *Havana Club Holding, S.A. v. Galleon S.A. ("Galleon II")*, 974 F. Supp. 302, 311 (S.D.N.Y. 1997). The *Galleon* court entered a partial judgment, ruling, among other things, that "the attempted assignment of [the] HAVANA CLUB mark and the related U.S. Registration [to HCH] were invalid and of no force and effect and *void ab initio*." *Havana Club Holding*, 96 Civ. 9655, Dkt. No. 63 at ¶ 4 (S.D.N.Y. Oct. 20, 1997) ("Partial Judgment") (attached as Ex. 2 to the Declaration of Michael C. Lynch ("Lynch Decl."), ECF No. 132-2)). Because Cubaexport was not a party to the *Galleon* litigation and had an interest in the cancellation of the registration in that proceeding, the court denied that relief, while preserving Bacardi's ability to challenge Cubaexport's claimed rights in the registration. *Galleon II*, 974 F. Supp. at 311–12; Partial Judgment, ECF No. 132-2 ¶ 10.

## F. The PTO Proceedings and Cubaexport's Renewal of the Mark in 2006

Bacardi first asked the PTO to cancel Cubaexport's HAVANA CLUB U.S. registration in 1995. Am. Compl., ECF No. 114 ¶ 79. The proceeding before the TTAB was stayed pending the *Galleon*

litigation, but resumed in 2003. *Id.* On January 29, 2004, the
TTAB issued a nonprecedential decision denying Bacardi's motion
for summary judgment and *sua sponte* dismissed Bacardi's
counterclaims for cancellation. *Galleon S.A. et al. v. Havana
Club Holding, S.A. et al.*, Cancellation No. 92024108, 2004 WL
199225 (T.T.A.B. 2004) ("TTAB Decision") (attached as Ex. A to
MTD), ECF No. 122-2.

In 2006, Cubaexport's registration was again due to expire.
Am. Compl., ECF No. 114 ¶ 107. On or about December 14, 2005,
Cubaexport, through its outside counsel, attempted to renew the
U.S. registration, but the renewal application was rejected on
July 20, 2006 because the fee had not been paid. *Id.* ¶ 113. By
law, the PTO could not accept payment from Cubaexport unless
Cubaexport obtained a specific license from OFAC to pay the
renewal fee. On July 28, 2006, OFAC denied Cubaexport's request
for a specific license to pay the registration renewal fee,
explaining that the State Department had determined that
permitting the renewal transactions would be "inconsistent with
U.S. policy." *Id.* ¶ 114.

The Post Registration Examiner subsequently confirmed that
Cubaexport's renewal finding "cannot be accepted," and that "the
registration will be cancelled/expired." *Id.* ¶ 115. Cubaexport
then filed a petition to the Director of the PTO challenging
this action. *Id.* ¶ 116.

On November 10, 2015, Cubaexport submitted another application to OFAC for a specific license to pay the renewal fee, and this license was granted on January 11, 2016. *Id.* ¶ 122–23. The PTO then granted Cubaexport's petition and treated the registration as renewed. *Id*. ¶ 123.

### G. Procedural Background

Defendants move to dismiss the Amended Complaint for failure to state a claim, *see* MTD, ECF No. 122; and for partial summary judgment, *see* MSJ, ECF No. 124. Bacardi opposes both motions. *See* MTD Opp'n, ECF No. 129; MSJ Opp'n, ECF No. 130. Defendants have replied to both oppositions. *See* MTD Reply, ECF No. 136; MSJ Reply, ECF No. 137. Both motions are ripe and ready for the Court's adjudication.

## II. Legal Standards

### A. Rule 12(b)(6) Motion to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). While detailed factual allegations are not required, a complaint must

11

contain "sufficient factual matter ... to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

When ruling on a Rule 12(b)(6) motion, the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). In so doing, the court must give the plaintiff the "benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not sufficient to state a claim. *Iqbal*, 556 U.S. at 678. The plaintiff must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted).

### B. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir.

2002). The moving party must identify "those portions of the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, which
it believes demonstrate the absence of a genuine issue of
material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323
(1986) (internal quotation marks omitted). To defeat summary
judgment, the nonmoving party must demonstrate that there is a
genuine issue of material fact. *Id.* at 324. A material fact is
one that is capable of affecting the outcome of the
litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
(1986). A genuine dispute is one where "the evidence is such
that a reasonable jury could return a verdict for the nonmoving
party." *Id.* Further, in the summary judgment analysis "[t]he
evidence of the non-movant is to be believed, and all
justifiable inferences are to be drawn in his favor." *Id.* at
255.

**III. Analysis**

In the Amended Complaint, Bacardi seeks two forms of
relief.[3] *See generally*, Am. Compl., ECF No. 114. In Count One,
Bacardi seeks an order directing the PTO to cancel Cubaexport's

---

[3] Because Defendants have conceded that they have not claimed any
state law rights in the HAVANA CLUB mark, Bacardi does not
object to the dismissal of Count IV. MTD Opp'n ECF No. 129 at 49
n.16. Accordingly, Count IV of the Amended Complaint is
**DISMISSED.**

registration or to rectify the register on a variety of grounds. *Id.* at 42-52. In Counts Two and Three, Barcardi seek declaratory judgments against HCH and Cubaexport. *Id.* at 52-54. Cubaexport has moved to dismiss all counts, *see generally* MTD, ECF No. 122; and moves for partial summary judgment on the issue of whether JASA abandoned the mark, *see generally* ECF No. 127-1. The Court first discusses the Counts alleged against HCH, and then proceeds to the Counts against Cubaexport.

### A. HCH Is Not a Proper Defendant to Bacardi's Declaratory Claims

Cubaexport argues that HCH is not a proper defendant to any of Bacardi's claims because: (1) only Cubaexport, the registration owner, is a proper defendant to a suit to cancel Cubaexport's registration; (2) all of Bacardi's claims against HCH are barred by res judicata; and (3) there is no live controversy between Bacardi and HCH that would support a declaratory judgment. *See* Defs.' MTD, ECF No. 122 at 20-26.[4] Bacardi responds that "[i]n light of Defendants' concession that HCH has no right in the HAVANA CLUB registration, and their apparent agreement that HCH does not need to be a party in order to grant Plaintiffs complete relief on Count I, [they] have no objection to dismissing Count I as to HCH only." MTD Opp'n, ECF

---

[4] When citing to filings throughout this Memorandum Opinion, the Court cites to the ECF header page number and not the original page number of the filed document.

No. 129 at 41 n.16. Accordingly, Bacardi's claim for cancellation based on fraud in obtaining and renewing the U.S. Registration in 1996 by HCH, *see* Am. Compl., ECF No. 114 ¶¶ 157-161; is **DISMISSED.**

Bacardi insists, however, that HCH is a proper defendant for their declaratory claims. *Id*. at 40. In Count II, Bacardi seeks a declaration that, as against HCH, Bacardi owns rights in the HAVANA CLUB mark, and in Count III that Bacardi's use of the trademark does not infringe any of HCH's federal rights. *See* Am. Compl., ECF No. 114 at 52-54.

The Declaratory Judgment Act provides that "in a case of actual controversy within its jurisdiction … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). To satisfy Article III's case-or-controversy requirement, "the dispute [must] be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and [] be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-241 (1937)). "Basically, the question in each case is

15

whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co,* 312 U.S. 270, 273 (1941).

Bacardi argues that its declaratory judgment claims are viable pursuant to the *MedImmune* all-the-circumstances standard because Cubaexport admits that it intends to transfer its purposed trademark rights to HCH once U.S. law allows, and Bacardi points to the fact that HCH is currently working to effect such changes in the law. *See* MTD Opp'n, ECF No. 129 at 40-41. Defendants respond—and the Court agrees—that the *MedImmune* standard "is not so flexible as to authorize a declaratory judgment on the effect of a hypothetical transaction that has not occurred and may never occur." MTD Reply, ECF No. 136 at 11. Furthermore, HCH concedes that it is not the owner of the mark. *Id.* at 12. To render a decision on HCH's rights when the parties agree that those rights are non-existent would require the Court to render "an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co.,* 300 U.S. at 241. This the Court cannot do. Accordingly, all Counts against HCH are **DISMISSED**, without prejudice.[5]

---

[5] Because the Court agrees that HCH is not a proper defendant to the declaratory claims, the Court need not reach Cubaexport's

**B. Rectification of the Register/Cancellation of Registration Claims**

In Count I, Bacardi seeks rectification of the register/cancellation of the register on five grounds: (1) Cubaexport's fraud in obtaining and maintaining the registrations; (2) Cubaexport's abandonment of the mark; (3) Cubaexport's misrepresentation of goods; (4) Cubaexport's failure to file the mandatory renewal application and declaration in 1996; and (5) Cubaexport's failure to pay the mandatory renewal fee in 2006. Cubaexport seeks to dismiss each claim for failure to state a claim pursuant to Rule 12(b)(6). For the reasons explained below, the Court **DENIES** Cubaexport's motion as to the fraud, misrepresentation of goods, and expiration of the registration in 1996 and 2006 claims. The Court **GRANTS** Cubaexport's motion as to whether Cubaexport abandoned the mark.

**1. Legal Standard for Cancellation of Registration/Rectification of the Register**

The Lanham Act provides in relevant part as follows:

> In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the Court to the

_____

alternative argument that Bacardi's claims against HCH are barred by res judicata.

>           Director, who shall make appropriate entry
>           upon the records of the [PTO], and shall be
>           controlled thereby.

15 U.S.C. § 1119.

A party seeking cancellation of a trademark that has been registered for more than five years,[6] which is known as an "incontestable" trademark, is strictly limited to one of the grounds enumerated under 15 U.S.C. § 1064. *See Park 'N Fly Inc. v. Dollar Park and Fly, Inc.* 469 U.S. 189, 195 (1985). *Id.* Relevant to the claims in this case, the enumerated grounds for cancellation in such cases include: (1) if the registration has been abandoned; (2) if the registration was obtained fraudulently; or (3) if the registered mark misrepresents the source of the goods or the services. 15 U.S.C. § 1064(3); *see also Park 'N Fly Inc.*, 469 U.S. at 195 ("[S]ection [1064] allows cancellation of an incontestable mark at any time if it has been abandoned, if it is being used to misrepresent the source of goods or services in connection with which it is used, or if it was obtained fraudulently or contrary to" certain other provisions.).

---

[6] There is no dispute that the HAVANA CLUB trademark has been registered for well over five years.

## 2. Bacardi Has Adequately Alleged Cancellation Based on Fraud

Cubaexport argues that the allegations fail to establish that Cubaexport's 1976 U.S. Registration was fraudulently obtained. *See* MTD, ECF No. 122 at 26. Bacardi responds that it has stated a valid claim of cancellation for fraud based on Cubaexport's representations in its 1974 application that resulted in the 1976 U.S. Registration. *See* MTD Opp'n, ECF No. 129 at 22.

To state a prima facie case of fraud in trademark registration, Bacardi must allege: "(1) the challenged statement is a *false* representation regarding a *material* fact, (2) the person making the representation *knew* that the representation was false ('scienter'), (3) an *intent to decei*ve the USPTO, (4) reasonable *reliance* on the misrepresentation, [and] (5) *damage* proximately resulting from such reliance." McCarthy on Trademarks and Unfair Competition § 31.61 (5th ed.)

"[S]ubjective intent to deceive by the signer [of the oath or declaration] is a crucial element of fraud in procuring or maintaining a trademark registration." *Id.* (citing *In re Bose Corp.*, 580 F.3d 1240, 1246 (Fed. Cir. 2009) (citation omitted)). Consequently, while a statement to the PTO can be false, a finding of fraud requires that the false statement be uttered with an intent to mislead the PTO: unless an applicant's

misstatements represented a "conscious effort to obtain for his business a registration to which he knows it was not entitled," there is no fraud. *In re Bose Corp.*, 580 F.3d at 1246 (quoting *Metro Traffic Control, Inc. v. Shadow Network Inc.*, 104 F.3d 336, 341 (Fed. Cir. 1997).

Bacardi argues that Cubaexport knowingly misrepresented that it owned the HAVANA CLUB mark because its application contained two material knowing misstatements: (1) "Cubaexport represented that it believed it owned the U.S. HAVANA CLUB mark, despite knowing that its only claim to the mark was based on a confiscation in Cuba that could not be recognized or given effect in the [United States]." MTD Opp'n, ECF No. 129 at 22 (citing Am. Compl. ¶¶ 42, 14); and (2) "Cubaexport represented that it knew of no one else with a right to use the mark, despite knowing that JASA had longstanding trademark rights that it had not abandoned," *id.* (citing Am. Compl., ECF No. 114 ¶¶ 42, 45, 149).

With regard to the first statement, Bacardi argues that Cubaexport claimed in 1974 to be the owner of the mark, but because that claim to ownership was based on the Cuban revolutionary government's expropriation of JASA's rum business and its assets, it knew that its claim to ownership could have no effect in the United States because of the latter's longstanding policy of not giving effect to a foreign

government's expropriation of property. *Id.* at 23 (citing cases). Because of ample precedent codifying the non-recognition policy, Bacardi argues that Cubaexport was aware that if the fact of the expropriation was disclosed, the registration would not have been accepted. *Id.* Bacardi points out that it has alleged that Cubaexport waited for JASA's U.S. registration to expire before it sought its own U.S. registration and that it did not use the already-existing Cuban registration that had been confiscated from JASA, but instead obtained a new Cuban registration. *Id.* at 24. Bacardi concludes that these allegations support the logical inference that "Cubaexport knew that an application betraying the link to JASA and the expropriation would be denied. These specific allegations amply demonstrate Cubaexport's intent to deceive the PTO." *Id.* at 24 (citing *Bose*, 580 F.3d at 1244 (Fed. Cir. 2009) ("[I]ntent must often be inferred from the circumstances and related statement made.") (quoting *First Int'l Servs. Corp. v. Chuckles, Inc.*, 5 U.S.P.Q.2d 1628, 1988 WL 252292, at *10 (T.T.A.B. 1988)).

The Court concludes that Bacardi's allegations are sufficient to state a claim because the facts Bacardi alleges amount to a "conscious effort to obtain for [its] business a registration to which [it] know it was not entitled." *In re Bose Corp.*, 580 F.3d at 1246 (quoting *Metro Traffic Control, Inc. v. Shadow Network Inc.*, 104 F.3d 336, 341 (Fed. Cir. 1997). Bacardi

alleges that Cubaexport made a false statement—that it believed it owned the U.S. HAVANA CLUB mark—with the intent of obtaining a registration to which it knew it was not entitled because it knew that its claim to the mark would not be recognized if it disclosed the expropriation to the PTO. Bacardi further alleges that this is why Cubaexport did not use the already-existing Cuban registration for the HAVANA CLUB mark, which had been confiscated from JASA, as the basis for its U.S. application, but rather obtained a new Cuban registration and used that as the basis for the application. Bacardi's allegation is a reasonable inference.

Cubaexport argues that these allegations are insufficient to show fraud because "Bacardi must plead facts showing that Cubaexport had **no basis** for a claim of ownership in 1974 and **knew** it had no basis for such a claim." MTD Reply, ECF No. 136 at 22. However, the cases Cubaexport cites do not support its argument. In *In re Bose*, the Federal Circuit held that "a trademark is obtained fraudulently under the Lanham Act only if the applicant or registrant knowingly makes a false, material representation with the intent to deceive the PTO." 580 F.3d at 1245. And in *General Healthcare Ltd. v. Qashat*, the Court of Appeals for the First Circuit affirmed the district court's finding that the party against whom a fraud claim was alleged

"reasonably believed that he was simply appropriating an abandoned mark." 364 F.3d 332, 338 (1st Cir. 2004).

For the reasons explained above, the Court is unpersuaded by Cubaexport's argument that Bacardi's allegations are conclusory. Rather, the facts Bacardi alleges amount to a "conscious effort to obtain for [its] business a registration to which [it] know it was not entitled." *In re Bose Corp.*, 580 F.3d at 1246. The allegations are anything but conclusory and are sufficient to state a claim for fraud as they contain "sufficient factual matter ... to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quotation and citation omitted).[7]

With regard to the second statement—that "Cubaexport represented that it knew of no one else with a right to use the mark, despite knowing that JASA had longstanding trademark rights that it had not abandoned"—Cubaexport makes two arguments. *See* MTD Reply, ECF No. 136 at 23-26.

First, Cubaexport argues that it had reasonable grounds to believe in 1974 that JASA had abandoned its U.S. mark and that "Bacardi must plead facts showing that Cubaexport had actual

_____

[7] The Court rejects Cubaexport's argument that Bacardi's fraud claim is merely an attempt to plead around the five-year statutory time limit on cancellation petitions based on conflicts between a registration and prior trademark rights. *See* MTD Reply, ECF No. 136 at 22-23. As explained above, Bacardi has stated a claim for cancellation based on fraud.

knowledge that there was no reasonable doubt that JASA retained trademark rights." MTD Reply, ECF No. 136 at 23. Cubaexport further argues that to avoid dismissal, Bacardi must plead facts showing that (1) "JASA's former owners actually had plans to resume us of their trademark in 1974 when Cubaexport filed its application"; and (2) "Cubaexport export actually knew of those plans." *Id.*

However, at this juncture, Bacardi need only allege an intent to deceive. *In re Bose Corp.*, 580 F.3d at 1246. Bacardi alleges that Cubaexport made a false statement—that "Cubaexport represented that it knew of no one else with a right to use the mark, despite knowing that JASA had longstanding trademark rights that it had not abandoned." MTD Opp'n, ECF No. 129 at 22 (citing Am. Compl., ECF No. 114 ¶¶ 42, 45, 149). In support, Bacardi alleges that: (1) Cubaexport, a state-owned entity, knew that the Cuban government had expropriated JASA and therefore knew that JASA did not voluntarily discontinue the use of the mark, Am. Compl., ECF No. 114 ¶¶ 27-32; and (2) JASA and its shareholders were determined to resume production and sale of HAVANA Club rum either as a result of the restitution of their confiscated assets in Cuba or through a partnership, *id.* (citing Am. Compl., ECF No. 114 ¶ 32). It is reasonable to infer from these alleged facts that Cubaexport had no reason to believe that JASA had abandoned the mark and every reason to believe

that JASA would resume use of the mark once, in view of the expropriation, it was able to do so.

At this juncture, Cubaexport's Act of State[8] doctrine argument is beside the point because the argument is based on the assumption that JASA abandoned its U.S. mark. *See* MTD Reply, ECF No. 136 at 24 ("Bacardi overlooks that, assuming JASA abandoned its U.S. trademark, the mark entered the public domain, and anyone could have registered the same or similar trademark"). However, as explained below, *see infra* Section III.C; Cubaexport is not entitled to summary judgment on the issue of whether JASA abandoned the HAVANA CLUB mark.

For these reasons, Cubaexport's Motion to Dismiss as to the cancellation based on fraud claims against is **DENIED**.

### 3. Bacardi Fails to State a Claim For Cancellation Based on Cubaexport's Abandonment of the Mark[9]

Bacardi alleges that Cubaexport abandoned the U.S. HAVANA CLUB mark and the registration it obtained in 1976 because Cubaexport has never used the mark in interstate commerce in the United States or foreign commerce. Am. Compl., ECF No. 114 ¶ 163. Bacardi further alleges that since 1993, Cubaexport has

---

[8] The Act of State doctrine requires courts to recognize acts of foreign government that nationalize property located within their own borders. S*ee F. Palicio y Compañía, S.A. v. Brush*, 256 F. Supp. 481 (S.D.N.Y. 1966).

[9] Abandonment is an enumerated ground for cancellation at any time. *See* 15 U.S.C. § 1064.

held "bare title" to the mark, but has never been ready or able to export HAVANA CLUB rum to the United States or anywhere else. *Id.* ¶ 166.

### a. The Court Rejects Bacardi's Argument That There Is a Time Limit On Excusable Non-Use

Cubaexport argues that Bacardi fails to state an abandonment claim on the grounds its non-use of the mark is excusable because there is no time limit on excusable non-use. MTD, ECF No. 122 at 44-45. Bacardi responds that "[w]hile the [e]embargo may have been an excusable ground for a period of nonuse, a trademark cannot lie dormant indefinitely." MTD Opp'n, ECF No. 129 at 35 (citing McCarthy § 29:11 ("While use as a mark in the United States is not required to obtain a registration under § 44  . . . , use is required within a reasonable time or the protection is subject to cancellation for abandonment.")).

Although Bacardi is correct that a trademark can be abandoned if it is not used for an extended period of time, it fails to address the issue of excusable nonuse. "Nonuse may be considered excusable where the owner of the registration is willing and able to continue use of the mark in commerce, but is unable to do so due to a trade embargo." *Altadis U.S.A. Inc.*, No. 91218161, 2016 WL 3566152, at *16 n.22 (T.T.A.B. June 9, 2016)(quoting The Trademark Manual of Examining Procedure ("TMEP") § 1064.11). Cubaexport is unable to use the mark

because of the embargo. Under this circumstance, nonuse may be excusable and the trademark is not considered abandoned. *See* TMEP § 1064.11. Bacardi points to no authority to support its argument that in light of the embargo, which it does not dispute will end eventually, there is a reasonable time limit on excusable non-use. Accordingly, this argument fails.

### b. The Court Rejects Bacardi's Constitutional Argument

Bacardi argues that the Lanham Act poses constitutional concerns if it is interpreted to apply to trademarks that are unused for an indefinite period of time because the reasonable nexus between Congress's power to regulate trademarks in foreign or interstate commerce that the Constitution demands would not be present. *See* MTD Opp'n, ECF No. 129 at 35. Bacardi therefore urges the Court to create a time limitation on the excused non-use provisions of the Lanham Act to avoid this constitutional problem. *Id.* Bacardi further urges the Court to construe Section 44 narrowly because Congress could not have intended for a foreign registrant to obtain U.S. registrations for an indefinite period of time without engaging in economic activity in the United States. *Id.* at 36.

Bacardi points to no authority to support its arguments in this context. While "[t]he [constitutional] power to regulate commerce presupposes the existence of commercial activity to be

27

regulated." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2586 (2012) (Roberts, C.J.); the Lanham Act allows foreign registrants to obtain a U.S. registration based on the applicant's bona fide intention to use the mark in commerce, without requiring prior use in commerce, 15 U.S.C. § 1126(e). Here, Cubaexport is prevented from using the mark in commerce due to the embargo and that non-use is excused. Accordingly, Bacardi's argument fails.

### c. The Court Rejects Bacardi's Assignment in Gross Arguments[10]

Cubaexport argues that Bacardi's assignment in gross claim fails because Bacardi has conceded that the mark was never assigned, and because it was not associated with underlying goodwill. MTD Reply, ECF No. 136 at 30. Bacardi responds that Cubaexport abandoned its right to the mark as follows: It has alleged that Cubaexport has entirely left the rum business and conveyed to HRL all the assets related to HAVANA CLUB rum, including the good will associated with the trademark. MTD

---

[10] Cubaexport states that Bacardi does not assert this theory in the Amended Complaint. MTD Reply, ECF No. 136 at 30. In Count I of the Amended Complaint, Bacardi seeks Rectification of Register/Cancellation of Registration based on a number theories, including abandonment. *See* Am. Compl., ECF No. 114 at 42, 49. As part of the abandonment theory, Bacardi alleges that Cubaexport has held "bare title" to the U.S. HAVANA CLUB registration since 1993. *Id.* ¶ 166. Accordingly, the Court will consider the assignment in gross argument.

Opp'n, ECF No. 129 at 33. It has pointed out that the conveyance did not effect an assignment of the registration itself, which the *Galleon* judgment confirmed. *Id.* As a result, Bacardi argues that since 1993, Cubaexport has held bare title to the HAVANA CLUB mark, without any ability to produce or sell rum in the United States or elsewhere. *Id.* (citing Am. Compl., ECF No. 114 ¶ 166. Bacardi argues that "[t]his is a classic assignment in gross that results in abandonment of the trademark." *Id.*

Bacardi's assignment in gross argument was rejected by the District Court in *Galleon* and by the TTAB. *Galleon II*, 974 F. Supp. 302 at 312 n.9; *see also* TABB Opinion, ECF No. 122-2 at 53-54. In *Galleon*, the District Court stated:

> Defendants additionally argue that the separation of the trademark from the appurtenant business, the hard assets in Cuba, resulted in an assignment in gross. *See* Def. Mem. at 15. As a general matter, Defendants are correct in asserting that such a situation may lead to an assignment in gross. However, the principle is inapplicable to the unique circumstances of this matter. Cubaexport and Plaintiffs never had assets in the United States. While the Havana Club trademark may be recognizable by U.S. consumers, the embargo has prevented Plaintiffs and Cubaexport from importing, distributing, selling, or maintaining any assets in this country. Thus, it was impossible for the Plaintiffs and Cubaexport to have separated the mark from the business assets when no assets existed in the United States.

*Id.*

A trademark has no economic value on its own, but rather is intertwined with "good will," which "signifies the favorable reputation of a business, product or service." McCarthy § 18:2. "There are no rights in a trademark apart from the business with which the mark has been associated; they are inseparable." *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984). "Thus, if there is a dissociation or separation of the business from the mark, there is nothing left for the mark to signify and hence it loses its inherent function and is abandoned," and a corresponding registration is cancelled. *Otis Elevator Co. v. Echlin Mfg. Co.*, 187 U.S.P.Q. 310, 1975 WL 21258, at *4 (T.T.A.B. 1975); *see also Gen. Cigar Co. v. G.D.M. Inc.*, 988 F. Supp. 647, 659 (S.D.N.Y. 1997) ("[A]bandonment may be found where a mark has been assigned in gross.").

Here, however, there is no dispute that, because of the embargo, Cubaexport may not import, distribute, sell, or maintain any assets in the United States. Therefore, as the *Galleon* court observed, it "was impossible for the Plaintiffs [there, HCH] and Cubaexport to have separated the mark from the business assets when no assets existed in the United States." *Galleon II*, 974 F. Supp. at 312 n.9. The TTAB also agreed with the District Court that the principle of assignment in gross does not apply this case because there were no business assets to separate from the trademark. TABB Opinion, ECF No. 122-2 at

53-54.

This Court also agrees. The rationale underlying the assignment in gross rule is that "[u]se of the mark by the assignee in connection with a different goodwill and different product would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing, whether used by one person or another." *Marshak*, 746 F.2d at 929. This is why courts determine whether an assignment in gross occurs using a "substantial similarity test," which focuses on whether the assignee is making a product that is substantially similar to that of the assignor such that a consumer would not be confused by the mark. *Id.* at 930 ("The courts have upheld such assignments if they find that the assignee is producing a product or performing a service substantially similar to that of the assignor and that the customers would not be deceived or harmed.").

The rationale underlying the assignment in gross rule confirms the *Galleon* court and the TTAB's conclusion that it is inapplicable to this case. Because the embargo prevents Cubaexport from selling or distributing rum in the United States, there is no risk of consumer confusion. Additionally, this Court would be unable to determine if any product was substantially similar, because there is currently no product sold in the United States by Cubaexport. Accordingly, the

assignment in gross theory is inapplicable to the circumstances in this case. *See Old Charter Distillery Co. v. Ooms*, 73 F. Supp. 539, 541-42 (D.D.C 1947)(stating invalid assignment in gross of a whiskey trademark during Prohibition did not result in abandonment, where the assignor validly assigned the mark to a different entity and nonuse of the mark remained excusable).

For these reasons, Cubaexport's Motion to Dismiss is **GRANTED** as to Bacardi's abandonment claim against Cubaexport.

### 4. Bacardi Has Stated A Claim for Cancellation Based on Misrepresentation of Source

The Lanham Act permits a registration to be canceled at any time "if the registered mark is being used by, or with the permission of, the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1064(3).

To state a § 14(3) claim, Bacardi must allege that Cubaexport

> engaged in a "deliberate and blatant misrepresentation of source wherein the registration is merely a vehicle for the misuse rather than evidence of even a colorable ownership claim[, and where the mark is intentionally displayed in such a manner as to facilitate passing off the goods as those of another]." *Global Maschinen GmbH v. Global Banking Sys., Inc.,* 227 U.S.P.Q. 862, 863 n. 3, (T.T.A.B. 1985). In other words, this cancellation statute requires proof of a "blatant, aggressive misuse of a registered mark ... in order to trade upon the renown and reputation" of the party seeking cancellation.

> *McDonnell Douglas Corp. v. National Data Corp.,* 228 U.S.P.Q. 45, 46 (T.T.A.B.1985); *see also* 2 *McCarthy* § 20.15[6] (a cancellation claim under § 14(3) "requires a pleading that registrant deliberately sought to pass off its goods as those of petitioner. Willful use of a confusingly similar mark is not sufficient.").

*SunAmerica Corp. v. Sun Life Assur. Co. of Canada,* 890 F. Supp. 1559, 1581 (N.D. Ga. 1994).

Cubaexport argues that Bacardi fails to state a misrepresentation of source claim on numerous grounds. Cubaexport first points out that in this case, the TTAB rejected the misrepresentation of source of goods argument, holding that "even a merely colorable claim of a right to use a trademark is enough to defeat a claim for cancellation based on misrepresentation of source." MTD, ECF No. 122 at 46. Bacardi responds that "even if Cubaexport had a colorable claim to ownership, it had no colorable claim to carry on a legacy dating back to 1878" seeking to pass off its new rum as being made with the Arechabala family recipe. MTD Opp'n, ECF No. 129 at 31-32. Cubaexport responds to this argument in a footnote, suggesting that the Court need not reach it, because: (1) Cubaexport had a reasonable basis to think that JASA had abandoned its U.S. trademark rights; and (2) "Cubaexport also had, at a minimum, a reasonable basis to believe the words 'Fundada en 1878' are accurate, because in Cuba, the enterprise that distills HAVANA

33

CLUB rum was and is the legal successor to JASA's business by reason of the 1960 expropriation decree." MTD Reply, ECF No. 136 at 33 n. 14.

As an initial matter, Cubaexport's representation of the holding of the TTAB is inaccurate. The TTAB did not reject Bacardi's misrepresentation of source argument on the merits. Rather, the TTAB cited the "colorable claim of ownership" standard, but its conclusion that Bacardi had not stated a claim of misrepresentation of source was based on entirely different reasoning: "Petitioner's claim is premised on the assumption that Cubaexport is not the true and legitimate owner of the HAVANA CLUB mark, which can only be regarded as a political question based on the premise that the Cuban government is not legitimate. Obviously, we, as a tribunal within the U.S. Department of Commerce, do not have the authority to answer that question." TTAB Decision, ECF No. 122-2 at 56-57. Furthermore, whether or not Cubaexport had a reasonable basis to think that JASA had abandoned its U.S. trademark rights is a disputed factual matter. *See infra* Section III.C. Finally, Bacardi has alleged that Cubaexport does not have the Arechabala family recipe, an allegation that the Court accepts as true for the purposes of the Motion to Dismiss.

The Court concludes that Bacardi has stated a claim here. First, the use of the "Fundada en 1878" legend constitutes

"blatant, aggressive misuse of a registered mark ... in order to trade upon the renown and reputation of the party seeking cancellation" because, making all inferences in Bacardi's favor, Cubaexport, by using the "Fundada en 1878" legend, is trading on the "renown and reputation" of the Arechabala family recipe. Furthermore, Cubaexport's reliance on *SunAmerica Corp.* is misplaced because there, following a bench trial, the Court found that there was no evidence that the defendant there sought to pass off its products of those of the plaintiff. 890 F. Supp. at 1581. Here, Bacardi has alleged just that.

Second, Cubaexport argues that the claim should be dismissed because, as Bacardi alleges in the Amended Complaint, Cubaexport's mark is not currently being used to sell good in the United States. MTD, ECF No. 122 at 46. Bacardi responds that Cubaexport's registration reflects how it intends to use the mark and that inaction should not be able to both be overlooked for purposes of abandonment and also serve as a defense to misrepresentation of source. MTD Opp'n, ECF No. 129 at 32.

Cubaexport has cited no authority that would compel dismissal of the claim in view of the fact that Cubaexport's non-use of the mark is attributable to the embargo. As alleged in the Amended Complaint, Cubaexport applied to the PTO under 15 U.S.C. § 1126. Am. Compl., ECF No. 114 ¶ 42. Accordingly, Cubaexport was not required to have used the mark in commerce in

the United States prior to applying, but it was required to
attest that it had a bona fide intention to use the mark in
commerce. 15 U.S.C. § 1126(e). Based on its application,
therefore, Cubaexport intended to use the mark in commerce in
the United States. However, it has been prevented from doing so
due to unusual circumstances beyond its control. Accordingly,
Cubaexport's non-use is not fatal to Bacardi's claim. *Cf. Cuban
Cigar Brands N.V. v. Upmann Int'l Inc.*, 457 F. Supp. 1090, 1100
n.43 (S.D.N.Y. 1978). Cubaexport has provided no authority that
would require the Court to construe the Lanham Act to require
Bacardi wait until the embargo is lifted and Cubaexport or its
successor uses the mark to seek cancellation based on
misrepresentation of source of goods.

Third, Cubaexport argues that Bacardi concedes that the
alleged use of the mark in advertisements are intended to build
brand recognition in the United States for the rum sold by HCI
in other countries and not to trade on any existing brand
recognition of Bacardi's product. *See* MTD, ECF No. 122 at 46-47.
Bacardi responds—and the Court agrees—that "[a]dvertising to
reach new customers while drawing on good will that already
exists is not an either/or proposition  . . . [and t]here is
nothing inconsistent in the [amended] complaint's allegation
that Defendants did both. MTD Opp'n, ECF No. 129 at 33.

Fourth, and finally, Cubaexport argues that Bacardi pleads no facts to suggest that the U.S. mark is being used to misrepresent HCI's goods as Bacardi's. *See* MTD, ECF No. 122 at 47. But as Bacardi responds, the Amended Complaint alleges just that. *See* Am. Compl., ECF No. 114 ¶¶ 169-174. Furthermore, "Bacardi can honestly claim to continue the Arechabala family legacy dating back to 1878, including its use of the secret family formula for making genuine Havana Club rum." MTD Opp'n, ECF No. 129 at 33.

For all these reasons, Cubaexport's Motion to Dismiss as to the misrepresentation of source claim is **DENIED**.

### 5. Cancellation/Rectification of the Register Claims

Bacardi's remaining claims are that the U.S. HAVANA CLUB & Design registration must be stricken because it expired when: (1) Cubaexport did not file the mandatory renewal application and declaration in 1996, Am. Compl, ECF No. 114 at 42-43; and (2) Cubaexport did not file the mandatory renewal fee in 2006, *id.* at 43-44.

### a. The Court Denies the Motion to Dismiss as to Whether the Registration Expired in 1996

Cubaexport argues that this claim should be dismissed on the grounds that: (1) "wrong party renewal" is not a ground listed in the Lanham Act for cancelling a trademark that has been registered for more than five years, Defs.' MTD, ECF No.

122 at 37 (citing 15 U.S.C. § 1064(3)); and (2) the fact that
the 1996 renewal submitted by HCH rather than Cubaexport is not
a basis for cancellation because HCH was the proper party to
submit the 1996 renewal, *id*. 34-37.[11]

With regard to the first argument, Cubaexport argues that
the claim should be dismissed because "wrong party renewal" is
not a basis to cancel a trademark that has been registered for
over five years because it is not an enumerated ground in 15
U.S.C. § 1064(3). Defs.' MTD, ECF No. 122 at 37; Defs.' Reply
ECF No. 136 at 12-15. Cubaexport argues that it is undisputed
that when a trademark is more than five years old, cancellation
is limited to fraud, abandonment, misrepresentation of origin,
and a few other specifically listed grounds not at issue in this
case. *Id.* at 12. Therefore, Cubaexport argues, any claim that a

---

[11] Cubaexport also argues that this claim is barred by issue
preclusion based on the *Galleon* court's denial of Bacardi's
counterclaim in which it sought to cancel the registration.
Defs.' MTD, ECF No. 122 at 36-37. However, the *Galleon* court
denied the cancellation claim without reaching the merits
because Cubaexport, which it found to be a necessary party to
the cancellation issue, was not before the court. *Galleon* II,
974 F. Supp. at 311-312. The Partial Judgment issued in the case
specifically provided that "nothing herein shall prevent the
defendants or others from contesting those rights or contending
that said rights were lost as a result of acts or omissions by
Cubaexport." Galleon Partial Judgment, ECF No. 132-2 ¶ 10.
Accordingly, this Court rejects Cubaexport's issue preclusion
argument. Additionally, since Bacardi has consented to the
dismissal of the Count I claims against HCH, the Court need not
address Cubaexport's argument that the 1996 registration was not
fraudulently obtained. MTD, ECF No. 122 at 38-40; MTD Reply, ECF
No. 136 at 26-27.

trademark should be cancelled because the wrong party renewed the trademark is not available for the HAVANA CLUB registration. *Id.*

Cubaexport (and HCH) made the same argument before the TTAB. *See* TTAB Decision, ECF No. 122-2 at 36. In rejecting that argument, the TTAB stated that "because petitioners base their summary judgment motion on the District Court's orders, we give petitioners benefit of any doubt and construe the motion as being based on a District Court order directed to the validity of the registration, and not based on the 'improper renewal of a registration.' Thus, we have considered the merits of petitioner's summary judgment motion." TTAB Decision, ECF No. 122-2 at 36. Here, Bacardi seeks review of the TTAB decision. *See* Am. Compl. ECF No. 114 ¶ 1. Just as the TTAB reached the merits of the arguments regarding the validity of the registration, so will this Court reach the merits in reviewing the TTAB's decision. *See El Paso Nat. Gas Co v. United States*, 632 F.3d 1272, 1276 (D.C. Cir. 2001)(noting "the strong presumption that Congress intends judicial review of administrative action").

With regard to the second argument, Cubaexport explains why, in its view, the TTAB was correct to hold that "HCH was the registrant of record at the time that the renewal request was filed and therefor was a proper party to submit the

application." Defs.' MTD, ECF No. 122 at 35-37; Defs.' Reply, ECF No. 136 at 15-18. However, in this proceeding, Bacardi seeks judicial review of that decision. Accordingly, this issue is not ripe for decision and Bacardi is entitled during subsequent proceedings to explain why, in its view, the TTAB decision was erroneous. It would be premature to make that determination at this juncture.

For these reasons, Cubaexport's Motion to Dismiss as to the cancellation/rectification of the register claims based on the 1996 renewal is **DENIED** without prejudice.

### b. The Court Denies the Motion to Dismiss as to Whether the Registration Expired in 2006

Cubaexport argues that Bacardi's claim that the U.S. HAVANA CLUB & Design registration must be stricken because it expired when Cubaexport did not file the mandatory renewal fee in 2006 should be dismissed because, even if the PTO erred by processing the renewal, that is not an enumerated ground in the Lanham Act for challenging an incontestable trademark registration. MTD, ECF No. 122 at 40-44. If Cubaexport's registration expired in 1996, then the question of whether it expired in 2006 would be moot. Since the Court has denied Cubaexport's Motion to Dismiss as to the 1996 registration, the Court declines to reach this issue at this juncture and **DENIES** without prejudice Cubaexport's Motion to Dismiss as to the 2006 registration. Cubaexport may

raise this issue in subsequent proceedings.

### C. The Court Denies the Motion to Dismiss as to Bacardi's Claims for Declaratory Relief Against Cubaexport

Bacardi's remaining claims for declaratory relief are for: (1) a declaration of Bacardi's common law rights in the HAVANA CLUB mark, *see* Am. Compl., ECF No. 114 ¶¶ 175-80; and (2) a declaration of non-violation of federal trademark laws, *see id*. ¶¶ 181-85. Cubaexport argues that Bacardi's allegations of superior rights in the HAVANA CLUB mark fail because Bacardi fails to show that its alleged rights have priority over Cubaexport's. MTD, ECF No. 122 at 47. In support, Cubaexport first argues that JASA abandoned any rights it had arising from the use of the mark in the United States long before it purportedly assigned those rights to Bacardi in 1997. However, Cubaexport is not entitled to summary judgment on the issue of whether JASA abandoned the mark. *See supra* Section III.D. For this reason, the Court **DENIES** the Motion to Dismiss as to the Declaratory claims against Cubaexport. The Court need not reach Cubaexport's second argument—that based on the allegations in the Amended Complaint, any common law rights Bacardi has obtained through use of the mark are junior to those of Cubaexport because Cubaexport had priority from at least February 12, 1974, the date of Cubaexport's Cuban registration—at this juncture. Cubaexport may raise this argument in

subsequent proceedings.

### D. Defendants are Not Entitled to Summary Judgment on the Issue of Whether JASA Abandoned the Mark

Defendants move for partial summary judgment on the issue of whether JASA, at the time it allegedly transferred its rights to Bacardi in 1997, had any U.S. trademark rights in the HAVANA CLUB name. *See generally* Defs.' Mot. for Partial Summ. J. ("MSJ"), ECF No. 127-1. Based on the discovery conducted in *Galleon* and trial testimony in that case, Defendants contend that the parties have conducted full discovery on the issue, and the undisputed evidence demonstrates that as a matter of law, JASA abandoned all U.S. rights in their HAVANA CLUB marks by 1973 at the latest. *Id*. A central issue in *Galleon* was whether JASA had abandoned its U.S. rights in the Havana Club mark. The parties took discovery on the issue and there was testimony on the issue at trial. However, the *Galleon* court never ruled on the issue because of the 1997 OFAC decision rescinding the authorization it had earlier granted allowing Cubaexport to transfer the mark. As a result, the *Galleon* court held that because of OFAC's action, the ownership of the mark reverted to Cubaexport and so HCH lacked standing to maintain a claim for infringement of the registered trademark. *Galleon II*, 974 F. Supp at 312.

Under the Lanham Act, a mark is abandoned "[1] [w]hen its use has been discontinued with [2] intent not to resume such use." 15 U.S.C. § 1127. "Intent not to resume may be inferred from circumstances," and "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment." *Id.* However, "[a] prima facie showing of abandonment may be rebutted with evidence excusing the nonuse or demonstrating an intent to resume use." *Specht v. Google*, 747 F.3d 929, 934 (7th Cir. 2014). "A mark owner's reason for suspending use of a mark is relevant to abandonment analysis only as circumstantial evidence shedding possible light on his intent to resume future use within a reasonable period of time." *ITC Ltd v. Punchgini, Inc.*, 482 F.3d 135, 151 n.10. (2d Cir. 2007).

If "a registrant's nonuse is excusable, the registrant has overcome the presumption that its nonuse was coupled with an "intent not to resume use" . . . . *Imperial Tobacco, Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed. Cir. 1990). "To prove excusable nonuse, the registrant must produce evidence showing that, under his particular circumstances, his activities are those that a reasonable businessman, who had a bona fide intent to use the mark in United States commerce, would have taken." *Rivard v. Linville*, 133 F.3d 1446, 1449 (Fed. Cir. 1998). Courts have found such "excusable non-use 'where there is a temporary, forced withdrawal from the market due to causes

43

such as war, import problems, or some other involuntary action.'" *Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F.R.D. 151, 157 (S.D.N.Y. 2003)(citing cases); *see also Cuban Cigar Brands N.V.*, 457 F. Supp. at 1101, 199 U.S.P.Q. at 202 ("the fact that plaintiff was intervened by the Cuban Government and thus prevented from exporting (its goods) to this country until recently does not constitute an abandonment of the mark").

Because abandonment is essentially a forfeiture, "it is incumbent upon the person alleging it to prove by clear and convincing evidence that the right claimed has been relinquished." *Mathy v. Republic Metalware Co.*, 35 App. D.C. 151, 156 (D.C. Cir. 1910). "The question of abandonment must be decided by the facts in each particular case; but a mark will never be held abandoned, unless a clear intention to do so appears." *Id.* "'Questions of intent, which involve intangible factors including witness credibility, are matters for consideration of the fact finder after a full trial.'" *Flynn v. Fischer Tile & Marble, Inc.*, 246 F. Supp. 2d 48, 55-56 (D.D.C. 2003 (quoting *Prochaska v. Marcoux,* 632 F.2d 848, 851 (10th Cir. 1980)).

Cubaexport argues that it is entitled to summary judgment because there is no genuine dispute of material fact that JASA abandoned its rights in the HAVANA CLUB mark before it allegedly transferred any rights to Bacardi. MSJ, ECF No. 127-1 at 8. For

the reasons explained below, the Court the Court concludes that a fact-finder could reasonably find that JASA's efforts to resume use were reasonable under the circumstances.

### 1. The Expiration of the Registrations, the *Galleon* Trial Testimony, and JASA's Activities From 1960 to 1968

Cubaexport argues that the expiration of the U.S. registrations by 1973 coupled with Jose Arechabala's statement that he "was not interested" in renewing JASA's trademark registrations for HAVANA CLUB result in it being undisputed that "JASA made a deliberate, voluntary decision to abandon" its U.S registrations. *Id.* at 20 (citing Ramon Arechabala's Trial Testimony). Cubaexport disputes that JASA's non-use was excusable, arguing that JASA's activities were not those of a reasonable businessperson because JASA failed to: (1) pay the minimal fee to maintain the registration; and (2) object to Cubaexport's registration of the mark. *Id.* at 21.

As an initial matter, "[a] failure to renew a registration or other loss of a registration should not be confused with 'abandonment' of the mark itself." McCarthy § 20:57. Furthermore, Cubaexport failed to provide the full context of the trial testimony. The full context is as follows:

> Q:   Now, isn't is true, Mr. Arechabala, that sometime after you came to the United States you had a conversation with your Uncle Jose Maria Arechabala about renewing the company's registration of

the Havana Club trademark in the United
States?

A:   That is correct, yes, sir.

Q:   Isn't it correct that he told you he was
not interested in renewing the
registration?

A:   That is correct, because we were going
back to Cuba at any moment and – that was
our hope, at least.

THE COURT:       Well, can we break that down?
Did your uncle tell you he was
not interested in renewing the
registration?

THE WITNESS:     He told me we could not do
anything right now with it
because let's wait because we
might be going to Cuba at any
moment.

THE COURT:       When was this? When did your
uncle say this?

THE WITNESS:     When I talked to him back in
1974.

THE COURT:       He said that back in '74?

THE WITNESS:     Yes, we were planning to go
back to Cuba real quick. They
are very optimistic, you know?
But that's the way it is.

ECF No. 132-1, Trial Tr. Vol. 9, 1282: 3-25.

Cubaexport fails to respond meaningfully to the full
context of Jose Arechabala's statement, *see generally* MSJ Reply,
ECF No. 137; arguing that "the involuntary loss of JASA's Cuban
assets in 1960 does not excuse nearly a decade of inactivity
from 1960 to 1968," *id.* at 17. Cubaexport, citing the caselaw
upon which Bacardi relies, argues that even if it is true that
"JASA's hands were tied because reconstituting a full-scale
distilling operation in the United States was beyond JASA's
means" this "in no way prevented JASA from making efforts to

46

resume use of the mark that would have been sufficient to avoid abandonment." *Id.* at 18.

"The question of abandonment must be decided by the facts in each particular case . . . ." *Mathy*, 35 App. D.C. at 156. Here, the facts include that "[o]n December 31, 1959, armed soldiers of the Cuban government seized the JASA distillery and all of its books, records, and other assets by force." Pls.' Response to Defs.' Statement of Material Facts ("SOMF"), ECF No. 131 ¶ 8. In the days following the seizure, certain members of the Arechabala family "were ordered to continue working but were searched daily to ensure no records or documents were removed from the facility." *Id.* During this time, Arechabala family members were jailed or threatened with jail, eventually choosing to flee Cuba. *Id.* The company's lawyer was jailed for ten years. Id. JASA was never compensated for the seized assets and its owners and leadership were "scattered around the globe." *Id.* These facts demonstrate the adversity JASA faced in the years following the expropriation with regard to resuming use of the mark.

Cubaexport argues that Bacardi needs to show that JASA made "continuous efforts to resume use" during the 1960 to 1968 time period. MSJ Reply, ECF No. 137 at 18 (citing *Seidelmann Yachts, Inc. v. Pace Yacht Corp.*, Civ. No. JH-87-3490, 1989 WL 214497 at *2, * 7 (D.Md. Apr. 26, 1989). However, the correct standard is

that "to rebut a presumption of abandonment on a motion for summary judgment, the mark owner must come forward with evidence 'with respect to … what outside events occurred from which an intent to resume during the nonuse period may be reasonably inferred.'" *ITC Ltd.*, 482 F.3d at 150 (quoting *Imperial Tobacco Ltd.*, 899 F.2d at 1581). Furthermore, *Seidelmann Yachts, Inc.* is easily distinguishable. There, the mark owner had left the boat business after a Chapter 11 bankruptcy filing and "continuously sought to sell the mark at all times" for a specific period of time. 1989 WL 214497 at *2, * 7. Here, of course, JASA's assets were expropriated, it was never compensated, and it initially anticipated a quick return to Cuba to begin manufacturing and selling HAVANA CLUB rum.

Drawing all justifiable inferences in Bacardi's favor, as the Court must at this juncture, Jose Arechabala stated that he "was not interested" in renewing JASA's trademark registrations for HAVANA CLUB because they were unable to produce rum at that time—"we could not do anything right now." And JASA believed, based on flawed legal advice they had been given, that they could not renew the registration for that reason:

> Q:  Mr. Arechabala, was it your understanding that to renew the trademark you had to be currently selling rum under the Havana Club name?
>
> A:  Yes, but how would you renew your trademark if you cannot produce the rum?

> Then you are doing something wrong
> against the law. Because in order to
> renew your trademark, you have to be able
> to make the rum, the sell the run, and to
> distribute the rum. So I could not, I
> mean, register the trademark again
> because I didn't have the facilities for
> doing that.

*Id.* 1284:2-11.

Whether or not JASA intended to resume use depends in part on the credibility of this testimony, which is a "matter[] for consideration of the fact finder after a full trial." *Flynn*, 246 F. Supp. 2d at 55-56.

## 2. JASA's Activities From 1969 to 1993

Cubaexport argues that JASA's activities from 1969 to early 1974 are insufficient to establish an intent to resume use. MSJ Reply, ECF No. 137 at 19. It further argues that "Bacardi does not even attempt to show intent to resume use during the nineteen-year period from 1974 to 1993," arguing that "Bacardi is [] obliged to come forward with some evidence from [the nineteen year] period of time that JASA intended to resume use." MSJ Reply, ECF No. 137 at 12.

Again, the correct standard is that "to rebut a presumption of abandonment on a motion for summary judgment, the mark owner must come forward with evidence 'with respect to … what outside events occurred from which an intent to resume during the nonuse period may be reasonably inferred.'" *ITC Ltd.*, 482 F.3d at 150

(quoting *Imperial Tobacco Ltd.*, 899 F.2d at 1581). Otherwise put, "[t]he registrant must put forth evidence with respect to what activities it engaged in during the non-use period or what outside events occurred from which an intent to resume use during the nonuse period may reasonably be inferred." *Imperial Tobacco Ltd.*, 899 F.2d at 1581. Bacardi has done just that— pointing to both "a special circumstance excusing the non-use— the expropriation and resulting adversity JASA faced—as well as ample evidence that the Arechabalas intended to resume making and selling HAVANA CLUB rum." MSJ Opp'n, ECF No. 130 at 15.

Making all inferences in Bacardi's favor, as the Court must at this juncture, JASA's intent to resume use during the non-use period may be reasonably inferred based on the fact that all of JASA's assets had been seized, its owners and family members exiled and scattered worldwide, and it lacked the facilities and assets to resume production, combined with JASA's efforts in the early 1970s to try produce HAVANA CLUB rum and exploring potential joint ventures to exploit the trademark. *See* Ramon Arechabala Dep., ECF No. 132-4 at 67:25-68:3 (testifying that he "was trying to get the rum to being produced in the United States but it was too expensive and I didn't have the money to go ahead and do it"); *Id*. at 113:13-15 (testifying that he "had been trying for several years to make Rum HAVANA CLUB in the United States but [] didn't have the cash flow needed for that

purpose"); *Id.* at 68:8-70:23 (recounting that JASA submitted a proposal for a joint venture to Gulf & Western, but it was not interested); *Id.* at 98:11-100:24 (describing potential for joint venture with Bacardi). JASA rejected an offer to pursue a venture in the Dominican Republic because that venture would have involved the expropriation of a distillery by a General in that company, which JASA was uninterested in participating in. *Id.* at 89:2-15. And JASA eventually reached an agreement with Bacardi to exploit the use of the mark.

Even if Bacardi points to no evidence of JASA's efforts from 1974 to 1993; a fact-finder could determine that JASA's attempts to resume use were reasonable under the circumstances. Cf. *Cuban Cigar Brands N.V.*, 457 F. Supp. at 1101 (S.D.N.Y. 1978) (owner did not abandon its mark when the expropriation of the company prevented it from exporting cigars to the United States for fifteen years)*aff'd sub nom, Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.* 607 F.2d 995 (2d Cir. 1979). This issue was not resolved in Cubaexport's favor in the *Galleon* litigation; rather, testimony was provided but the Court did not issue findings of fact.

For all these reasons, and in view of the high bar facing Cubaexport, the Court **DENIES** Cubaexport's Motion for Partial Summary Judgment on the issue of whether JASA abandoned the

mark.[12]

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss, ECF No. 122; and **DENIES** Defendants' Partial Motion for Summary Judgment, ECF No. 124. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:     **Emmet G. Sullivan**
            **United States District Judge**
            **March 6, 2023**

---

[12] Bacardi argues that Cubaexport's motion is procedurally improper because it "attempt[s] to dispose of an allegation rather than the underlying claim." MSJ Opp'n, ECF No. 130 at 20. The Court need not reach this argument since it has denied the motion for partial summary judgment. Cubaexport further argues that no reasonable fact-finder could conclude that Cubaexport committed fraud. MSJ Reply, ECF No. 137 at 23-27. In view of the Court's denial of Cubaexport's Motion for Partial Summary Judgment and denial of Cubaexport's Motion to Dismiss as to the cancellation based on fraud claim, the Court need not reach this argument at this time.