UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BACARDI & COMPANY LIMITED, and

BACARDI U.S.A., INC.,

        Plaintiffs and Counterdefendants,

    v.

EMPRESA CUBANA EXPORTADORA
DE ALIMENTOS Y PRODUCTOS VARIOS
d/b/a CUBAEXPORT,

        Defendant and Counterclaimant.

Case No. 1:04-cv-00519 (EGS)

**CUBAEXPORT'S COUNTERCLAIM AND
ANSWER TO FIRST AMENDED COMPLAINT**

    Defendant Empresa Cubana Exportadora de Alimentos y Productos Varios d/b/a Cubaexport ("Cubaexport"), by and through its undersigned counsel, hereby submits its Counterclaim together with its Answer to the First Amended Complaint of Plaintiffs Bacardi & Company Limited and Bacardi U.S.A., Inc. (collectively "Bacardi") filed March 11, 2016.

**I.
PRELIMINARY STATEMENT**

    1.    This action, filed by Bacardi in 2004, is continuation of a petition that Bacardi filed at the Trademark Trial and Appeal Board ("TTAB") in 1995, seeking cancellation of Cubaexport's registration of a trademark (Reg. No. 1,031,651) consisting of a design including the words HAVANA CLUB.  Bacardi lost at the TTAB in 2004

because Cubaexport had lawfully obtained trademark rights in HAVANA CLUB in the 1970s, and Bacardi was unable to establish that the registration was procured by fraud or to prove other grounds sufficient to cancel a mark, like Cubaexport's HAVANA CLUB registration, that has been on the trademark register for over five years and is therefore protected from cancellation on most grounds by Section 14 of the Lanham Act (15 U.S.C. § 1064).

2.    The relevant facts regarding registration of the mark have not changed in the years since Bacardi lost its case at the TTAB.  A Cuban company named José Arechabala S.A. ("JASA") had held registrations for several trademarks containing the words HAVANA CLUB between the 1930s and 1950s.  JASA's former owners, who left Cuba in the 1960s, chose to let all of JASA's remaining U.S. trademark registrations expire, along with JASA's trademark registrations in other countries.  After the last of the U.S. registrations had expired, Cubaexport applied for and in 1976 was granted a new and different trademark registration consisting of a newly created design including the words HAVANA CLUB, which was not based on any of JASA's earlier registrations. Cubaexport applied for the registration in the good-faith and accurate belief that any prior claim to any trademark containing the HAVANA CLUB name had been abandoned, so that the mark was then free for anyone to register and use.  Despite years of litigation around ownership of the mark in this case and in related litigations, no facts have come to light to suggest otherwise, because none exist.

3.    For nearly two decades after Cubaexport registered its trademark, neither Bacardi nor JASA's former owners showed any interest in the HAVANA CLUB

trademark.  But in late 1993, the global spirits distributor Pernod Ricard S.A. entered into a joint venture agreement with Havana Rum & Liquors, S.A., to distribute HAVANA CLUB rum around the world.  Bacardi for the first time saw a competitive threat and began desperately looking for ways to stifle this potential new competition to its own existing rum brands around the world.

4.     In the United States, Bacardi submitted its own application for a HAVANA CLUB trademark registration in 1994 based not on a claim of existing rights but on an intent to use the trademark in the future.  Then in 1995, Bacardi filed the proceeding at the TTAB, noted above, seeking to cancel Cubaexport's registration.  Also in 1995, Bacardi began releasing limited quantities of Bahamian rum in the United States under the HAVANA CLUB name, but Bacardi discontinued those sales after Havana Club Holding, S.A. ("HCH"), as Cubaexport's assignee, sued Bacardi for trademark infringement.  Later, in April 1997, Bacardi purported to enter into an agreement with some of JASA's former owners to acquire JASA's former trademark rights, even though those rights had long ago been abandoned and no longer existed.

5.     Recognizing the weakness of its legal case against the HAVANA CLUB trademark registration, Bacardi also turned to backroom political lobbying.  To derail HCH's trademark infringement suit, Bacardi lobbied for the retroactive revocation of the Treasury Department license that had allowed Cubaexport to transfer its rights to HCH. Bacardi even lobbied its allies in Congress in 1998 to slip into a lengthy appropriations bill, without notice to other members of Congress, a targeted section ("Section 211") specifically designed to prevent HCH and Cubaexport from enforcing rights arising from

the HAVANA CLUB registration against infringers like Bacardi—though not actually cancelling the registration or confiscating the mark.

6.      In 2006, Bacardi relaunched its rum misleadingly branded with the HAVANA CLUB name, this time using rum from Puerto Rico, in violation of Cubaexport's rights as owner of the registered trademark.

7.      By trying to lay claim to the HAVANA CLUB brand in this way, Bacardi not only sought to interfere with the activity of its primary competitor in the global rum market but also to misappropriate for itself the benefit of the investments of others, which had built for the HAVANA CLUB trademark a global renown that the trademark had not previously enjoyed.

8.      Neither Bacardi's efforts to steal the HAVANA CLUB trademark nor its attempts to trade off of the goodwill of the HAVANA CLUB mark have any legal or factual justification.  Bacardi can no longer rely on inferences and benefits of the doubt as at the pleading stage.  It must prove its claims with evidence.  Bacardi has received extensive discovery into the ownership history of the HAVANA CLUB trademark from prior litigations, and it still has no evidence to support its supposed superior rights in the trademark or any valid claim for cancellation of the trademark.  In short, Bacardi has no valid claim to the HAVANA CLUB trademark registration in the United States or elsewhere nor any basis to cancel Cubaexport's registration.  For these reasons, Bacardi's claims must be rejected.

9.      Bacardi also should be enjoined from infringing Cubaexport's HAVANA CLUB trademark in the United States.  Although Bacardi has continuously been

infringing Cubaexport's rights by selling Puerto Rican rum under the HAVANA CLUB trademark since 2006, Cubaexport was prevented from seeking affirmative judicial enforcement of those rights in a U.S. court by Section 211, the 1998 law that Bacardi had lobbied for.  For the reasons discussed below, the relevant clause of Section 211 no longer applies, and Cubaexport is now able to affirmatively enforce its trademark rights arising from the registration.  Accordingly, Cubaexport is entitled to an injunction against Bacardi's infringing sales of rum under the HAVANA CLUB name.

10.     Cubaexport looks forward to fully and finally vindicating its rights to the HAVANA CLUB trademark that it lawfully registered nearly fifty years ago and hopes that one day, after the U.S. lifts its embargo against Cuba, genuine HAVANA CLUB rum from Cuba will be available to consumers in the United States.

## II.
## CUBAEXPORT'S COUNTERCLAIM

As and for its counterclaim against Plaintiffs Bacardi & Company Limited and Bacardi U.S.A., Inc., Defendant Cubaexport asserts as follows:

### NATURE OF COUNTERCLAIM

11.     This is a counterclaim against Bacardi under Section 32 of the Lanham Act (15 U.S.C. § 1114) for injunctive relief for infringement of Cubaexport's registered HAVANA CLUB & Design trademark (Reg. No. 1,031,651).

## JURISDICTION

12.     If and to the extent an independent basis of jurisdiction for this counterclaim may be required, the Court has jurisdiction over this counterclaim under Section 39 of the Lanham Act (15 U.S.C. § 1121) and 28 U.S.C. §§ 1331 and 1338(a).

## FACTS IN SUPPORT OF COUNTERCLAIM

**A.      The pre-1959 HAVANA CLUB trademarks are abandoned by 1973**

13.     From 1934 to 1936, and again in 1953 and 1956, a Cuban company named José Arechabala S.A. (defined above as "JASA") registered a number of rum trademarks containing the phrase HAVANA CLUB with the U.S. Patent and Trademark Office ("USPTO").

14.     The rum that JASA sold under the HAVANA CLUB name was always a relatively minor product for JASA.  The manufacture and distribution of alcoholic beverages was not JASA's only activity or even its main activity prior to the 1959 Cuban Revolution.  Moreover, HAVANA CLUB was not the only rum produced by JASA, and JASA's other products were better known and more prominent in the Cuban market.  JASA's export volumes of HAVANA CLUB rum also were very low, and the brand was not well known in the United States or in other countries.  Based on these facts and others, it is apparent that, even before 1959, JASA had no intent to develop the HAVANA CLUB brand into a well-known brand in the United States or elsewhere.

15.     As of 1959, JASA continued to hold three unexpired HAVANA CLUB trademark registrations at the USPTO:  No. 578,679 and No. 578,680, both of which

were registered on August 11, 1953, and No. 632,828, which was registered on August 14, 1956.  JASA's other registrations had expired in or before the mid-1950s.

16.     JASA's property in Cuba, like that of most private businesses in Cuba, was nationalized following the Cuban Revolution of 1959.  The formal expropriation of JASA's property took effect on October 13, 1960, under Cuba's Law No. 890.

17.     Under binding U.S. Supreme Court precedent, the Act of State Doctrine requires the Court to recognize as valid the expropriation of JASA's property *in Cuba*. But under U.S. law, the expropriation did not affect ownership of JASA's property then located *in the United States*.  This includes the three U.S. trademark registrations then owned by JASA.

18.     JASA's U.S. trademarks were never expropriated but ultimately expired or were cancelled by the USPTO under the terms of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, because JASA's former owners did not take the steps necessary to renew or otherwise maintain them.

19.     Specifically, on August 14, 1962, the USPTO cancelled JASA's Registration No. 632,828 for failure to file a declaration of use or excusable non-use. JASA's former owners could have prevented the cancellation of this registration by filing a declaration of excusable non-use citing the expropriation of their rum-producing assets in Cuba and paying a $25 filing fee if they had intended to resume use of the trademark. They did not do so.

20.     Then, on August 11, 1973, JASA's last two remaining "Havana Club" trademark registrations in the United States, Nos. 578,679 and 578,680, expired.  At the

time, U.S. trademark registrations had a 20-year duration, and those two trademarks had been registered in 1953 and never renewed.  JASA's former owners could have prevented the expirations of these registrations by filing an application for renewal with a declaration of excusable non-use and paying a $25 filing fee if they had intended to resume use of the trademarks.  They did not do so.

21.    JASA's former owners were aware of the impending expiration of their trademark registrations but did not renew or maintain the U.S. trademarks because they had intentionally chosen to abandon them.  Certain of JASA's former owners have admitted, in sworn testimony, that they had discussed and considered renewing their remaining U.S. trademark registrations in 1973 and intentionally chose not to do so because they had no plans to reenter the rum business and therefore no intent to use the trademarks again.

22.    In other countries as well, JASA's former owners chose not to maintain their trademark rights, although they had an opportunity to do so by renewing their trademark registrations, rehabilitating them after they expired, or filing for new trademark registrations.

23.    For over 20 years after their deliberate decision not to renew their last remaining U.S. trademark registrations, JASA's former owners took no steps to reenter the rum business or to assert rights in any HAVANA CLUB trademark.  During this time, many of them pursued other business ventures in Spain, the United States and elsewhere that were unrelated to the rum business.  This contrasts with the behavior of the former

owners of some other Cuban rum producers, including Bacardi, who reentered the rum business, using their old trademarks, from outside of Cuba.

24.     These facts and others demonstrate that JASA's former owners abandoned, no later than 1973, all rights in any "Havana Club" trademarks.

**B.     Cubaexport lawfully obtains trademark rights in HAVANA CLUB in the United States in 1976**

25.     Cubaexport is a Cuban state-owned foreign trade corporation that was established in 1965 by the Cuban Ministry of Foreign Commerce for the purpose of exporting food and other products.

26.     In 1972, Cubaexport began exporting rum under the HAVANA CLUB brand, mainly to the Soviet Union and Eastern Europe.

27.     At that time, and today, Cubaexport could not export rum to the United States because of the ongoing U.S. embargo against Cuba.  However, Cubaexport wished to secure U.S. rights in the Havana Club name so that, when the embargo is lifted, it could sell rum in the United States under the same name as it was using elsewhere. Accordingly, in 1974, Cubaexport submitted an application to the USPTO to register the HAVANA CLUB trademark that is in issue in this lawsuit.

28.     When it submitted its application, Cubaexport believed in good faith—and correctly—that no other persons or entities had rights to the HAVANA CLUB trademark. At the time of the 1974 application, JASA's former owners had shown no interest in pursuing the rum business in the U.S. or elsewhere and had allowed each of JASA's trademark registrations in the U.S. and elsewhere to expire one by one.  Under the

circumstances, a reasonable observer would conclude that JASA had no intent to resume use of the HAVANA CLUB trademark.

29.     Cubaexport's application sought registration of a different HAVANA CLUB mark than the ones JASA had used for Cuban rum, featuring a new design that was unlike any that JASA had ever used.  Cubaexport's application was based on a newly obtained Cuban registration that it had filed with the Cuban trademark office that same year.  The application was not based on any of JASA's former registrations, nor was it based on any trademark rights or other property that had been expropriated from JASA.

30.     On October 31, 1975, the USPTO gave notice pursuant to Section 12(a) of the Lanham Act (15 U.S.C. § 1062(a)) that Cubaexport's mark appeared to be registrable and would be published in the Official Gazette of the Patent and Trademark Office (the "Gazette").  The mark was published for opposition in the Gazette on November 4, 1975. The publication of the mark in the Gazette began the 30-day period under Section 13 of the Lanham Act (15 U.S.C. § 1063) for anyone to file with the TTAB an opposition to the registration or to request an extension of time to oppose.

31.     The 30-day period passed without JASA, any of its former owners, or anyone else opposing the registration or seeking an extension of time to oppose the registration.

32.     On January 27, 1976, the USPTO issued Registration No. 1,031,651 to Cubaexport.

33.     Neither Bacardi nor the former owners of JASA took any steps to question, seek cancellation of, or otherwise challenge Cubaexport's ownership of the

U.S. registration—or Cubaexport's then-existing HAVANA CLUB trademark registrations in multiple other countries—for over 17 years after the U.S. registration was issued, although they were well aware that a Cuban entity was exporting rum to other countries under the HAVANA CLUB trademark.

**C.   Beginning in 1993, a new joint venture between Pernod Ricard and Cuba Ron builds the previously little-known HAVANA CLUB brand into a world-leading rum brand**

34.     On November 22, 1993, Pernod Ricard S.A. ("Pernod Ricard"), one of the world's leading spirits distillers and distributors, entered into an agreement ("*Convenio*") with the Cuban state-owned enterprises Corporación Cuba Ron ("Cuba Ron") and Havana Rum & Liquors S.A. ("HRL").  The *Convenio* formed two joint ventures: Havana Club International S.A. ("HCI") to produce and distribute the rum, and Havana Club Holding S.A. ("HCH") to hold the relevant intellectual property.

35.     Prior to the execution of the *Convenio*, Cubaexport had assigned its worldwide HAVANA CLUB trademark rights to HRL.  After the execution of the *Convenio*, HRL assigned the rights to the new joint venture HCH.  Insofar as the assignments of U.S. rights under U.S. law was concerned, the transfers were authorized and validated by a license issued by the Treasury Department's Office of Foreign Assets Control ("OFAC") on November 13, 1995.  As described further below, however, OFAC later revoked the license as a result of Bacardi's lobbying efforts.

36.     Before the formation of the HCH and HCI joint ventures in 1993, Cubaexport had been developing and promoting the HAVANA CLUB brand in a number of countries outside of Cuba, though its primary market had been the Soviet Union and

Eastern Europe.  The joint venture arrangements allowed the rum to be distributed to a much wider global market using Pernod Ricard's distribution channels.  At the time of the formation of the joint ventures, Cubaexport's rights in the HAVANA CLUB mark around the world were understood to be secure, because JASA's prior registrations for HAVANA CLUB marks had been abandoned and Cubaexport's trademark registrations in multiple countries around the world—including the United States—had gone unchallenged for decades.  Moreover, the rum that JASA had distributed under the name HAVANA CLUB had never been a widely distributed or well-known brand.  By 1993, JASA had not been producing rum for decades.

37.     Over the next few decades, the HCI joint venture, through its efforts and expenditures, built HAVANA CLUB into the powerhouse global brand that it is today. According to The IWSR, a leading analyst of the global alcoholic beverage market, HAVANA CLUB is the world's fifth-leading rum brand by volume of sales and the world's third-leading rum brand in the "standard and above" quality category.

38.     Currently, the HCH joint venture owns the HAVANA CLUB trademark in over 120 countries around the world.  Bacardi has consistently been unsuccessful in its attempts to appropriate the trademark for itself.  It is only in the United States that litigation over ownership of the HAVANA CLUB trademark has continued.

39.     Cuban rum cannot currently be sold in the United States because of the U.S. embargo of Cuba, but Cubaexport hopes that, with future changes in the law, U.S. consumers will be able to buy genuine HAVANA CLUB rum from Cuba.  The U.S. market represents 40% of the global rum market, and it is important to be able to enter

the market with the same brand that is used in the rest of the world and that has achieved

its current worldwide fame through 30 years of continuous investment in the brand.

**D.      Bacardi suddenly takes an interest in the HAVANA CLUB mark only after Pernod Ricard and Cuba Ron form a rum production and distribution joint venture**

40.      Shortly after the HCH and HCI joint ventures were announced in late

1993, Bacardi began taking action to try to disrupt the launch of the joint ventures'

HAVANA CLUB rum.  Bacardi's rum brand BACARDI SUPERIOR has long been one

of the world's best-selling rums, and the creation of a joint venture involving the major

spirits distributor Pernod Ricard meant that Bacardi would have a major new competitor

to contend with.  Bacardi also may have hoped that, by pursuing aggressive tactics

against the new competitor, it could gain leverage for its own claims against Cuba and

perhaps gain an opportunity to distribute rum from Cuba itself.

**E.      Bacardi files its false 1994 trademark registration application with the USPTO**

41.      On September 12, 1994, Bacardi & Company Limited's then-subsidiary

Galleon S.A. filed its own "intent to use" application (Serial No. 74/572,667) to register a

HAVANA CLUB trademark with the USPTO.  Galleon S.A. subsequently was merged

into Bacardi & Company Limited, which, as the surviving entity in the merger, succeeded

to all of Galleon S.A.'s assets and assumed all of its liabilities.  Bacardi & Company

Limited was later substituted for Galleon S.A. as the applicant for registration at the

USPTO.  Accordingly, all references to "Bacardi" or "Bacardi & Company Limited" in

this Counterclaim and Answer should be understood to include Galleon S.A.

42.     In its 1994 application for registration, as originally filed, Bacardi did not claim to be the successor to any prior user of the mark.  Rather, its application, as originally filed, was based on a stated intent by Bacardi to use the mark in commerce for the first time in the future.

43.     Bacardi's application for registration stated that "no other person has the right to use said mark in commerce."  This statement was false, and Bacardi knew it was false.  Bacardi knew that the USPTO had validly issued a HAVANA CLUB trademark registration to Cubaexport in 1973.  Because Bacardi had been in discussions with—but had reached no agreement with—some of the former owners of JASA at the time, Bacardi either (a) knew that JASA had abandoned all U.S. trademark rights before 1973, so any U.S. trademark rights now belonged to Cubaexport or to HCH as its assignee, or (b) believed that JASA's former owners still held such rights and fraudulently failed to disclose them.

44.     In 1995, Bacardi began selling Bahamian rum in the United States, in limited quantities, using the HAVANA CLUB name to try to establish rights in the mark. It did so without any assignment of rights from JASA or its former owners.

45.     All of these circumstances demonstrate that Bacardi—like Cubaexport 20 years earlier—understood in 1994 that any rights of JASA or its former shareholders had long since been abandoned.  A former JASA shareholder named José Maria Arechabala Rodrigo had filed his own application to register a HAVANA CLUB trademark (Serial No. 74/522,925) on May 2, 1994, but Bacardi apparently did not regard that application as an impediment to its own application for registration.  Bacardi also does not claim to

have reached an alleged "agreement in principle" with JASA's former owners to use the
HAVANA CLUB trademark until 1995, the year after Bacardi submitted its registration
application, and that alleged agreement was not memorialized in writing in any event.
Bacardi only received a purported assignment of some of the former JASA owners'
alleged rights in 1997, two years after it began using the HAVANA CLUB name.  Even
then, at least one of the former JASA owners, Gloria Márquez Arechabala, refused to join
that assignment.  The 1997 assignment agreements also conspicuously lacked any
warranty that the purported assignors owned any rights in the HAVANA CLUB mark;
instead, the assignors quitclaimed to Bacardi whatever rights they might or might not
have, reflecting a recognition that their ownership of any trademark rights was doubtful at
best.

47. 46.    In the alternative, if Bacardi truly believed that JASA or its shareholders
still had rights in their old HAVANA CLUB trademarks, its application was knowingly
false and fraudulent for the additional reason that Bacardi failed to disclose those rights in
its application, which stated that "no other person has the right to use said mark in
commerce."

**F.      Bacardi asks the TTAB to cancel Cubaexport's registration**

47.    The USPTO examiner who reviewed Bacardi's September 12, 1994
application refused registration in an office action dated March 14, 1995, on four
grounds:

(a)    Bacardi's proposed trademark conflicted with the existing trademark
registration that had been issued to Cubaexport;

(b)     Bacardi's proposed trademark also conflicted with the then-pending HAVANA CLUB registration application filed by José Maria Arechabala Rodrigo on May 2, 1994 (which was later abandoned in 1997);

(c)     the use of the name HAVANA CLUB in reference to non-Cuban rum constituted a deceptive geographical indication and was therefore prohibited from registration by Section 2(a) of the Lanham Act (15 U.S.C. § 1052(a)); and

(d)     the use of the name HAVANA CLUB for non-Cuban rum was "primarily geographically deceptively misdescriptive" and therefore prohibited from registration by Section 2(e)(3) of the Lanham Act (15 U.S.C. § 1052(e)(3)).

48.     Bacardi responded by, among other things, filing a petition with the Trademark Trial and Appeal Board ("TTAB") on July 12, 1995, seeking to cancel Cubaexport's existing registration, which at that time had been assigned to HCH in USPTO's records.  The TTAB granted summary judgment dismissing Bacardi's cancellation petition in 2004, and Bacardi then brought this civil action to challenge that decision.

49.     Further action on Bacardi's trademark application has been stayed pending litigation, including the final outcome of this action and of the underlying cancellation petition at the TTAB.

**G.      Bacardi launches an aggressive campaign of infringing sales, litigation, and lobbying to try to disrupt Cubaexport's and HCH's ownership of the HAVANA CLUB trademark**

50.      In 1995, Bacardi began selling Bahamian rum under the HAVANA CLUB trademark in the United States in limited quantities in an effort to challenge HCH's trademark ownership and to seek to establish its own rights in the mark.  This led HCH and HCI, that same year, to sue Bacardi in the United States District Court for the Southern District of New York for trademark infringement and other claims arising from Bacardi's sale of Bahamian rum bearing the HAVANA CLUB name.  That lawsuit was captioned *Havana Club Holding, S.A. v. Galleon S.A.*, 95 Civ. 9655 (SHS).

51.      Because Bacardi was concerned that it would lose the trademark litigation on the law and the facts, it went looking for political help.  After HCH renewed the HAVANA CLUB registration in 1996, Bacardi lobbied the U.S. Treasury Department's Office of Foreign Assets Control—which had issued a license authorizing the transfer of the U.S. HAVANA CLUB registrations from Cubaexport to HCH—to revoke that license with retroactive effect.

52.      The District Court in the trademark legislation then held, in a decision dated August 12, 1997, that the revocation of the OFAC license caused the trademark registration to revert to Cubaexport, and that HCH no longer had standing to pursue its infringement claims.  The District Court, however, specifically rejected Bacardi's claim that the revocation of the license meant that Cubaexport's registration had to be cancelled.  The District Court's decision is reported as *Havana Club Holding S.A. v. Galleon, S.A.*, 974 F. Supp. 302, 311 (S.D.N.Y. 1997).

53.     Bacardi, however, recognized that it remained vulnerable to an infringement claim by Cubaexport.  Bacardi began to lobby Congress to interfere in the pending litigation by passing a bill—for the benefit of Bacardi and only Bacardi—to interfere with Cubaexport's ability to enforce its rights.  Bacardi's proposal, however, met strong opposition in the Senate.  Bacardi then arranged for its supporters in the Senate to insert the proposal at the last minute into a jumbled, 16-inch-thick, 40-pound omnibus appropriations bill—which reportedly contained email printouts, handwritten notes, and pages numbered out of sequence—without any notice to the relevant Senate committees or other senators.  As a result of Bacardi's machinations, the appropriations bill passed Congress without the opponents of Bacardi's proposal being aware that the provision was included.  Bacardi's proposal became law as Section 211 of the Omnibus, Consolidated and Emergency Supplemental Appropriations Act 1999, Pub. L. No. 105-277, sec. 211, 112 Stat. 2681 at p. 88 (Oct. 12, 1998) ("Section 211").

54.     The underhanded tactics of Bacardi and its supporters in the Senate met with strong bipartisan condemnation.  For example, a Democratic senator decried Section 211 as "snuck into an appropriations bill under the radar of most members of the Senate, done in a way specifically intended to bypass the normal legislative process."[1]  A Republican senator criticized Section 211 as a provision that "benefits one foreign

---

[1]     Hearing before Senate Committee on the Judiciary, *An Examination of the Omnibus Appropriations Act of 1998*, 108th Cong., 2nd Sess., at 13 (2004) (Statement of Sen. Leahy).

company alone"—referring to Bacardi—and noted that "no U.S. company receives the slightest advantage from that law."[2]

55.     Both a panel of the World Trade Organization ("WTO") Dispute Settlement Body and the WTO Appellate Body have held that Section 211 violates the obligations of the United States under the Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPS")[3].  In the context of the WTO decisions, editorial pages across the country were harsh in their condemnation of Section 211 and the manner in which it was adopted, labeling it, among other things, "a classic case of narrow, well-financed interests trumping the best interests of the United States."[4]  Bacardi, however, has continued to lobby Congress to prevent the repeal of Section 211, which would bring the United States into compliance with its obligations under TRIPS and undo the unilateral advantage that Bacardi deceptively obtained in 1998.

56.     Section 211, as adopted, imposes restrictions on the registration, renewal and enforcement of trademarks that were "the same or substantially similar" to trademarks that had once been used by a "confiscated" Cuban business, even if the

---

[2]     *Id.* at 58 (Statement of Sen. Craig).

[3]     Report of the Panel, Dispute Settlement Body, *United States – Section 211 Omnibus Appropriations Act of 1998*, Doc. No. WT/DS176/R (Aug. 6, 2001), *upheld in part and rev'd in part*, Appellate Body Report, *United States — Section 211 Omnibus Appropriations Act of 1998*, Doc. No. WT/DS176/AB/R, 2002:II DSR 589 (Jan. 2, 2002) (adopted Feb. 1, 2002).

[4]     *Rum, Macaroni and Bad Politics*, Chicago Tribune, Sept. 2, 2002, at 20; *see also A Special-Interest Cocktail*, Washington Times, Jan. 20, 2002 (describing Section 211 as an "ill-conceived 'Bacardi lawsuit law'" that was "virtually scrawled on a napkin," and was "designed specifically to help out rum-maker Bacardi, which has U.S. subsidiaries but is not even a U.S. company"); *Rum War: Sometimes Even Fidel Castro Is on the Right Side*, Houston Chronicle, Nov. 21, 2002, at A34 (calling Section 211 a "rum-dumb special-interest law that helps only Bacardi"); *Play Fair on Trade Rights*, South Florida Sun-Sentinel, Mar. 26, 2001, at 22A (opining in regard to Section 211 that "changing [trademark] rules in midstream isn't fair").

trademark had been abandoned by its former owner.  As Bacardi intended, the only
registered trademark that has ever been subject to Section 211's restrictions is the
HAVANA CLUB trademark.

57.     By design, however, Section 211 did not remove from OFAC the
discretion to grant specific licenses authorizing the registration or renewal of particular
trademarks, nor does it bar the enforcement of trademark registrations obtained under
those specific licenses.  Section 211 also does not mandate the cancellation of existing
trademark registrations.

58.     Following Section 211's passage, the United States District Court for the
Southern District of New York held on April 13, 1999, after a bench trial, that Section
211 prevented HCH and HCI from asserting their remaining claims that Bacardi's use
violated their trademark rights under treaties to which the United States was a party.  The
District Court also held that HCH and HCI lacked standing to sue Bacardi for false
designation of origin because they did not compete with Bacardi in the U.S. market.  The
District Court's decision is reported as *Havana Club Holding, S.A. v. Galleon S.A.*, 62 F.
Supp. 2d 1085 (S.D.N.Y. 1999).

59.     HCH and HCI appealed, and the United States Court of Appeals for the
Second Circuit affirmed the District Court's judgment.  The Second Circuit's decision is
reported as *Havana Club Holding v. Galleon, S.A.*, 203 F.3d 116 (2d Cir. 2000).

60.     Because of these decisions, Bacardi was able to infringe Cubaexport's
rights without Cubaexport being able to enforce those rights.  But Bacardi still had no
rights to the HAVANA CLUB trademark.

61.     After the trademark infringement suit concluded, Bacardi's TTAB cancellation proceeding from 1995 resumed and, in 2004, the TTAB granted summary judgment denying all of Bacardi's asserted grounds for cancellation of Cubaexport's registration, including the principal grounds that Bacardi now asserts here.

62.     Despite the TTAB's denial of its petition, Bacardi resumed selling rum labeled "HAVANA CLUB" in the United States in 2006, this time from Puerto Rico.

**H.     The otherwise routine renewal of Cubaexport's trademark registration is delayed by Section 211**

63.     Cubaexport's trademark registration at the USPTO was due for renewal in 2006, as Congress had by that time shortened the renewal period for trademark registrations from 20 years to 10 years.  But through no fault of Cubaexport's, this normally routine process went haywire.

64.     Cubaexport timely submitted a combined renewal application and declaration of excusable nonuse in 2005 with the required fee to the USPTO.  Cubaexport sent a copy of its application to OFAC.

65.     On April 6, 2006, OFAC wrote a letter to Cubaexport's counsel, with a copy to the USPTO, stating that, in light of Section 211, Cubaexport would need to apply for a specific license to renew the trademark registration.  Cubaexport filed such an application for an OFAC specific license the next day.  In a letter dated July 28, 2006, OFAC denied Cubaexport's application for a specific license to permit the renewal of its longstanding trademark registration, stating that OFAC had received "guidance from [the Department of] State informing us that it would be inconsistent with U.S. policy to issue

a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark."

66.     On August 3, 2006, USPTO's post-registration staff informed Cubaexport that its renewal could not be accepted because of OFAC's denial of a specific license. Cubaexport then petitioned the Director of the USPTO (acting through the Commissioner of Trademarks) on October 4, 2006, as authorized by 37 C.F.R. § 2.146(a), to review the USPTO staff's refusal to accept Cubaexport's timely renewal application and fee payment.

67.     Cubaexport also filed a civil action against OFAC challenging, among other things, its refusal to issue a license and the applicability and constitutionality of Section 211.  The petition to the USPTO Director was stayed during the pendency of that suit.  The District Court entered summary judgment for OFAC on the ground, among others, that issuance or refusal of the license was a matter of OFAC's discretion.  The dismissal was affirmed (over a dissent) on appeal, and the United States Supreme Court denied certiorari on May 14, 2012.  The case is reported as *Empresa Cubana Exportadora de Alimentos y Productos Varios v. United States Department of the Treasury*, 606 F. Supp. 2d 59 (D.D.C. 2009), *aff'd*, 638 F.3d 794 (2011), *cert. denied*, 566 U.S. 986 (2012).

68.     In 2012, at risk of losing its valuable trademark rights through no fault of its own and due in large part to Bacardi's behind-the-scenes lobbying efforts, Cubaexport wrote to the USPTO regarding its still-pending petition, noting that the Cuban Assets Control Regulations (31 C.F.R. Part 515) appeared to require that the trademark be frozen

rather than "cancelled" under Lanham Act § 8 (15 U.S.C. § 1058) or "expired" under Lanham Act § 9 (15 U.S.C. § 1059) in the absence of an OFAC license. The USPTO sought guidance from OFAC, which suggested that recording the expiration under Lanham Act § 9 did not require a license, but OFAC did not address the issue of cancellation under Lanham Act § 8, nor is it clear from OFAC's letter that OFAC fully understood the USPTO's renewal and declaration-of-use processes. The USPTO did not immediately act on Cubaexport's petition or OFAC's guidance.

## I.    After a shift in U.S.-Cuba relations, OFAC licenses Cubaexport's trademark renewal

69.    In December 2014, U.S. President Barack Obama and Cuban President Raúl Castro jointly announced a new direction in U.S.-Cuban relations, and the two countries took a number of steps in 2015 to implement that approach, including the restoration of diplomatic relations in July 2015.

70.    In light of these shifts in U.S. foreign policy, Cubaexport filed a new application for a specific license with OFAC in November 2015. This new application was specifically authorized by U.S. law because OFAC's regulations provide that "[t]he denial of a specific license does not preclude the reconsideration of an application or the filing of a further application." 31 C.F.R. § 501.801(b)(5).

71.    Cubaexport's application asked OFAC to reconsider its 2006 foreign-policy-based denial of Cubaexport's application "in light of recent developments in U.S. policy toward Cuba and the changed diplomatic situation between the two nations." The application requested a specific license to allow Cubaexport to renew its trademark

registration, both for the 10-year period starting in 2006 and the additional 10-year period

starting in 2016, and it noted OFAC's power to validate the 2006 transactions

retroactively.

72.     Among other things, Cubaexport's license application to OFAC noted that

"the dispute over who is the rightful owner of the HAVANA CLUB trademark in the

United States is a commercial dispute … over an intellectual property right", which

should be resolved in court; that Bacardi had sought to "short-circuit the normal

operation of the judicial process by seeking to prevent Cubaexport from renewing its

registration at all"; that "nothing in Section 211 purports to restrict OFAC's specific

licensing authority"; and that allowing the 2006 and 2016 renewals would be consistent

with multiple U.S. policy interests, including the interest in protecting U.S. companies'

intellectual property rights in Cuba and around the world.

73.     OFAC granted specific license No. CU-2015-323847-1 on January 11,

2016, authorizing all transactions necessary for the 2006 and 2016 renewals of

Cubaexport's trademark registration.  The authorized transactions specifically included

transactions "related to Cubaexport's submission filed with the USPTO on or about

December 14, 2005, and the payment referenced therein."  The validation of past

transactions is specifically authorized by U.S. law, as OFAC's regulations recognize that

an OFAC license may "authorize or validate any transaction effected prior to the issuance

thereof" if "such license or other authorization specifically so provides."  31 C.F.R.

§ 515.502(a).

74.     After receiving a copy of the specific license, the Commissioner of Trademarks, on behalf of the USPTO Director, granted Cubaexport's Petition (which was then still pending) and accepted the 2006 and 2016 renewals and the associated fee payments.

**J.     Cubaexport is once again able to enforce its trademark rights**

75.     As a result of the renewal of the HAVANA CLUB trademark under an OFAC specific license, Section 211 no longer bars Cubaexport from enforcing its trademark rights.  Section 211(a)(2), which is the relevant clause of Section 211, only bars recognition of an "assertion of rights" in certain trademarks (*i*) at "common law" or (*ii*) under a "registration obtained" under "Section 515.527" of Title 31 of the Code of Federal Regulations, which is the OFAC general license authorizing Cuban nationals to register and renew trademarks in the United States.  In this Counterclaim, Cubaexport is asserting trademark rights arising under the 2006 and 2016 renewals of its registration. Those renewals were obtained under the specific license that OFAC granted in 2016 rather than under the general license in Section 515.527, under which Cubaexport had obtained its original registration in 1976.

76.     Accordingly, nothing in Section 211(a)(2) restricts Cubaexport's right to assert this Counterclaim.  The U.S. Court of Appeals for the D.C. Circuit has held, in Cubaexport's case against OFAC, that renewal of a trademark registration creates new rights that are distinct from the rights under the original registration.  Moreover, under federal case law and OFAC precedent, a transaction for renewal of a trademark registration is itself a "registration".  This result also is consistent with the scheme of

Section 211(a)(2), which gives OFAC broad discretion to grant or deny a license for registration or renewal of a covered trademark in the United States.

**SOLE COUNTERCLAIM COUNT**
**(Trademark Infringement, 15 U.S.C. § 1114)**

77.    Cubaexport realleges and incorporates by reference the allegations of paragraphs 1 through 76 above.

78.    Cubaexport owns the rights to the registered U.S. trademark for HAVANA CLUB & Design, registered as Reg. No. 1,031,651 in the United States Patent and Trademark Office.

79.    The following is a true and accurate image of the trademark in Cubaexport's registration as it appears in the USPTO records:



80.     Bacardi has been and is using the trademark "HAVANA CLUB" in connection with the sale, offering for sale, distribution and advertising of Puerto Rican rum in the United States.

81.     The following are true and accurate images of Bacardi's bottles using the HAVANA CLUB name, which are currently being sold in the United States:

  

82.     Bacardi's use of the name HAVANA CLUB, which is identical to the name in the mark registered by Cubaexport, is likely to cause confusion, or to cause mistake, or to deceive.

83.     Cubaexport's rights in the HAVANA CLUB trademark are senior to any alleged rights claimed by Bacardi, because, among other reasons,

(a) Cubaexport's trademark registration No. 1,031,651 has priority from the date of filing of its underlying Cuban trademark registration in 1974, or in the alternative from its initial application for registration with the USPTO in 1974;

(b) Bacardi's use of the HAVANA CLUB mark only dates from 2006 or, in the alternative, 1995;

(c) in any event, Bacardi's use of the HAVANA CLUB mark was deceptive and therefore gave rise to no common-law rights;

(d) JASA abandoned any rights in its HAVANA CLUB trademark in or before 1973, and therefore JASA had no rights to assign when certain of its shareholders purported to sell JASA's rights to the newly formed Liechtenstein joint-stock company José Arechabala International Ltd. ("JAI") in 1997, which then purported to sell the rights to Bacardi & Co. Ltd.; and

(e) in any event, the shareholders who purported to transfer JASA's rights to JAI lacked authority to act on behalf of JASA.

84. Judicial recognition of Cubaexport's rights arising from its trademark registration is not barred by Section 211(b) of the Omnibus, Consolidated and Emergency Supplemental Appropriations Act 1999, Pub. L. No. 105-277, because the current renewal of the trademark registration was obtained under OFAC specific license No. CU-2015-323847-1, and not under section 515.527 of Title 31, Code of Federal Regulations.

85.     Cubaexport has not consented to Bacardi's use of the HAVANA CLUB trademark.

86.     Bacardi's use of the HAVANA CLUB trademark infringes Cubaexport's rights arising from its U.S. trademark registration No. 1,031,651 in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

87.     Cubaexport lacks an adequate remedy at law.

88.     Cubaexport will suffer irreparable harm, including to its trademark rights, its ability to use its trademarks in the future, and the reputation of its trademarks, unless Bacardi's infringing use is enjoined pursuant to Section 34(a) of the Lanham Act, 15 U.S.C. § 1116(a).

89.     Wherefore, Cubaexport requests that the Court enter the injunctive and other relief against the plaintiffs set forth below in Part V of this Counterclaim and Answer.

### III.
### ANSWER TO SPECIFIC ALLEGATIONS
### OF THE FIRST AMENDED COMPLAINT

Cubaexport answers each of the numbered paragraphs of the First Amended Complaint as follows:

1.     Deny, except admit the first two sentences of Paragraph 1; refer to the referenced USPTO records and TTAB Decisions for their true and complete contents; admit that Bacardi has brought this civil action; refer to the First Amended Complaint for

identification of the relief that Bacardi seeks; and deny that Bacardi is entitled to this or any relief.

2.      Deny.

3.      Deny, except admit that JASA's property in Cuba was nationalized in 1960, that JASA's last U.S. HAVANA CLUB trademark registration expired in 1973, and that Cubaexport in 1974 sought and obtained U.S. Trademark Registration No. 1,031,651, HAVANA CLUB & Design, for rum.

4.      Deny, except admit that the United States District Court for the Southern District of New York issued a decision in *Havana Club Holding, S.A. v. Galleon S.A.*, 95 Civ. 9655 (SAS), on August 12, 1997, and refer to the decision for its true and complete contents.

5.      Deny, except admit that the TTAB rendered a decision on or about January 29, 2004, denying Bacardi's petition to cancel the registration, and refer to the decision of the TTAB for its true and complete contents.

6.      Deny that Bacardi is entitled to any of the relief it seeks and refer to the First Amended Complaint in this action for identification of the relief sought.

7.      Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations in the first sentence of Paragraph 7.  Deny the second sentence of Paragraph 7.

8.      Deny knowledge or information sufficient to form a belief as to Bacardi's allegations, except admit that Bacardi & Co. Limited ("BACO") and/or certain of its affiliates and/or their respective licensees and distributors produce and market distilled

spirits in many countries around the world, and admit that BACO was a party to the cancellation proceeding at the TTAB.

9.      Deny, except deny knowledge and information sufficient to form a belief as to the truth of the allegations of the fifth sentence of paragraph 9.

10.      Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations.

11.      Deny.

12.      Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations, except admit that BACO was substituted for Galleon in the litigation captioned *Havana Club Holding, S.A. v. Galleon S.A.*, 96 Civ. 9644 (SAS), and admit that BACO is the successor by merger to Galleon, succeeded to its assets, and assumed its liabilities.

13.      Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations.

14.      Deny, except admit that Bacardi U.S.A. began selling rum in the United States that it misleadingly labeled as HAVANA CLUB.

15.      Deny, except admit that BACO has filed a U.S. trademark application with the USPTO, serial no. 74/572,667, for registration of the word mark HAVANA CLUB for rum; admit that the application was filed as an intent-to-use application and was later amended to allege use from 1934; and state that the application is currently suspended.

16.      Admit.

17.     Admit, except deny that Pernod Ricard S.A. currently has offices at 142 Boulevard Hausmann.

18.     Admit.

19.     Deny, except admit that Havana Club Holding, S.A. ("HCH") is organized under the laws of Luxembourg, that HCH holds trademark rights to HAVANA CLUB in countries other than Cuba, and that it is considered a Cuban national for purposes of the Cuban Assets Control Regulations.

20.     Admit.

21.     Deny, except admit that the Court has subject-matter jurisdiction as to Count I of the First Amended Complaint, and further admit that venue is proper in this district.

22.     Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations.

23.     Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations except refer to the referenced trademark registrations for their true and complete contents.

24.     Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations and refer to the referenced trademark registrations for their true and complete contents.

25.     Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations.

26.     Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations.

27.     Deny that members of the family who ran the rum distillery and other family businesses were expelled, deny that executives and shareholders were eventually forced to leave Cuba, and otherwise deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations.

28.     Deny, except admit that under Law No. 890, dated October 13, 1960, the Cuban Government nationalized a number of Cuban businesses, including JASA and Compañía Ron Bacardi, S.A., and refer to Law No. 890 for its true and complete contents.

29.     Deny, except refer to Law No. 890 for its true and complete contents.

30.     Deny, except admit that the Cuban government legally transferred to Cubaexport the Cuban trade names and Cuban trademark registrations expropriated from JASA.

31.     Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations in the first sentence.  Deny the allegations in the second sentence, and deny that Havana Club rum is currently produced through use of any of the alleged assets identified in Paragraph 31.

32.     Deny.

33.     Refer to the laws and regulations referenced in Paragraph 33 for their true and complete contents, and aver that the allegations in Paragraph 33 assert a legal conclusion to which no response is required.

34.     Refer to the CACR for their true and complete contents, and aver that the allegations in Paragraph 34 assert a legal conclusion to which no response is required.

35.     Refer to the CACR for their true and complete contents, and aver that the allegations in Paragraph 35 assert legal conclusions to which no response is required.

36.     Refer to the CACR for their true and complete contents, and aver that the allegations in Paragraph 36 assert legal conclusions to which no response is required.

37.     Deny.

38.     Refer to Section 211 for its true and complete contents, and otherwise deny.

39.     Refer to the referenced statute and regulations for their true and complete contents.

40.     Deny.

41.     Deny.

42.     Deny, except admit that, subsequent to the abandonment and expiration of JASA's HAVANA CLUB Registrations, Cubaexport applied to the USPTO, under 15 U.S.C. § 1126, to register a trademark consisting of a label design displaying the words HAVANA CLUB, and that this application claimed priority based on Cuban Registration No. 110,353.

43.     Refer to the application for its true and complete contents, aver that the allegations in paragraph 43 state a legal conclusion to which no response is required, and deny to the extent that a response is required.

44.     Deny, except admit that the HAVANA CLUB trademark that Cubaexport registered in the United States includes the Spanish legend "Fundada en 1878", refer to U.S. Reg. No 1,031,651 for its true and complete contents, and admit that Cubaexport was founded in 1965.

45.     Deny.

46.     Deny.

47.     Deny.

48.     Admit and refer to U.S. Reg. No 1,031,651 for its true and complete contents.

49.     Deny, and further deny that JAI or BACO are JASA's bona fide successors in interest or that the consent of JASA, JAI, their shareholders or BACO was necessary for the registration and use complained of.

50.     Aver that the allegations assert legal conclusions to which no response is required; and deny the allegations to the extent a response is required.

51.     Refer to Section 44 and Sections 1 and 45 of the Lanham Act for their true and complete contents; aver that the allegations assert legal conclusions to which no response is required; and deny the allegations to the extent a response is required.

52.     Deny, except admit only that Cubaexport has never sold rum in the United States under the HAVANA CLUB & Design mark and that Cubaexport's non-use of the trademark for rum in the United States is excused by the Cuban embargo under the excusable-non-use-doctrine, and refer to Section 8 of the Lanham Act for its true and complete contents.

35

53.      Denied, except admit that Cubaexport filed an affidavit with the USPTO on January 12, 1982, in respect of the U.S. HAVANA CLUB Registration; refer to the affidavit for its true and complete contents; and further aver that the first sentence of Paragraph 53 asserts legal conclusions to which no response is required.

54.      Deny.

55.      Deny, except admit that Pernod Ricard S.A., Havana Rum & Liquors S.A., and Corporación Cuba Ron entered into a *Convenio Asociativo* creating two joint ventures in 1993.

56.      State that no response is required because Bacardi's claim that Cubaexport abandoned its trademark rights has been dismissed.  To the extent a response is required, deny, except admit the second sentence and deny knowledge and information sufficient to form a belief as to the third sentence.

57.      Admit and refer to the *Convenio Asociativo* dated November 23, 1993 for its true and complete contents.

58.      Deny, except admit that Pernod Ricard paid to HRL a fixed sum, the amount of which has not been publicly disclosed; deny knowledge or information sufficient to form a belief as to the truth of the allegation that the payment is "believed to be many millions of dollars"; and admit the allegation contained in the final sentence of Paragraph 58.

59.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first and third sentences of Paragraph 59, but admit the allegation contained in the second sentence of Paragraph 59.

60.     State that no response is required because Bacardi's claim that Cubaexport abandoned its trademark rights has been dismissed.  To the extent a response is required, deny, except admit that Cubaexport executed a written assignment dated January 10, 1994; refer to the assignment for its true and complete contents; state that Cubaexport subsequently applied for and obtained an OFAC license validating the transfer of the U.S. registration; state that OFAC subsequently retroactively revoked the license as a result of lobbying by Bacardi; state that the United States District Court for the Southern District of New York and the United States Court of Appeals for the Second Circuit in *Havana Club Holding S.A. v. Galleon S.A.*, held that the result of the revocation was that ownership of the registration reverted to Cubaexport; and refer to the decisions of the courts in that case for their true and complete contents.

61.     State that no response is required because Bacardi's claim that Cubaexport abandoned its trademark rights has been dismissed.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to what HRL, HCH and Pernod understood and intended, but otherwise admit and refer to the written instrument implementing the transfer for its true and complete terms.

62.     State that no response is required because Bacardi's claim that Cubaexport abandoned its trademark rights has been dismissed.  To the extent a response is required, deny.

63.     Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations.

64.     Deny.

65.     Deny.

66.     Deny.

67.     Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations.

68.     Admit that on May 9, 1994, Jose Maria Arechabala Rodrigo filed a cancellation petition against U.S. Registration No. 1,031,651 and refer to that petition for its true and complete contents.

69.     Deny, except admit that a deed of assignment was executed on June 24, 1994; refer to that deed of assignment for its true and complete contents; admit that the United States District Court for the Southern District of New York and the United States Court of Appeals for the Second Circuit in *Havana Club Holding S.A. v. Galleon S.A.*, held that the transfer was invalid in view of the revocation of the OFAC license that had permitted it and that the rights in the trademark reverted to Cubaexport as stated in the response to paragraph 60 above; and refer to the decisions of the courts in that case for their true and complete contents.

70.     Deny, except admit only the allegations contained in the first and second sentences of Paragraph 70, and refer to the documents submitted in the USPTO and TTAB proceedings for their true and complete contents.

71.     Admit that the proceeding was dismissed by the TTAB and refer to the TTAB decision for its true and complete contents.

72.     Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations.

73. Deny.

74. Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations, refer to the referenced documents for their true and complete contents, and deny the validity of the alleged transfers.

75. Deny.

76. Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations.

77. Refer to the alleged BATF approval for its true and complete contents; deny that the misbranded rum sold by Bacardi is properly described as "HAVANA CLUB rum"; and otherwise deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations.

78. Admit that Galleon filed an "intent-to-use" application on or about September 12, 1994, and refer to the application for its true and complete contents.

79. Deny, except admit that Galleon and Bacardi U.S.A. initiated a cancellation proceeding in July 1995 and refer to the cancellation petition for its true and complete contents.

80. Deny, except admit that Cubaexport, HRL and HCH applied for an OFAC license on October 5, 1995, and refer to that application for its true and complete contents.

81. Admit that OFAC granted License No. C-18147 on or about November 13, 1995, and refer to that License for its true and complete contents.

82.     Deny, except admit that HCH filed a renewal application in 1996 and that the USPTO issued a Certificate of Renewal for the HAVANA CLUB registration in the name of HCH, and refer to the application, the accompanying declaration and the certificate of renewal for their true and complete contents.

83.     Admit that HCH and HCI filed an action captioned *Havana Club Holding, S.A. et al. v. Galleon S.A. et al.*, No. 96 Civ. 9655 (SAS), in the U.S. District Court for the Southern District of New York in December 1996 and refer to the pleadings in that action for their true and complete contents.

84.     Admit and refer to the TTAB stay order for its true and complete contents.

85.     Admit and refer to the Notice of Revocation for its true and complete contents.

86.     Admit that on or about August 8, 1997, the United States District Court for the Southern District of New York issued an Opinion and Order, and refer to the Opinion and Order for its true and complete contents.

87.     Admit that on or about October 20, 1997, the United States District Court for the Southern District of New York rendered a Partial Judgment, and refer to that Partial Judgment for its true and complete contents.

88.     Deny, and refer to the October 20, 1997 Partial Judgment for its true and complete contents.

89.     Deny, except admit that a bench trial was held; state that on or about June 25, 1999, the United States District Court for the Southern District of New York issued

an Amended Opinion and Order; and refer to that Amended Opinion and Order for its true and complete contents.

90.     Deny, except admit that on February 4, 2000, a three-judge panel of the United States Court of Appeals for the Second Circuit unanimously affirmed the trial court's judgment; that the decision is reported at 203 F.3d 116; that the Court of Appeals issued its mandate on February 25, 2000; that HCH and HCI petitioned the United States Supreme Court for a writ of certiorari; and that that Court denied the writ on October 2, 2000; and refer to the referenced decisions for the true and complete contents thereof.

91.     Deny, except admit that the USPTO issued an Order to Show Cause on October 26, 2001, and refer to that document for its true and complete contents.

92.     Deny, except admit the first sentence of Paragraph 92, and refer to the Notice of Recordal and related Order for their true and complete contents.

93.     Admit that the USPTO issued a notice pursuant to 15 U.S.C. § 1119 on or about January 15, 2002, and refer to that notice for its true and complete contents.

94.     Deny, except admit that Cubaexport, HRL, HCH, HCI, Cuba Ron and Pernod Ricard entered into an agreement on March 19, 2002, and refer to that agreement for its true and complete contents.

95.     Admit, except refer to the referenced motion and TTAB orders for their true and complete contents.

96.     Deny, except admit that Bacardi asserted certain grounds in its summary judgment motion, and refer to the motion and accompanying memorandum of law for their true and complete contents.

97.     Deny, except admit that the TTAB denied Bacardi's motion for summary judgment on or about January 29, 2004 and refer to that decision for its true and complete contents.

98.     Deny and refer to the TTAB's decision dated January 29, 2004, for its true and complete contents.

99.     Deny and refer to the TTAB's decision dated January 29, 2004, for its true and complete contents.

100.    Deny and refer to the TTAB's decision dated January 29, 2004, for its true and complete contents.

101.    Deny and refer to the TTAB's decision dated January 29, 2004, for its true and complete contents.

102.    Deny and refer to the TTAB's decision dated January 29, 2004, for its true and complete contents, and further state that Section 211 was not applicable to any issue presented to or decided by the TTAB.

103.    Deny and refer to the TTAB's decision dated January 29, 2004, for its true and complete contents.

104.    Deny and refer to the TTAB's decision dated January 29, 2004, for its true and complete contents.

105.    Deny and refer to the TTAB's decision dated January 29, 2004, for its true and complete contents.

106.    Deny and refer to the TTAB's decision dated January 29, 2004, for its true and complete contents.

107.    Deny.

108.    Admit that on or about January 26, 2005, Cubaexport's counsel applied to OFAC for a specific license authorizing its counsel to receive fees and expenses in connection with representation of Cubaexport in litigation; admit that OFAC granted License No. CU-74488 on or around March 4, 2005; and refer to the application and license for their true and complete contents.

109.    Deny and refer to the affidavit for its true and complete contents.

110.    Deny and refer to the affidavit for its true and complete contents.

111.    Admit that OFAC sent a letter to Cubaexport's counsel and the USPTO on or about April 6, 2006, and that Ropes & Gray sent a license application to OFAC on or about April 6, 2006, and refer to those documents for their true and complete contents.

112.    Admit that Cubaexport's counsel wrote to the USPTO on or about June 14, 2006 and refer to that correspondence for its true and complete contents.

113.    Admit that a USPTO Office Action was initiated on or about July 20, 2006 and refer to that Office Action for its true and complete contents.

114.    Admit that on or about July 28, 2006, OFAC sent a letter denying Cubaexport's April 7, 2006 request for a specific license and refer to that correspondence for its true and complete contents.

115.    Admit that an Office Action was initiated on or about August 3, 2006 and refer to that Office Action for its true and complete contents.

116.    Admit that on or about October 4, 2006, Cubaexport petitioned the Director of the USPTO to review the August 3, 2006 Office Action and refer to that petition for its true and complete contents.

117.    Deny, except admit and state that Cubaexport filed an action captioned *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury, et al.*, Case No. 06-cv-1692, in the United States District Court for the District of Columbia (the "OFAC Action"), that the USPTO stayed action on the October 4, 2006 petition pending disposition of the OFAC action, that the district court in the OFAC Action dismissed Cubaexport's claims on March 30, 2009, that a panel of the United States Court of Appeals for the District of Columbia Circuit upheld the dismissal of Cubaexport's claims by a 2-1 vote on March 29, 2011, and that the United States Supreme Court denied Cubaexport's petition for a writ of certiorari; and refer to the complaint in the OFAC Action and the referenced court decisions for their true and complete contents.

118.    Deny, except admit that on or about June 8, 2012, Cubaexport sent correspondence to the USPTO concerning the status of its litigation against OFAC and refer to that correspondence for its true and complete contents.

119.    Admit that Cubaexport wrote to OFAC on July 11, 2012; admit that on August 31, 2012, OFAC wrote to the USPTO; admit that on September 27, 2012, the USPTO wrote to OFAC; and refer to that correspondence for its true and complete contents.

120.     Admit that on November 30, 2012, OFAC wrote to the USPTO, and refer to that correspondence for its true and complete contents.

121.     Deny, except admit the USPTO did not remove Cubaexport's registration from its records and that Bacardi's application to register a HAVANA CLUB mark remains suspended.

122.     Deny, except admit that on or about November 10, 2015, Cubaexport submitted an application to OFAC for a specific license and refer to that application for its true and complete contents.

123.     Deny, except admit OFAC granted Cubaexport's application for a specific license on or about January 11, 2016, that a copy of the license was filed with the USPTO on or about January 12, 2016, and that on or about January 13, 2016, the USPTO granted Cubaexport's 2006 petition, and refer to the license application, the license, and the USPTO order for their true and complete contents.

124.     Deny, except admit and state that Pernod Ricard USA LLC sued Bacardi U.S.A., Inc. in the United States District Court for the District of Delaware in or around August 2006 asserting that specific claims on Bacardi's label, in context, falsely advertised that the rum it sold in the United States was a product of Cuba in violation of Section 43(a) of the Lanham Act; admit that following a bench trial, judgment was entered in favor of Bacardi U.S.A., Inc. in or around April 2010; admit that the judgment was affirmed by the United States Court of Appeals for the Third Circuit in August 2011; and refer to the pleadings and the court decisions in that case for the true and complete contents thereof.

125.    Deny, except admit that Cubaexport will continue to take legal action to preserve its rights in the HAVANA CLUB trademark, and deny knowledge or information sufficient to form a believe as to the accuracy of the quotation in the *Beverage Daily* article cited in Paragraph 125.

126.    Deny, except state that Bacardi has initiated litigation challenging ownership of foreign HAVANA CLUB trademark rights in jurisdictions outside the United States and that Bacardi has consistently lost those litigations.

127.    Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations, except admit and state, on information and belief, that both Pernod Ricard and Bacardi have lobbied Congress in connection with proposed legislation to amend or repeal Section 211, and refer to any pleadings in prior trademark infringement actions brought by HCH for their true and complete contents.

128.    Deny, except refer to the public statements of Pernod's CEO for their true and complete contents.

129.    Deny knowledge or information sufficient to form a belief as to the truth of Bacardi's allegations, except refer to the February 26, 2016 Certificate of Label Authorization for its true and complete contents.

130.    Admit that Cubaexport intends to enforce its rights to the fullest extent of the law, but otherwise deny.

**ANSWER TO COUNT I**
**(Rectification of Register / Cancellation of Registration)**

131.     Cubaexport repeats and re-alleges each of its responses to Paragraphs 1 to 130 as if fully set forth herein.

132.     Deny and refer to the referenced judgment for its true and complete contents.

133.     State that paragraph 133 states a legal conclusion to which no response is required, and deny to the extent a response is required.

134.     Deny.

135.     Deny, except admit that a Renewal Declaration was filed by HCH on or about January 18, 1996, and refer to the Renewal Declaration and the judgment referenced in paragraph 135 for their true and complete contents.

136.     Deny.

137.     Deny and state that a renewal application and declaration were filed in the name of HCH rather than Cubaexport because, at the time, HCH was the holder of record and the sole entity with rights to file for renewal.

138.     Deny.

139.     Cubaexport repeats and re-alleges each of its responses to Paragraphs 1 to 130 as if fully set forth herein.

140.     Deny.

141.     Deny.

142.     Deny.

143.    Cubaexport repeats and re-alleges each of its responses to Paragraphs 1 to 130 as if fully set forth herein.

144.    Deny

145.    Deny, except admit that Cubaexport applied to the USPTO, pursuant to Section 44 of the Lanham Act among other grounds, to register the HAVANA CLUB trademark based on the newly issued Cuban registration No. 110,353, dated February 12, 1974; and refer to the application for its true and complete contents.

146.    Deny and refer to the application for its true and complete contents.

147.    Deny.

148.    Deny, except admit that Cubaexport never obtained a "secret Arechabala family formula" to produce HAVANA CLUB rum and deny that any such formula exists.

149.    Deny.

150.    Admit.

151.    Deny and further deny that Bacardi is "JASA's bona fide successor in interest" or that any consent was necessary.

152.    Aver that the first sentence states a legal conclusion to which no response is required; admit that on or about January 12, 1982, Cubaexport filed an affidavit with the USPTO; and refer to that affidavit for its true and complete contents.

153.    Deny.

154.    Deny, except admit that Cubaexport filed an affidavit in the USPTO signed by Francisco Santiago Pichardo on or about December 13, 2005, and refer to the affidavit for its true and correct contents.

155.    Deny.

156.    Deny.

157.    Cubaexport repeats and re-alleges each of its responses to Paragraphs 1 to 130, as if fully set forth herein.

158.    Deny, and refer to the OFAC license application for its true and complete contents.

159.    Deny, and refer to the Renewal Declaration for its true and complete contents.

160.    Deny knowledge or information sufficient to form a belief as to Bacardi's allegations, and further deny that HCH was not the true owner of the U.S. HAVANA CLUB & Design mark at that time.

161.    Deny.

162.    Bacardi's claim for cancellation based on alleged abandonment has been dismissed by the Court, and therefore no response is required.  To the extent any response may be required, Cubaexport repeats and re-alleges each of its responses to Paragraphs 1 to 130 as if fully set forth herein.

163.    Bacardi's claim for cancellation based on alleged abandonment has been dismissed by the Court, and therefore no response is required.

164.    Bacardi's claim for cancellation based on alleged abandonment has been dismissed by the Court, and therefore no response is required.

165.    Bacardi's claim for cancellation based on alleged abandonment has been dismissed by the Court, and therefore no response is required.

166.    Bacardi's claim for cancellation based on alleged abandonment has been dismissed by the Court, and therefore no response is required.

167.    Bacardi's claim for cancellation based on alleged abandonment has been dismissed by the Court, and therefore no response is required.

168.    Bacardi's claim for cancellation based on alleged abandonment has been dismissed by the Court, and therefore no response is required.

169.    Cubaexport repeats and re-alleges each of its responses to Paragraphs 1 to 130 as if fully set forth herein.

170.    Deny.

171.    Deny.

172.    Deny.

173.    Deny.

174.    Deny.

## ANSWER TO COUNT II
### (Request for Declaration of Common Law Rights in the Havana Club Trademark)

175.    Cubaexport repeats and re-alleges each of its responses to Paragraphs 1 to 130 as if fully set forth herein.

176.    Deny.

177.    Deny.

178.    Deny.

179.    Deny, except refer to Section 211 for its true and complete contents, and further deny that Bacardi is "JASA's bona fide successor in interest".

180.    Deny.

## ANSWER TO COUNT III
### (Request for Declaration of Non-Violation of Federal Trademark Laws)

181.    Cubaexport repeats and re-alleges each of its responses to Paragraphs 1 to 130 as if fully set forth herein.

182.    Deny.

183.    Deny.

184.    Deny.

185.    Deny.

## ANSWER TO COUNT IV
### (Request for Declaration of Non-Violation of State Law)

186.    Count IV has been dismissed by the Court, and therefore no response is required.  To the extent any response may be required, Cubaexport repeats and re-alleges each of its responses to Paragraphs 1 to 130 as if fully set forth herein.

187.    Count IV has been dismissed by the Court, and therefore no response is required.

188.    Count IV has been dismissed by the Court, and therefore no response is required.

189.    Count IV has been dismissed by the Court, and therefore no response is required.

190.    Deny that plaintiffs are entitled to the relief requested in paragraph 190 or to any other relief.

## IV.
## <u>AFFIRMATIVE AND OTHER DEFENSES</u>

Cubaexport affirmatively sets forth the following defenses; by setting forth these defenses, Cubaexport does not assume the burden of proving any fact, issue, or element of claim where such burden properly belongs to Bacardi; and nothing herein constitutes an admission that the defense is an affirmative defense rather than a general defense:

### FIRST DEFENSE
### (General Denial)

1.      Except as otherwise expressly admitted in this Counterclaim and Answer, Cubaexport hereby denies each and every allegation contained in the First Amended Complaint to which a response is or may be required, including, without limitation, any allegations contained in headings, subheadings, introductory paragraphs or prayers for relief within the First Amended Complaint, and any allegations to which Cubaexport has otherwise not responded if and to the extent the Court determines that a response is required.

### SECOND DEFENSE
### (Failure to State a Claim on Which Relief Can Be Granted)

2.      Bacardi's claims, in whole or in part, fail to state a claim upon which relief can be granted.

### THIRD DEFENSE
### (Collateral Estoppel)

3.      Bacardi's claims are barred, in whole or in part, by the doctrine of collateral estoppel, including by reason of the judgment of the United States District

Court for the Southern District of New York in *Havana Club Holding, S.A. v. Galleon S.A.*, 95 Civ. 9655 (SHS), and the United States Court of Appeals for the Second Circuit on appeal from that judgment.

**FOURTH DEFENSE**
**(Act of State Doctrine)**

4.      Bacardi's claims are barred, in whole or in part, by the Act of State Doctrine, which precludes U.S. courts from questioning the validity of the acts of a foreign state within its own jurisdiction.

**FIFTH DEFENSE**
**(Unclean Hands—Fraudulent Application for Registration)**

5.      The allegations of paragraphs 41 to 46 of Cubaexport's Counterclaim (Part II, above) are incorporated by reference as if fully set forth herein.  Bacardi's claims are barred in whole or in part by the doctrine of unclean hands, including because Bacardi is seeking relief in whole or in part for the purpose of clearing the way for its application to register a HAVANA CLUB trademark that is premised on false and/or fraudulent representations.

**SIXTH DEFENSE**
**(Unclean Hands—Passing Off and False Designation of Origin)**

6.      Bacardi's claims are barred in whole or in part by the doctrine of unclean hands, including because Bacardi is seeking relief in whole or in part for the purpose of enabling it to pass off its rum as the genuine HAVANA CLUB rum sold in Cuba and

elsewhere around the world through the use of the geographically deceptively misleading name HAVANA CLUB.

## SEVENTH DEFENSE
### (Time Bar in 15 U.S.C. § 1064)

7.      Bacardi's claims for cancellation based on alleged improper renewal or alleged renewal by the wrong party are barred by Section 14 of the Lanham Act (15 U.S.C. § 1064), because Bacardi failed to seek cancellation within five years of registration of Cubaexport's HAVANA CLUB & Design trademark registration, and those grounds are not among the specifically enumerated grounds for cancellation of a trademark outside the five-year period.

## EIGHTH DEFENSE
### (Laches)

8.      Bacardi's claims are barred in whole or in part by the doctrine of laches, including by reason of the long delay of Bacardi and its alleged predecessors in interest in challenging Cubaexport's trademark registration between 1976 and 1994.  Cubaexport and others reasonably relied on the absence of a challenge to the trademark registration in entering into the 1993 assignments and agreements that led to the formation of the HCH and HCI joint ventures.

## NINTH DEFENSE
### (Abandonment)

9.      Bacardi's claims are barred in whole or in part because JASA abandoned any rights in or use of the HAVANA CLUB trademark in the United States between 1959

and 1973, if not earlier, and therefore Bacardi could not acquire any rights to the

HAVANA CLUB trademark in the United States from Jose Arechabala, S.A. or its

alleged former owners.

**TENTH DEFENSE**
**(Priority)**

10.     Cubaexport's rights with regard to the HAVANA CLUB mark have

priority from 1974, while any rights alleged by Bacardi have priority only from 1995 or

later.  Accordingly, Cubaexport's rights take precedence over any alleged rights of

Bacardi.

**ELEVENTH DEFENSE**
**(Lack of Standing—No Valid Transfer of Rights)**

11.     Bacardi's claims are barred in whole or in part because the Arechabala

family members who entered into the purported 1997 assignments referenced in the First

Amended Complaint had no U.S. trademark rights in HAVANA CLUB to assign to JAI,

and therefore JAI acquired no rights that it could assign to Bacardi & Company Ltd.

Therefore, Bacardi acquired no rights that could give it standing.

**TWELFTH DEFENSE**
**(Lack of Standing—Bacardi U.S.A., Inc.)**

12.     Bacardi U.S.A., Inc. lacks standing to assert some or all of claims alleged

in the First Amended Complaint, including because they assert purported rights of

Bacardi & Company Limited (and not of Bacardi U.S.A., Inc.) as an alleged indirect

transferee of JASA's rights or as an applicant for a trademark registration.

**THIRTEENTH DEFENSE**
**(Section 211—Inapplicability Generally)**

13.     To the extent Bacardi relies on Section 211 of the Omnibus, Consolidated and Emergency Supplemental Appropriations Act 1999, Pub. L. No. 105-277 (defined above as "Section 211"), that provision does not apply.  Section 211 does not give Bacardi any rights in the HAVANA CLUB trademark, nor does it take away Cubaexport's rights in its existing registration, but at most it limits certain remedies and future renewals.

**FOURTEENTH DEFENSE**
**(Section 211—Inapplicability Because of OFAC License)**

14.     By its terms, subsection (a)(2) of Section 211 bars recognition of an "assertion of rights" in certain trademarks under a "registration obtained" under "Section 515.527".  However, the 2006 and 2016 renewals of Cubaexport's trademark registration were obtained under the specific license that OFAC granted in 2016 rather than under Section 515.527.  Accordingly, Section 211(a)(2) does not apply to the HAVANA CLUB trademark registration that Cubaexport owns.

**V.**
**REQUEST FOR RELIEF**

Wherefore, Cubaexport respectfully requests that the Court:

1.     Dismiss plaintiffs' claims with prejudice and with costs;

2.     Enjoin each of the plaintiffs, their successors in interest, and anyone acting in concert with any of them, from using any trademark containing the words "HAVANA

CLUB" in commerce in the United States and its commonwealths, territories and possessions, without the express prior written consent of defendant Cubaexport; and

3.      Grant defendant Cubaexport such other and further relief as may be appropriate.

Defendant Cubaexport reserves the right to amend this Counterclaim and Answer as appropriate.

Dated:          April 19, 2023

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By:  _/s/ David H. Bernstein_____
David H. Bernstein (DDC Bar No. NY0228)
Michael Schaper (admitted *pro hac vice*)
Carl Micarelli (admitted *pro hac vice*)
66 Hudson Boulevard
New York, New York 10001
Telephone:  (212) 909-6000
Email:  dhbernstein@debevoise.com

*Attorneys for Defendant and Counterclaimant*
*Empresa Cubana Exportadora de Alimentos y*
*Productos Varios d/b/a Cubaexport*